2:24-cr-00155-JAD-DJA • September 26, 2024

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,    )
                                  ) Case No. 2:24-cr-00155-JAD-DJA
 4            Plaintiff,          )
                                  ) Las Vegas, Nevada
 5   vs.                          ) September 26, 2024
                                  ) 8:23 a.m. - 2:15 p.m.
 6   MICHELE FIORE,               ) Courtroom 6D
                                  ) JURY TRIAL, DAY 3
 7            Defendant.          )
     _____  )
 8                                  CERTIFIED COPY

 9

10           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                     JURY TRIAL, DAY 3
11         BEFORE THE HONORABLE JENNIFER A. DORSEY
              UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:  ALEXANDER B. GOTTFRIED, ESQ.
                          DAHOUD ASKAR, ESQ.
15                        U.S. DEPARTMENT OF JUSTICE
                          1301 New York Avenue NW
16                        Washington, D.C. 20001
                          (202) 368-1667
17

18   (Appearances continued on page 2.)

19

20

21   Court Reporter:     Amber M. McClane, RPR, CRR
                         United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                        (702) 464-5423 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

(Appearances continued on page 2.)

2:24-cr-00155-JAD-DJA • September 26, 2024

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant:

 3       MICHAEL W. SANFT, ESQ.
         SANFT LAW
 4       411 East Bonneville Avenue, Suite 360
         Las Vegas, Nevada 89101
 5       (702) 497-8008

 6                        * * * * *

 7                     I N D E X

 8   Government's Witnesses:                       Page

 9   JAY BROWN

10       Direct Examination by Mr. Gottfried         8

11       Cross-Examination by Mr. Sanft            31

12   ROBERT GROESBECK

13       Direct Examination by Mr. Gottfried        42

14       Cross-Examination by Mr. Sanft            49

15   ROBERT RICHARDSON

16       Direct Examination by Mr. Askar            52

17       Cross-Examination by Mr. Sanft            59

18   SHAUNA BAKKEDAHL

19       Direct Examination by Mr. Gottfried        63

20       Cross-Examination by Mr. Sanft            82

21   TAMI MONTES

22       Direct Examination by Mr. Gottfried        91

23       Cross-Examination by Mr. Sanft           101

24

25   / / / / /
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*I N D E X   C O N T.*

Government's Witnesses:                                           Page

**MARK WLASCHIN**

    *Direct Examination by Mr. Gottfried*              *107*

    *Cross-Examination by Mr. Sanft*                   *164*

    *Redirect Examination by Mr. Gottfried*            *189*

**THOMAS WHITE**

    *Direct Examination by Mr. Askar*                  *194*

    *Cross-Examination by Mr. Sanft*                   *203*

**PETER LEE**

    *Direct Examination by Mr. Gottfried*              *205*

**CICELY HOFFMAN**

    *Direct Examination by Mr. Askar*                  *223*

    *Cross-Examination by Mr. Sanft*                   *226*

**GEORGE KAIME**

    *Direct Examination by Mr. Gottfried*              *230*

* * * * *

*E X H I B I T S*

| EXHIBIT NO.: | OFFERED | RECEIVED | WITHDRAWN |
| --- | --- | --- | --- |
| 31 | 125 | 125 | |
| 32 | 77 | 78 | |
| 36 | 66 | 66 | |
| 37 | 68 | 68 | |
| 38 | 72 | 72 | |
| 49 | 97 | 97 | |

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

```
 1              I N D E X   C O N T.

 2                E X H I B I T S

 3    EXHIBIT NO.:        OFFERED    RECEIVED   WITHDRAWN

 4    50                    23         23

 5    60A                 152,162     163

 6    61A                   136        136

 7    64                    197        197

 8    80                    212        212

 9    82                    222        222

10    83                    209        209

11                          *  *  *  *  *

12    / / / / /

13    / / / / /

14    / / / / /

15    / / / / /

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

```
 1        LAS VEGAS, NEVADA; THURSDAY, SEPTEMBER 26, 2024; 8:23 A.M.

 2                            --o0o--

 3                   P R O C E E D I N G S

 4        (Outside the presence of the jury.)

 5            THE COURT:  Who's going to be our first up this

 6   morning?

 7            MR. GOTTFRIED:  Well, Your Honor.  The plan was for

 8   it to be Jay Brown.  He is -- my understanding is he hasn't

 9   arrived yet, so we might need to make a last-minute switch and

10   have him testify second or third.

11            THE COURT:  Okay.  So if not Jay?

12            MR. GOTTFRIED:  I think, if not Jay, we have Robert

13   Groesbeck.  Or is Shauna Bakkedahl here?  There's one witness

14   who I know is here.  So if that's the only person's who's

15   here, then that's who we're calling.

16            Oh.  Jay Brown is here, so it will be Jay Brown.

17            THE COURT:  Jay.  Okay.  And are we doing case agent

18   today?

19            MR. GOTTFRIED:  We are not.

20            THE COURT:  Okay.  Do you think we'll have a full day

21   of witnesses today?

22            MR. GOTTFRIED:  I do expect that we will.

23            THE COURT:  Okay.

24            MR. GOTTFRIED:  We have eight lined up with the

25   potential that we could get another one or two, if necessary.
```

1          **THE COURT:**  Fantastic.

2          And then we have an investiture later today, so other

3     things going on in the courthouse.  We have an investiture of

4     our newest magistrate judge tonight or this afternoon.

5          **MR. GOTTFRIED:**  Okay.  Well, we could also end early

6     because we expect a light day tomorrow.

7          **THE COURT:**  Oh, no, no.  I'm just saying you-all can

8     just roll right into that the investiture if you...

9          **MR. ASKAR:**  What time is that, Your Honor?

10         **THE COURT:**  I think it's like 5:00.

11         **COURTROOM ADMINISTRATOR:**  It's 5:00.

12         **THE COURT:**  Yeah.

13         **MR. ASKAR:**  I don't think we'll run that late,

14    Your Honor.

15         **THE COURT:**  Okay.  All right.

16         **COURTROOM ADMINISTRATOR:**  Jury's here.

17         **MR. GOTTFRIED:**  I don't want to overpromise.

18         **MR. SANFT:**  Well, I do practice in this jurisdiction,

19    and I don't want to necessarily offend that particular

20    magistrate if I'm not present for that.

21         **THE COURT:**  I'm just saying, you're here.  You might

22    as well just, you know, roll right into the jury room and --

23    downstairs, first floor.  That's right.  That is right.

24         It sounds like our -- all of our jurors are here, so

25    we can go ahead and bring them in, Summer.

1    *(Pause in proceedings.)*

2    **COURTROOM ADMINISTRATOR:**  All rise.

3    *(Jury in at 8:30 a.m.)*

4    **THE COURT:**  Good morning.  Welcome back.  Welcome

5    back.  Good morning.  Glad to have you.  You will notice that

6    we are two lighter than we were yesterday.  So that back row

7    can spread out, sit where you'd like in the back.

8    All right.  Please have a seat.  Will the parties

9    stipulate to the presence of the jury?

10    **MR. ASKAR:**  Yes, Your Honor.

11    **MR. SANFT:**  Yes, Your Honor.

12    **THE COURT:**  All right.  Everyone have a seat.

13    Government, please call your next witness.

14    **MR. GOTTFRIED:**  Yes, Your Honor.  Government calls

15    Jay Brown.

16    **THE COURT:**  Mr. Brown, you're going to head right on

17    over here.

18    **THE WITNESS:**  Okay.

19    **THE COURT:**  And Summer's going to meet you.

20    **COURTROOM ADMINISTRATOR:**  Watch your step.

21    **THE WITNESS:**  Yep.

22    **COURTROOM ADMINISTRATOR:**  Come right around here.

23    Raise your right hand.

24    *(The witness is sworn.)*

25    **THE WITNESS:**  I do.

1          **COURTROOM ADMINISTRATOR:**  Perfect.  Go ahead and take

2    a seat.

3          **THE WITNESS:**  Okay.

4          **COURTROOM ADMINISTRATOR:**  And then just state and

5    spell your first and last name.

6          **THE WITNESS:**  Jay Brown; J-a-y, B-r-o-w-n.

7          **COURTROOM ADMINISTRATOR:**  Thank you.

8          **THE COURT:**  Mr. Gottfried, you may inquire, sir.

9                    **DIRECT EXAMINATION**

10   BY MR. GOTTFRIED:

11   Q.   Good morning, sir.

12   **A.**   Good morning.

13   Q.   Mr. Brown, are you retired, or are you still working?

14   **A.**   I'm still working.

15   Q.   And what is it that you do for work, sir?

16   **A.**   I'm an attorney.

17   Q.   And what type of attorney are you?

18   **A.**   I -- my firm specializes in I would say three different

19   areas:  Land use entitlements, licensing, and also I'd call it

20   government relations.

21   Q.   Okay.  So do you appear in court, or do you represent

22   clients before other types of bodies?

23   **A.**   I represent clients before local municipalities.

24   Q.   I see.

25        And how long have you been practicing, sir?

Jay Brown - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1   **A.**    You're really aging me.  Over 50 years.

2   Q.    Over 50.

3        And is that all here in Las Vegas --

4   **A.**    Yes.

5   Q.    -- or in other places?

6        And how long have you lived in Las Vegas?

7   **A.**    I came here to be a law clerk in 1969, took the Bar in

8   '70, and I've been practicing ever since.

9   Q.    And where are you from originally, sir?

10  **A.**    Brooklyn, New York.

11  Q.    Mr. Brown, do you donate to charitable causes?

12  **A.**    Yes.

13  Q.    In general, what types of charitable causes do you

14  typically donate to?

15  **A.**    A variety.  I mean, I don't -- you -- you name it.  I

16  mean, Alzheimer's, cancer, MD Anderson.  My -- I have a

17  granddaughter in San Diego who's -- had -- born with water on

18  the brain, and there's a hospital that does that type of work.

19  And they need different types of equipment periodically, and

20  we help there.

21       And if I don't get the mail first, I don't know what

22  my wife writes checks to.  You know?

23  Q.    Sure.

24  **A.**    Three Square.  You know, like I said, you can go on and

25  name it.

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Q.   And do you ever donate to causes supporting law

2    enforcement or Veterans?

3    **A.**   Absolutely.

4    Q.   Now, Mr. Brown, do you know the defendant in this case,

5    Michele Fiore?

6    **A.**   Yes, I do.

7    Q.   And how is it that you know Ms. Fiore?

8    **A.**   I met her I guess shortly before she was running for City

9    Council.  I guess that would have been about 2017.

10   Q.   In what context did you meet her?

11   **A.**   My recollection is she called me, and she said, I'm

12   running for City Council and I'd like to sit down and talk

13   with you about my campaign.  I get lots of calls like that

14   from candidates.  I accepted, and we had lunch together.

15   Q.   And is the reason you get so many calls like that from

16   candidates, is that because of your work with local

17   government?

18   **A.**   Yes, sir.

19   Q.   And did you -- so would you say that you enjoyed a

20   friendly relationship with Ms. Fiore or just a professional

21   relationship?

22   **A.**   I don't know what you're referring to, but not

23   professional.  But I certainly enjoyed my relationship with

24   her.

25   Q.   Well, I'm not referring to anything except did you have a

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

Jay Brown - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    friendly relationship --

2    **A.**    Okay.  Yes, a very friendly relationship.

3    Q.    Okay.  And during the course of that relationship, did

4    at-the-time Councilwoman Fiore ever ask you to donate to her

5    various political campaigns?

6    **A.**    Yes.

7    Q.    And did you donate to her various political campaigns?

8    **A.**    Yes.

9    Q.    Do you --

10   **A.**    Not all of them but, yes, I did do --

11   Q.    Not all of them, but some of her campaigns?

12   **A.**    Absolutely.

13   Q.    Do you recall, Mr. Brown, if Michele Fiore ever asked you

14   to donate to any charitable cause?

15   **A.**    Yes.

16   Q.    Now, sir, I want to show you what is already in evidence

17   marked as Exhibit 45A, and that's going to appear on your

18   screen right there (indicating).

19          **MR. GOTTFRIED:**  Can the jurors see 45A?

20          **COURTROOM ADMINISTRATOR:**  Nobody can yet.

21      *(Pause in proceedings.)*

22          **THE COURT:**  We have daily technical difficulties, so

23   just bear with us.

24          **THE WITNESS:**  No problem.

25          **MR. GOTTFRIED:**  Let me know if it does pop up on your

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

```
 1    screen.
 2              MS. DEPREMIO:  Yeah, we're plugged in.
 3              THE COURT:  All right.  Sometimes it takes a bit.  I
 4    think mine's starting to flash, so...
 5              COURTROOM ADMINISTRATOR:  The ELMO should work.
 6              MR. GOTTFRIED:  The ELMO should work?  And we're --
 7              THE COURT:  That's not -- so it would be the screens.
 8              COURTROOM ADMINISTRATOR:  Hold on.  There it goes.
 9              THE COURT:  There we go.  This is in evidence; right?
10              MR. GOTTFRIED:  This is in evidence as
11    Government's Exhibit 45A.
12              THE COURT:  Great.  Can you all see it on your
13    screens down below?
14              A JUROR:  Yes.
15              THE COURT:  Perfect.
16         (Reporter instruction.)
17    BY MR. GOTTFRIED:
18    Q.   Sir, do you see the letter that's up on your screen over
19    there?
20    A.   Yes, I do.
21    Q.   And --
22    A.   How do I scroll?  But I've -- I've seen it.
23    Q.   And you've seen that letter before, sir; is that right?
24    A.   Yes.
25    Q.   And that's because, you know, you -- when you and I have
```

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    met, I've showed you this letter?

2    **A.**    That's correct.

3    Q.    And could you -- you know, tell the jury, who is this

4    letter addressed to?

5    **A.**    To me.  It says "Dear Jay," so to me.

6    Q.    And Jay is your name?

7    **A.**    Yes, it is.

8    Q.    And what's the date on that letter?

9    **A.**    October 1, 2019.

10   Q.    Okay.  And up at the top, on the top left corner, it says

11   Sheena Siegel, officer.  Do you have an understanding of who

12   Sheena Siegel is?

13   **A.**    I believe it's Ms. Fiore's daughter.

14   Q.    So you -- you know, you have -- you said you have a

15   friendly relationship with Ms. Fiore.  Have you met her

16   daughters?

17   **A.**    Yes, but I don't -- you know, I don't know them at all

18   really.

19   Q.    Okay.  But it's your understanding that Sheena Siegel is

20   a daughter of Michele Fiore?

21   **A.**    That's my understanding.

22   Q.    And the name of the organization at the top, could you

23   read that for the jury?

24   **A.**    A Bright Present Foundation, Inc.

25   Q.    And then the -- in the signature line at the bottom, what

1  name is that in the signature line?

2  **A.**    Michele Fiore.

3  Q.    And the substance of this letter, what -- if -- you've

4  seen this before.  What is the sum and substance of this

5  letter?

6  **A.**    I would say that she was trying to raise $80,000 to be

7  utilized for Officer Alyn Beck's statue, a life-sized statue.

8  Q.    And does she make any representation in this letter of

9  whether -- what percentage of those contributions will be used

10  for this charitable event?

11  **A.**    100 percent of all contributions are used for this

12  charitable event.

13  Q.    Now, sir, do you recall having any conversations with the

14  defendant orally about this charity?

15  **A.**    I mean, I -- I can't remember the specific time and date,

16  but certainly I -- I had a conversation.  She approached me

17  about helping this would appear to be a very worthwhile

18  charity --

19  Q.    Okay.  And so understanding you cannot recall the

20  specific time and date, would it have been about the same time

21  frame of that letter --

22  **A.**    Sure --

23  Q.    -- perhaps October --

24  **A.**    -- sure.

25  Q.    -- 2019?

1    **A.**    Yes.

2    Q.    And what do you recall her saying in those conversations?

3    **A.**    Basically what's in the letter.

4    Q.    Basically what's in the letter.  That she was going to --

5    she was raising money for Officer Alyn Beck's -- a statue of

6    Officer Alyn Beck?

7    **A.**    That's correct.

8    Q.    And, sir, as someone who's lived in this community for a

9    long time and, you know, is in the legal space, were you

10   familiar with the story of Officer Alyn Beck?

11   **A.**    Somewhat, yes.

12   Q.    What was your understanding of what that story was?

13   **A.**    I believe he and a fellow officer were having lunch or a

14   break at I think it was a pizza restaurant, and somebody in

15   cold blood murdered them.

16   Q.    So, sir, based on those representations that the

17   defendant made to you about what she was raising money for,

18   did you donate to A Bright Present Foundation?

19   **A.**    Yes, I did.

20   Q.    And, sir, I want to show you -- and I believe this is

21   also in evidence -- Government's Exhibit 46.

22           **MR. GOTTFRIED:**  Are we going to have to use the ELMO

23   for that one as well?

24           **MR. ASKAR:**  I think we're up.

25           **MR. GOTTFRIED:**  Oh, we're up.

1          So, Heather, can you zoom in on the first check?

2     **BY MR. GOTTFRIED:**

3     Q.   So, sir, you said that you did donate to A Bright Present

4     Foundation based on the representations that were made to you

5     by the defendant.  I'm going to show you three checks.

6     **A.**   Okay.

7     Q.   The first one -- so did you, in fact, make a series of

8     donations to the charity in December 2019?

9     **A.**   Apparently only because of our previous meetings

10    together.  I knew I made contribution.

11    Q.   Sure.

12    **A.**   I -- it's five years.  You've already talked about my

13    age.  I just -- I didn't remember specifically how many checks

14    or how much money --

15    Q.   Sure.

16    **A.**   -- but I knew for sure that I had made the contribution.

17    Q.   So it's fair to say, sir, then you did recall making some

18    sort of contribution to this charity, but you didn't recall

19    the specifics of how many or what the number was until you saw

20    these checks?

21    **A.**   I think that's an accurate description.

22    Q.   Okay.  But looking at this first check, Jay H. Brown,

23    Ltd, what is that, sir?

24    **A.**   That's my law firm.

25    Q.   And that's your law firm.

1        And the address that's at the bottom, is that the

2    address of your law firm?

3    **A.**   Yes, it is.

4    Q.   And whose signature is that at the bottom right of that

5    check?  It doesn't appear to be yours.

6    **A.**   My secretary.

7    Q.   Okay.  And did you or would you have authorized your

8    secretary to sign that check on your behalf?

9    **A.**   She wouldn't have written it if I hadn't.

10   Q.   So I know you said your wife sometimes writes a check --

11   **A.**   No.

12   Q.   -- without --

13   **A.**   No.

14   Q.   -- your knowledge but --

15   **A.**   Oh, yes.

16   Q.   -- would your secretary have written a check without your

17   knowledge?

18   **A.**   I don't believe so.

19   Q.   Okay.  And your recollection is that you did, in fact,

20   authorize a donation to this charity?

21   **A.**   Yes.

22   Q.   And what is the amount, sir, of this -- of this first

23   check?

24   **A.**   $10,000.

25   Q.   And in the top right corner, what is the date of this

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    first check?

2    **A.**    December 3rd, 2019.

3    **Q.**    Okay.

4        **MR. GOTTFRIED:**  Heather, can you zoom in on the

5    second check?

6    **BY MR. GOTTFRIED:**

7    **Q.**    So, sir, is this also a check from your law firm signed

8    by your secretary?

9    **A.**    That's correct.

10   **Q.**    Also written to A Bright Present Foundation?

11   **A.**    That's also correct.

12   **Q.**    And what is the amount on this check?

13   **A.**    $9,700.

14   **Q.**    And what about the date?

15   **A.**    12/30/2019.

16       **MR. GOTTFRIED:**  And then, Heather, can you show us

17   the third check?

18   **BY MR. GOTTFRIED:**

19   **Q.**    And, sir, is this also a check that you authorized from

20   your law firm to A Bright Present Foundation?

21   **A.**    I have no recollection if -- I must have.  Okay?

22   **Q.**    And -- and what's the amount on this check?

23   **A.**    $7,000.

24   **Q.**    And what about the date on this check?

25   **A.**    December 31, 2019.

1    Q.   So with the total of those three checks written in

2    December 2019, is my math correct that that's about $27,000

3    that you would have donated to A Bright Present Foundation?

4    A.   Apparently that's correct.

5    Q.   And what is your recollection of the purpose of those

6    donations?

7    A.   To assist in paying for that statue.

8    Q.   Now, sir, do you recall -- did you have any discussions

9    with anyone else besides the defendant about these donations

10   before you wrote those checks?

11   A.   It's five years.  I don't -- you know, if someone said

12   that I did, then I did.  But I don't have any recollection

13   either way.

14   Q.   Do you -- do you recall, sir, when we've talked before

15   that you had a recollection of discussing your donations with

16   the sheriff at the time?

17   A.   I don't know if that was before or after that I -- that I

18   had that discussion, yes.

19   Q.   Okay.  Do you recall having at some point a discussion

20   with then-Sheriff Lombardo about your donations?

21   A.   Yes.

22   Q.   What do you recall about that discussion?

23   A.   Best of my recollection is that I went to see him about

24   an unrelated matter to this statue, and during the course of

25   that discussion I told him that I was -- either I did or was

Jay Brown - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    going to -- I suspect that I did, but maybe -- maybe it was

2    that I was going to.  I don't know the date of the meeting,

3    but it was in proximity to that date, and that I was going to

4    make a contribution.  And I may have asked him if he was doing

5    the same or what his belief is.  I really can't remember that.

6    But he made it clear during the course of the conversation

7    that he was also supporting the building of that statue.

8    Q.    Okay.  And did he -- what was the purpose of that

9    discussion from your perspective?  Why did you bring up that

10   donation to the sheriff?

11   **A.**    As I mentioned to you, I -- I'm not sure.  You know, I'd

12   be speculating.  I said -- maybe I wanted to tell him I'm

13   helping his team.  Maybe I just -- it wasn't for permission,

14   if that's what you're -- you're asking me for.

15   Q.    No, sir.  I'm just asking --

16   **A.**    No, no --

17   Q.    -- you what your recollection is.

18   **A.**    -- I'm just saying, again, it's five years.  I don't -- I

19   just may have told him I'm helping out on this --

20   Q.    Sure.

21   **A.**    -- you know?

22   Q.    Now, you told us earlier, sir, that you represent clients

23   before the City and before other local government bodies.  Do

24   you recall if you encouraged any of your clients to donate to

25   this cause?

Jay Brown - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1   **A.**   You know, I really didn't remember that. You -- at one

2   time during our discussions, you read a whole list of people

3   and asked me if I knew those people, and I told you a good

4   number of those people I did know. And some of them were just

5   friends, some of them were clients, and very frankly, it has

6   amazed me how many people I apparently, you know, asked for.

7   And I'd be proud to say that I did, but I don't have any

8   specific recollection of conversations with them. And if they

9   were to testify that I asked them, I'm sure they're telling

10  the truth. Okay? But if you ask me a name today, I'll tell

11  you. But people have said that to me, and I just had no

12  recollection of it at all.

13  Q.   Sure. But --

14  **A.**   The cause was worthy, and I'd be proud to say that I did.

15  Q.   Now, in the course of your work and your friendly

16  relationships with people, do you often encourage people to

17  donate to charitable causes?

18  **A.**   No. I mean in the sense of, I have my charity I talked

19  about before that I like. And, you know, I think people

20  should support charities if they -- that they like. In this

21  particular case, this was such an outstanding, you know,

22  charitable event that I might very well have said to them, you

23  know, would you join in? And apparently I did. Okay? But --

24  Q.   So, sir, I'm going to show you -- or I'm going to ask you

25  to look at -- you should have a binder next to you that has

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  exhibits in it.  So I'd ask you to turn to Exhibit 50.

2  **A.**   There's a lot of binders.

3         **THE COURT:**  Sorry.  Which -- which Number?

4         **MR. GOTTFRIED:**  It's Exhibit 50.  It should be in the

5  second binder.

6         **THE COURT:**  Okay.

7         **MR. GOTTFRIED:**  So this is an exhibit that's not

8  already in evidence.

9         **THE WITNESS:**  Whoa.  And I'm sorry, what was the

10 exhibit?

11 **BY MR. GOTTFRIED:**

12 **Q.**   Exhibit Number 50.

13 **A.**   Yes.  I see it.

14 **Q.**   So do you see the document that's before you, Exhibit 50?

15 **A.**   Yes.

16 **Q.**   And, sir, is that an e-mail from you to a gentleman named

17 Bob Groesbeck?

18 **A.**   Yes, it is.

19 **Q.**   And then also it contains Bob Groesbeck's forwarding that

20 e-mail to another individual?

21 **A.**   Yes.

22 **Q.**   Is that your e-mail address in the "From" section where

23 it says --

24 **A.**   Yes, it is.

25 **Q.**   -- Jay Brown?

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**   Yes, it is, sir.

2    Q.   And do you have any reason to doubt that you, in fact,

3    sent this e-mail in December of 2019?

4    **A.**   No doubt that I did, but I have -- till you've showed

5    this to me, I had no recollection of it.  But absolutely.

6    Q.   So no specific recollection, but it appears --

7    **A.**   It had to --

8    Q.   -- to be from your --

9    **A.**   -- happen.

10   Q.   -- e-mail address?

11   **A.**   It had to happen.

12       *(Reporter instruction.)*

13          **THE WITNESS:**  I'm sorry.

14          **MR. GOTTFRIED:**  My apologies.

15          **THE WITNESS:**  It had to happen.

16          **MR. GOTTFRIED:**  Your Honor, at this point I'd like to

17   ask to admit Government's Exhibit 50 into evidence and publish

18   to the jury.

19       *(Exhibit No. 50, offered.)*

20          **MR. SANFT:**  No objection, Your Honor.

21          **THE COURT:**  All right.  50 can come in.

22       *(Exhibit No. 50, received.)*

23          **THE COURT:**  And you may publish.

24          **MR. GOTTFRIED:**  So, Heather, if you could zoom in on

25   the portion that's written by the witness.

1  **BY MR. GOTTFRIED:**

2  Q.   So, sir, could you -- so as -- you told us before that

3  this e-mail was from your e-mail address to someone named Bob

4  Groesbeck?

5  **A.**   Yes.

6  Q.   Who is Bob Groesbeck?

7  **A.**   He's an attorney in Las Vegas.  I think he's the former

8  mayor of Henderson, and I think that he's also a client of

9  mine as well as a friend.

10  Q.   Okay.  And, sir, could you just read for the jury what

11  this e-mail from your e-mail address says?

12  **A.**   I'm basically telling him that I had a meeting with the

13  sheriff and with councilwoman and that I'm looking to help

14  raise $80,000 in honor of Officer Beck.

15  Q.   So in this e-mail you say that counsel -- that Sheriff

16  Lombardo and Councilwoman Fiore are looking to raise $80,000

17  from Alyn Beck -- for Alyn Beck.

18  **A.**   Frankly, I have no -- even after reading this -- and it

19  says what it says.  Okay?  But I have no recollection of the

20  sheriff asking me to help raise money.

21  Q.   Okay.

22  **A.**   I mean, you know, more likely Ms. Fiore would have asked

23  me to help raise money, but he certainly didn't ask me to

24  raise money.  He did tell me that he had already -- the time I

25  saw him, he had previously made a contribution.  Okay?

1    Q.    So you --

2    **A.**    So I know he was in favor.  And I might have gotten

3    carried away.  I'm just trying to see if I dictated this for

4    my secretary off of the letter that was previously sent to me,

5    you know, that I might have paraphrased.  Okay?

6    Q.    So, sir, your testimony here then is that you do not

7    believe that Sheriff Lombardo asked you to raise money for

8    this?

9    **A.**    I do not believe that he did.

10   Q.    And it sounds like, in fairness, do you have a specific

11   recollection that Councilwoman Fiore asked you, or you just

12   believe that she would have?

13   **A.**    Certainly she'd be more likely to have.  There -- I would

14   remember -- I've had lots of conversations, you know, during

15   that period of time and over the years with Ms. Fiore.  I

16   didn't have that many with the sheriff, and I was -- I'm very

17   specific in knowing that he didn't ask me to raise money.  He

18   just confirmed that he made a contribution to the statue

19   already.

20   Q.    Now, sir, reading this e-mail and comparing it with the

21   letter that we looked at earlier, you know, some of the

22   phrases like "100 percent of all contributions are used for

23   this charitable event" appear to be similar or identical to

24   what's in the letter from Michele Fiore addressed to you.

25          Do you know where you would have gotten these phrases

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    that you used in this e-mail?

2    **A.**    I think, just remembering what you showed me a few

3    minutes ago, it looks like it's the exact language that was in

4    that letter.

5    Q.    So --

6    **A.**    And --

7    Q.    -- would you have -- was that language that you would

8    have come up with independently, or would you have taken it

9    from the letter you received from the defendant?

10   **A.**    You know, the truth of the matter is I don't even

11   remember getting the letter that -- that you showed me from

12   Ms. Fiore to myself.  I know she made the request of me

13   exactly along the terms that are in that letter.  All right?

14   The letter's an accurate description that I received from her

15   of our conversation.  All right?  But it's been a lot of

16   years.  I have no reason to believe that I didn't see that

17   letter, but I'm just saying to you I --

18   Q.    Sure.

19   **A.**    -- don't remember seeing the letter.  And the language

20   I'm just recalling from a few minutes ago is the exact same

21   language that's here.  So my assistant would have -- I would

22   asked her to just use the same language.

23   Q.    Sure.  So understanding that this was a long time ago,

24   your recollection is that the representations that were made

25   in that letter and that you made in this e-mail were what

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Councilwoman Fiore told you about this charity?

2    **A.**    That's correct, sir.

3            **MR. GOTTFRIED:**  Now, Heather, can you pull up Exhibit

4    -- is Exhibit 41 in evidence?  All right.  Can you pull up

5    Exhibit 41?

6    **BY MR. GOTTFRIED:**

7    Q.    Looking at this -- sir, do you recall whether in February

8    of 2020, a few months after you made those three donations to

9    this charity, did you receive some money back from A Bright

10    Present Foundation?

11    **A.**    Apparently I did.  And, again, you -- we've had this

12    conversation.  You know, I have no reason to believe those

13    aren't real checks and that I didn't get it back.  I have no

14    recollection of that, though, no.

15    Q.    Sure.  Well, let's -- let's look at the first check.

16            So what is -- first of all, sir, what is the date of

17    that check?

18    **A.**    February 3rd, 2020.

19    Q.    And on the top left corner, who does this check appear to

20    be from?

21    **A.**    Bright Present Foundation, Inc.

22    Q.    And where it says "Pay to the Order," is that your name,

23    Jay Brown?

24    **A.**    Yes, it is.

25    Q.    And the amount of the check, sir?

*Jay Brown - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  **A.**   $8,350.

2  **Q.**   And do you recognize the signature at the bottom right of

3  the check?

4  **A.**   No, I do not.

5  **Q.**   Okay.

6      **MR. GOTTFRIED:**   Could we look at the next check,

7  Heather?

8      **THE WITNESS:**   It's not that I can't recognize the --

9  I can't recognize anything, but --

10     *(Simultaneous crosstalk.)*

11  **BY MR. GOTTFRIED:**

12  **Q.**   Sure.

13  **A.**   -- on the signature, you know.

14  **Q.**   And is this check also from A Bright Present Foundation?

15  **A.**   Yes, sir.

16  **Q.**   Also in February of 2020?

17  **A.**   February 11th, yes, sir.

18  **Q.**   And this one is for $8,350?

19  **A.**   That's correct.

20  **Q.**   And adding those two checks together, seems like you

21  received about $17,000 back from this organization, A Bright

22  Present Foundation?

23  **A.**   Yes, sir.

24  **Q.**   And then so doing the math, if you donated $27,000 in

25  December and got $17,000 back in February, you still were out

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 28*

Jay Brown - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1   about $10,000 from, you know, your exchanges with this
2   charity?
3   **A.**   That's correct.
4   Q.   Now, sir, I want to return to the intent behind your
5   original contributions.
6          When you donated to A Bright Present Foundation, did
7   you believe that 100 percent of your donation would be used
8   for the Alyn Beck charity?
9   **A.**   Yes.
10  Q.   Would you have given this money if you believed that it
11  would have been used for Michele Fiore's personal expenses,
12  like her rent?
13  **A.**   No, I would not.  I can explain that, but I'll just --
14  the answer is no.
15  Q.   Why would you not have given if you thought it would be
16  used for her personal expenses?
17  **A.**   First of all, if she was going to ask for that, she would
18  have asked me for that I think because of our relationship.
19  But she knew and I knew that, if I had made a personal
20  loan/contribution to her personally, I would not be able to
21  appear before her without her making a full disclosure and
22  maybe even then I couldn't.  Not that I'm so selfish, which I
23  could be a little bit, of wanting to have the -- to appear
24  there, it's where I make my living.  But to my clients, they
25  would not be able to use me because of that conflict.

1    So, you know, that's why.  And that's not because I
2  have anything against Ms. Fiore.  To the contrary, you know,
3  we're friends.  Okay?
4  Q.   So despite the fact that you had a friendly relationship
5  with her, you would not have donated to her personally because
6  that would be a conflict of interest given your profession?
7  **A.**   And she would not be able to, like I say, vote.  And, you
8  know -- anyway, she's never, ever asked me about that, to do
9  that, so...
10 Q.   Now, to your recollection, sir, were you ever contacted
11 by the defendant to say that your donation was no longer
12 needed for the Alyn Beck statue?
13 **A.**   I just don't have a recollection of any -- as you can
14 tell from what I said earlier, even clients and friends I
15 don't remember speaking about it.  It's fully possible we've
16 talked about speculating why I got that money, but it would be
17 sheer speculation.  I don't remember having any conversation
18 with her about that at all.
19 Q.   So you don't have any recollection of that?
20 **A.**   That's correct.
21 Q.   And you never received your full contribution back, did
22 you?
23 **A.**   Apparently not.
24 Q.   To your recollection, were you ever contacted by Michele
25 Fiore to ask if she could use your money for something besides

*Jay Brown - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    the Alyn Beck statue?

2    **A.**    I have no recollection of that.

3    Q.    Thank you, sir.  I have no more questions for you at this

4    time.

5                **THE COURT:**  Cross, Mr. Sanft?

6                **MR. SANFT:**  Thank you, Your Honor.

7                        **CROSS-EXAMINATION**

8    **BY MR. SANFT:**

9    Q.    Hi, Jay.

10    **A.**    Hi.

11    Q.    How you doing, sir?

12    **A.**    Fine.

13    Q.    Yeah.  Could be doing better besides sitting up here

14    drinking water on a witness stand; right?

15    **A.**    Especially at this time of day, yes.

16    Q.    Right.  Well, good morning.

17    **A.**    Good morning.

18    Q.    Just some follow-up questions with regards to what the

19    Government's asked you.  The -- first thing's first; right?

20    So you've looked at Government's Exhibit 45A which is the

21    letter; right?

22    **A.**    Yes.

23    Q.    Now, this letter, once again, you didn't have that in

24    your possession?

25    **A.**    I'm sorry, what do you mean I didn't have it in my

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

1    possession?

2    Q.    Meaning it wasn't a letter that you provided to the

3    Government.  The Government showed you this letter; right?

4    **A.**    That's correct.

5    Q.    Okay.  And with regard to this particular letter, you

6    know, once again, your relationship with Michele Fiore was --

7    when you say friendly, it was actually you guys were friends?

8    **A.**    Absolutely.

9    Q.    Right.  And fair to say you do not want to be here today;

10   right?

11   **A.**    Does anybody?  I mean... whatever.

12   Q.    Yeah.  But what I'm asking for specifically, though, Jay,

13   is this.  Is that, you know, in essence, your relationship

14   with Michele Fiore, you care about this woman that's sitting

15   over here to my left?

16   **A.**    Very much.

17   Q.    Yeah.  And as a result, when you had shared with us

18   earlier, you would have done anything you could have to help

19   Michele if you knew that Michele was in, say, financial

20   straights; right?

21   **A.**    I'd like to think so.

22   Q.    Right.  But you have certain professional constraints,

23   meaning that you also have a duty to your clients.  You cannot

24   do anything that would jeopardize your position with regards

25   to what you do for your clients and so forth?

1    **A.**    Correct.

2    Q.    Okay.  And so, as a result of that, though, throughout

3    the entire time you've known Michele, you also know that

4    Michele would come to you for certain things for help.  Like,

5    for instance, hey, I'm doing this charitable thing, and I

6    would like a donation from you?

7    **A.**    Yes.

8    Q.    Okay.  And fair to say, though, that the other people

9    that you work with within the government sometimes would come

10   to you and ask you for donations as well?

11   **A.**    Often.

12   Q.    So it's not just Michele; it's other people in the

13   government?

14   **A.**    Absolutely.

15   Q.    Yeah.  And for the most part, as long as you can help

16   these people, you would; right?

17   **A.**    For charitable purposes you're talking about?

18   Q.    Absolutely.

19   **A.**    Absolutely.

20   Q.    Yeah.  And so there's many times where Michele have

21   actually approached you on other charitable things besides the

22   Alyn Beck statue?

23   **A.**    I don't know if I'd say many times, but like the other

24   people that you were referring to, absolutely.

25   Q.    Now, with regards to the -- this particular letter, you

1  know, your relationship with Michele is in such a way that she

2  could have just very easily just called you on the phone and

3  said, hey, Jay, by the way, we have this statue that we're

4  erecting for Officer Beck, can you donate some money to that?

5  She could have just done that; right?

6  **A.**   I believe she did.

7  Q.   Yeah.  Had she ever done before where she sent you a

8  letter on some other charitable thing and said, hey, you know

9  what, Mr. Brown -- or Jay Brown -- can you please donate to

10  this other cause?

11  **A.**   I have no recollection of that.

12  Q.   Right.  And it would be fair to say that, once again, the

13  level of your friendship with Michele would be such that she

14  could just pick up the phone and call you at any point; right?

15  **A.**   Of course.

16  Q.   It wouldn't require an appointment or some type of

17  scheduled meeting in order for her to meet with you, for

18  instance?

19  **A.**   Yes.  You're absolutely correct.

20  Q.   Now, in addition to that little bit here, the e-mail that

21  was provided to the jury, we saw an e-mail to Bob Groesbeck.

22  Yes?

23  **A.**   Yes, we did.

24  Q.   Okay.  And that would have been, just for the jury,

25  Exhibit Number 50.

```
 1              That particular e-mail, you have yourself on there
 2    and you have Bob on there, but Michele's not cc'd on that
 3    e-mail; is that right?
 4    A.   I don't recall.  We can look at it.
 5    Q.   Okay.
 6    A.   I don't recall seeing that, no.  I don't even recall
 7    sending it myself, frankly.
 8    Q.   Yeah.  Well, you know, so do I.  I don't recall anything
 9    either besides yesterday.
10              But let me ask you this.  So with regards to the --
11    to the money that was provided in this case, why did you get
12    money back from the charity?
13    A.   I do not know.
14    Q.   Okay.  And fair to say, though, that the donations that
15    you provide, when you do provide donations, just like we --
16    just like you just talked about a little bit ago, sometimes
17    you just lose track of your donations; right?  Like the money
18    that you give to different charities.
19    A.   All the time.
20    Q.   Yeah.  Which means, in essence, like, if you donate
21    something to a charity, you typically donate it to the charity
22    and forget and move on to the next thing that you're doing?
23    A.   Absolutely.
24    Q.   Do you keep a ledger, for instance, of all the charitable
25    donations that you make to follow up at the end of the year to
```

1  say, hey, whatever happened to this money for this thing or

2  that thing?  Nothing like that?

3  **A.**   Perhaps my bookkeeper does for tax purposes --

4  Q.   Yeah.

5  **A.**   -- if they're charitable, something like that, but I -- I

6  don't.

7  Q.   Right.  So, in essence, when you receive money back from

8  the -- this particular charity, Michele's charity, it's not

9  like you sat there thinking in your mind, like, when's this

10  money coming back to me?  You weren't doing that; right?  You

11  weren't thinking in your mind, expecting this money --

12  **A.**   I have no --

13      *(Reporter instruction.)*

14          **THE WITNESS:**  Sorry.

15          **MR. SANFT:**  Sorry.

16          **THE WITNESS:**  Sorry.  I have no recollection of that.

17  I could have at the time.  We're talking five years, and I

18  just --

19  **BY MR. SANFT:**

20  Q.   Sure.

21  **A.**   -- don't have a recollection of that.

22  Q.   Okay.

23  **A.**   I can speculate, but I wasn't going to do that.  But, you

24  know -- but I don't know.

25  Q.   Right.  Now, this -- this particular letter -- going back

1    again to Government's Exhibit 45A, the exhibit that we are

2    looking at right now --

3    **A.**    Which was the 45A?

4    Q.    It's 45A.  I don't think it --

5            **MR. SANFT:**  Is it in the book?

6            **MR. GOTTFRIED:**  It is in the book.

7            **MR. SANFT:**  It's in the book.

8            **THE COURT:**  It's on your screen now, Mr. Brown.

9            **MR. SANFT:**  Thank you.  Appreciate it.

10            **THE WITNESS:**  Yes.

11    **BY MR. SANFT:**

12    Q.    With regard to this particular thing here, the person

13    that's at the top left-hand corner that's mentioned, this

14    Sheena Siegel, do you know who that is?

15    **A.**    As I said, I believe that that's Ms. Fiore's daughter.

16    Q.    Okay.  Do you know -- has she ever been to your office

17    before, as far as you can recall?

18    **A.**    I don't believe I've ever seen her at my office, but she

19    could have picked up a check.

20    Q.    Okay.  And that's the next question.  The next question

21    is, is as far as you know, did Michele Fiore ever come to your

22    office to pick up the checks that the jury saw today?

23    **A.**    Possibly.  I don't remember seeing her at my office.

24    Q.    Okay.  And fair to say, though, if that were to happen,

25    it's probably something that it's more notable than not,

1    right, if you saw Michele come in --

2        *(Reporter instruction.)*

3            **MR. SANFT:**  I apologize, Amber.

4    **BY MR. SANFT:**

5    Q.   It would be fair to say that it would be more notable

6    than not that you would have remembered Michele coming into

7    your office, you know, picking up --

8    **A.**   To meet with me, you mean?

9    Q.   Yes.  To talk to you about this check.

10   **A.**   Probably, only because we've met on a number of

11   occasions.  I just don't recall us ever meeting at my office.

12   But I -- frequently people, you know, will send a runner, you

13   know, and pick up a check, and I'll leave it with my

14   receptionist, you know, rather than meet me at the office.

15   Q.   Yeah.

16   **A.**   Most of the people that you're referring to, like

17   Ms. Fiore, elected officials, I wouldn't necessarily ask them

18   to come themselves, you know, if they want to.  Or I'll put it

19   in the mail.  And most people want the check right away, so

20   I'll tell them to come by and pick it up at my receptionist

21   desk.

22   Q.   All right.  I appreciate that.  Now just a last set of

23   questions here for you, Jay --

24   **A.**   Sure.

25   Q.   -- and then I can let you go.

Jay Brown - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

1          Your conversations with Sheriff Lombardo at the time,

2    the -- you met with Sheriff Lombardo.  Can you -- once again,

3    this is five years ago?

4    A.    Right.

5    Q.    So let's caveat everything here; right?

6    A.    Sure.

7    Q.    Can you tell us sort of the time frame in which you met

8    with him when you had sort of this aside conversation with

9    regards to the charity?

10   A.    As I pointed out to -- and answered that to the

11   Government, to the best of my recollection, it was in or

12   around that same time of that October, you know, request.

13   Q.    Okay.  And as far as you know, do you know if the sheriff

14   had already made a donation or not to that point?

15   A.    My recollection is that he told me that he had already

16   made a contribution.

17   Q.    Okay.  And in terms of when you make your contributions,

18   this is your personal money that you're contributing into a

19   charitable purpose; right?

20   A.    Yes.

21   Q.    It's not somebody else's money; it's your money?

22   A.    Correct.  My firm's money, same as me.  My money, yes.

23   Q.    Your money that you've earned over the years.  You've

24   been practicing longer than I've been born.  But, I mean, in

25   terms of that --

*Jay Brown - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    Thank you for that.

2    Q.    Right.

3    **A.**    Yes.

4    Q.    But let me ask you this.  With regards to the sheriff in

5    this case, you don't recall for sure whether or not he said,

6    you know, I -- I would like to help with this project because

7    it is one of my fallen officers that is --

8    **A.**    No, I don't remember -- I don't recall him saying that.

9    He just confirmed that he also had made a contribution.

10    Q.    Okay.

11    **A.**    It was a very -- just about that and that was it on this

12    point.  Like I said, I think the meeting in the office was

13    about something that I can't remember, but that's why I was

14    there.  Just in passing -- when I mentioned it, just in

15    passing he said it back in four words.  You know?

16    Q.    Right.

17    **A.**    It wasn't anything else.

18    Q.    It's like, I'm donating to the statue.  Me, too.

19    **A.**    Yes.  I already have.

20    Q.    All right.

21        **MR. SANFT:**  I have no further questions, Your Honor.

22        **MR. GOTTFRIED:**  Your Honor, no redirect for this

23    witness.  We ask that Mr. Brown be excused.

24        **MR. SANFT:**  Yes, Your Honor.

25        **THE COURT:**  Mr. Brown, you are excused.  Please watch

*Robert Groesbeck - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    your step.

2          **THE WITNESS:**  Thank you very much.

3          **THE COURT:**  And then watch your step right there in

4    front of the jury box, too.

5          **THE WITNESS:**  Sure.  Thank you.

6          **THE COURT:**  Thank you, sir.

7          Thank you, Mr. Wright.

8          Next witness.

9          **MR. GOTTFRIED:**  Next witness is Bob Groesbeck.  He

10   might be downstairs.

11       *(Pause in proceedings.)*

12         **THE COURT:**  Hi, sir.  You're going to head right on

13   up here.  Good morning.

14         **THE WITNESS:**  Good morning.

15         **COURTROOM ADMINISTRATOR:**  Watch your step.

16         **THE WITNESS:**  Okay.

17         **COURTROOM ADMINISTRATOR:**  Go ahead and go around.

18       *(The witness is sworn.)*

19         **THE WITNESS:**  I do.

20         **COURTROOM ADMINISTRATOR:**  Please take a seat, and

21   then state and spell your first and last name.

22         **THE WITNESS:**  Thank you.  Robert Groesbeck,

23   G-r-o-e-s-b-e-c-k.

24                      **DIRECT EXAMINATION**

25   **BY MR. GOTTFRIED:**

Robert Groesbeck - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    Q.   Good morning, sir.

2    A.   Good morning.

3    Q.   Could you tell the jury what it is that you do for a

4    living?

5    A.   I do lots of things, but my primary business now is I own

6    a integrated marijuana company, a multistate operator.  So I

7    was a lawyer for many years; transitioned into selling

8    marijuana.

9    Q.   And what is the name of that marijuana company that you

10   own?

11   A.   Well, the parent company is Planet 13 Holdings.  We've

12   got plenty of -- I shouldn't say plenty -- many subsidiary --

13   Q.   Okay.

14   A.   -- operations.

15   Q.   Is one of your subsidiaries MM Development Company?

16   A.   It is.

17   Q.   Okay.  And, sir, either personally or through your

18   business, do you donate to charitable causes?

19   A.   We do.

20   Q.   What types of charitable causes do you donate to?

21   A.   Anything that makes sense for the community.  We're very

22   supportive of law enforcement.  Health care.  Veterans.  We

23   try to be very active in the community.

24   Q.   The first thing you mentioned there, sir, was law

25   enforcement.  Why is that a cause that's important to you?

*Robert Groesbeck - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **A.**   Well, I just -- I think it's important.  They're a big

2   part of our community, and I've got family that are police

3   officers, retired now.  But, yeah, we've got law enforcement

4   in my family, and it's just always been important.

5   **Q.**   Now, sir, did your -- did you or your company, one of

6   your companies, make a donation to a statue of Officer Alyn

7   Beck in December of 2019?

8   **A.**   Yes, we did.

9           **MR. GOTTFRIED:**  Now, Heather, can you bring up

10  Exhibit 50?  This is already in evidence.

11  **BY MR. GOTTFRIED:**

12  **Q.**   If you could, could you take a look at your screen, sir?

13          **MR. GOTTFRIED:**  If you could highlight the e-mail

14  address at the top, Heather.  The "From" section.

15          **THE WITNESS:**  Yeah, that appears to be an e-mail that

16  I authored.

17  **BY MR. GOTTFRIED:**

18  **Q.**   That's an e-mail from your -- that's from your e-mail

19  account?

20  **A.**   Correct.

21  **Q.**   And does -- could you please read that top e-mail from

22  yourself, and could you -- and could you tell us who that's

23  to?

24  **A.**   Well, it's from me to Lulu, and I copied my copartner,

25  Larry Scheffler.  And this was dated December 27, 2019.  And

*Robert Groesbeck - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    it was forward, A Bright Present Foundation, Inc./Officer Alyn

2    Beck.

3    Q.   And what is that substance of that e-mail, if you

4    could -- if you could read what you wrote?

5    **A.**   You want me to read it in --

6    Q.   Yeah.

7         **MR. GOTTFRIED:**  Can you make that bigger, Heather?

8         **THE WITNESS:**  Okay.  So it says sent from my iPhone,

9    begin forwarded message.  This is from Jay Brown dated

10   December 27, 2019, to me --

11   **BY MR. GOTTFRIED:**

12   Q.   Sorry, sir.  Just -- just the top part from you.  So

13   above the "Sent from my iPhone."

14   **A.**   Oh.  I said:  Please prepare a charitable contribution in

15   the amount of $5,000 for the referenced charity.  This needs

16   to be cut by 12/31/2019.  Please let me know when the check is

17   ready.  Thanks.  Bob.

18   Q.   And the -- this is a forwarded message that's in response

19   to another e-mail below.  Who is that e-mail from?

20   **A.**   From a gentleman named Jay Brown.

21   Q.   And who is Jay Brown?

22   **A.**   Jay's a lobbyist, attorney, very active in Southern

23   Nevada.  For many, many years he's represented by company for

24   a number of years on land use and zoning matters.

25   Q.   And what is your relationship with Jay Brown?

1  **A.**   Well, other than a business relationship, I've known him

2  forever.  You know, I practiced law here in town for years and

3  got to know Jay, and he's one of, it if not the best, land use

4  and zoning guy in town.

5  Q.   Okay.  And has Jay in the past, has he asked you to make

6  charitable contributions?

7  **A.**   You know, I don't recall specifically whether he has.  I

8  wouldn't be surprised.  I mean, I get calls all the time from

9  people that work for us, from elected officials, from the

10  charities themselves.  So he may have.  I just don't recall.

11  Q.   So in this e-mail that you receive from Mr. Brown, he

12  says:  As a follow up to our meeting earlier this week,

13  Sheriff Lombardo and Councilwoman Fiore are looking to raise

14  $80,000 to honor Alyn Beck.

15      Do you recall having a meeting with Mr. Brown where

16  that subject came up?

17  **A.**   No, I don't recall a specific meeting on that item.  This

18  has been so long ago.  But like I said, I would meet with him

19  on -- on a regular basis, you know, with -- with respect to

20  our expansion plans and things like that.  So that could have

21  certainly come up.  It obviously did because it was reduced to

22  an e-mail.

23  Q.   And in this e-mail he asks -- he says that he's

24  raising -- he, along with Sheriff Lombardo and Councilwoman

25  Fiore, are raising money for the Alyn Beck statue?

*Robert Groesbeck - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    Correct.

2    **Q.**    And then below, that 100 percent of all contributions are

3    to be used for this charitable event?

4    **A.**    That's correct.

5    **Q.**    Was that consistent with your -- with your understanding

6    of what your donation was for?

7    **A.**    Yes.

8    **Q.**    Do you -- did you know who Officer Alyn Beck was?

9    **A.**    Didn't know him personally, no.

10    **Q.**    But were you familiar with his -- with his story?

11    **A.**    Oh, I was very familiar, yeah, with the event, the

12    shooting.  Of course.

13    **Q.**    So why was this a cause that was important for you to

14    donate to?

15    **A.**    Well, again, as I said, it involved law enforcement.

16    They were looking to honor a fallen officer, and I thought it

17    was really important to participate.  That's -- that's what

18    our company does.

19    **Q.**    Now, the e-mail from Mr. Brown references Councilwoman

20    Fiore.  Did you have any type of relationship with

21    Councilwoman Fiore?

22    **A.**    Oh, yeah.  I've know Michele for a long time.

23    **Q.**    Yeah.  And did -- do you have -- have any recollection of

24    any conversations with Councilwoman Fiore about this topic?

25    **A.**    No.

*Robert Groesbeck - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  Q.   Now, based on the e-mail that you sent, did MM

2  Development Corporation issue a check to A Bright Present

3  Foundation?

4  **A.**   Well, we did, yeah.  As it turns out, that's -- I didn't

5  know about this until I got a call like a year ago asking

6  about it and had no recollection.  But, yeah, it was

7  documented in our finance department.

8       **MR. GOTTFRIED:**  Can you show the witness Exhibit 51?

9  **BY MR. GOTTFRIED:**

10  Q.   Sir, on the top left there, is that your company, MM

11  Development Company, Inc.?

12  **A.**   That is.

13  Q.   And what is the date on that check?

14  **A.**   12/27/2019.

15  Q.   And what was the amount of the check that you wrote?

16  **A.**   $5,000.

17  Q.   And is that your signature on the bottom right?

18  **A.**   Yeah, it appears.  It was probably auto pen.  But, yeah,

19  that's my signature.

20  Q.   But did you authorize that --

21  **A.**   I did.

22  Q.   -- to be signed?

23  **A.**   I did.

24  Q.   And the -- the memo says, "Charitable Donation."  Is that

25  what you understood this was?

*Robert Groesbeck - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    That's correct.

2    **Q.**    Now, sir, when you made this donation, did you believe

3    that 100 percent of your donation would be used for the Alyn

4    Beck statue?

5    **A.**    Of course.

6    **Q.**    Would you have made this donation if you thought that the

7    money was going to go to Michele Fiore's personal expenses?

8    **A.**    No.

9    **Q.**    Would you have given this money if you thought it was

10   going to be used for a purpose other than the Beck statue?

11   **A.**    No.

12   **Q.**    As far as you recall -- you said you have a relationship

13   with Councilwoman Fiore.  Did she ever contact you to say that

14   your donation was not needed for the Alyn Beck statue?

15   **A.**    Not that I recall.

16   **Q.**    Were you ever contacted by Michele Fiore to ask if she

17   could use your money for something besides the Alyn Beck

18   statue?

19   **A.**    No.

20   **Q.**    And were either you or any of your subsidiary

21   corporations, like MM Development Company, were you ever

22   reimbursed for this donation?

23   **A.**    Not that I recall.

24   **Q.**    Thank you, sir.  I have no further questions.

25           **THE COURT:**  Cross-examination, Mr. Sanft?

*Robert Groesbeck - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          **MR. SANFT:**  Thank you, Your Honor.

2                          **CROSS-EXAMINATION**

3     **BY MR. SANFT:**

4     Q.   Good morning, Mr. Groesbeck.

5     **A.**   Good morning.

6     Q.   How are you doing today?  I know.

7     **A.**   You got me on a witness stand here, yeah.

8     Q.   Well, let me ask you some further questions here, and

9     I'll let you go.  A couple just details.

10         Just to make sure I'm clear, you've never spoken

11    directly to Michele Fiore with regards to your donation prior

12    to you making it?

13    **A.**   I don't believe so.  I don't recall.

14    Q.   Okay.  And as far as you know, you never received a

15    letter of some sort, you know, from the charitable

16    organization that was, you know, kind of spearheading this

17    idea of building the statue?

18    **A.**   Not that I recall.

19    Q.   Okay.  Now, what you had looked at earlier was an e-mail

20    that was sent I believe to your -- to your assistant

21    indicating that you wanted the check cut in the amount that --

22    **A.**   Correct.

23    Q.   And it was in response to something that Jay Brown had

24    sent you --

25    **A.**   Correct.

Robert Groesbeck - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

1    Q.   -- is that right?  Okay.

2         Now, the question that was asked specifically about

3    the statue -- now, just to make sure I'm clear, with regards

4    to the -- the statue itself, the -- what you donated to was

5    the representations made by Jay Brown in his e-mail; right?

6    A.   That is correct.

7    Q.   And the question that was asked by the Government was you

8    were donating 100 percent of your -- of your donation to the

9    statue; right?

10   A.   Well, I don't know about the statue.  To the charitable

11   foundation, whatever the charity was.

12   Q.   Thank you.  And that's my next question.  Because, in

13   essence, that's what you were doing.  You were donating to --

14   and just within the e-mail -- all contributions are used for

15   this charitable event.  That's the language that's in the

16   e-mail?

17   A.   Correct.

18   Q.   Okay.

19   A.   That's correct.

20   Q.   So whether or not it's to the statue or something related

21   to the statue, that's what you were donating your money to?

22   A.   Yeah.  We -- we just assumed it would be related to the

23   memorial, whatever that turned out to be.

24   Q.   Thank you.

25        Now, in addition to that, did you, at any point prior

*Robert Groesbeck - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    to the Government meeting with you, indicate or think that

2    there was a problem with your donation?

3    **A.**   I didn't even know we'd made the donation until I got a

4    call.  Like I said, this was years ago and --

5    Q.   Yeah.  And so, in essence, you're relying heavily upon

6    the records that you have and so forth in this case?

7    **A.**   Exclusively, until that -- my finance department did a

8    search.  I did get a call from an agent sometime ago.  I had

9    no recollection of the event even.  And so I had my finance

10   department research it, and there was a paper trail.

11   Q.   And you met with the Government how many times prior to

12   your testimony here today?

13   **A.**   Never met with anyone.  I had a meeting, oh, maybe a

14   month ago with -- a pretrial meeting with --

15   Q.   The Government --

16   **A.**   -- the team --

17   Q.   -- that's here?

18   **A.**   Yeah.  I had a couple phone calls with the special agents

19   over the last year, just a couple calls.

20   Q.   I see.

21   **A.**   Very brief.

22   Q.   All right.  Thank you, sir.  No further questions.

23           **THE COURT:**  Mr. Gottfried?

24           **MR. GOTTFRIED:**  No redirect, Your Honor.  I'd ask

25   that Mr. Groesbeck be excused.

*Robert Richardson - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1        **MR. SANFT:**  No objection, Your Honor.

2        **THE COURT:**  Mr. Groesbeck, you are excused.  You can

3    step down.  Thank you, sir.

4        **THE WITNESS:**  Thank you, Your Honor.

5        **THE COURT:**  And watch your step right there in front

6    of the jury.  I didn't say "watch your step," and see what

7    happens?

8            Next witness.

9        **MR. ASKAR:**  Your Honor, the Government's going to

10   call Robert Richardson at this time.

11       **THE COURT:**  Sir, you're going to head right on up

12   here.

13       **COURTROOM ADMINISTRATOR:**  Watch your step right

14   there.  And then go round.  There's one more step or two.

15           Please raise your right hand.

16     *(The witness is sworn.)*

17       **THE WITNESS:**  Yes.

18       **COURTROOM ADMINISTRATOR:**  Please take a seat, and

19   then state and spell your first and last name.

20       **THE WITNESS:**  Robert Richardson.  R-o-b-e-r-t.  Last

21   name Richardson, R-i-c-h-a-r-d-s-o-n.

22                      **DIRECT EXAMINATION**

23   BY MR. ASKAR:

24   Q.   Good morning, Mr. Richardson.

25   **A.**   Good morning.

```
 1   Q.    Thank you again for making the time to be here today.

 2         Can you tell us, what do you do for a living, sir?

 3   A.    Right now currently I'm a CEO and owner of Community

 4   Ambulance.

 5   Q.    What's Community Ambulance?

 6   A.    It's an ambulance service -- private ambulance service

 7   here in Southern Nevada.

 8   Q.    How did you get into that line of work?

 9   A.    Well, fell into it.  I was up at college trying to figure

10   out what I want to do for life and became a paramedic.  Talked

11   my wife into moving to Vegas, said we'll only be here for a

12   couple years, and that was 1989.  I worked for Emergency

13   Ambulance for quite a few years, and then I went to the fire

14   department, a local fire department, Henderson Fire

15   Department, and worked there as a firefighter paramedic.  And

16   then with -- had some opportunities there, and then I was a

17   division chief.  And the ambulance provider that was here in

18   town wasn't providing service in Henderson as well as what we

19   thought should be, so we went ahead and started Community

20   Ambulance just to create a small, little company to, you know,

21   just do some of the inner facilities and stuff like that.  It

22   had a tendency to grow, and so I went and retired early.  And

23   now that's what we do for the last 15 years, been doing

24   Community Ambulance.

25   Q.    That's fantastic.
```

1    You know, let me start by saying, you know, thank you

2    for your service to the community.  Really appreciate that.  I

3    do want to ask you, do you -- as the owner of the Community

4    Ambulance, do you guys donate to any charities?

5    **A.**   Yes, we do.

6    **Q.**   What kind of charities do you generally support?

7    **A.**   We do different ones.  Like we do Pull For A Cure.  We do

8    different cancer stuff.  We do blood drives.  We do

9    different -- just anything that we feel for the community.  We

10   actually do some other stuff that we don't necessarily do as

11   donations of money.  But we do, you know, book drives for, you

12   know, low-income schools.  We'll buy uniforms for them.  We'll

13   have books for them.  We'll put them on the gurney and bring

14   them into the school so the kids can pick a book out, things

15   like that.

16   **Q.**   That's great.

17        Do you support any causes for law enforcement, for

18   example?

19   **A.**   I mean, we have multiple different things that just come

20   through that we support and we sponsor.

21   **Q.**   Yeah.  Let me ask you, are you familiar with the losses

22   of Officers Alyn Beck and Igor Soldo?

23   **A.**   Yes, I'm aware of that.

24   **Q.**   What's your awareness of that event?

25   **A.**   Just that they -- the officers were -- you know, they

1    died in the line of duty.  And -- and I think, if my

2    understanding was correct, is that they were having lunch and

3    somebody took their life and they were killed.

4    Q.    You were -- were you living here in this community at

5    that time?

6    **A.**    Yes, I was.

7    Q.    All right.  That event strike home for you for any

8    personal reasons?

9    **A.**    It's -- you know, I've got a brother who's in law

10   enforcement, and he's retired out of law enforcement as well.

11   And, again, being a retired firefighter, those are all kind

12   of -- if you will, we look at that as like a family, you know,

13   where we're all part of a brother and sisterhood in those kind

14   of lines of work.  And so, yeah, any time those things happen,

15   it's a loss to our -- our service.

16   Q.    Now, are you aware of a -- a statue that was being built

17   to Officer Alyn Beck?

18   **A.**    The memory on that is -- is limited, but it was just I

19   remember -- and I'll just cut to the point, is I remember

20   getting a phone call and saying, hey, there's a good cause

21   that's happening, there's some money being raised to erect a

22   statue for the fallen officer, Officer Beck.  And I said, by

23   all means this would be something that we would jump on board

24   with.  And I -- and I -- we did.  We did donate the $2,500.

25   I'll be honest.  After I did that, I forgot all about it until

1    I got a phone call from you folks.

2    Q.    Absolutely.

3          **MR. ASKAR:**  So, Heather, please, if you wouldn't mind

4    putting up Exhibit 56, which is in evidence?

5    **BY MR. ASKAR:**

6    Q.   A moment ago you mentioned that, you know, after

7    receiving a call asking you to support this cause, you wrote a

8    check for $2,500 to a charity.  Let's take this piece by

9    piece.

10          Community Ambulance, is that the company you were

11    telling us about before?

12   **A.**   Yes.

13   Q.   Okay.  And I see something on the signature line.  Is

14   that your signature?

15   **A.**   Yes, it is.

16   Q.   And date of this check is January 14th, 2020; right?

17   **A.**   That's correct.

18   Q.   Now, you mentioned you received a phone call.  Who was

19   that -- do you remember who that call was from?

20   **A.**   It would have been from Jay Brown.

21   Q.   And how do you know Jay Brown?

22   **A.**   Jay Brown, he works -- he's kind of like a -- if you

23   will, a lobbyist.  He helps us navigate through political

24   affairs with the local governments and stuff, and we're pretty

25   close with Jay.  And so he's the one that gave us a call and

*Robert Richardson - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   said this was a good cause that's coming out, and we jumped on

2   board.

3   Q.   Yeah.  And the cause he was telling you that this charity

4   was supporting was building a statue to the officer who was

5   killed in the line of duty; right?

6            **MR. SANFT:**  Objection, Your Honor.  Leading.

7            **THE WITNESS:**  That's correct.

8            **THE COURT:**  I'll allow that question, but let's work

9   on nonleading questions.  Thank you.

10           **MR. ASKAR:**  Yes, Your Honor.  So sorry.

11   **BY MR. ASKAR:**

12   Q.   The -- the cause that Jay Brown called you for was the

13   statue to a fallen officer; right?

14   **A.**   Yeah, that's when he called me and said that they're --

15           **MR. SANFT:**  Objection.  Leading, Your Honor.

16           **MR. ASKAR:**  Your Honor, it's just --

17           **THE COURT:**  It was -- yeah, he just reasked it since

18   it had gotten interrupted the first time.  So I'll let you ask

19   it one more time.

20           **MR. ASKAR:**  Thank you, Your Honor.

21           **THE COURT:**  And then move it the next nonleading

22   question.

23           **MR. ASKAR:**  Not a problem.

24   **BY MR. ASKAR:**

25   Q.   Sorry.  One more time.  The cause that Jay Brown called

*Robert Richardson - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    you for to support, to make this donation, was to build a

2    statue of Alyn Beck; right?

3    **A.**    That's correct.

4          **MR. SANFT:**  Objection, Your Honor.  Leading.

5    Your Honor, I think the question's already been asked.  The

6    jury understands.  I think we all understand.

7          **THE COURT:**  All right.  We're going to move on.

8          **MR. SANFT:**  Yes.

9          **MR. ASKAR:**  Okay.

10          **MR. SANFT:**  Thank you.

11          **MR. ASKAR:**  That's fine, Your Honor.

12    **BY MR. ASKAR:**

13    Q.    Now, do you know Michele Fiore?

14    **A.**    We've met a couple times.

15    Q.    To be clear, she didn't ask you personally about this

16    check; is that your understanding?

17    **A.**    Yeah.  It was through Jay Brown.

18    Q.    When you made this donation, was your understanding that

19    any of this money was going to be used for Michele Fiore's

20    personal expenses?

21    **A.**    My understanding was it was going to go to erect the

22    statue for Officer Beck.

23    Q.    Would you have made this $2,500 donation to this charity

24    if any of that money -- if you knew any of that money was

25    going to be used for Michele Fiore's personal expenses?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

Robert Richardson - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

1    **A.**   I would not have authorized that for personal use.

2    Q.   Mr. Richardson, if -- let's say the money was going to be

3    used for some other purpose.  Would you have wanted to be

4    consulted before the charity used your money for any other

5    purpose besides the one you donated for?

6    **A.**   I would have anticipated there had some been transparency

7    and said, hey, you know, the money is going to go -- is it

8    okay if it goes a different direction?  And -- which I would

9    have had probably no problem at all with that.

10   Q.   Yeah.  Were you contacted by Michele Fiore to say, hey,

11   your donation isn't needed anymore?

12   **A.**   No.

13   Q.   Were you contacted by anyone to say, hey, can we use your

14   money for something else?

15   **A.**   No.

16   Q.   And were you ever reimbursed for this 2,500-dollar

17   donation that you made to A Bright Present Foundation?

18   **A.**   No.

19   Q.   Thank you so much, Mr. Richardson.

20             **THE COURT:**  Cross, Mr. Sanft?

21         **MR. SANFT:**  Thank you, Your Honor.

22                      **CROSS-EXAMINATION**

23   **BY MR. SANFT:**

24   Q.   Mr. Richardson, just a couple quick questions.  The

25   question that was asked, you've donated to charities in the

Robert Richardson - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

1    past?

2    **A.**    Yes.

3    Q.    And you continue to do so even up to today?

4    **A.**    Yes.

5    Q.    With regards to charities, have you also donated to

6    political campaigns?

7    **A.**    Yes.

8    Q.    Okay.  And that's just over the years that you've been

9    here in the valley and doing business and so forth?

10    **A.**    Correct.

11    Q.    Have you ever had any charitable donation that was --

12    that you provided, was that ever -- at any point did any

13    charity call you back to say, hey, you know what, we -- we

14    don't need your money anymore for whatever the purpose was?

15    **A.**    No.

16    Q.    How about for politics?  Like, for instance, if -- if

17    you're donating to somebody and they're running for office,

18    right, say they decide they're going to run for a different

19    office, have you ever been called to say, hey, you know what,

20    we're actually doing something else, we're running for a

21    different office?

22        **MR. ASKAR:**    Objection, Your Honor.  I don't believe

23    that this is the proper witness to talk about political

24    donations with.  There had been other witnesses and will be

25    other witnesses who can speak to that.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Robert Richardson - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1      **MR. SANFT:**  It's his personal experience, Your Honor.

2      **THE COURT:**  So what's the objection, Mr. Askar?

3      **MR. ASKAR:**  Your Honor, at this time the objection is

4   to relevance.

5      **THE COURT:**  Mr. Sanft?

6      **MR. SANFT:**  Your Honor, it's with regards to

7   donations that are made to -- for one intention that is then

8   used for another intention.  It goes to our theory,

9   Your Honor.

10     **THE COURT:**  Okay.  I think it's within the scope, and

11  I will allow it but limited.

12     **MR. SANFT:**  Yes, Your Honor.

13     **MR. ASKAR:**  Thank you, Your Honor.

14  **BY MR. SANFT:**

15  Q.   I'm sorry, Mister --

16  **A.**   Could you repeat that question, please.

17  Q.   I barely remember the question myself.

18       Have you ever donated to a political campaign?  The

19  answer would be yes; right?

20  **A.**   Yes.

21  Q.   Okay.  And have you ever had a political campaign call

22  you back and say, look, we're no longer running for this

23  position, we're running for something else?

24  **A.**   No.

25     **MR. SANFT:**  I have no further questions, Your Honor.

Robert Richardson - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

```
 1   Thank you.
 2           THE COURT:  Anything else, Mr. Askar?
 3           MR. ASKAR:  Nothing further for this witness,
 4   Your Honor.  We ask that Mr. Richardson be excused.
 5           THE COURT:  Any objection?
 6           MR. SANFT:  No objection, Your Honor.  Thank you.
 7           THE COURT:  All right.  Mr. Richardson, you are
 8   excused.  Please watch your step.  Particularly that one right
 9   there.  Thank you, sir.
10           Next witness.
11           MR. GOTTFRIED:  Government calls Shauna Bakkedahl.
12           THE COURT:  Hi, there.  You're going to head right on
13   up here.
14           COURTROOM ADMINISTRATOR:  Watch your step.
15           THE WITNESS:  Thank you.
16           COURTROOM ADMINISTRATOR:  And there's two more steps.
17           THE WITNESS:  Thank you.
18           COURTROOM ADMINISTRATOR:  Please raise your right
19   hand.
20       (The witness is sworn.)
21           THE WITNESS:  I do.
22           COURTROOM ADMINISTRATOR:  Please take a seat.  And
23   then state and spell your first and last name.
24           THE WITNESS:  First name Shauna, S-h-a-u-n-a.  Last
25   name Bakkedahl, B-a-k-k-e-d-a-h-l.
```

1            **DIRECT EXAMINATION**

2    **BY MR. GOTTFRIED:**

3    Q.    Good morning, ma'am.

4    **A.**    Good morning.

5    Q.    Would you tell the jury where it is that you work.

6    **A.**    I currently work at the Secretary of State for Nevada.

7    My role is deputy secretary of state specifically for the

8    Commercial Recordings Division.

9    Q.    You said Secretary of State's Office in Nevada.  Is that

10   up in Carson City, or is that down here?

11   **A.**    We have offices in both locations.  So I oversee

12   commercial recordings for the north and the south.  My office

13   is currently in Carson City, Nevada.

14   Q.    And how long have you been working with the Nevada

15   Secretary of State?

16   **A.**    A year and five months.

17   Q.    Okay.  And you said that your position is you're the

18   deputy secretary for commercial recording?

19   **A.**    That is correct.

20   Q.    Can you talk about what the Commercial Recording Division

21   does?

22   **A.**    The Commercial Recordings Division houses all of the

23   licensing for the state of Nevada.  So business licensing,

24   LLCs, nonprofit organizations, business trusts.  We also do

25   trademarks within the Commercial Recordings Division.

1    Q.   So why is it that businesses need to register with your

2    office?

3    **A.**   Any time a business or thereof is conducting any sort of

4    business-like activities, they're to register with our office

5    so we know the activities that they're taking within Nevada

6    we're aware of.

7    Q.   Okay.  And, you know, does your office also administer

8    any regulations with respect to businesses in Nevada?

9    **A.**   We do, yes.

10   Q.   And is part of the purpose of having businesses register

11   to make sure that the regulations are followed?

12   **A.**   Correct.

13   Q.   Now, you mentioned there's different forms that, you

14   know, a business entity can take in Nevada.  Can you -- can

15   you talk about what some of those different forms are?

16   **A.**   Sure.  So there's a business license that one --

17   depending on their structure, there's a business license that

18   would be required, Articles of Incorporation or Organization,

19   initial list of managers.  There's also a registered agent

20   form that one would fill out, and typically in the packet

21   there's also instruction forms, things that we would need to

22   do as a part of our processing.

23   Q.   Okay.  Now, what is an LLC?

24   **A.**   Limited-liability corporation.

25   Q.   And what is the -- what are the features of an LLC that

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    make it distinct from a regular, you know, business?

2    **A.**    How it's structured.  So LLCs are structured differently

3    than, like, a limited-liability partnership.  It's how it's

4    managed and the structure and setup.

5    Q.    Okay.  So broadly speaking, what do I have to do if I

6    want to register an LLC in Nevada?

7    **A.**    You would fill out your Articles of Incorporation or

8    organization.  If it is a nonprofit, you would make that

9    designation.  If it's a regular LLC, it would also be

10   accompanied by a business license.  We would need to have your

11   initial list of managers, your registered agent who's

12   representing you.

13   Q.    Now, does the Nevada Secretary of State's Office keep

14   records of every LLC that registers in the state of Nevada?

15   **A.**    We do.

16   Q.    And how are those records housed or stored?

17   **A.**    We keep them electronically in our system.

18   Q.    Okay.  And, you know, how -- what types of records do you

19   keep about the LLCs?

20   **A.**    Anything that's submitted with their information packet.

21   So when they come to register with the Secretary of State, we

22   would keep all of the forms that they submitted with it.

23   Sometimes people will include their own Articles of

24   Organization that we keep with the records.

25   Q.    All right.  So, ma'am, I want to show you, you know,

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    incorporation records for a few different LLCs registered in

2    Nevada.  And you should have a couple of binders next to you

3    that have the Government's exhibits in this case.

4        Could you please flip to -- in your binder to

5    Government's Exhibit 36?  Let me know when you get there.

6    **A.**    I'm here.

7    Q.    All right.  So what is -- are you able to describe for

8    the jury what is Government's Exhibit 36 in front of you

9    there?

10   **A.**    So specifically it is a certified copy of the records we

11   had for Politically Off The Wall, LLC.

12   Q.    Okay.  And the first page of that exhibit, is that a -- a

13   certification from the Secretary of State's Office Commercial

14   Recordings Division basically, you know, certifying that these

15   are authentic records from the Secretary of State?

16   **A.**    Yes.

17       **MR. GOTTFRIED:**  Your Honor, I'd like to move into

18   evidence Government's Exhibit 36 and ask to publish to the

19   jury.

20       *(Exhibit No. 36, offered.)*

21       **MR. SANFT:**  No objection, Your Honor.

22       **THE COURT:**  36 will come in.

23       *(Exhibit No. 36, received.)*

24       **THE COURT:**  And you can publish.

25       **MR. GOTTFRIED:**  So, Heather, can you go to page 3?

1    **BY MR. GOTTFRIED:**

2    Q.   So I see at the top this says Articles of Organization,

3    Limited-liability Company.  Is this the sort of registration

4    paperwork that every LLC has to fill out with your office?

5    **A.**   Yes.

6    Q.   And the name of this particular LLC, is that Politically

7    Off The Wall, LLC?

8    **A.**   It is.

9    Q.   And, you know, I see there's a list here down on Item

10    Number 5, it says name and address of each manager or managing

11    member.  Does every LLC in Nevada have to -- have to have at

12    least one manager or managing member?

13    **A.**   Yes.

14    Q.   And why is that?

15    **A.**   So we know who the manager of the corporation is.  So

16    typically if there is any action that is being taken on the

17    company, we know who the manager is.

18    Q.   Now, are there any regulations about whether, you know,

19    the manager or managing members that are listed on these forms

20    must be accurate to who is actually managing the company?

21    **A.**   Yes.  They sign under penalty of perjury that the

22    information they have provided is correct.

23    Q.   Now, ma'am, who is the sole manager or managing member

24    that is listed for this LLC, Politically Off The Wall?

25    **A.**   Jannette Hill.

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   Q.   And, ma'am, do you have any personal knowledge of who

2   that is?

3   **A.**   I do not.

4   Q.   Okay.  And do you have any personal knowledge of this LLC

5   and what type of business they conduct?

6   **A.**   I do not, no.

7   Q.   All right.  Thank you, ma'am.

8        I want you to flip in your binder to just the next

9   exhibit, Government's Exhibit 37.  And what -- are you there?

10  **A.**   Yes, I am.

11  Q.   And if you could tell the jury, what is

12  Government's Exhibit 37?

13  **A.**   This is a certified copy of the documents filed in our

14  office for Truth in Politics the Magazine, LLC.

15  Q.   Okay.  And is this -- so this is also -- the first page

16  of that also certifies from your office that these are

17  authentic, you know, documents that were submitted to your

18  office to form this LLC?

19  **A.**   Yes.

20       **MR. GOTTFRIED:**  Your Honor, I'd like to move in

21  Government's Exhibit 37 and ask to publish to the jury.

22  *(Exhibit No. 37, offered.)*

23       **MR. SANFT:**  No objection, Your Honor.

24       **THE COURT:**  37 is in.  You can publish.

25  *(Exhibit No. 37, received.)*

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **BY MR. GOTTFRIED:**

2   Q.   Now, ma'am, so the name of the --

3        **MR. GOTTFRIED:**  If you could -- yeah.  Page 3,

4   Heather.

5   **BY MR. GOTTFRIED:**

6   Q.   If you could read for us, what is the name of this LLC?

7   **A.**   Truth in Politics the Magazine, LLC.

8   Q.   And looking down, this is a slightly different format

9   than the document we looked at before.  Do you know why that

10  would be?

11  **A.**   This is an initial list of managers.  So this is their

12  initial list of managers that they submitted with their

13  formation documentation.

14  Q.   I see.

15       **MR. GOTTFRIED:**  So, actually, if you go to the next

16  page, Heather, page 4.

17  **BY MR. GOTTFRIED:**

18  Q.   That's the Articles of Organization of Limited-liability

19  Company?

20  **A.**   Correct.

21  Q.   And that's the -- that also lists the name and address of

22  each manager or managing member; is that right?

23  **A.**   True, yes.

24  Q.   And here the sole manager or managing member that's

25  listed for this document is Michele Fiore; is that right?

Shauna Bakkedahl - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    **A.**    That is correct.

2    **Q.**    Now, do you have any personal knowledge of Truth in

3    Politics the Magazine, LLC, and what type of business they do?

4    **A.**    I do not.

5    **Q.**    Could you read for us -- do you see on this document the

6    date that this -- that this LLC was filed, that this paperwork

7    was filed?

8    **A.**    It was filed September 29th, 2015.

9    **Q.**    And there are a couple of other items at the bottom here

10   that I want to ask you about.  So the name, address, and

11   signature of organizer, is that somebody named Dianna Temple?

12   **A.**    Yes.

13   **Q.**    What does that mean, the organizer?

14   **A.**    The person who organized the documentation for

15   submission.

16   **Q.**    Okay.  And is that separate from who is actually managing

17   or controlling the LLC itself?

18   **A.**    Yes.

19   **Q.**    So -- and what about the registered agent?  So at the

20   bottom it says that the registered agent is Nevada Corporate

21   Headquarters, Incorporated.

22          What is the registered agent?

23   **A.**    The registered agent is someone who helps put together

24   documentation.  So they're certified to submit documentations

25   to the Secretary of State.  Each person who submits

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   documentation has a registered agent in Nevada.

2   Q.   Okay.  And do you have any familiarity with Nevada

3   Corporate Headquarters.  Do you know what that is?

4   **A.**   I do.

5   Q.   What is Nevada Corporate Headquarters?

6   **A.**   They are our -- one of our commercial registered agents

7   in Nevada.

8   Q.   And so what is a commercial registered agent?

9   **A.**   You have noncommercial and commercial.  Commercial

10  registered agents usually have multiple, anything over 15 --

11  or anything over 15.  Noncommercial are 15 and less.

12  Q.   Okay.

13          **MR. GOTTFRIED:**  So, Heather, if you could go back to

14  Government's Exhibit 36 and go to page 3.

15          So to remind the jury, this is the Articles of

16  Organization for the Politically Off The Wall, LLC.

17          Can we go back to those items at the bottom,

18  Numbers 6 and 7?

19  **BY MR. GOTTFRIED:**

20  Q.   Now, here it's the -- we see the name and signature --

21  address and signature, the organizer is also Dianna R. Temple?

22  **A.**   That's correct.

23  Q.   And the registered agent, that's also Nevada Corporate

24  Headquarters?

25  **A.**   Correct.

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Q.   Is it -- is it common to see the same organizers and

2    registered agents on multiple different, you know, LLCs or

3    other businesses?

4    **A.**   Yes.

5    Q.   And the date on the -- on the filings for the Politically

6    Off The Wall, LLC, what is that date?

7    **A.**   February 22nd, 2017.

8    Q.   Thank you.

9         Ms. Bakkedahl, if you could flip to the next exhibit

10   in your binder, which should be Government's Exhibit 38.  Let

11   me know when you're there.

12   **A.**   I'm here.

13   Q.   What is Government's Exhibit 38?

14   **A.**   This is a certified copy of records filed in our agency

15   for Hamlet Events, LLC.

16   Q.   Okay.  And have these records also been certified by your

17   office as true and exact copies of all requested documentation

18   filed with the Secretary of State's Office?

19   **A.**   Yes.

20        **MR. GOTTFRIED:**  Your Honor, I would like to move into

21   evidence Government's 38 and ask to publish to the jury.

22       *(Exhibit No. 38, offered.)*

23        **MR. SANFT:**  No objection, Your Honor.

24        **THE COURT:**  38 will come in.  You can publish.

25       *(Exhibit No. 38, received.)*

1          **MR. GOTTFRIED:**  And if you could go to page 2,

2     Heather?

3     **BY MR. GOTTFRIED:**

4     Q.   So -- and what is the name of this LLC that was

5     registered with your office?

6     **A.**   Hamlet Events, LLC.

7     Q.   And the date that these -- this paperwork was filed?

8     **A.**   October 16th, 2018.

9     Q.   Now, this -- looking at the name, address, and signature

10    of the organizer, is that the same as the other two LLCs?

11    It's also Dianna R. Temple?

12    **A.**   Yes.

13    Q.   And the registered agent, is that also Nevada Corporate

14    Headquarters?

15    **A.**   It is.

16    Q.   And looking at that name and address of each manager or

17    managing member, who is the sole manager or managing member

18    listed for Hamlet Events?

19    **A.**   Sheena Siegel.

20    Q.   And so do you have any personal knowledge of Hamlet

21    Events or what type of business they do?

22    **A.**   I do not.

23    Q.   Do you have any personal knowledge of Sheena Siegel?

24    **A.**   I don't.

25    Q.   So we talked about different forms that, you know,

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  corporations can take in Nevada.  Can you tell us what a

2  nonprofit corporation is under Nevada law?

3  **A.**   So a nonprofit organization is a charitable organization.

4  Sometimes they're tax exempt.  Sometimes they're not.  That

5  also registers with our office specifically to -- sometimes

6  they are soliciting charitable contributions and things of

7  that nature.  So we keep those files also in our office.

8  Q.   So those are also housed within your office, is the

9  paperwork for nonprofit corporations?

10  **A.**   That's correct.

11  Q.   How are -- how is a nonprofit different than an LLC or

12  another type of business?

13  **A.**   They're stating to us, the State, that they are

14  conducting business as a nonprofit organization within the

15  state of Nevada, and they're telling us that they have filed

16  proper documentation with the Federal Government to be

17  considered a charitable organization.

18  Q.   Okay.  You said filed documentation with the Federal

19  Government.  What type of documentation would they have to

20  file?

21  **A.**   They would -- a 501(c)(3).  They would have to get an

22  employer identification number.  So there's forms that they

23  fill out with the Federal Government that they are submitting

24  to us as a part of a charitable organization.

25  Q.   Sure.  What is -- and what is the purpose -- you

1  mentioned a term 501(c)(3) that some members of the jury may

2  be familiar with.  Can you just explain what a 501(c)(3) is?

3  **A.**  501(c)(3) is a nonprofit organization that can solicit

4  charitable organizations under a tax exempt status.

5  Q.  Okay.  So basically -- so you don't have -- if you're a

6  nonprofit, you don't have to pay taxes?

7  **A.**  Correct.

8  Q.  And are there requirements about what you have to do to

9  maintain that nonprofit status?

10  **A.**  You file with our office on a annual basis.  So in our

11  office we are -- we file the documentation to ensure the

12  documentation is current within our office.  But when it comes

13  to the enforcement side, we enforce the actual documentation.

14  If you're conducting business, we enforce that the

15  documentation or registrations happen.  As it relates to

16  federal, we don't do any enforcement activities as far as

17  that's concerned.

18  Q.  So your office is just enforcing the state registration

19  requirements, and you don't have anything to do with the

20  federal tax exempt status?

21  **A.**  Correct.

22  Q.  Now, are there regulations in Nevada about whether -- you

23  know, and this may be -- sound like it's definitional -- but

24  whether any director or member or officer at a nonprofit can

25  receive income or profit from that nonprofit?

Shauna Bakkedahl - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    **A.**    They can.  Reasonable.

2    Q.    They can receive a salary but can they receive --

3    **A.**    Oops.  Sorry.  Yes.

4    Q.    -- income or profit?

5    **A.**    No, they cannot.

6    Q.    Okay.  And is a nonprofit permitted to be established for

7    illegal purpose or with fraudulent content to conceal any

8    business activity?

9    **A.**    No.

10    Q.    Now, these regulations about the purpose for which a

11    nonprofit can be founded or whether, you know, people can take

12    profits from them, is your office enforce -- enforcing those

13    regulations?

14    **A.**    No, we don't enforce those.  Again, we enforce the

15    registration process and the paperwork, but we don't -- if

16    there is a complaint, we would file the complaint and then we

17    would partner with the regulatory authority for proper actions

18    to be taken by those authorities.

19    Q.    So your office is just making sure basically that the

20    paperwork is filed correctly, not whether there -- you know,

21    the charity is actually doing what it's supposed to be doing?

22    **A.**    That is correct.

23    Q.    Now, ma'am, I'd like to ask you to -- strike that.  One

24    more question.

25           Are there requirements about whether nonprofits have

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   to keep records related to their activities?

2   **A.**   Yes, they do have to keep records.

3   Q.   Okay.  What type of records do they have to keep?

4   **A.**   So the types of activities.  So one of the submissions to

5   our office is the types of activities they'll be conducting as

6   an LLC -- or a nonprofit.

7   Q.   What about financial records, are they required to keep

8   any financial records?

9   **A.**   Yes.  We also ask for, if it's their first year, a -- an

10  estimate -- a good-faith estimate as to what their

11  contributions -- the solicitation contributions might be.

12  That is also regulated by the IRS, specifically the 990 form.

13  Q.   Okay.  So, ma'am, I'd like to ask you to turn in your

14  binder to Government's Exhibit 32.  Can you tell the jury what

15  Government's Exhibit 32 is?

16  **A.**   This is a certified copy of documents registered in our

17  office for A Bright Present Foundation, Inc.

18  Q.   And like the other documents, is this -- this document is

19  accompanied by a certification from your office stating that

20  these are true and exact copies of the paperwork that was

21  filed with your office?

22  **A.**   Yes.

23       **MR. GOTTFRIED:**  Your Honor, at this time I'd like to

24  move Government's Exhibit 32 into evidence.

25       *(Exhibit No. 32, offered.)*

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **MR. SANFT:**  No objection, Your Honor.

2    **THE COURT:**  32 will come.  You can publish.

3    *(Exhibit No. 32, received.)*

4    **MR. GOTTFRIED:**  And if you could go to page 2,

5    Heather.

6    **BY MR. GOTTFRIED:**

7    Q.   So the name of this entity is A Bright Present

8    Foundation, Incorporated?

9    **A.**   Yes.

10   Q.   And this -- this paperwork is similar to what we saw with

11   the IRCs but it looks a little bit different.  Can you

12   explain, you know, what the differences are and what a person

13   would have to file for a nonprofit?

14   **A.**   So specifically, when you file your formation documents

15   the first year for your nonprofit, you do have to have three

16   managers listed.  So that's the first difference that you see.

17        It also talks about the jurisdiction.  So you are

18   telling us in what jurisdiction that you intend on performing

19   your activities.

20   Q.   Okay.  So just going down the paperwork here.  So the

21   second section is the registered agent.  So does the

22   registered agent have the same function that it would for a

23   for-profit LLC?

24   **A.**   It does.

25   Q.   And who is the registered agent for A Bright Present

1    Foundation?

2    **A.**    Nevada Corporate Headquarters, Inc.

3    Q.    And that's the same registered agent on those other three

4    LLCs that we looked at?

5    **A.**    Yes.

6    Q.    And looking at the names and addresses of the board of

7    directors, members, or trustees, you said that there have to

8    be three for a nonprofit?

9    **A.**    Upon the initial formation, yes.

10   Q.    And, you know, we can see that that's different from the

11   LLCs because each of those had only one manager or managing

12   member listed.  Why is the requirement that there be three for

13   a nonprofit?

14   **A.**    So we know who is acting in the interest of the nonprofit

15   organization.

16   Q.    And who are the names that are listed here on -- as

17   managers -- or as board of directors, member, or trustees for

18   A Bright Present Foundation?

19   **A.**    The first one is Michele Fiore, the second one is

20   Jannette Hill, and the third is Sheena Siegel.

21   Q.    And those three names, ma'am, those are the same names

22   that were listed as the managers for Politically Off The Wall,

23   Truth in Politics, and Hamlet Events?

24   **A.**    That is correct.

25   Q.    And what is the address that is listed for all three

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  members of the board of directors or trustees?

2  **A.**   6205 Red Pine Court, Las Vegas, Nevada 89130.

3  **Q.**   And what is the jurisdiction of incorporation that's

4  listed here?

5  **A.**   Nevada.

6        **MR. GOTTFRIED:**  And then, Heather, if you could go to

7  the next page, page 3.

8  **BY MR. GOTTFRIED:**

9  **Q.**   There is a -- on -- the purpose of the corporation is

10  listed as Number 7.  Are nonprofits required to list a purpose

11  for their -- why they exist?

12  **A.**   Yes.

13  **Q.**   What is the reason they have to list their purpose?

14  **A.**   So we -- so we know what kind of -- Number 1, what kind

15  of activities they are doing.  So if you are soliciting

16  charitable contributions, we are made aware of that because

17  there's other forms.  Even in existence where there -- they

18  may be exempt, they still tell us the purpose of their -- of

19  their vision for the corporation or the nonprofit.  But

20  there's forms to accompany each one of those.

21  **Q.**   And are there certain purposes that would not be

22  permitted to be established for a nonprofit?

23  **A.**   Yes.

24  **Q.**   Now, can you read what the purpose was supposed to be for

25  A Bright Present Foundation?

*Shauna Bakkedahl - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    The purpose of the corporation shall be to raise funds

2    for the Las Vegas community to provide goods and/or services

3    as needed.

4    Q.    Now, ma'am, going down to Item Number 3, could you

5    explain to us what that item requires?

6    **A.**    This is the name and title of the person -- so similar to

7    the previous -- that made the statement or the organization of

8    this specific nonprofit organization.

9    Q.    Okay.  And what is the name of the person who is listed

10    here for A Bright Present Foundation?

11    **A.**    Dianna Temple.

12    Q.    And that's the same name that was listed on those other

13    three documents for the LLCs as well?

14    **A.**    Yes.

15    Q.    Now, you said that a nonprofit may also include their own

16    Articles of Organization or Articles of Incorporation with

17    this -- this filed paperwork?

18    **A.**    Yes.

19    Q.    And is that included in the documents that you've

20    certified and been provided here today?

21    **A.**    Yes.

22            **MR. GOTTFRIED:**  Now, if we could look at the first

23    page of the Articles of Incorporation for A Bright Present

24    Foundation.

25    **BY MR. GOTTFRIED:**

1    Q.    Does that -- does that also list the registered agent,

2    Nevada Corporate Headquarters?

3    **A.**    Yes.

4    Q.    And the name and address of the incorporator, Dianna

5    Temple?

6    **A.**    Yes.

7    Q.    Skipping forward two pages to article 8, the board of

8    directors, who are the directors here that are listed for A

9    Bright Present Foundation?

10   **A.**    Michele Fiore, Jannette Hill, and Sheena Siegel.

11   Q.    Thank you, Mrs. Bakkedahl.  That's all the questions I

12   have for now.

13            **THE COURT:**  Thank you.

14            Cross, Mr. Sanft?

15   **MR. SANFT:**  Yes, Your Honor.

16            **THE COURT:**  And just a reminder, we'll probably take

17   our morning break around 10:15, so about 15 minutes from now.

18            **MR. SANFT:**  Yes, Your Honor.

19                          **CROSS-EXAMINATION**

20   **BY MR. SANFT:**

21   Q.    Hello.

22   **A.**    Hello.

23   Q.    Good morning.

24   **A.**    Good morning.

25   Q.    Just some follow-up questions for you.

Shauna Bakkedahl - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

1   **A.**   Sure.

2   Q.   Now, your -- your job is just to come here today to

3   basically tell us that those documents came from the Secretary

4   of State?

5   **A.**   Correct.

6   Q.   And also just give us some context as to the -- the

7   division that you work for in terms of what you do?

8   **A.**   Correct.

9   Q.   You're not enforcement?

10  **A.**   No.

11  Q.   Now, if someone has a problem with -- with one of these

12  entities, like either an LLC or a charity, do they complain to

13  your office?

14  **A.**   They do, and then we look into it to determine the

15  validity of the complaint.  Sometimes they're referred out,

16  again, to the proper regulatory agency.

17  Q.   So what determines if a complaint is valid or not valid?

18  **A.**   Sometimes people complain because there may have been a

19  falling out between two parties within the company.  So we're

20  just looking to establish the type of a complaint it was.  Is

21  it a regulatory-type complaint, or is it more a complaint that

22  two parties disagree about the management of their

23  corporation, et cetera?

24  Q.   I see.  And so if you find that there's a complaint that

25  is valid, who do you refer that to typically?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Shauna Bakkedahl - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**   Most times the Attorney General's Office.

2    Q.   Okay.  Now, in your review of the documents in

3    preparation for today's testimony, were you the one that

4    produced these documents to the Government?

5    **A.**   The certified copies, I was not.

6    Q.   Okay.  Are you the one that would be the most

7    knowledgeable as to any type of corporate entity that was

8    filed by Michele Fiore in this case that went through the

9    Secretary of State?

10   **A.**   Could you rephrase that for me, please?

11   Q.   I knew that was a little confusing.

12        Would you be the one that's more knowledgeable here

13   today as to any of the entities that were filed for Michele

14   Fiore in this case?

15   **A.**   I would be the most knowledgeable about the documents

16   that are contained in our office.  I wouldn't know all of the

17   information regarding Michele Fiore if that's what you're

18   asking.

19   Q.   Yeah, that would be a lot.

20        But let me ask you this question.  The complaint in

21   this case, did you ever receive any complaints with regards to

22   the documents that you've shown us here today?  So the

23   charitable organization or the LLCs and so forth.

24   **A.**   No.

25   Q.   Okay.  Now, in addition to that, the purpose that was

*Shauna Bakkedahl - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    outlined in I want to say that was document -- I believe that

2    was 32.  We had looked a little bit at the Articles of

3    Incorporation, and under the Articles of Incorporation there

4    was a purpose.  Let me see where it's at here.

5    **A.**   Number 7?

6    Q.   Yes.  Thank you.

7         No, that's the restrictions; right?  So this is

8    Exhibit 32, and this would be article 5.  Is that it?  Do you

9    see where I'm at?

10   **A.**   No.

11   Q.   All right.  So this would be -- Exhibit 32 you have in

12   front of you?

13   **A.**   Yep.

14   Q.   And I want to say it's one, two, three, four -- four

15   pages, the fourth page in.

16   **A.**   Page 2 of the articles that they submitted with their

17   documentation, is that what you're talking --

18   Q.   Yeah.

19   **A.**   Okay.

20   Q.   In that particular page there, that's part of the

21   Articles of Incorporation that's filed with your office?

22   **A.**   Yes.

23   Q.   Okay.  And that would be standard articles or whatever

24   that's filed with your office?

25   **A.**   Articles of organize -- yeah.

*Shauna Bakkedahl - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Q.    Yeah.  And in -- with regards to article 5, it's -- it

2    basically says that it's -- that the -- that the nonprofit

3    corporation is organized and will be operated exclusively for

4    general charitable purposes as set forth in IRS Code

5    501(c)(3)?

6    **A.**    Correct.

7    Q.    Okay.  And with regards to that -- and it would also

8    include -- and they say purposes on the next page of

9    article 5, it says making distributions to organizations that

10   qualify as exempt organizations under IRS Code 501(c)(3).  Do

11   you see that?

12   **A.**    Correct, yes.

13   Q.    Okay.  And fair to say that that is -- that's not

14   something that's unusual.  Sometimes that is the declared

15   purpose of a charitable organization?

16   **A.**    From a 501(c)(3) standpoint, I would not be able to

17   testify to that.

18   Q.    And the reason why you can't is because that's an IRS

19   code and that requires interpretation of federal law; is that

20   right?

21   **A.**    Correct, yes.

22   Q.    Okay.  But you're just here just to say these things were

23   actually just filed?

24   **A.**    Correct.

25   Q.    All right.  Now, in addition to that, your -- have you --

*Shauna Bakkedahl - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    have you ever had a charity that was -- that was organized for

2    one specific purpose and then get dissolved right after?

3    **A.**    I would have to refer to records.  I don't know of any

4    offhand.

5    Q.    Okay.  Meaning, if it was set up for one event only --

6    you know, a charity just is there for one event, and then once

7    the event is done, the charity dissolves?

8    **A.**    It's possible, yes.

9    Q.    Have you ever seen that yourself personally?

10   **A.**    I have not personally, no.

11   Q.    Okay.  And then, in addition to that, your -- your

12   testimony here today with regards to tax exempt status, once a

13   person decides that they want to do a charitable organization,

14   they can fill out the paperwork, but they have to get approval

15   from the IRS to have that tax exempt status?

16   **A.**    Correct.

17   Q.    And so when someone files with you, that application is

18   not complete until such time as they actually get the exempt

19   status from the IRS and show you proof?

20   **A.**    Correct.

21   Q.    Okay.  So they can't just file with you and have a tax

22   exempt status walking around when, in reality, they don't have

23   the proof from the IRS?

24   **A.**    Correct.

25   Q.    All right.  I have no further questions.  Thank you,

1    ma'am.

2    **A.**    Thank you.

3            **MR. GOTTFRIED:**  Your Honor, no redirect for this

4    witness.  We would ask that Ms. Bakkedahl be excused.

5            **THE COURT:**  Thank you.

6            **MR. SANFT:**  Yes, Your Honor.

7            **THE COURT:**  All right.  You can be excused.  You can

8    step down.  Please watch your step.

9            **THE WITNESS:**  Thank you.

10           **THE COURT:**  And particularly that step right there in

11   front of the jury box.

12           **THE WITNESS:**  Thank you.

13           **THE COURT:**  Thank you.

14           This is probably a good time for us to just go ahead

15   and take our morning break.

16           Please remember while you're on this break, don't

17   talk about the case among yourselves or with anybody else.

18   Don't read or view or listen to anything about the case.

19   Please don't conduct your own research, and wait to formulate

20   your final opinions until you've heard all of the evidence and

21   my instructions of law.

22           We'll see you -- it's 10:06.  We'll see you about

23   10:16.

24           **MR. ASKAR:**  Your Honor, we --

25           **THE COURT:**  Oh.

1    **MR. ASKAR:**  -- we are flying through to the extent

2    that a longer break would be appreciated by the jury or by the

3    Court, you know, we'd be more than amenable to that and still

4    be able to finish early today.

5        **THE COURT:**  Okay.  Well, we'll just -- we'll do about

6    10, 15 minutes, and that might mean you-all get to go home a

7    little early today.  So thank you.

8    *(Jury out at 10:06 a.m.)*

9        **THE COURT:**  All right.  Let's talk about that

10   schedule for just a minute.  Who's next?

11       **MR. GOTTFRIED:**  Next is Tami Montes, and she's here

12   at the courthouse.  She will be relatively quick, and then our

13   next witness is not at the courthouse, which is part of why --

14   and has been told to come to the courthouse.

15       **THE COURT:**  Okay.

16       **MR. GOTTFRIED:**  So that's part of why we are asking

17   for a little bit of a longer break just to get the logistics

18   together.  It's hard to anticipate sometimes how fast things

19   will move.

20       **THE COURT:**  I know.  And then, after that witness who

21   has been told to come to the courthouse, do we have other

22   people lined up for the day or is that it?

23       **MR. GOTTFRIED:**  Yes, we do.  We have two others lined

24   up.

25       **THE COURT:**  Two others.  Okay.

1    **MR. ASKAR:**  We are reaching out to them because they

2  were also anticipating getting here around 1:00 o'clock or

3  after the afternoon lunch break.  So we're reaching out to

4  them to try and get them here earlier to see if we can, you

5  know, keep moving right along, Your Honor, but we'll keep the

6  Court updated.

7    **THE COURT:**  Okay.  All right.  Well, we'll come back

8  in about 10 minutes and hear from Tami Montes, and hopefully

9  this other person can get here.  But we'll see you in about

10  ten minutes.

11    **MR. GOTTFRIED:**  Thank you, Your Honor.

12    **MR. SANFT:**  Thank you, Your Honor.

13    *(Recess at 10:08 a.m., until 10:24 a.m.)*

14    **THE COURT:**  Let's go ahead and bring the jury back

15  in.

16    *(Pause in proceedings.)*

17    **COURTROOM ADMINISTRATOR:**  All rise.

18    *(Jury in at 10:26 a.m.)*

19    **THE COURT:**  Welcome back, everyone.

20    Will the parties stipulate to the presence of the

21  jury?

22    **MR. ASKAR:**  Yes, Your Honor.

23    **MR. SANFT:**  Yes, Your Honor.

24    **THE COURT:**  All right.  Everyone, you can sit down.

25    Government's next witness.

1          **MR. GOTTFRIED:**  Government calls Tami Montes.

2          **THE COURT:**  Hi, there.  You're going to head right on

3    up here.

4          **COURTROOM ADMINISTRATOR:**  Watch your step.  Please

5    raise your right hand.

6       *(The witness is sworn.)*

7          **THE WITNESS:**  Yes, I do.

8          **COURTROOM ADMINISTRATOR:**  Go ahead and take a seat.

9          **THE WITNESS:**  Thank you.

10         **COURTROOM ADMINISTRATOR:**  And then state and spell

11   your first and last name.

12         **THE WITNESS:**  Tami Montes; T-a-m-i, M-o-n-t-e-s, as

13   in Sam.

14                          **DIRECT EXAMINATION**

15   BY MR. GOTTFRIED:

16   Q.   Good morning, ma'am.

17   A.   Good morning.

18   Q.   Could you tell the jury where it is that you work.

19   A.   I work for The Siegel Group Nevada, Inc.

20   Q.   And what is The Siegel Group?

21   A.   The Siegel Group? is a commercial real estate development

22   company, and we own Siegel Suites, Siegel Selects, Pinkbox

23   Doughnuts, Bagelmania restaurants.  So we are a wide variety

24   of commercial entities and apartment complexes and

25   restaurants.

1    Q.   So a variety of different --

2    **A.**   Correct.

3    Q.   -- industries?

4        *(Reporter instruction.)*

5            **MR. GOTTFRIED:**  Sorry, ma'am.

6    **BY MR. GOTTFRIED:**

7    Q.   Who owns The Siegel Group?

8    **A.**   Stephen Siegel.

9    Q.   And how long have you been working there?

10   **A.**   Thirteen years.

11   Q.   What is your position with The Siegel Group?

12   **A.**   I'm the director of accounts payable.

13   Q.   What is accounts payable?

14   **A.**   We pay invoices, bills, anything that comes in for any of

15   the entities.  We're all individual LLC companies under the

16   umbrella of The Siegel Group.  So we pay every bill that comes

17   in for any company or entity within that umbrella.

18   Q.   Okay.  And what does the director of accounts payable do?

19   What are your job responsibilities?

20   **A.**   I do everything from talking to vendors, vendor

21   relationships, cut checks, coordinate the checks to go to

22   Mr. Siegel for direct signature.  I have a team of AP

23   clerks -- accounts payable clerks, purchase order clerks,

24   so -- and I also establish all our new entities as far as

25   utilities within the company.  So I started off from the

1    ground up with Mr. Siegel for the last 13 years, and we

2    developed into a huge apartment -- we have over 60 entities

3    now at least within our Siegel Suites and Selects.

4    Q.    Now, in addition to making business payments to vendors,

5    does The Siegel Group also make charitable donations?

6    **A.**    Yes, sir.

7    Q.    And are you familiar with something called Siegel Cares?

8    **A.**    Yes, sir.

9    Q.    Can you explain to the jury what Siegel Cares is?

10    **A.**    Siegel Cares is a entity within our organization where we

11    do donations, charitable contributions, political

12    contributions to help the different communities where --

13    different regions we are in.  We also in -- we allocate those

14    across our different properties and entities, and we have a

15    budget -- an annual budget.  But we have vendor relation

16    people that go out and work with the veterans, work with the

17    school districts, work with the police department, work with

18    all the different entities within, and then that's -- their

19    job is to -- their job is the relationship.  They submit

20    different types of requests to us in accounts payable to do

21    charitable contributions or political contributions to such

22    entities.  My job as the director of accounts payable, we

23    process them once they come in.

24    Q.    And who is it that make those requests?  Who is deciding

25    where the money from Siegel Cares is going to go to?

1   **A.**   They have a team of employees.  They -- but ultimately,

2   the ultimate decision-maker is the -- Mr. Siegel if he wants

3   to process the request or not, and he ultimately signs those

4   checks as well.

5   Q.   Okay.  And do you keep records of charitable

6   contributions that are made?

7   **A.**   Yes, sir.

8   Q.   What type of records?

9   **A.**   We have an accounting-based software system.  So we have

10  an electronic-based system.  At the time, back in 2019, it was

11  called Sage MAS 500.  We -- so it's still live.  It's still --

12  we have all our records stored in there with what comments we

13  put in any for request, any payment to any vendor whatsoever.

14  Q.   And so does someone manually input information into that

15  account, or is it automatically generated?

16  **A.**   No, it's all manual.

17  Q.   And when --

18  **A.**   We don't have anything coming across electronically.

19  Q.   My apologies.

20  **A.**   It's okay.

21  Q.   When would that occur?  How soon after the charitable

22  donation was made?

23  **A.**   Once the approved we call them check requests come into

24  our accounts payable department, sometimes they come via

25  e-mail -- we also have an accounting window basket where

1    they'll drop hard copies off.  It's processed right away, and

2    then it goes over for signature.  So within the 24-hour period

3    or the same day it's going to be processed.

4    Q.    Okay.  And are those records maintained indefinitely or

5    are they purged after --

6    **A.**    Yes.

7    Q.    -- a certain time?

8          Yes, they're maintained indefinitely?

9    **A.**    Indefinitely, yes, sir.

10   Q.    Now, ma'am, were you or was your company contacted by the

11   Government to provide information related to a charitable

12   contribution made by The Siegel Group in December of 2019?

13   **A.**    Yes, we were.

14         **MR. GOTTFRIED:**  Heather, can you bring up what's

15   already in evidence as Government's Exhibit 48?

16   **BY MR. GOTTFRIED:**

17   Q.    And let me know if you can see that on your screen.

18   **A.**    Yes.

19   Q.    All right.  So do you recognize this -- this check that's

20   appeared on your screen?

21   **A.**    Yes, I do.

22   Q.    And in the top left corner it says The Siegel Group

23   Nevada, Inc.  Is that the -- that's the company you work for?

24   **A.**    Yes, sir.

25   Q.    And do you see where it says to the order of?  What --

1    what organization is this check made out to?

2    **A.**    A Bright Present Foundation.

3    Q.    And, ma'am, what is the date of that check?

4    **A.**    December 30th, 2019.

5    Q.    And do you recognize the signature that's on the bottom

6    right corner?

7    **A.**    Yes, sir.  That's Mr. Siegel's signature.

8    Q.    Mr. Siegel, the owner of your company?

9    **A.**    Yes.

10    Q.    And would he have then had to authorize this check?

11    **A.**    Correct.

12    Q.    Now, you said -- did you have records associated with

13    this donation that indicate what the purpose of the

14    contribution was?

15    **A.**    Yes.  We have the electronic database system, which is

16    our MAS 500 accounting software, where you can then pull up

17    that transaction and see the details of what we manually typed

18    into the computer at that time to cut the check.

19    Q.    And did you provide the Government with a printout of

20    those -- you know, that internal accounting system that shows

21    the purpose of that contribution?

22    **A.**    Yes, sir.

23    Q.    I'd like for you to flip in your -- I think it's in your

24    binder.  This isn't already in evidence.  Binder 2, there's

25    Exhibit 49.  You should have a -- sorry.  You should have a

*Tami Montes - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    stack of binders up there -- over there.

2   **A.**   This one?

3   Q.   I think it's the second one.

4   **A.**   Okay.  Gotcha.

5   Q.   It's Exhibit 49 --

6   **A.**   My apologies.

7   Q.   -- if you can flip to it.

8   **A.**   Forty-nine.  Forty-two or 49 you said?

9   Q.   Forty-nine.

10  **A.**   Thank you.

11          Yes, this is the documents I provided.

12  Q.   These are the documents that you provided?

13  **A.**   Yes.

14  Q.   And these were created close in time to, you know, when

15  that donation was made?

16  **A.**   Yes.

17  Q.   And this is something that you regularly do in the course

18  of your business?

19  **A.**   Yes.

20          **MR. GOTTFRIED:**  Your Honor, I'd like to move these

21  accounting records into evidence as Government's Exhibit 49.

22      *(Exhibit No. 49, offered.)*

23          **MR. SANFT:**  No objection, Your Honor.

24          **THE COURT:**  49 will come in.

25      *(Exhibit No. 49, received.)*

1          **MR. GOTTFRIED:**  And ask to publish to the jury?

2          **THE COURT:**  You may.

3     BY MR. GOTTFRIED:

4     Q.    So the first page here, what does this show?

5     **A.**    This shows our accounting database.  Top right-hand

6     corner says The Siegel Group Nevada, Inc.  It's going to tell

7     you the check number underneath the bank account.  And it was

8     a check request that we made.  We just used that term because

9     it -- we have to have a unique invoice system for -- so it

10    won't duplicate in our accounting software.  So we usually use

11    the date of the request, and it's telling us that it's going

12    out for $2,500 from our TSG Clearing, which means -- a

13    clearing account is what we're being allocated across our

14    entities.

15    Q.    And this first page, ma'am, this is basically the

16    information that we could see on the face of the check?

17    **A.**    This first page will not be on the check, no, sir.  This

18    is the accounting software system.

19    Q.    But the type of dates -- the type of information --

20    **A.**    Oh --

21         *(Reporter instruction.)*

22    BY MR. GOTTFRIED:

23    Q.    -- such as the --

24    **A.**    Yes.

25    Q.    -- date, the amount --

1    **A.**    Yes, sir.

2    Q.    Okay.

3        **MR. GOTTFRIED:**    Can we go to the second page,

4    Heather, and can you blow up the portion where it says

5    "Comment"?

6    **BY MR. GOTTFRIED:**

7    Q.    So, ma'am, is there a comment included for every payment

8    that your -- you know, that your -- The Siegel Group issues?

9    **A.**    Correct.  Yes, there is.

10    Q.    And who inputs that comment?

11    **A.**    It's manually inputted by myself or our AP team as we

12    process the -- any check payment.  So, example, if you're

13    going to pay NV Energy, you're going to put the date of the

14    use of the services and put, dash, power.  This case, our

15    request said it was an Officer Beck statue.

16    Q.    Okay.  Do you know where that information came from when

17    you input it?

18    **A.**    It came from the person providing us the check request,

19    which is our Siegel Cares team.

20    Q.    Okay.  So the Siegel Cares team said that this donation

21    is for the Officer Beck statue?

22    **A.**    Yes, sir.

23    Q.    And, ma'am, if we could go -- I think pages 3 through the

24    rest of them, most of it is redacted here in the version you

25    provided, but what is this chart that you provided us with?

1   **A.**   This is the Siegel Cares annual budget, so as a

2   redaction.  At the very end of year, on 12/30, this is where

3   they allocated the Albright Family -- or the Albright -- A

4   Bright Present Foundation memorial fund for fallen -- for a

5   cop killed in the line of duty.  This is where they allocated

6   it within their budget for the annual year for $2,500.  This

7   is the notes that they have to provide to us in regards to

8   their request.

9   Q.   Okay.  So this -- this is basically the -- this is the

10  annual budget that you're provided with.  The only part that

11  we can see is what was for that check that we're discussing.

12  But does it -- so could you read what it says next to A Bright

13  Present Foundation?

14  **A.**   Memorial statue for cop killed in the line of duty.  It's

15  repeated again, memorial statue for a cop killed in line of

16  duty.  I would assume one is a description.  I don't recall

17  what the second column is for, but it's obviously a duplicate.

18  And the amount is $2,500 dated 12/30/2019.

19  Q.   All right.  Thank you, ma'am.

20          **MR. GOTTFRIED:**  You can -- you can take that down,

21  Heather.

22  **BY MR. GOTTFRIED:**

23  Q.   So was it -- based on these records, would it be your

24  understanding that, you know, Siegel Cares provided this

25  donation for a memorial of an officer killed in the line of

1    duty?

2    **A.**    Yes, sir.

3    Q.    And do your accounting records show whether The Siegel

4    Group ever received any money back from A Bright Present

5    Foundation?

6    **A.**    No, sir.

7    Q.    Thank you, Ms. Montes.  I have no further questions.

8    **A.**    Thank you.

9         **THE COURT:**  Cross-examination, Mr. Sanft?

10         **MR. SANFT:**  Yes, Your Honor.

11                    **CROSS-EXAMINATION**

12    **BY MR. SANFT:**

13    Q.    Good morning.

14    **A.**    Good morning.

15    Q.    Just a couple of follow-up questions for you.

16    **A.**    Sure.

17    Q.    Now, you're here obviously to testify as to The Siegel

18    Group's accounts receivable, but you're not -- you have no

19    knowledge as to why this check was generated within the

20    company?

21    **A.**    Accounts payable --

22    Q.    Yeah.

23    **A.**    -- just to give you a clarification.

24    Q.    I'm sorry.  Accounts payable.

25    **A.**    That's okay.

Tami Montes - Cross
2:24-cr-00155-JAD-DJA - September 26, 2024

1    Q.    Sorry.

2    A.    Repeat your -- the end question.  I apologize.

3    Q.    You don't have any personal knowledge as to why this

4    check was generated and issued from The Siegel Group?

5    A.    No, I was not the requestor.  I was just -- I'm just --

6    we just perform the duties at task, cutting the checks as they

7    are requested.

8    Q.    Sure.  The document that you have in front of you, which

9    is the -- Exhibit 49.

10   A.    Um-hum.

11   Q.    Is that a "yes"?

12   A.    Yes, sir.  Sorry.

13   Q.    That's all right.  With regards to Exhibit 49, the

14   portion that shows the screenshot of the software?

15   A.    Yes.

16   Q.    We have the Officer Beck statue that's listed in the

17   comments.  Do you know who inputted that information into your

18   system?

19   A.    In December 30th of 2019, it was either myself or my AP

20   clerks.  Unfortunately, this is my screenshot at the bottom

21   where you can see "TM."  This is where all of our AP clerks

22   have access to the database.  This is me providing this when

23   they requested the information.

24   Q.    Okay.

25   A.    But, honestly, almost five years ago, I can't tell you if

*Tami Montes - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    I cut it or one of my AP clerks cut it on that particular day.

2    I have a team of AP clerks.

3    Q.   For sure.  And is it your recollection or experience

4    working with The Siegel Group that it would have been

5    Mr. Siegel himself that would have signed donation checks out

6    of your company?

7    **A.**   Yes, sir.

8    Q.   Okay.  Now, with regards to this particular situation

9    here, you had mentioned earlier that you had not received any

10   type of phone call or indication that the money was no longer

11   needed from The Siegel Group?

12   **A.**   Correct.

13   Q.   Okay.  Have you ever received a refund back for any

14   donation that The Siegel Group has ever given?

15   **A.**   A refund back that we've ever given?

16   Q.   Yes.

17   **A.**   Not to my knowledge.  I am AP, not accounts receivable,

18   AR.  But not to my knowledge.

19   Q.   Okay.  So you're talking about you're accounts

20   receivable, but you're not the other -- what's the other one?

21   **A.**   I'm payables.  So we pay bills.  Receivable is a person

22   getting money in.  They deposit it within, you know, checking

23   accounts.

24   Q.   Okay.

25   **A.**   But if we were going to get money back, they would have

*Tami Montes - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    to come to me and ask how we originally coded it --

2    Q.    I see.

3    **A.**    -- so I could provide them clarification on coding.

4    Example, if you get a refund back from NV Energy for a

5    deposit, they need to come to me and say, what was this for?

6    What year?  Can you pull your records?  And that's where I

7    would give them a GL coding to provide it back, and I have no

8    recollection of ever receiving any funds back.

9    Q.    You've received a refund from NV Energy?

10   **A.**    Well, I was just using that as a --

11   Q.    I know.

12   **A.**    -- good example, but honestly probably never.

13   Q.    You're right.  But specifically with regards to

14   donations, though, you would still have some indication or

15   information of that sort of thing happening where a refund is

16   from a charitable donation?

17   **A.**    Correct.

18   Q.    Okay.  And based upon your years of working there, you

19   don't recall ever having to do something like that?

20   **A.**    Correct.

21   Q.    Okay.

22           **MR. SANFT:**  No further questions.

23           **THE WITNESS:**  Thank you.

24           **MR. GOTTFRIED:**  Nothing further for this witness.

25   We'd ask that Ms. Montes be excused.

2:24-cr-00155-JAD-DJA • September 26, 2024

1        **MR. SANFT:**  No objection, Your Honor.

2        **THE COURT:**  Thank you, Ms. Montes.  You are excused,

3  and you can step down.  Please watch your step, and

4  particularly that step right there.

5        **THE WITNESS:**  Thank you.

6        **THE COURT:**  Thank you.

7        Mr. Gottfried, do we have someone lined up?

8        **MR. GOTTFRIED:**  My understanding is we need a brief

9  recess, that he is very close --

10       **THE COURT:**  Okay.

11       **MR. GOTTFRIED:**  -- to the courthouse but he is not

12  presently here.

13       **THE COURT:**  All right.  We are waiting for our next

14  witness show up.  So we are going to let you relax in the jury

15  room while we do that.  So same rules apply.  Don't talk about

16  the case.  Don't read, view, or hear anything about the case.

17  Don't conduct any investigation.  Don't Google anything, and

18  wait to formulate your final opinions until you've heard

19  everything.

20       We'll let you take a break, and we'll call you back

21  as soon as our next witness is ready to go.

22    *(Jury out at 10:42 a.m.)*

23       **THE COURT:**  All right.  We'll just be in recess.

24  Please let Summer know as soon as our next witness is here.

25       **MR. GOTTFRIED:**  Yes, Your Honor.

1          **THE COURT:**  And we'll go ahead.

2      *(Recess at 10:42 a.m., until 10:52 a.m.)*

3          **THE COURT:**  All right.  We're -- go ahead, bring the

4   jury in.

5          **COURTROOM ADMINISTRATOR:**  All right.  All rise.

6      *(Jury in at 10:52 a.m.)*

7          **THE COURT:**  You can have a seat.

8          Will the parties stipulate to the presence of the

9   jury?

10         **MR. ASKAR:**  Yes, Your Honor.

11         **MR. SANFT:**  Yes, Your Honor.

12         **THE COURT:**  All right.  Have a seat.

13         Government, please call your next witness.

14         **MR. GOTTFRIED:**  Government calls Mark Wlaschin.

15         **THE COURT:**  Hi, there.  You're going to head right on

16  up here.

17         **COURTROOM ADMINISTRATOR:**  Watch your step there.

18         **THE WITNESS:**  Thank you.

19         **COURTROOM ADMINISTRATOR:**  Please raise your right

20  hand.

21      *(The witness is sworn.)*

22         **THE WITNESS:**  I do.

23         **COURTROOM ADMINISTRATOR:**  Thank you.  Go ahead and

24  take a seat, and then state and spell your first and last

25  name.

1          **THE WITNESS:**  Certainly.  My name is Mark Wlaschin.

2   My first name is spelled M-a-r-k.  My last name is spelled

3   W-l-a-s-c-h-i-n.

4                   **DIRECT EXAMINATION**

5   BY MR. GOTTFRIED:

6   Q.   Good morning, Mr. Wlaschin.

7   **A.**   Good morning.

8   Q.   Could you tell the jury where it is that you work.

9   **A.**   I work in the office of the Secretary of State.

10  Q.   And is there a particular division within the office of

11  Secretary of State that you work in?

12  **A.**   Yes, there is.  I oversee the Elections Division.

13  Q.   And how long have you overseen the Elections Division?

14  **A.**   I've been the deputy secretary for elections for just

15  about four years.

16  Q.   And prior to that, did you work in the Elections

17  Division?

18  **A.**   No.  Prior to that I was a deputy overseeing a different

19  division about a year, the Operations Division, also in the

20  Secretary of State.

21  Q.   Okay.  And prior to working at the Nevada Secretary of

22  State's Office, what did you do?

23  **A.**   Prior to that, my career was with the United States

24  Marine Corp.  I spent a little bit over 20 years, both on the

25  enlisted and officer side, before retiring.

1    Q.    Can you talk a little bit about what the Elections

2    Division does within the Secretary of State's Office?

3    **A.**    Certainly.  So Secretary Aguilar has a statutory

4    responsibility as the chief officer of elections for the state

5    of Nevada to oversee the execution and administration -- I'm

6    sorry, execution and enforcement of state and federal laws

7    relating to elections.

8            The division I oversee, the Elections Division,

9    supports the Secretary's role by liaising with the 17 county

10   election officials, working closely with the 18 city election

11   officials to ensure compliance, answer questions, facilitate

12   training, voter education and outreach is an increasingly

13   important role that we play also.

14   Q.    And did -- I didn't hear if you said this or not, but do

15   your responsibilities include enforcing campaign finance

16   regulations?

17   **A.**    Yes, they do.  Yes.

18   Q.    And what -- what are the rules very broadly speaking

19   about, you know, how a candidate in -- for office in Nevada

20   can solicit and receive money for their campaigns?

21   **A.**    Very broadly?  Well, I do want to state that, you know,

22   campaign finance laws in Nevada, especially the state-specific

23   ones -- different from the federal requirements -- are pretty

24   detailed and nuanced.  But generally speaking, a candidate can

25   solicit funds to support their campaign.  They have to report

1    the -- both the funds they receive as well as what they expend

2    over certain thresholds in the sake of transparency, very

3    broadly.

4    Q.   Okay.  Are there rules about -- as far as receiving

5    money, are there rules about whether a candidate must

6    segregate contributions that they've received from their

7    personal funds and assets?

8    **A.**   Yes, there are.

9    Q.   And what are those rules?

10   **A.**   Again, generally speaking, the intent is that campaign

11   donations not intermix with personal funds, specifically to

12   facilitate transparency, the idea being that, if you have a

13   personal account and your campaign funds get mixed in, it is

14   harder for a member of the public to see and understand.

15   Q.   And is there a requirement that a candidate must

16   establish a dedicated account with a bank or another financial

17   institution in the name of that candidate's campaign?

18   **A.**   Yes.

19   Q.   And why does that requirement exist?

20   **A.**   Again, it goes back to ultimately the transparency and

21   really auditing purposes, both to support the candidate as

22   well as to increase transparency for the members of the

23   public.  If there are questions, again, it allows forensic

24   accounting analysis, those sorts of things.

25   Q.   So -- and is that -- broadly speaking, is that the

1  purpose of these campaign finance rules is to facilitate

2  transparency so that the voters can understand what -- you

3  know, who candidates are receiving money from?

4  **A.**   Absolutely.  And I'd add what those candidates are

5  spending their money on, too.  It's the contributions and

6  expenses.

7  Q.   So let's talk about the expenditure side.  Are there

8  rules about what a candidate for office in Nevada can spend

9  money on for their campaign?

10  **A.**   Absolutely.

11  Q.   What -- is a candidate for office in Nevada permitted to

12  spend money -- what are they permitted to spend money on?

13  **A.**   Really it goes back to things that are related to the

14  campaign.  Office supplies for the campaign.  For permanent

15  staff, for special events.  There's actually a specific list

16  in statute about what types of events and types of things a

17  candidate can spend money on.  They -- let's see here.

18  Special events, permanent staff, office supplies, travel,

19  transportation, those sorts of things.

20  Q.   Okay.  So there's a specific list in the Nevada campaign

21  finance regulations about what types of things are campaign

22  related?

23  **A.**   Correct.

24  Q.   Is a candidate for office in Nevada permitted to spend

25  money for personal use or for their family?

1    **A.**    Personal use, no.  And there's actually a statute that

2    specifically calls that out as well.  This is all in NRS 294A.

3    But it specifically says that the personal use of campaign

4    funds or funds for personal use are prohibited.

5    **Q.**    And when you say NRS, are you referring to the Nevada

6    Revised Statutes?

7    **A.**    I am.

8    **Q.**    Now, can a candidate for office use campaign funds to pay

9    themselves a salary?  You know, they're running a campaign

10   organization.  Can they pay themselves a salary?

11   **A.**    No.

12   **Q.**    Are there circumstances where a candidate may make

13   payments to themselves or to a family member?

14   **A.**    There are.  Again, there's a lot of nuance to it, but

15   yes.

16   **Q.**    But do those payments have to be documented in the same

17   way as other payments that they would make to outside

18   entities?

19   **A.**    Absolutely.

20   **Q.**    Now, are there requirements, sir, for whether a candidate

21   needs to publicly report their contributions and their

22   expenses?

23   **A.**    You'll be pleased to hear there's extensive requirements

24   about the when, the where, the how those reports are filed,

25   yes.

1  Q.   And so if you could summarize what those rules are about

2  how candidates need to report their contributions and

3  expenses.

4  **A.**   Certainly.  I'll tell you this is of the utmost

5  importance that, from the first day of candidate filing, every

6  candidate receives documentation and is talked to about this

7  process and the requirements.  But, in general, there are --

8  during an election year where a candidate is on the ballot and

9  they have filed for candidacy, there are four reports --

10 Contribution & Expense Reports that they have to file

11 quarterly.  Those reports are filed -- they can be done in

12 paper, but it can also be done electronically and most are on

13 the Office of the Secretary of State's websites.

14        Those reports instantly become publicly available,

15 and they lay out the amounts of contributions, the amounts of

16 expenses, and the categories that those funds were expended in

17 as well.

18 Q.   Okay.  And I think you said at the beginning -- did the

19 candidate receive information -- when you file for office in

20 Nevada, if you're returning for, you know, governor, would you

21 receive information about what those rules are and what you're

22 required to report?

23 **A.**   Yes, absolutely.

24 Q.   What type of information do you receive?

25 **A.**   There -- it's a couple pages.  I think three at my last

1   review.  One -- really, two pages that talk about the

2   Contribution & Expense Reports that detail the schedule.

3   There's a separate page that talks about financial disclosure

4   statements and who they're applicable to and the requirements.

5   There's also -- in fact, now that I think about it, a whole

6   separate three or four pages that explain each of the fields

7   on the Contribution & Expense Reports as well.  And that's

8   something that we know is so important that we, again, provide

9   it in writing.  Oftentimes people come to file for office.

10  They're excited about the office.  They're thinking ahead.  So

11  we really try to drive home the importance of these forms, and

12  also, again, provide them for future reference.

13  Q.   Now, these forms that are filed, do they have -- is there

14  a shorthand name that they're often known by in your field?

15  **A.**   The C&E Reports, Contribution & Expense.  But, yes, C&E

16  Reports.

17  Q.   And the C&E Reports, are those available publicly for any

18  member of the public to see?

19  **A.**   Yes.

20  Q.   Where are those available?

21  **A.**   They're available on the Secretary's website under the

22  Aurora website.  It's an application for campaign finance.

23  Q.   Now, are there -- I know you said they have to be filed

24  quarterly for campaigns?

25  **A.**   (Nods head up and down.)

1   Q.   Has that timing requirement -- has that changed at all

2   over the years?

3   **A.**   You know, I believe -- again, prior to my start with the

4   Office of the Secretary of State in 2019, I believe there were

5   some changes in previous legislative sessions.  I can't speak

6   to the specifics, though.

7   Q.   But since 2019, they've been required to be filed

8   quarterly?

9   **A.**   Correct.  With also -- and I should mention there's an

10  annual report as well that's due.  The idea being that, during

11  an election year, you have four reports with an additional

12  report that covers the previous calendar year and any funds

13  that were received or expended that kind of fall into a

14  certain category.

15  Q.   Understood.  Are there any exceptions to the requirement

16  that candidates submit C&E Reports?

17  **A.**   Exceptions for a C&E Report?  Extremely nuanced, but if

18  somebody, for example, loses the primary, there's a way they

19  can file the rest of the calendar year and kind of closeout

20  their campaign.  But in general -- and, really, to the best of

21  my knowledge right now -- no one has the ability to opt out or

22  say I'm just -- I'm not going to do that one.

23  Q.   And can a candidate have someone else prepare the C&E

24  Reports on their behalf, or do they have to do it themselves?

25  **A.**   Oh, absolutely.  In fact, you know, across -- between the

1    700 to 1,400 candidates, you know, frankly most do it

2    themselves.  In counties across the state with some statewide

3    individuals that have campaign managers maybe do it or others.

4    Even for larger offices with larger amounts of money may have

5    a CPA do it.  That's acceptable.

6    Q.   But if a candidate decides to have someone else prepare

7    those reports for them, are they required to certify -- review

8    those filings and certify in some way that those reports are

9    accurate?

10   **A.**   Absolutely.  The candidate ultimately is responsible for

11   the accuracy of the reports.

12   Q.   And are there regulations administered by your office

13   with regard to whether those reports are required to be

14   accurate?

15   **A.**   Yes.

16   Q.   Now, we're going to look at some specific examples of C&E

17   Reports a little bit later, but I want to shift gears for a

18   moment and talk to you about a term that the members of the

19   jury may have heard throughout trial.

20        What is a political action committee under Nevada

21   law?

22   **A.**   Oh.  A political action committee.  So there's a specific

23   definition, again, also in the Nevada Revised Statutes 294A,

24   that talks about a political action committee.  And it defines

25   it something along the lines of as a group of individuals --

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    not an individual themselves but a group, business, or

2    otherwise, that receives funding or expends it and either has

3    that as their sole purpose or -- and just to clear, if it's

4    their sole purpose and they receive over $1,500, they are a

5    PAC.  Or, otherwise, if it's not their sole purpose, their

6    primary role as a business or otherwise, if they receive over

7    $5,000 or expend it, that also qualifies them as being a

8    political action committee.

9            But ultimately, again, it's a group that gathers

10   money, expends money to influence a political -- or an

11   election -- primary, general, or special election -- or

12   advocates for or against a ballot question.

13   Q.    And what, sir -- if anything, what distinguishes it from

14   a campaign committee?

15   **A.**    A campaign committee, again, really -- the way it's

16   viewed is that a campaign is I guess more closely related to a

17   candidate.  A candidate will set up a campaign and, you know,

18   move forward to advocate for that candidate winning

19   themselves.  Political action committee is viewed as being

20   essentially separate from that candidate themselves.

21   Q.    Okay.  Does a political action committee have to register

22   with the Nevada Secretary of State's office?

23   **A.**    Yes, they do.

24   Q.    Does it have to have designated officers?

25   **A.**    It does, yes.

1    Q.    Is there a reason for that?

2    **A.**    The intent is to understand who makes the decisions, who

3    oversees and is involved in the leadership of that

4    organization.

5    Q.    Now, do political action committees have fundraising

6    reporting requirements that are similar to what a campaign

7    would have?

8    **A.**    They do, yes.

9    Q.    And does that include the requirement to segregate funds

10   from personal funds and to maintain a separate bank account?

11   **A.**    So because it's an organization, it's expected that it's

12   going to have a separate set of funds as is and not be

13   intermeshed with an individual's account.  So yes.

14   Q.    Now, what are -- if there are any, what are the

15   differences in the reporting requirements between a campaign

16   and a PAC?

17   **A.**    Certainly.  So there's, again, a little bit of nuance;

18   right?  Candidates, during the time they're filing for office,

19   have to report certain things.  You know, to become a

20   candidate doesn't even mean necessarily that you have to file

21   for office.  If you receive over $100 and you're planning on

22   it, then that kind of essentially makes you legally a

23   candidate.

24          But with the political action committees, there's

25   forms that need to be filled out.  There's different

1    thresholds for the amount of money that you receive.

2    Candidates, for example, have to report every contribution

3    over $100.  If you donate to a campaign -- or to a candidate,

4    rather, for $50, for example, they don't have to report that

5    individual line item but in the aggregate, rather, instead.

6         With political action committees, the threshold's

7    higher; it's over a thousand.  A contribution over a thousand

8    dollars requires these sorts of reports.  And there's also an

9    activity and inactivity kind of clause and set of rules about

10   when a PAC is active they have certain reporting requirements

11   and when they're not.

12   Q.   Okay.  And can you explain what you mean by that?  How is

13   a PAC distinguished as active or inactive?

14   **A.**   Certainly.  So one of the requirements for a political

15   action committee is they have to identify their purpose.  And

16   there are some PACs that have been around for years and years,

17   and during that active period of time is when they are

18   essentially gathering funds and expending funds.  They're

19   doing the thing that they're organized and intending to do.

20   And then sometimes you may see them become active during an

21   election year and then off cycle in an odd-numbered year.

22   They may -- you know, we're going back to doing other things

23   so we're going to be inactive.  And there may not even

24   necessarily be a need.  If it's a PAC focused on a ballot

25   question, for example, and that ballot question came up and it

1    was addressed, they may want to go inactive in case it comes

2    back at a future election cycle.

3    Q.    Understood.

4          And is the timing requirements for how often the --

5    these reports must be filed, is that the same?  Is that

6    quarterly as well?

7    **A.**    It is, yes.

8    Q.    And as far as expenditures, are there rules about what a

9    political action committee is permitted to spend donor money

10   on?

11   **A.**    There are some, in general, rules, yes.  Different,

12   though, from a candidate.

13   Q.    Different from the campaign rules?

14   **A.**    (Nods head up and down.)

15   Q.    Does Nevada law require that political action committees

16   expend contributions only for the declared political purpose

17   of the PAC?

18   **A.**    Yes, but there's a little bit more wiggle room in that as

19   well.

20   Q.    Explain.

21   **A.**    Certainly.  The purpose of a PAC can be changed and

22   amended with ease whenever.  And so as that -- you know, even

23   if the purpose is to support candidates of a political party,

24   right, that definition by itself, that purpose, is very

25   broad -- in some cases, by design -- to allow that PAC the

1  ability to expend resources and receive contributions in a

2  number of different ways.

3  Q.   What about this, sir.  What does Nevada law say about

4  whether a PAC, a political action committee, can spend

5  contributions for the personal use and benefit of that PAC's

6  members and officers?

7  **A.**   Again, personal use is not accepted.

8  Q.   It's prohibited by Nevada law?

9  **A.**   Correct.

10  Q.   Now, how, if at all, does the Secretary of State's

11  Office -- in particular, the Elections Division -- enforce

12  these rules about, you know, reporting what you can raise

13  money for, what you can spend money on?  What are your

14  enforcement mechanisms?

15  **A.**   Certainly.  So it's -- it's growing and developing.  I

16  will say, too, this is something that the current

17  administration -- transparency and integrity of the process

18  collectively being an important focus for Secretary of State

19  Francisco Aguilar.

20        So what does the Office do now?  We recently -- and

21  this is as of the last legislative session just back in 2023.

22  We now have two dedicated full-time compliance audit

23  investigators that are part of the Elections Division.  These

24  two individuals receive complaints of elections integrity

25  violations or we refer to them as Election Integrity Violation

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Reports.  EIVRs just for speed.

2            When an EIVR comes into the Agency, it goes to our

3    two compliance investigators first.  They review the entirety

4    of the allegations.  They'll reach out to individuals related

5    to it, collaborate closely and do research with the county

6    election officials, if needed.  And the same thing applies for

7    campaign finance.  They do investigate all manner of

8    allegations.  But for a campaign finance report, they look

9    closely at it.  We also have a weekly meeting on Thursdays in

10   the afternoon with members of the Office of the Attorney

11   General to discuss legal implications and some of the

12   requirements, the nuance to everything before taking further

13   steps and continuing down one of a couple paths.

14           In some cases, an investigation will reveal there

15   wasn't a crime; that the individual responds and says, you

16   know, here's -- here's the details about what I purchased or

17   expended the money on or received the money on.  In some

18   cases, it will say -- or that the individual might respond to

19   or the PAC and say, oh, we realize that wasn't an error -- or

20   was an error and then they amend it, their report, and then

21   fix it.  Or in some cases, it may be referred to criminal

22   investigation.

23   Q.   Understood.  So I think you said, Mr. Wlaschin, that some

24   of these measures that you've just described were more

25   recently adopted?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

1   **A.**   That's correct.  It was something that the previous

2   administration was interested in pursuing.  We simply didn't

3   have the staffing for it.  And at that time, generally we

4   would learn about allegations from the public, and it was

5   essentially a more slow, in-house process to address

6   violations and do that research.

7   **Q.**   And when you refer to the previous administration, you're

8   referring to Secretary of State Barbara Cegavske?

9   **A.**   Correct.

10  **Q.**   And did you work for that administration as well as the

11  current administration?

12  **A.**   I did.  Secretary Cegavske hired me in October of '19,

13  and it was in October of 2020 that she asked and appointed me

14  to the deputy for elections position.

15  **Q.**   So when you first arrived in 2019 and 2020, were the

16  processes for and the mechanisms for enforcing these -- these

17  rules, was it different?

18  **A.**   So the statutory requirements were the same, but our

19  resources to review and dedicate time to investigating, those

20  were different for sure.

21  **Q.**   At the time that you started, was the Secretary of

22  State's Office conducting any independent audits of C&E

23  Reports to see if they were accurate?

24  **A.**   Secretary Cegavske expressed that she wanted to, but we

25  simply had lacked the resources and she understood that.  So,

1    in essence, no; not independent, uniform audits across the

2    collective universe of candidates.

3    Q.   And speaking specifically about that time, would your

4    office -- did your office have the ability or did they review

5    a candidate or a PAC's bank accounts to cross-reference them

6    with the C&E Reports?

7    **A.**   So the short answer is no because we lack the subpoena

8    authority.  So outside of if a candidate did send bank

9    records, they would -- we would review what was offered but

10   had no independent ability to go to the banks themselves.

11   Q.   And so do you then -- do you receive citizen complaints

12   then if there's an alleged discrepancy in what was actually

13   spent and what's been reported?

14   **A.**   Yes.  The complaints we receive come from citizens.  In

15   some cases -- rarely -- but from the press occasionally.

16   Routinely from other candidates.

17   Q.   And when those complaints arise, do you investigate them?

18   **A.**   Every single investigation occurs, absolutely.  Every

19   single allegation across the board, from the -- even things

20   that we view as -- yes.  Yes, we do.  Very -- and I apologize.

21   It's hard not to get passionate about it because we are so

22   determined to ensure the integrity of our process from start

23   to finish.

24   Q.   No, I understand, sir.

25       Now, you mentioned, though, some limitations in your

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  ability to investigate.  You said that you lack subpoena

2  power?

3  **A.**  Correct.

4  Q.  Do you then often work with or refer matters to other law

5  enforcement agencies when you receive complaints?

6  **A.**  Yes.

7  Q.  Now, are you aware -- moving -- moving now to a specific

8  political action committee registered in the state of Nevada,

9  are you aware of a PAC formerly registered in Nevada called

10  Future for Nevadans?

11  **A.**  Yes.

12  Q.  And I want to --

13      **MR. GOTTFRIED:**  Is 31 in evidence?

14  **BY MR. GOTTFRIED:**

15  Q.  If you can -- sir, you have a couple of binders by your

16  side over there.  If you could flip in your binder to

17  Exhibit 31.  Let me know when you've found it.

18  **A.**  I have it here.

19  Q.  Now, can you tell the jury what is Exhibit 31 that you

20  have in front of you?

21  **A.**  This is the notice of inactivity for the political action

22  committee called Future for Nevadans.

23  Q.  So that's the front page, sir, but is there, in fact, a

24  stack of documents that encompass Exhibit 31?

25  **A.**  Yes, there are.

1    Q.    And are those documents that the Nevada Secretary of

2    State's Office provided to the Government in response to a

3    request for documents --

4    **A.**    Yes.

5    Q.    -- related to Future for Nevadans?

6           So does this, in fact -- does this exhibit, in fact,

7    include a number of documents related to Future for Nevadans?

8    **A.**    It does, yes.

9    Q.    And are these documents true and correct copies of what

10   was filed with the Secretary of State's office?

11   **A.**    Yes.

12          **MR. GOTTFRIED:**  Your Honor, I would like to move into

13   evidence Government's Exhibit 31 and ask to publish to the

14   jury.

15       *(Exhibit No. 31, offered.)*

16          **MR. SANFT:**  No objection, Your Honor.

17          **THE COURT:**  31 will come in.

18       *(Exhibit No. 31, received.)*

19          **MR. GOTTFRIED:**  All right.  And, Heather, if you

20   could put up page 10 on the screen?

21   **BY MR. GOTTFRIED:**

22   Q.    The documents, sir, are in reverse chronological order,

23   so we're going to be starting from the back of the documents.

24          So, sir, do you see what's on the screen in front of

25   you?

1    **A.**    I do.

2    Q.    Is this a form that is regularly filed with your office

3    to newly register a political action committee?

4    **A.**    An older version of the form, but yes.  Yes, it is.

5    Q.    So you say it's an older version of the form.  Can you

6    tell what year this form is from?

7    **A.**    This is from 2017.

8    Q.    So this form I guess would have been filed actually

9    before you began working for the Elections Division?

10    **A.**    Correct.

11    Q.    Now, just going through.  So we see this is a new

12    registration.  There's a few other boxes.  What are the

13    different types of boxes that you can check as part of this

14    form?

15    **A.**    The different types of boxes, again, ultimately indicate,

16    you know, if it is a new registration, if it's a certain type

17    of registration, an annual.  Essentially validation that the

18    political action committee exists.  If it's a -- an amended

19    one -- if you change officers, for example, you have to submit

20    an amended registration and then indicating maybe what those

21    changes are; change of officers, registered agent, or

22    otherwise.

23    Q.    So it's the same form then whether you're -- whether you

24    have a newly registered PAC or whether you're revising your

25    registration.  It's just that you check a different box; is

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   that -- is that basically right?

2   **A.**   Correct, yes.

3   Q.   So looking at the name of the committee, the name of the

4   committee, is that Future for Nevadans?

5   **A.**   Yes.

6   Q.   And what's the mailing address that's listed on this

7   form?

8   **A.**   The mailing address is 6205 Red Pine Court in Las Vegas.

9   Q.   And is there an e-mail address that's listed as a contact

10  for the PAC?

11  **A.**   Yes, there is.

12  Q.   And if you could read what that e-mail address is?

13  **A.**   Michelefiore@me.com.

14  Q.   Now, sir, is it required that there be an e-mail address

15  as a contact for registering a PAC?

16  **A.**   Not a statutory requirement as I recall, but it's an

17  important point of contact and method for us to reach out to

18  and contact the political action committee.

19  Q.   Now, we talked about that a PAC has to have a stated

20  purpose; right?

21  **A.**   Correct.

22  Q.   And that purpose can affect what they're permitted to

23  raise funds for; is that correct?

24  **A.**   Yes.

25  Q.   Is there a stated purpose on this form?

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    Yes, there is.

2    Q.    And what is that purpose?

3    **A.**    Raising funds to educate Nevadans.

4    Q.    Okay.  And is there a requirement -- we talked a little

5    bit about this in the context of -- with a colleague of yours

6    in the context of commercial entities, but is there a

7    requirement that a PAC have a registered agent?

8    **A.**    There is, yes.

9    Q.    What is the function of a registered agent?

10    **A.**    Again, really a point of contact so that, if there are

11    questions relating to the political action committee or if

12    there are changes, there are statutes, there are laws that

13    kind of provide for who's allowed to make changes, to make an

14    amended report, and the registered agent's an important part

15    of that.

16    Q.    Okay.  And here, who is the registered agent who is

17    listed for Future for Nevadans?

18    **A.**    The name listed for the registered agent is Michele

19    Fiore.

20    Q.    And is that that same address above, 6205 Red Pine Court?

21    **A.**    Yes.

22    Q.    And below that, is that the signature of the registered

23    agent?

24    **A.**    I believe so, yes.

25    Q.    And the date of February 24th, 2017?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 128*

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    Yes.

2    Q.    On this form, this new registration form, are there any

3    other officers or affiliations listed?

4          **MR. GOTTFRIED:**  And I think we can go to the next

5    page, Heather.

6          **THE WITNESS:**  No.  No, there are no other officers

7    listed on the second page of the form.

8    **BY MR. GOTTFRIED:**

9    Q.    Now, looking down at the bottom, it says that the form

10   was submitted by someone.  Who does it say that it was

11   submitted by?

12   **A.**    It was submitted by Jannette Hill.

13   Q.    And so is it permitted that the form can be submitted by

14   someone other than the registered agent or the point of

15   contact for the PAC?

16   **A.**    Yes.  As I recall, though, it may have been different

17   back in 2017 to 2019 when this was done.

18   Q.    All right.

19         **MR. GOTTFRIED:**  Now, let's -- Heather, if we could go

20   to page 8 of the same document.

21   **BY MR. GOTTFRIED:**

22   Q.    So you mentioned, sir, when we talking about the

23   purposes, that a purpose can be easily -- can be easily

24   changed?

25   **A.**    That's correct, yes.

 1    Q.    And there's other -- are there other changes that you can

 2    make to a political action committee?

 3    **A.**    Certainly.  The address, points of contact, the officers,

 4    sometimes the treasurer will change or other officers on that

 5    political action committee change.

 6    Q.    And is that done by filing an amended registration form?

 7    **A.**    It is, yes.

 8    Q.    So here, sir, what are we looking at with this document?

 9    **A.**    This is a newer version of the form.  This is an amended

10    registration changing the registered agent for the political

11    action committee Future for Nevadans.

12    Q.    Now, sir, I see that the registered agent here is, in

13    fact, changed.  Who is the person -- prior to this, it was

14    Michele Fiore.  Who is the new registered agent for -- on this

15    amended registration?

16    **A.**    The new registered agent is Jannette Hill.

17    Q.    And what is the date on this form?

18    **A.**    The date is April 5th of 2019.

19    Q.    Now, there's some other information on the form that

20    remains the same.  Is the mailing address -- is the mailing

21    address still the same?

22    **A.**    Yes.

23    Q.    And what about the e-mail address?

24    **A.**    E-mail address remains the same as well.

25    Q.    And the purpose is -- is the purpose still the same?

1    **A.**    Raising funds to educate Nevadans.  Yes.  Yes, that's the

2    same.

3    Q.    Okay.

4          **MR. GOTTFRIED:**  Now, if we could go, Heather, to

5    page 6, which is another amended registration form filed in

6    February 2020.

7    **BY MR. GOTTFRIED:**

8    Q.    Sir, do you see the document that's on the screen in

9    front of you now?

10   **A.**    Yes.

11   Q.    And is this another amended registration form?

12   **A.**    Yes, it is.

13   Q.    And are there changes that you can see on this form to

14   the previous registration for this PAC?

15   **A.**    Changes on the form, again, it looks like it's indicating

16   it's changing the registered agent.  So yes.  And the name of

17   the registered agent has changed, but the address and the

18   e-mail remains the same.

19   Q.    And so in the -- and what is the name of the registered

20   agent who it has been changed to?

21   **A.**    The name of the registered agent is Michele Fiore.

22   Q.    So I guess is it fair to say, February 2017 to when the

23   amended form is filed in 2019, Michele Fiore is the registered

24   agent.  Then Jannette Hill becomes the registered agent, and

25   then when this form is filed, it reverted back to Michele

1    Fiore?

2    **A.**    Yes.

3    Q.    And what is the date on this form?

4    **A.**    February 28th of 2020.

5            **MR. GOTTFRIED:**  Now, Heather, if you could zoom in on

6    the purpose that's listed on this form?

7    **BY MR. GOTTFRIED:**

8    Q.    So, sir, the only box that was checked up there was

9    change registered agent, but was the purpose also changed in

10   this amended registration?

11   **A.**    It was, yes.  The purpose is now community outreach.

12   Q.    So in February of 2020, the purpose was changed from

13   raising funds to educate Nevadans to community outreach?

14   **A.**    That's correct.

15           **MR. GOTTFRIED:**  If you could go to page 4, Heather.

16   **BY MR. GOTTFRIED:**

17   Q.    What type of form is this that we're looking at?

18   **A.**    This is an annual registration for a political action

19   committee for Future for Nevadans.

20   Q.    And as far as you can tell, sir, looking at this

21   document, are there any changes to the purpose of the

22   organization or to the registered agent in this form?

23   **A.**    Registered agent remains the same.  The purpose remains

24   community outreach.  Address is the same.

25   Q.    And this is filed on what date?

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    This was filed, I see in the bottom right, February 26th

2    of 2021.

3    Q.    So are political action committees then required to file

4    annual registration forms regardless of whether there are

5    amendments to the structure or membership of the PAC?

6    **A.**    Yes.

7    Q.    Okay.

8           **MR. GOTTFRIED:**  And then, Heather, if you could go to

9    the next document, page 2.

10    **BY MR. GOTTFRIED:**

11    Q.    Is this another amended registration form?  This is an

12    annual registration form?

13    **A.**    This is an annual registration, and it is arguably

14    amended as the purpose has changed, the e-mail address has

15    changed, and the registered agent has changed.

16    Q.    So let's go through those.  So this is an annual

17    registration form, but there appear to be some changes.

18    What -- are the -- is the address still listed -- the physical

19    mailing address still the same?

20    **A.**    The address is the same, yes.

21    Q.    But what about the e-mail address?

22    **A.**    The e-mail has changed to tcdatwyler@gmail.com.

23    Q.    So the physical address remains the same, but the e-mail

24    is different?

25    **A.**    Correct.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Q.    Is the registered agent the same?

2    **A.**    No.  The registered agent is now Thomas Datwyler.

3    Q.    And that appears to be an individual with a similar name

4    to the new e-mail address that's now listed?

5    **A.**    Correct.

6    Q.    And what about the purpose of the political action

7    committee, is that the same or has that changed?

8    **A.**    The purpose has changed to support conservative

9    candidates for office.

10   Q.    And what was the date that this latest annual

11   registration was filed?

12   **A.**    February 25th of 2023.

13          **MR. GOTTFRIED:**  And then finally, Heather, if you

14   could go to the first page of the document --

15   **BY MR. GOTTFRIED:**

16   Q.    Which is what you looked at when we first showed you.

17   What is this form that we're looking at?

18   **A.**    And this -- this is the notice of inactivity of the

19   form -- or from the political action committee Future for

20   Nevadans submitted by the registered agent, Thomas Datwyler,

21   on April 30th of 2024.

22   Q.    Okay.  And so does this mean -- what does this mean

23   legally?

24   **A.**    So the -- a notice of inactivity indicates that this

25   political action committee will be stopping all activities

1    within the state.

2    Q.   And to your knowledge, has Future for Nevadans, since

3    this was filed, ever become reactive?

4    **A.**   Not that I'm aware, no.

5    Q.   Okay.  So, sir, I want to talk to you about whether

6    Future for Nevadans ever filed Contributions & Expense Reports

7    with the Secretary of State's Office.  Did they?

8    **A.**   I believe they did.

9    Q.   And if you could look at in your binders Exhibit 61A?

10         **THE COURT:**  It's going to be in this one right here.

11         **THE WITNESS:**  Yes, ma'am.  Thank you, Your Honor.

12   **BY MR. GOTTFRIED:**

13   Q.   Let me know when you get to it.  I know it's a lot of

14   pages to flip through.

15   **A.**   I have it.  Thank you.

16   Q.   Okay.  So, sir, did your office provide us -- provide the

17   Government with certified copies of the Contributions &

18   Expense Reports that were filed by Future for Nevadans with

19   the Secretary of State's Office?

20   **A.**   Yes.

21   Q.   And if you could just flip through the exhibits in

22   pages 61A, are -- you know, are these Contributions & Expense

23   Reports filed within a particular time period?

24   **A.**   They appear to -- yes, they are.

25   Q.   Well, what period do they cover?

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  A.    They cover a period from -- January 15th of 2019 is when

2  the report was due, but that period covers November 2nd of

3  2018 through March 31st, 2020, it appears.

4  Q.    And so are these all the reports that were filed with

5  your office in the period between the end -- the last filing

6  period of 2018 through -- through the end of 2019 -- or,

7  sorry, the first quarter of 2020?

8  A.    Yes.

9  Q.    And does -- do these also include any amended reports

10  that were filed during that period?

11  A.    Yes.

12  Q.    And based on your knowledge and your prior review of

13  these documents, are these true and correct --

14  A.    Yes.

15  Q.    -- copies of the reports that were filed with your

16  office?

17  A.    That were filed, yes.

18        MR. GOTTFRIED:  Your Honor, I would move at this time

19  Government's Exhibit 61A into evidence.

20     (Exhibit No. 61A, offered.)

21        MR. SANFT:  No objection, Your Honor.

22        THE COURT:  61A will come in.

23     (Exhibit No. 61A, received.)

24  BY MR. GOTTFRIED:

25  Q.    Now, sir, we're not going to go through all of these

 1   because then we'd be here for the next week, but I just want

 2   to look at the -- at least the first one and help the jury to

 3   interpret what it is that they're seeing and just go through

 4   what a Contribution & Expense Report looks like.

 5          So can you -- first of all, Mr. Wlaschin, can you

 6   just walk us through this first page and -- which summarizes

 7   the information contained in the later report and explain, you

 8   know, what the information is that's provided here.

 9   **A.**    Certainly.  So C&E Reports, again, are really set up --

10   when you think about who the intended audience is, it really

11   is a member of the public -- to understand, you know, that

12   candidate's -- where the candidate's receiving funds from and

13   expending them.

14          This cover sheet essentially has the name in this

15   case for the political action committee -- which, of course,

16   is the same intent; has the organizational information across

17   the top, along with the contact information, phone number,

18   e-mail.  Then it identifies the type of organization.  If it's

19   a -- again, an amended report, if it's a PAC, if it's a PAC

20   advocating -- like a question on the ballot.  Then it talks

21   about the reporting period, when the report's due, first of

22   all, which is important because, you know, for a report that's

23   due on October 16th, for example, you know, by being

24   consistent, the public knows that they can go on the website

25   October 17th and see these reports if filed timely.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1        Directly below that it explains the period covered,

2   the months that the period relates to.  So you can see -- and,

3   again, this has a number of different reports due during an

4   election cycle.  So it indicates which report it is.

5        Moving down through, there's a summary of where the

6   contributions, as well as the expenses, before an affirmation.

7   Ultimately it gets signed and it affirms that everything is

8   true and correct.

9   Q.   And the name at the bottom under the signature, what name

10  is that?

11  **A.**   The name at the bottom of this form is Michele Fiore.

12  Q.   So this is a -- and is this a form that would have been

13  signed by Michele Fiore for Future for Nevadans during the

14  period of November 2nd, 2018, through December 31st, 2018?

15  **A.**   Correct.

16  Q.   And just looking at the contribution summary, Item

17  Number 5 says that the total has both the total amount of

18  contributions in this period as well as the cumulative from --

19  is that -- from period one.  Is that the beginning of the

20  year?

21  **A.**   The -- yes.

22  Q.   So am I correct in saying then, sir, that what's being

23  reported here is that this PAC has raised $33,200 within that

24  two-month period and then a cumulative total of $251,200

25  during the year of 2018?

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  **A.**    Correct.

2  Q.    And then looking at the summary of expenses, what are

3  these different categories?  I see it says monetary and in

4  kind.  Can you just explain the difference between those two

5  different types of expenses?

6  **A.**    Certainly.  So a monetary expense paid is as simple as --

7  an example is a bill.  You purchase food for a special event.

8  That is a monetary expense.

9          Total of in kind expenses, that may be a circus troop

10  of jugglers who are coming to that same special event, albeit

11  for free.  So their services of juggling at your special event

12  is an in kind contribution or expense.

13  Q.    So I guess it would be a service provided in this case by

14  the political action committee --

15  **A.**    Correct.

16  Q.    -- that's valued at some amount of money but which is

17  provided for free?

18  **A.**    Correct.

19  Q.    And --

20  **A.**    And when it comes to political action committees -- and

21  probably a better example is consulting services.

22  Q.    Sure.  Probably not too many political action committees

23  providing juggling services.

24  **A.**    I would have to check to give you an honest answer on

25  that one.

1    Q.   Not that you've seen in your experience?

2    **A.**   Correct.

3    Q.   Now, looking at the expenses summary, so what's listed

4    here, if I'm interpreting it correctly, is that the PAC is

5    reporting having spent $22,940.79 during that two-month period

6    and that they would have spent a cumulative total of

7    $212,000 -- two thousand hundred and twelve ninety-two dollars

8    and nine cents during the entire year; is that correct?

9    **A.**   Correct.  That is correct.

10   Q.   And that's what's being reported by the PAC; correct?

11   **A.**   Yes.

12   Q.   Now, if we could just go to the next page, sir.

13        Does this -- do these reports also list where the

14   contributions come from, who's giving those donations?

15   **A.**   They do.  Any contribution in excess of a thousand

16   dollars -- or, again, that collectively exceed a thousand

17   dollars -- get listed -- are required to be listed.

18   Q.   Okay.  So if a contribution within the period is less

19   than a thousand dollars, does that also -- does that have to

20   be listed?

21   **A.**   In the aggregate as part of the total, but it does not

22   have to be listed in this specific breakdown.

23   Q.   Okay.  So the total on the first page that we looked at

24   would include donations of less than a thousand dollars, but

25   that person or business' name does not have to be listed out

1    on the second page?

2    **A.**    Correct.

3    Q.    And I think we -- you know, we see a few names here of

4    people who have contributed to the PACs that may be known to

5    the jury.  You see Elizabeth Stavola would have given $10,000

6    to the political action committee on November 26th?

7    **A.**    That's correct.

8    Q.    And Jay Brown -- or, rather, Jay H. Brown, Ltd, would

9    have given $6,000 to the political action committee on

10   December 11th?

11   **A.**    Correct.

12   Q.    And then -- so I want to move finally into the sort of

13   the third thing that you can see here, which is what

14   specifically money has been spent on in this report.  So let's

15   go to page 3.

16          So here's some -- I guess a list of it says expense

17   categories.  Can you explain what we're looking at here?

18   **A.**    Certainly.  The list I mentioned in statute that defines

19   exactly what can be spent -- these are, again, out of

20   NRS 294A -- and ultimately these are the categories so that

21   it's attributable so that if somebody -- the PAC, for example,

22   had a special event, that would be under code H.

23   Q.    And where do these categories come from?  I mean, who

24   decides what -- you know, what categories are going to be

25   listed on the -- you know, the C&Es?

1    **A.**    Our legislature and then approved by the governor.

2    Q.    Okay.  And so are these the sort of permissible

3    categories that a political action committee can spend money

4    on?

5    **A.**    Yes.

6    Q.    And so we see, you know, things here like office

7    expenses, expenses related to volunteers, et cetera, and they

8    each have a code with a letter; is that right?

9    **A.**    Correct, yes.

10         **MR. GOTTFRIED:**  And then so if you flip to the next

11    page, Heather, page 4.

12    **BY MR. GOTTFRIED:**

13    Q.    We can actually see some of the monetary expenses that

14    are listed.  So, again, this is over a thousand dollars.  So

15    if -- if there's an expense and it's less than a thousand

16    dollars, does that have to be listed out separately in this

17    report?

18    **A.**    Not in this report, no.

19    Q.    But is that total included in the summary that we looked

20    at on page 1?

21    **A.**    It is.

22    Q.    And so just, again, looking at -- looking at the first

23    expense here, we see Hamlet Events.  Can you just walk us

24    through, you know, what information we're able to glean about

25    the expenditures to Hamlet Events based on this report?

1    **A.**    Certainly.  So the name and organization starting on the

2    left side of the -- the spreadsheet, the breakdown, lists the

3    location and the address where that occurred.  Moving over to

4    the category, you can see that it's H.  And as we saw earlier,

5    that's a special event.  The third column from the left, the

6    date of the expense, indicates that there were four events at

7    Hamlet Events.  The first on November 15th of 2018, then

8    November 30th of 2018, December 15th and then December 30th

9    also of 2018.  And then to the right, the associated costs of

10   the expense of each of those four events.

11   Q.    Okay.  So here we can see the person who's the recipient

12   of an expenditure of over a thousand dollars during the

13   period, and we see here, based on the category, that these are

14   being reported as expenses related to special events --

15   **A.**    Correct.

16   Q.    -- because of the code H?

17          And then we have the dates -- we have four separate

18   expenses and the amounts of those.  So $27,000, $2,100,

19   $2,800, and $2,200?

20   **A.**    (Nods head up and down.)

21   Q.    Is that correct?

22   **A.**    Yes.

23   Q.    So, sir, you mentioned before that these -- this -- these

24   also include amended reports?

25   **A.**    (Nods head up and down.)

1          Yes.

2     Q.   So I'm going to flip --

3          **MR. GOTTFRIED:**  Ask Heather to flip to I believe it's

4     page 6 of Exhibit 61A.

5     **BY MR. GOTTFRIED:**

6     Q.   And this is -- so can you describe what the rules are

7     about whether a PAC or a campaign is allowed to amend their

8     reports?

9     **A.**   Certainly.  So amendments are permissible.  So when a --

10    you know, a report is filed by the deadline, if there is a

11    clerical error, some sort of, you know, I don't know, an

12    administrative issue one way or the other or a candidate

13    realizes -- or PAC, for that matter -- realizes that there was

14    an error that needs to be corrected, they simply file an

15    amended report.  There's no penalty.  Again, the intent is --

16    my understanding anyway, is that, you know, we want amended

17    reports if it's applicable.  We don't want to scare a PAC or a

18    candidate away from doing so with a fine because the point of

19    all of this is transparency to the public, and that's the most

20    important.

21    Q.   So basically if the candidate or the campaign, you know,

22    realizes or discovers there's some sort of error in the

23    original report, they -- at any time they're able to file an

24    amended report?

25    **A.**   Yes.

1  Q.   And looking at the page that's in front of you here, sir,

2  page 6 of Exhibit 61A, is this -- would this be an example of

3  an amended report?

4  **A.**   Yes, it is.  And I can tell because up in the top

5  directly below the e-mail address the appropriate box that was

6  selected is a PAC, and it's amended report.  Those are both

7  checked.

8  Q.   Okay.  And looking at the -- at the period that this

9  report is covering, is this, in fact, for that final period of

10 2018, the same period that that previous report was covering?

11 **A.**   Yes.

12 Q.   And can we see when the amended report was filed?

13 **A.**   It was filed on March 11th of 2021.

14 Q.   Okay.  So we have the original report filed in January of

15 2019, and then a little over two years later is when the

16 amended report is filed covering that same period?

17 **A.**   Correct.

18 Q.   All right.  So we're just going to go through very

19 briefly what are the C&E Reports that are in this exhibit

20 without looking at, you know, every expense or every

21 contributor that have been reported.

22      **MR. GOTTFRIED:**  So, Heather, if you could go to

23 page 12 of this exhibit.

24 **BY MR. GOTTFRIED:**

25 Q.   Can you tell us what report -- or, sorry, what period

1    this report covers?

2    **A.**    This is for report 1, which covers a period of January

3    1st, 2019, to March 31st of 2019.

4    Q.    And we're still looking at Future for Nevadans?

5    **A.**    That's correct.

6    Q.    And then -- and the date that that report is filed?

7    **A.**    This report was filed on April 15th of 2019.

8            **MR. GOTTFRIED:**    And, Heather, if you could go to

9    page 18 of the exhibit.

10   **BY MR. GOTTFRIED:**

11   Q.    Are you able to tell, is this an original report or is

12   this an amended report?

13   **A.**    This is an amended report also for the political action

14   committee Future for Nevadans.  An amended report 1 from that

15   same period, from January 1st to March 31st of 2019.

16   Q.    So an amended report from that same period?

17   **A.**    Yes.  The report covers that period of time, but it was

18   filed in March -- March 11th of 2021.

19   Q.    So the amended report filed in March of 2021?

20   **A.**    Yes.

21           **MR. GOTTFRIED:**    And, Heather, if you could go to

22   page 24.

23   **BY MR. GOTTFRIED:**

24   Q.    Is this a -- the original report from the second quarter

25   of 2019?

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    Report 2, yes.

2    Q.    Also for Future for Nevadans?

3    **A.**    Yes.

4         **MR. GOTTFRIED:**  And, Heather, if you can go to

5    page 30.

6    **BY MR. GOTTFRIED:**

7    Q.    Is this the amended report for quarter two of 2019?

8    **A.**    Two, amended, yes.

9    Q.    And what date was that filed?

10   **A.**    March 11th of 2021.

11   Q.    Okay.  And if you could go to page 37.  Is this the --

12   sorry.  Is this the original report that was filed for the

13   third reporting period of 2019?

14   **A.**    Yes.

15        **MR. GOTTFRIED:**  And if you could go, Heather, to

16   page 43.

17   **BY MR. GOTTFRIED:**

18   Q.    Would this be the amended report that was filed covering

19   the period -- the third quarter of 2019?

20   **A.**    Yes.

21   Q.    And what was the date that that amended report was filed?

22   **A.**    March 11th of 2021.

23   Q.    Okay.

24        **MR. GOTTFRIED:**  And, Heather, if you could go to

25   page 50.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **BY MR. GOTTFRIED:**

2    Q.   Is this the original report that was filed with your

3    office for Future for Nevadans for the fourth quarter of 2019?

4    **A.**   This one has amended checked.  So I believe this is the

5    amended version of the fourth quarter report.

6    Q.   Oh, I'm sorry.  Are we on page --

7            **MR. GOTTFRIED:**  What page are we on?  Page 50?

8    **BY MR. GOTTFRIED:**

9    Q.   So this is an amended report covering the fourth quarter

10   of 2019 or is this the --

11   **A.**   It appears to be the amended report for Future for

12   Nevadans covering the fourth quarter, October 1 to

13   December 31st of 2019.

14   Q.   Okay.  Can you look at the date that that was filed?

15   **A.**   January 22nd of 2020.

16           **MR. GOTTFRIED:**  And if you could -- Heather, if you

17   could go to page 56?

18   **BY MR. GOTTFRIED:**

19   Q.   Is this another amended report covering that period?  Or,

20   I'm sorry --

21   **A.**   Yes, it is another amended report.  The previous one,

22   again, may have been submitted and then it was amended later

23   that month in 2020.  But this one also covers the same period

24   of time from report 4 for Future for Nevadans, though it was

25   submitted March 11th of 2021.

1    Q.   So here then, sir, it appears what we're looking at is

2    multiple amended reports covering that same period?

3    **A.**   Correct.

4    Q.   And for this second amended report, are you able to see

5    when that was filed?

6    **A.**   The second report was filed on March 11th of 2021.

7    Q.   Okay.

8         **MR. GOTTFRIED:**  And then, finally, last one, Heather,

9    if you could go to page 62.

10   **BY MR. GOTTFRIED:**

11   Q.   What period is this covering?

12   **A.**   This is the original report covering the entirety of

13   calendar year 2019, from January 1st to December 31st of 2019.

14   Q.   Okay.  So in addition to the quarterly reports, there's

15   also the annual report that's required at the end of the year?

16   **A.**   Correct.

17        **MR. GOTTFRIED:**  And then, Heather, if you could go to

18   page 68?

19   **BY MR. GOTTFRIED:**

20   Q.   What are we looking at here?

21   **A.**   This is an amended -- or, I'm sorry, this is the original

22   report for Future for Nevadans covering the period January 1st

23   2020 to March 31st of 2020 filed on April 15th of 2020.

24   Q.   Okay.  Thank you, sir.

25        **THE COURT:**  Mr. Gottfried, we are at our lunch

 1    break --

 2          **MR. GOTTFRIED:**  We're pretty --

 3          **THE COURT:**  -- time.

 4          **MR. GOTTFRIED:**  We're pretty close.  Yeah, we should

 5    be very close.

 6          **THE COURT:**  Oh.  So you just have a few minutes left?

 7          **MR. GOTTFRIED:**  Less than five.

 8          **THE COURT:**  All right.  Well, go ahead.  We'll do

 9    cross after lunch.

10          **MR. SANFT:**  Yes, Your Honor.

11    **BY MR. GOTTFRIED:**

12    Q.   Now, sir, you know, we discussed that -- you know, PACs

13    file C&Es, but campaigns also file C&E Reports?

14    **A.**   Yes, the candidate specifically would be.  Yes.

15    Q.   The candidate would file a report.

16          Now, are you familiar with a campaign called Fiore

17    for Nevada that has filed Contributions & Expense Reports with

18    your office?

19    **A.**   Yes.

20    Q.   Do you know what office that -- that committee was

21    related to?

22    **A.**   I don't offhand.

23    Q.   Could you turn to page 60A -- or Exhibit 60A in your

24    binder?

25    **A.**   I'm there.

1    Q.   Okay.  Do you recognize this stack of documents that

2    encompass Government's 60A?

3    **A.**   Yes.

4    Q.   Are these Contributions & Expense Reports that were filed

5    by Michele Fiore with your office?

6    **A.**   Yes.

7    Q.   Are they true and accurate copies of the same?

8    **A.**   Yes.

9    Q.   Did you provide those to the Government in response to a

10   request?

11   **A.**   Yes.

12   Q.   Now, are these all -- these are all reports from the

13   candidate Michele Fiore?

14   **A.**   Yes.

15   Q.   And do they include amended, as well as original,

16   reports?

17   **A.**   Yes.

18   Q.   And can you tell us what time period these reports cover?

19   **A.**   Certainly.  The first report cover -- it starts

20   January 1st of 2018, and it continues through the reports to

21   December 31st of 2020.

22   Q.   Okay.  And is the -- I know you said you couldn't recall

23   offhand the office.  Are you able to refresh your recollection

24   by looking at the C&E Reports?

25   **A.**   These in particular were in her capacity as City Council

1  member.

2  Q.   These are reports for the City Council campaign?

3  **A.**   Correct.

4  Q.   And even that's a -- even though that's a local office,

5  the reports still have to be filed with the statewide

6  Secretary of State?

7  **A.**   Yes.  There was a legislative change a few years back --

8  again, before my time -- centralizing campaign finance with

9  the office of the Secretary of State.

10       **MR. GOTTFRIED:**  Your Honor, at this point I would

11  move to admit Government's 60A.

12       *(Exhibit No. 60A, offered.)*

13       **THE COURT:**  Request to admit 60A.  Any objection?

14       **MR. SANFT:**  Your Honor, may we approach?

15       **THE COURT:**  All right.

16       *(At sidebar on the record.)*

17       **MR. SANFT:**  Your Honor, the document that the

18  Government's trying to introduce into evidence right now is

19  within the time period that the Court had ordered before would

20  not come in.  I think it's 2018; right?

21       **MR. GOTTFRIED:**  It's the last quarter of 2018 through

22  2020.

23       **MR. ASKAR:**  I believe so.  It may be that there's the

24  annual report in there.

25       **MR. GOTTFRIED:**  Yeah.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **MR. ASKAR:**  And the annual report may cover a larger

2    time period.  Your Honor, you know, while I don't want to kind

3    of take all of the Court's time, especially right now on this,

4    you know, if I could make an offer -- a very brief offer of

5    proof?  I know this is Mr. Gottfried's witness.  But I

6    think --

7            **MR. GOTTFRIED:**  I'm okay with it, if you want.

8            **MR. ASKAR:**  I think I can very quickly cover this for

9    all parties, if that's okay?

10           **THE COURT:**  What do you mean?

11           **MR. ASKAR:**  If I can just briefly explain why I think

12   this is going to be fine?

13           **THE COURT:**  Okay.  Let's hear it.

14           **MR. ASKAR:**  Your Honor, we just heard Michele Fiore's

15   amendments to these documents largely occurred in March of

16   2021.  That's two months after the search warrant.  I believe,

17   you know, while the Court's order covers December 2018 to

18   February 2020, now that we're seeing actions taken after that

19   period that affect records from before that period, I believe

20   that, you know, allowing a little bit of latitude in allowing

21   us to introduce this document which does contain -- I'm under

22   the impression it contains the annual report from 2018 --

23   would be appropriate.

24           **THE COURT:**  Mr. Sanft?

25           **MR. SANFT:**  I think with regard to the Court's ruling

1    on this matter, the Court was very careful to make sure that

2    it was crafted that, from the moment the statute was declared

3    in December of 2018, the Government would have the ability to

4    talk about everything to deal with that -- you know, with

5    financial issues from that point forward.  I don't know if

6    what Government's asking for is a complete picture sort of

7    idea, but I don't -- I just think that they can do without

8    this information.  I don't know if it's necessary towards

9    their case.

10        **THE COURT:**  And you say without this information, you

11   mean without that annual report for 2020 which would go beyond

12   February 2020 time period?

13        **MR. SANFT:**  Oh.  No, no.  I'm not worried about

14   beyond.  I'm talking the beginning.

15        **MR. GOTTFRIED:**  We do have the annual report from

16   2018.

17        **MR. SANFT:**  Yeah.

18        **THE COURT:**  Okay.

19        **MR. SANFT:**  Because I think the Court's order was

20   that if there was something that traipsed beyond, that's fine,

21   as long as it's within the relevancy.

22        **MR. GOTTFRIED:**  It was.

23        **THE COURT:**  Yes, that was.  So we've got the annual

24   report for 2018.  Do we also have the individual periods?

25        **MR. GOTTFRIED:**  We do not.  It's just the annual

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    report.  It's the -- it's the annual report for 2018, 2019,
2    and 2020, along with the amendments that were filed in 2021.
3            **THE COURT:**  Is there particular information from the
4    2018 that -- because my time frame was December 18th, 2018.
5    So it's literally the last two weeks of 2018.  And so you'd be
6    seeking to introduce information from the other 50 weeks of
7    that year.
8            **MR. ASKAR:**  Largely, Your Honor -- and, frankly, it's
9    about the -- that last period, December of 2018 is the
10   pertinent period for what we have prepared for our financial
11   analysis to demonstrate that, based on the reporting, we're
12   seeing a significant difference between what was reported
13   during that time period and what we can see in the bank
14   records was spent.
15           **THE COURT:**  Okay.
16           **MR. ASKAR:**  So we can excise if we need to.
17           **MR. GOTTFRIED:**  I don't expect we'll be directing the
18   jury's attention to anything from prior to December 2018.
19           **MR. SANFT:**  The danger, though, is that if it's
20   admitted as an exhibit in this case, they do have access to
21   that information and they can draw their own conclusions.
22           **THE COURT:**  Yeah.  I'm going to need to take a look
23   at that annual report for 2018 to have a better sense of
24   whether I think that there's a danger.  So I just -- I'll do
25   that over the lunch break.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          MR. GOTTFRIED:  Sure.

2          THE COURT:  What do you have left with him right now?

3          MR. GOTTFRIED:  Almost nothing.

4          THE COURT:  Okay.  So we'll just go ahead and break

5     now.  I realize you'll have to pick up as soon as we get back

6     once I've decided what -- whether we need to pull some pages

7     out of this exhibit.

8          MR. GOTTFRIED:  Sure.  We'll prepare a redacted

9     version.

10         THE COURT:  Okay.  And I'll take a look at it in the

11    meantime.  So we'll just go ahead and say that we're going to

12    go ahead and take our lunch break because there's something we

13    need to address, and we'll come back with this witness in --

14    after lunch.

15         MR. SANFT:  Okay.  Are you going to be sending them

16    out on a longer lunch break so you can have an opportunity to

17    have lunch before you work on this?

18         THE COURT:  Let me ask this.  Who else do we have?

19         MR. ASKAR:  We have three witnesses here and waiting.

20         THE COURT:  All right.

21         MR. SANFT:  But we'll still finish well within the

22    time period, I think.

23         MR. GOTTFRIED:  Depends --

24         MR. ASKAR:  We also --

25         *(Reporter instruction.)*

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          **MR. ASKAR:**  I apologize, Amber.

2          We're also trying to get more witnesses here just to

3    see what we can do to, you know, provide the Court with an

4    option as to how to handle tomorrow.

5          **THE COURT:**  Okay.  We might get a break tomorrow.

6          All right.  We'll go ahead and break now.  I think

7    we'll take about 30 minutes.

8          **MR. ASKAR:**  Okay.

9          **THE COURT:**  So thank you.

10         *(End of discussion at sidebar.)*

11         **THE COURT:**  We are actually going to take our lunch

12    break now because there's something I need to look at over the

13    lunch break and, also, I'm starving.  So we're going to take

14    our half an hour lunch break.  It is 11:55.  So we'll come

15    back at 12:25.

16         Please remember, don't talk about the case among

17    yourselves or with anybody else.  Don't read, view, or listen

18    to anything about the case.  Don't conduct any of your own

19    investigation or research, and wait to formulate your final

20    opinions until you've heard everything.  We'll see you in a

21    half an hour.

22         *(Jury out at 11:56 a.m.)*

23         **THE COURT:**  Thank you, Summer.

24         See you in a half an hour.  You'll still be under

25    oath when you return.

1    **THE WITNESS:** Yes, ma'am. Thank you.

2    *(Lunch recess at 11:56 a.m., until 12:27 p.m.)*

3    **THE COURT:** All right. I had a chance to take a look

4    at Exhibit 60A, the copies of the reports for the Michele

5    Fiore campaign.

6    As you recall, I did have a in-limine ruling that the

7    evidence originating from the campaign fund or the PAC

8    unrelated to the statute must be limited to the time frame of

9    December 18th, 2018, through February of 2020. I understand

10   that reports span greater time frames than those end

11   limitations. However, the annual report for the entirety of

12   2018, which I've now combed through carefully, only has a very

13   small handful of transactions that would be covered by my

14   in-limine ruling or permitted based on my in-limine ruling.

15   So I'm going to grant Mr. Sanft's objection to that

16   portion of this exhibit. So I'm going to ask that the

17   Government pull out of Exhibit 61 [sic] that 2018 annual

18   report.

19   **MR. ASKAR:** Your Honor, just as a quick clarification

20   for this ruling, will we still be able to rely on C&E filings

21   for December of 2018 should another witness have relied on

22   them in their assessment of financial analyses, or would you

23   like to us to excise that until such time as we've entered in

24   some C&E filing from December 2018?

25   **THE COURT:** Yeah, let's reach that when we get to it.

1    **MR. ASKAR:**  Okay.

2    **THE COURT:**  So yeah.  So for now, though, this

3    year-long report I'm going to ask you to remove from

4    Exhibit 61 [sic].  So if you can tell us then what -- there's

5    a DOJ Bates number at the bottom of exhibit -- I'm sorry, 60A.

6    Not 61.  60A.

7    *(Reporter instruction.)*

8    **MS. DEPREMIO:**  My apologies.  It goes from page 1 of

9    the document to page 14.  The ending Bates number on page 14

10    is DOJ-0000023925.  And those will be removed.

11    **THE COURT:**  All right.  So we're going to remove from

12    23912 to 23925?

13    **MR. ASKAR:**  Yes, Your Honor.

14    **THE COURT:**  Okay.

15    **MR. ASKAR:**  One additional thing before we call the

16    jury back in.

17    **THE COURT:**  Sure.

18    **MR. ASKAR:**  There was a filing this morning, ECF 55 I

19    believe, Your Honor, the --

20    **THE COURT:**  This was the redacted exhibit.

21    **MR. ASKAR:**  We have reviewed -- in reviewing it

22    briefly during the break, there's still some PII in it that

23    I'm sure was inadvertently left in, that being at least in the

24    very quick scrub.  So I'm not in a position to say that this

25    is all of the PII that has not yet been redacted, but we

1    noticed the agent's e-mail, vest number, phone number had not

2    been redacted.

3           **THE COURT:**  Summer's going to just re-save a version

4    with that redacted.

5           **MR. ASKAR:**  Thank you, Your Honor.

6           **THE COURT:**  Have you identified for her the page

7    number?

8           **MR. ASKAR:**  I believe so, Your Honor.  And if we have

9    not, it's page 76.

10          **THE COURT:**  Okay.  Got it, Summer?

11          **COURTROOM ADMINISTRATOR:**  Yes.

12          **THE COURT:**  All right.  She's going to just replace

13   the image with one where that information is also redacted.

14          **MR. ASKAR:**  Thank you, Your Honor.

15          **THE COURT:**  Anything else, Mr. Sanft?

16          **MR. SANFT:**  No, Your Honor.

17          **THE COURT:**  All right.

18          **MR. GOTTFRIED:**  Your Honor, I'm trying to determine

19   how quickly we can amend the exhibits so that we can still

20   admit it through this witness.

21       *(Conferring amongst counsel.)*

22          **THE COURT:**  Right.  So I'm going to -- can you hand

23   me your exhibit that has...

24       *(Pause in proceedings.)*

25          **THE COURT:**  Are we ready to bring the jury back?

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          **MR. GOTTFRIED:**  Yes, Your Honor.

2          **MR. SANFT:**  Yes, Your Honor.

3          **THE COURT:**  All right.  Let's go get them, Summer.

4      *(Pause in proceedings.)*

5          **THE COURT:**  Welcome back.

6          Will the parties stipulate to the presence of the

7    jury?

8          **MR. SANFT:**  Yes, Your Honor.

9          **MR. GOTTFRIED:**  Yes, Your Honor.

10          **THE COURT:**  Everyone have a seat.

11          You can continue your -- continue your inquiry,

12    Mr. Gottfried.

13    **BY MR. GOTTFRIED:**

14    Q.   Good afternoon, Mr. Wlaschin.

15    **A.**   Good afternoon.

16    Q.   Did you have a chance to eat lunch?

17    **A.**   Yes.

18    Q.   Before we last -- when we were last speaking, we were

19    discussing the Contributions & Expense Reports filed by

20    Michele Fiore's City Council campaign; is that correct?

21    **A.**   Yes.

22    Q.   And you were looking at a Government exhibit which has

23    been marked as Government's 60A?

24    **A.**   (Nods head up and down.)

25          I have it here in front of me.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  Q.  And to clarify the time frame that we're looking at with

2  the -- Government's Exhibit 60A, does that include the annual

3  report filed in 2019, the amended annual report for 2019 filed

4  in 2021, the annual report filed in 2020, and the amended

5  annual report for 2020 filed in 2021?

6  **A.**  Yes.  I see annual filing 2020.  I see the amended one

7  filed in 2021, the original 2021.  You said 2019 also?

8  Q.  2019 --

9  **A.**  It covers the period January 1st of 2019 to December 31st

10  of 2019, but that was filed in 2020 in January.

11  Q.  I see.  So the annual report for 2020 -- or, I'm sorry,

12  the annual report for 2019 filed --

13  **A.**  Yes.

14  Q.  -- in January of 2020?

15  **A.**  Yes, those are all included.

16  Q.  Okay.  So are the four reports that are included in this

17  exhibit?

18  **A.**  Yes.

19  Q.  And are all of those reports true and correct, you know,

20  copies that were filed with your office?

21  **A.**  Yes.

22      **MR. GOTTFRIED:**  Your Honor, at this time I would move

23  Government's 60A into evidence.

24  *(Exhibit No. 60A, offered.)*

25      **MR. SANFT:**  No objection, Your Honor.

*Mark Wlaschin - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          **THE COURT:**  All right.  60A will come in.

2      *(Exhibit No. 60A, received.)*

3          **MR. GOTTFRIED:**  And I will not be asking to publish

4   to the jury at this point.

5          **THE COURT:**  All right.

6   **BY MR. GOTTFRIED:**

7   Q.   I want to make something clear, Mr. Wlaschin.  Have you

8   or has anybody from your office reviewed Michele Fiore's bank

9   records?

10   **A.**   Bank records, no, not that I'm aware of.

11   Q.   Or the bank records either for Future for Nevadans or for

12   her City Council campaign?

13   **A.**   No, I don't believe so.

14   Q.   So, sir, are you able to tell the jury whether the

15   Contributions & Expense Reports that you have in front of you

16   are accurate?

17   **A.**   All I can say is that they were attested to under penalty

18   of perjury by the candidate so that, in my opinion, they're

19   accurate because of that, but I have not validated that

20   information against any other source.

21   Q.   And your opinion is based only on reviewing the reports

22   and not any actual knowledge of her contributions and

23   expenses?

24   **A.**   That's correct.

25   Q.   All right.  Thank you, sir.  I have no more questions for

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  you at this time.

2            **THE COURT:**  All right.  Cross, Mr. Sanft?

3            **MR. SANFT:**  Thank you, Your Honor.

4                        **CROSS-EXAMINATION**

5  **BY MR. SANFT:**

6  Q.   Good afternoon.

7  **A.**   Good afternoon.

8  Q.   Your last is spelled interesting, W-l.  And how do you

9  pronounce your last name again?  I'm sorry.

10  **A.**   It's said Wlaschin.

11  Q.   Wlaschin?

12  **A.**   I found it's easier to say if you don't look at it.

13  Q.   Wlaschin.  Okay.  I understand completely.  I've got the

14  same issues.  It's a lifelong thing, by the way, so...

15            A couple questions.  I just want to make sure I'm

16  clear.  Your role here is only to testify as to campaign

17  contribution accounts -- or how do you pronounce that?

18  Campaign finance accounts, is that what it is?

19  **A.**   The C&E Reports, Contribution & Expense Reports, and

20  campaign finance --

21  Q.   Okay.  For campaign finance and then also for political

22  action committees?

23  **A.**   Correct.

24  Q.   Those are the two things that you're here to talk about

25  today with us?

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **A.**    Yes.

2   Q.    You're not here to talk about charities?

3   **A.**    No.

4   Q.    Okay.  That's out of your purview, that's not why you're

5   here today?

6   **A.**    Correct.

7   Q.    And you're not qualified to answer any questions with

8   regards to the charities?

9   **A.**    Correct.

10  Q.    Okay.  Now, just to make sure I'm clear, do you know --

11  do you know what a restricted donation would be if it was

12  given to, say, a campaign -- campaign account -- I'll just

13  call it a campaign account -- or a political action committee?

14  Do you know what that would be?

15  **A.**    A restricted donation?

16  Q.    Right.

17  **A.**    I'm not familiar with the term.

18  Q.    Could a donor turn around and donate money to a political

19  action committee and say I only want this money to go towards

20  a specific purpose within --

21        **MR. GOTTFRIED:**  Your Honor, I would object to

22  misleading and ask for a sidebar.

23        **THE COURT:**  All right.  Sidebar.

24      *(At sidebar on the record.)*

25        **THE COURT:**  What's going on?

1      **MR. GOTTFRIED:**  Yeah, Your Honor.  My concern is that

2    Mr. Sanft's questions need to be couched in terms solely of

3    the Nevada campaign finance law.  When he's speaking about

4    restricted donations, what's permitted, what's not permitted,

5    this, as you know, is a wire fraud case based on federal wire

6    fraud law.  So regardless of whether these donations -- while

7    a restricted donation may or may not be permitted under Nevada

8    campaign finance law, it needs to be made clear, you know,

9    that Mr. Wlaschin can't speak about, you know, the --

10    whether -- federal wire fraud law.  And that's just something

11    that needs to be clarified for the jury.

12      **MR. SANFT:**  I didn't realize that that's where I was

13    going with it.

14      The -- there's a couple counts.  One count is the

15    count with -- I think it's Count 2 with Governor Lombardo.

16    His donation is from his PAC to Michele Fiore's PAC

17    specifically for $5,000 towards the statute.  So that's what I

18    was getting into with -- with regards to this particular

19    witness.

20      **MR. GOTTFRIED:**  I think my concern is that by saying

21    that, you know, it's -- a donation that's given for a specific

22    purpose, maybe under Nevada campaign finance law it can be

23    spent on something else, it's still subject to federal wire

24    fraud laws.  So I wouldn't want to give the -- I wouldn't want

25    the jury to be left with the impression that it's somehow

1    permitted to spend money that was designated for one purpose

2    under false pretensions, you know, based on fraud, to be spent

3    on something else just because it may be permitted under

4    Nevada campaign finance law.

5          **THE COURT:**  Okay.  I understand the limitation.  Can

6    you couch it in those terms with respect to --

7          **MR. SANFT:**  To state law?

8          **THE COURT:**  -- his understanding of what a PAC --

9    because you've already talked, Mr. Gottfried, in detail about

10   what a PAC can spend money on.  And so if you can just make

11   sure you couch it in terms of under Nevada -- the Nevada

12   rules --

13         **MR. SANFT:**  Campaign laws, yes.

14         **THE COURT:**  Yes.  Do the Nevada rules permit --

15         **MR. SANFT:**  Okay.

16         **THE COURT:**  -- that.  Okay?

17         **MR. SANFT:**  Okay.

18         **THE COURT:**  Let's try to do that.

19         **MR. GOTTFRIED:**  Thank you, Your Honor.

20         **MR. SANFT:**  Thank you, Your Honor.

21         **THE COURT:**  Thank you.

22        *(End of discussion at sidebar.)*

23         **THE COURT:**  Give us just a minute for Amber to hook

24   back up again.

25         **MR. SANFT:**  Yes, Your Honor.

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **BY MR. SANFT:**

2   Q.   Mr. Wlaschin, let me rephrase the question for you.

3   You're here to testify today as to your knowledge and

4   understanding as to state campaign law?

5   **A.**   Yes.

6   Q.   Specifically as is captured or enumerated in NRS-- let me

7   make sure I'm not messing this up here -- 294A?

8   **A.**   That's correct.

9   Q.   Is there any other of statutes besides 294A that you'd be

10  talking about here today within Nevada?

11  **A.**   So far we haven't talked about financial disclosure

12  statements, which is 281.

13  Q.   Okay.

14  **A.**   But there's also associated regulations in NAC -- the

15  Nevada Administrative Code 294A as well that might come up.  I

16  think you're right, though.  NRS 294A and NAC 294A.

17  Q.   So most of the questions that was asked by the Government

18  today are questions that fall within the purview of 294A?

19  **A.**   Correct.

20  Q.   NRS 294A?

21  **A.**   Yes.

22  Q.   Okay.  So within the -- your understanding of 294A or

23  NRS 294A, is there such thing as a restricted donation?

24  **A.**   Not that I'm aware of.

25  Q.   And what I mean by restricted donation is can a donation

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    be made to a political action committee or a campaign with an

2    intent purpose?

3    **A.**    Not defined in statute that I'm aware of.

4    Q.    Now, just to make sure I'm clear as well, you've worked

5    now for the Secretary of State for four years?

6    **A.**    Almost five.

7    Q.    Almost five years.  And during that time period, have you

8    ever heard of a restricted donation made within the purview of

9    what we're talking about here, which is 294A?

10   **A.**    No, I have not.

11   Q.    Okay.  Now, in addition to that, we talked a lot about

12   the forms, you know, the C&Es.

13   **A.**    (Nods head up and down.)

14   Q.    And just to make sure we're clear, the Contributions &

15   Expense forms.

16   **A.**    That's correct.

17   Q.    I'm going to call them C&Es from now on.

18          With regards to the C&Es, you talked about two

19   different types; right?  You've got your campaign C&Es and you

20   have your PAC C&Es?

21   **A.**    (Nods head up and down.)

22   Q.    Now, within those C&Es -- and if I could just have you

23   turn to 60A.

24       *(Conferring amongst counsel.)*

25          **MR. SANFT:**  Thank you.

1    **BY MR. SANFT:**

2    Q.    Now, I'm showing you what's been admitted already as

3    Government's Exhibit 60A.  Within this document, when a person

4    is filing or filling out this document, down on the

5    Contribution Summary, which you see that says Contribution

6    Summary?

7    **A.**    Um-hum.

8    Q.    That first -- is that a "yes," by the way?

9    **A.**    Yes.

10    Q.    Okay.  Under that first line it says, Number 1, total

11    monetary contributions received in excess of $100.  What does

12    that mean?

13    **A.**    So if an individual contributes to a campaign of $90, it

14    does not need to be specifically annotated in the following

15    breakdown.  But if it's in excess of $100, those will be.  So

16    the -- I believe the intent there is so that the number under

17    this period in the left column there, the $15,800, so that

18    somebody who's looking at this can then turn the following

19    page and see $15,800 worth of broken-down contributions that

20    were all collectively in excess of $100.

21    Q.    So you could have someone who's donating $99 and not have

22    that contribution be listed in the C&Es for this particular

23    document here?

24    **A.**    Correct.  It would be included in the total but not with

25    the contributor's name and information.

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   Q.   When you say in the total, it would still be in the

2   actual total number?

3   **A.**   In the -- the cumulative total for the bottom line that

4   candidate or political action committee has, yes.

5   Q.   Okay.  So meaning, for instance, if -- like in this

6   amount here, even though it shows, like, say, $15,800, the

7   donors -- the donors that are listed or the -- yeah, the

8   donors that are listed there thereafter might only add up to,

9   say, $9,000, and there would be a difference of $6,000 with,

10  like, 99-dollar donations along the way?

11  **A.**   So -- close but no.

12  Q.   Okay.

13  **A.**   The $15,000 is the cumulative total of everyone who's

14  contributed more than 100.  So individuals that contributed

15  $101, $200.  It may be two individuals, one that donated --

16  well, I guess, a $10,000 donation, for example, and then an

17  $8,000 and $5,000.  So those collectively are what add

18  together for this period in that line specifically.

19  Q.   But say a whole bunch of kids who come forward and

20  they're exited, turning 18, and they're donating $99 each,

21  that --

22  **A.**   Right.

23  Q.   -- those donations do not -- do not add into the total

24  number here of the monetary contributions because they're

25  under $100 each?

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **A.**   Correct.

2   Q.   I see.  Even -- okay.  So as a result, the numbers that

3   we're looking at here, that also applies in reverse; right?

4   So with regards to expenses.

5           So look down here at the bottom of this particular

6   document, 60A, and this would be line Number 9, total monetary

7   expenses paid in excess of $100.

8   **A.**   I see it.

9   Q.   Same thing?

10  **A.**   Yes.

11  Q.   So if you're spending money -- if you spend under $100,

12  you don't have to necessarily put it on the C&E?

13  **A.**   Correct.

14  Q.   So you can just spend $99 all over the place and not have

15  to report that?

16  **A.**   It would be, again, in the aggregate total, but it

17  wouldn't be required in the breakdown.

18  Q.   And it's a little confusing when you say that because

19  what I mean is this, is that if -- if you're --

20      *(Reporter instruction.)*

21      **MR. SANFT:**  I'm sorry.  Sorry, Amber.

22  **BY MR. SANFT:**

23  Q.   All right.  So what I'm saying is, is that if I spend $99

24  out of my -- out of this campaign account, does that show

25  anywhere at all within this C&E?

1   **A.**   Not in the detailed breakdown, but it would be included

2   in the total amount of all expenses and the cumulative dollar

3   value.  Though, I will say that, when people ask if they have

4   to, the statutory requirement is in excess of $100.  But you

5   are free to report any and all contributions or expenses.

6   And, in fact --

7   Q.   Yeah.

8   **A.**   -- there are candidates and political action committees

9   who report 5-dollar contributions and 10-dollar expenses.

10  Q.   Absolutely.  And -- but, in essence, though, like with

11  regards to campaign accounts, the numbers here would be not

12  accurate; right?  I mean, because, in essence, it's not like

13  you're looking at a QuickBooks accounting here in terms of the

14  contributions and the expenses?

15  **A.**   That could be, yes.

16  Q.   Because that's not what you're asking for; right?  That's

17  not what the law requires with regards to NRS 294A?

18  **A.**   I see.  I understand.  And that's correct.

19  Q.   Yeah.  So if someone is following within the parameters

20  of Nevada law 294A, if their -- if their accounting's off,

21  it's not necessarily because they're violating 294A?

22  **A.**   Correct.

23  Q.   Now, that would also apply as well as to political action

24  committees; right?

25  **A.**   Yes.

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  Q.   In fact, the difference, though, between the campaign and

2  the political action committee is actually -- instead of $100,

3  it's a thousand dollars?

4  **A.**   Yes.

5  Q.   And that's for both contributions as well as for -- I'm

6  sorry.  My brain just went out there.

7  **A.**   Expenses.

8  Q.   Expenses.  Thank you.

9       **MR. SANFT:**  So let's just go ahead and just show that

10 to the jury here.  This is -- has 61 been admitted?  61A.

11 **BY MR. SANFT:**

12 Q.   Okay.  So here once again for the jury, 61A, looking at

13 Number 1 under Contributions Summary, it's money contributions

14 in excess of a thousand dollars --

15 **A.**   Correct.

16 Q.   -- yes?

17      And then, under the Expenses Summary, line 6,

18 monetary expenses in excess of a thousand dollars?

19 **A.**   Correct.

20 Q.   Now, it's -- it's clear, though, that the reason why we

21 require these types of numbers is to help the public

22 understand where money is coming and going?

23 **A.**   Yes.

24 Q.   Okay.  And fair to say that, if you noticed something

25 that was a problem, something that was legitimately an issue,

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    your office would be the one that would be responsible for,

2    like, maybe starting an audit or an investigation?

3    **A.**    That's correct.

4    Q.    Okay.  You had shared with us earlier that -- that you

5    just recently just got two auditors?

6    **A.**    Correct.

7    Q.    But prior to that you had no auditors?

8    **A.**    Correct.  We audited in-house with available resources,

9    existing staff who otherwise have other duties, but yes.

10    Q.    Okay.  And -- and if there's issues to which need to be

11    followed up because you believe that you do have

12    discrepancies, those discrepancies could be reported to the

13    enforcement arm of the SOS?

14    **A.**    Correct.

15    Q.    Of the Secretary of State?

16    **A.**    Correct.

17    Q.    And who is that?

18    **A.**    So the -- the Secretary has -- in his eight divisions

19    that he's responsible for, we have a Securities Division.  The

20    Securities Division includes a number of POST-certified law

21    enforcement officers who split their time team investigating

22    securities fraud and other investment fraud, as well as

23    reviewing allegations related to elections.

24    Q.    I see.  In this particular case, when you were pulling

25    the records with regards to Michele Fiore, was any such

1    investigation ever started with Michele Fiore?

2    **A.**    Not that I recall specific to this -- these individual

3    reports, though there may -- there were investigations

4    conducted, which I also want to clarify is not unusual.  Those

5    discrepancies, like you highlighted, oftentimes one candidate

6    running against the other may point out and say there is a

7    discrepancy and I think that's nefarious.  And then we will

8    reach out and ask, and then the candidates will oftentimes

9    explain, proving that -- you know, like you -- having

10   highlighted, you don't have to identify those under-$100

11   contributions or expenses, but it kind of cuts to the chase

12   and prevents those sorts of allegations.

13   Q.   Right.  And fair to say -- and I'm glad you brought up

14   that point because literally that was my next question.

15        Because we're talking about the political process,

16   sometimes people will put in complaints against opponents or

17   whatever the case may be to try to get other people in trouble

18   or, you know, draw up some type of problem?

19   **A.**    That's correct.

20   Q.   Okay.  And now, in addition to that, you -- we talked a

21   little bit about Michele Fiore.  Fair to say, though, that

22   there are times that Michele had actually reached out to your

23   office for direction or suggestions or just questions that she

24   had about how she was handling her accounts?

25   **A.**    Absolutely.

1    Q.    And you know that personally because you've actually

2    dealt with her on that level?

3    **A.**    That's correct.

4    Q.    Okay.  And then with regards to her asking questions

5    about her accounts -- and we're talking about her political

6    action committee account as well as her campaign account --

7    other people from her office did the same thing.  It wasn't

8    just her, maybe whoever it was that was there?

9    **A.**    Absolutely.  A number of candidates -- every election

10    cycle, even as recently as this week, have reached out

11    personally, oftentimes to the Secretary of State -- oftentimes

12    to me or my staff -- asking those sorts of questions.

13    Q.    And it's fair to say that that's done in a way to help in

14    terms of just managing the responsibilities of running for

15    office?

16    **A.**    Yes.

17    Q.    Now, when a person decides they're going to run for

18    office, though, you mentioned a little bit earlier that

19    it's -- that you do have -- let me make sure I'm clear here --

20    training?

21    **A.**    We provide documentation as part of the candidate filing

22    process; the first two weeks of January for judicial, and the

23    first two weeks of March for nonjudicial.  I don't know that I

24    would refer to it as training, but there's information that we

25    draw the candidates' attention to to make sure they're

1    prepared for at least the administrative requirements of

2    filing and running for office.

3    Q.    Meaning, for instance, it's not like you hold a class and

4    say, okay, anyone who's running for office, we actually are

5    putting on a free class to let you know on how or what things

6    you'll be expected to handle when you're a candidate?

7    **A.**    That's correct.  There's no such class.

8    Q.    And with regards to the documentation you provide, I

9    would imagine it's like a frequently answer questions sort of

10   thing and then a referral back to 294A?

11   **A.**    We do have explanations.  We try to -- because of the

12   years of experience in doing this, seeing the questions the

13   candidates ask throughout an election cycle, we gather that.

14   And there's this constant analysis and updating of those

15   documents to, you know, bold certain things that we found is

16   effective, make it bulletized [sic] in other areas,

17   highlighting due dates, requirements.

18          So it's more than just a basic FAQ, but certainly

19   something that -- again, the importance is transparency.  And

20   if you fail to file one Contribution & Expense Report, the

21   fine is up to $10,000 per report.  So it's something that we

22   take very seriously because, you know, essentially $40,000

23   worth of fines from a campaign cycle would deter anybody from

24   running for office.  And we're trying to make sure that the

25   candidates are aware of the requirements.

1   Q.   Right.  And so we're talking specifically the time period

2   of basically 2019 until, you know, 2022, something like that;

3   right?

4   A.   Yes.

5   Q.   During that time period, though, did that documentation

6   that you're talking about, did that exist as of, you know,

7   early 2019 on?

8   A.   There were in different forms of that documentation

9   provided during candidate filing.  We continue to refine it.

10  The paperwork we used this election cycle was different from

11  then but essentially the same; the deadlines, timelines,

12  requirements, fine schedule, those sorts of things.

13  Q.   But ultimately, though, just to be fair, it's still the

14  responsibility of the candidate to be aware of what 294A and

15  the other NRSes that we're talking about apply?

16  A.   An excellent point and one that we also try to drive home

17  that ultimately, again, when you are interested in running for

18  elected office, this is a responsibility to read and

19  understand those requirements.  And while the office of the

20  Secretary of State goes I think really above and beyond to

21  make sure that questions are answered and people are aware of

22  those requirements, if they ignore it, don't pay attention,

23  and don't do what is required by law, that ultimately does

24  fall back on the candidate.

25  Q.   Yeah.  But in this case, your experience with Michele

1  Fiore is that, when she had questions, she would reach out to

2  your office and to you?

3  **A.**    She did, yes.

4  Q.    Okay.  Now, in addition to that, the -- the forms -- so

5  we were talking about the C&E expenses.  We had some

6  discussion about, well, you know, at the end the person who's

7  the candidate signs the form indicating that it's true and

8  correct based upon their knowledge and so forth?

9  **A.**    Correct.

10  Q.    Now, in the forms that were shown to you, once again,

11  these are -- looks like maybe electronically signed forms?

12  **A.**    Yes.

13  Q.    Okay.  And with regards to the forms, are you telling us

14  that the candidate needs to sit down and go through all of

15  their expenses and all of their contributions to verify that

16  it's everything?  Because I would imagine, if there's a lot of

17  activity during the course of a quarter, that that's something

18  that, you know, at some point becomes very tedious.

19  **A.**    I don't provide legal advice to any candidate.  But if it

20  were my name that was going to sign under penalty of perjury

21  that something was true and correct, I would.

22  Q.    Yeah.  And typically what happens is, with most

23  candidates, as far as your experience, is that they usually

24  have people to help them?

25  **A.**    I would say out of a -- the majority of the candidates or

 1    out of the universe of candidates, easily three-quarters don't

 2    receive contributions or expenses at all, talking about

 3    hospital boards, GID candidates.  Nothing taken, nothing

 4    received, nothing spent.

 5           The other remaining, you know, roughly 25 to maybe a

 6    third of the candidates collectively receive contributions,

 7    and then probably about half of them, because of the volume

 8    of -- of events recorded, funds that come in and go out, hire

 9    somebody else, a CPA or otherwise, to file these reports for

10    them.

11    Q.   Right.  And so they just rely on, you know, people to

12    help them with regards to the campaign stuff, the money and so

13    forth?

14    **A.**   Yes.

15    Q.   Okay.  Now, in addition to that, is it unusual for a

16    candidate to loan money to their own political action

17    committee or campaign account?

18    **A.**   Rare but it happens.

19    Q.   Yeah.  And it's not something that's prohibited or

20    precluded under Nevada state law?

21    **A.**   That's correct.  There is also a regulation in NAC 294A

22    that specifically says a candidate can use their personal

23    funds to -- you know, they're not limited to the same $5,000

24    for primary, $5,000 for general that other contributors are.

25    Q.   Right.  And that's -- and, once again, just to be

 1    specific to the jury, we're talking about the campaign

 2    accounts only in terms of the limitations for contributions?

 3    **A.**    Right.

 4    Q.    But the political action committees you can actually

 5    donate whatever you want?

 6    **A.**    Right, yes.

 7    Q.    Okay.  All right.  So -- but in essence, though, either

 8    way, a candidate can turn around and donate money into their

 9    own campaign?

10    **A.**    Yes.

11    Q.    Or into their own political action committee?

12    **A.**    Yes.

13    Q.    Is there a prescribed way on handling that?  Meaning, is

14    there anything at all that's prescribed in Nevada NRS 294A or

15    any of the other regulations you've talked about that says you

16    have to do it a certain way?  You have to, you know, put in

17    writing and put it in a form, whatever?

18    **A.**    There are some details about -- and, again, I think a lot

19    of this goes back to transparency.  There are details about,

20    you know, recording as a contribution or an expense, even if

21    it's a repayment, those sorts of things.  So there is some.

22          And I will tell you that, when we get asked, if maybe

23    it seems like a gray area or, again, there's a lot of very

24    nuanced, unique situations that come up, the guidance is the

25    intent is to be transparent.

1  Q.   Yeah.

2  **A.**   You know, do what you think you need to do so that a

3  member of the public who has no understanding of what you're

4  doing, the events you're conducting or where you're going, can

5  look at this report, understand where you're receiving funds

6  from, how you're expending them related to your campaign so

7  they can, you know, confidently be aware of what you're doing

8  and where you're receiving funding from.

9  Q.   So basically it's like err on the side of caution and

10  just go ahead and just, you know, cover yourself by

11  documenting something?

12  **A.**   Essentially, yes.

13  Q.   Yeah.  But in essence, though, still, once again, under

14  NRS 294A or any of the other Nevada statutes that we're

15  talking about, it's not required?

16  **A.**   Not specifically laid out with a -- this -- you know,

17  like a procedure.

18  Q.   Fair to say that, if you were to do something like that,

19  it would probably be considered to be maybe a little sloppy

20  and, you know, probably not -- not -- it would be ill-advised,

21  right, to do something like that?

22  **A.**   Potentially.  And, again, we're very careful in the

23  office to not create requirements that exceed what is in the

24  statute or regulation.  And that's kind of -- we stray away

25  from, again, that sort of legal guidance or recommendations.

*Mark Wlaschin - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    But essentially, yes, it may result -- doing that -- and I

2    don't -- I don't think I've ever necessarily called somebody

3    out or said you should do this or else.  But if -- when

4    campaigns or candidates or PACs don't, that usually results in

5    an Election Integrity Violation Report from somebody else

6    trying to get to the bottom of why and -- you know, and what

7    happened.

8    Q.   Right.  Now, in addition to that, the declared purpose of

9    a political action committee, I couldn't remember earlier if

10   you said it could be changed.

11   **A.**   Yes, it can.

12   Q.   Okay.  But that would require an amended filing of the

13   political action documents that were associated with it?

14   **A.**   Correct.

15   Q.   Okay.  And is there like a -- is there, like, sort of a

16   set, like, type of purpose, or could it be any articulated

17   purpose that the person puts in paper on -- you know, in words

18   on the document itself?

19   **A.**   There -- there's no limit.  I've seen some very

20   interesting and creative, again, reasons for political action

21   committees.

22   Q.   Yep.

23   **A.**   But, yes, there's not a list of specific types of

24   reasons, limitations, those sorts of things.

25   Q.   And political action committees are a little different

1    from campaigns in that campaigns represent a person; right?

2    It's like, if you're going -- if you, as the general public,

3    were to turn around and donate money to a campaign, we're

4    donating it to the person?

5    **A.**    Right.  And there are limits, again, as you had said.

6    Q.    Right.  $5,000 or $10,000 -- $5,000?

7    **A.**    $5,000 for the primary, and $5,000 for the general.  So

8    ultimately $10,000.  It's actually in the Nevada Constitution.

9    But yes.  And then for a political action committee, like you

10   had identified, no limits.

11   Q.    There's no limits on the political action?

12   **A.**    (Nods head up and down.)

13   Q.    But, once again, the political action's a little

14   different; right?  Because the political action is basically

15   you're donating money to an idea?

16   **A.**    Um-hum.

17   Q.    A declared -- a declaration or whatever the group

18   declares themselves to be part of; right?

19   **A.**    Right.

20   Q.    All right.  Now, in addition to that, your -- we talked a

21   little bit about accounts.  If a candidate is running for

22   office and wins but there is money left in his campaign

23   account, there is laws that -- that address the -- how you

24   handle that particular issue --

25   **A.**    Yes.

```
1    Q.   -- right?

2    A.   Absolutely.

3    Q.   And that is state law.  Is that within NRS 294A?

4    A.   It is, yes.

5    Q.   Okay.  And what can the candidate do with that money

6    after they win their campaign?

7    A.   It's, again, an interesting and nuanced question.  The

8    statute is fairly lengthy because it covers not only those who

9    win but those who lose, those who withdraw, et cetera.  I

10   would essentially -- again, a candidate who wins has the

11   ability to continue holding onto that and using it for future

12   campaigns.

13   Q.   Okay.  For future campaigns.  And that could be any

14   campaign that they decide to run for?

15   A.   That's correct.

16   Q.   Now, is the money at any point ever discharged back to

17   the donors if the person decides he never wants to run for a

18   campaign again?

19   A.   That is one of the options.  If a candidate says they are

20   done and, you know, essentially intend to never file for

21   office again, that there are statutory timelines about

22   disbursement of the funds, donating it to other candidates,

23   and there's a number of other things and timelines associated

24   with those.

25   Q.   But that would require a declaration by the person
```

1    saying, I'm now retiring from politics, I've decided I'm gonna

2    go and ride horses in Nye County?

3    **A.**    No, doesn't require documentation at all.  And that

4    question comes up pretty decently.  If somebody files for

5    office and, you know, as they get towards the end of their

6    term they haven't made any public announcements, we'll get

7    questions, you know, are they going to withdraw?  Do you know

8    if they've, you know, started to shed their funds?  And nope.

9    What's in the report, you see it as well as I do, and we don't

10   speak to intent of any candidate one way or the other.

11   Q.    Have you ever -- with regards to complaints when it comes

12   to the end of a campaign and you still have monies left in the

13   account, obviously sometimes people decide that they want to

14   run for a different office?

15   **A.**    That's correct.

16   Q.    And as a result, what they do is they -- can they take

17   that money that was donated to them when they were running for

18   one position and then take that money and use that for a

19   completely different position?

20   **A.**    Yes.

21   Q.    Have you ever -- has there ever been an issue where a

22   donor said, look, I didn't want that person running for that

23   particular office, I only donated so he could run for this

24   office?

25   **A.**    Yes.

1    Q.   Okay.  And what typically happens then?

2    **A.**   We explain that that's between ultimately you and the

3    candidate, that there's not a binding clause in NRS 294A

4    about, you know, you donated to them to run for the hospital

5    board, they now want to run for the mosquito board.  That's

6    the two of them to work out.

7    Q.   Right.  So, in essence, it's sort of like a -- it's the

8    candidate and the donor that would have to work that issue

9    out, and sometimes maybe the only issue here would be some

10   type of political issue; right?  Like the donor says, hey,

11   this happened in this particular situation?

12   **A.**   And looking at it through our lens, that's correct.  The

13   only thing we may need to see is a -- again, a refund if that

14   ends up being the case or maybe a contribution to a different

15   candidate if they work something out like that.  But

16   ultimately the reporting piece is all we would be worried

17   about.

18   Q.   I see.  So, in essence, though, you're still sort of

19   brokering a deal between the parties, not necessarily

20   something that is a -- that's a violation of an actual statute

21   within NRS 294 or any of the other Nevada laws in this case?

22   **A.**   That's correct.  And we would not broker.  It would be:

23   That's not a violation of 294A, please work that out between

24   the two parties.  And then we would stand back.

25   Q.   Okay.  Thank you.  I really appreciate it.

*Mark Wlaschin - Redirect*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          **MR. SANFT:**  No further questions, Your Honor.

2          **THE COURT:**  Thank you.  Redirect?

3          **MR. GOTTFRIED:**  Yes.  A few more questions,

4     Your Honor.

5                    **REDIRECT EXAMINATION**

6     BY MR. GOTTFRIED:

7     Q.    So, Mr. Wlaschin -- sorry, Wlaschin, I want to clarify a

8     couple issues that Mr. Sanft was asking about related to what

9     has to be reported and what doesn't have to be reported.

10          If a single donor were to donate four times to a

11    specific candidate, each time $25, and so that the cumulative

12    total were $100, would that have to be reported in the report

13    or not?

14    **A.**    Yes.

15    Q.    It would?

16    **A.**    Yes.

17    Q.    Okay.  And is that -- that's both in the cumulative total

18    in the summary on the front of the document as well as

19    reporting that donor's contribution by name in the more

20    detailed portion of the document?

21    **A.**    Because the cumulative is $100 or more, that would

22    require both, yes.

23    Q.    And if that donor only gave once of $25, even though that

24    donor's name would not appear in the more detailed portion of

25    the report, would that still have to be reported in that

1    summary portion of the report?

2    **A.**    Yes.  Yes.  And, again, the candidate could include it,

3    if they desired.  It's just not required by law.

4    Q.    And then, you know, on the flip side of that with

5    expenditures.  So let's say a candidate, you know, makes four

6    payments to Joe Smith and, you know, none of the individual

7    payments is above that threshold of what has to be reported

8    but cumulatively they total to above that threshold, does that

9    have to be reported?

10   **A.**    Yes.

11   Q.    Okay.  And either way, even if it's below the threshold,

12   does that amount have to be reported in that cumulative --

13   sorry, the summary portion of that?

14   **A.**    Summary portion.

15   Q.    Thank you for clarifying that.

16        I want to -- also want to clarify something Mr. Sanft

17   said about, you know, when you donate to a campaign, you're

18   donating to a person.  You know, did I hear that correctly?

19   **A.**    Yes.

20   Q.    And Mr. Wlaschin, is a candidate permitted to spend

21   campaign money on their personal expenses?

22   **A.**    Not on their personal expenses, no.

23   Q.    So when you're donating to a candidate, you're actually

24   donating to their campaign and to the political causes

25   associated but not to the person themselves?

1    **A.**    I see what you're saying.  Yes, there is a distinction

2    there.  But you're correct.  And that -- that's also -- again,

3    it goes back to the statute prohibiting the use of funds for

4    personal use.

5    **Q.**    Okay.  And then -- and finally, Mr. Wlaschin, you know,

6    Mr. Sanft asked you a lot of questions about Nevada Revised

7    Statutes 294A.

8    **A.**    Right.

9    **Q.**    Is that basically the campaign finance law here in the

10    state of Nevada?

11    **A.**    It is, yes.

12    **Q.**    Now, political action committees and campaigns, are they

13    still required to follow other laws besides 294A?

14    **A.**    Outside of 294A, there are.  Depending on, one -- again,

15    if you're talking about federal candidates, then there's a

16    separate federal series of laws for federal contributions.

17    And then, otherwise, again, depending on the nature, there are

18    some -- there's some overlap with the filing -- the business

19    licensing-type stuff separately, but that's --

20    **Q.**    Mr. Wlaschin, is there anything in 294A that exempts, you

21    know, campaigns or PACs from following, you know, federal wire

22    fraud laws?

23              **MR. SANFT:**  Objection, Your Honor.

24              **THE COURT:**  What's the objection, Mr. Sanft?

25              **MR. SANFT:**  Well, it's -- the question that the

1    Government's asking is, is there anything at all in 294A that

2    exempts campaigns from breaking federal law.  And I think

3    that's an improper question and a hypothetical to which this

4    particular witness is not qualified to answer.  He does not

5    know anything at all about federal law.

6            **MR. GOTTFRIED:**  Your Honor, the question is about

7    294A.

8            **THE COURT:**  I'm going to sustain the objection.

9    **BY MR. GOTTFRIED:**

10   Q.   Mr. Wlaschin, is the universe of laws that applies to

11   political candidates or political action committees, is that

12   just state campaign finance law?

13   **A.**   No.  Ultimately there are other organizational laws.

14   They can't commit crimes otherwise.  It's -- 294A really just

15   speaks to the employment, the conduct of the campaign finance

16   donations, contributions, that element to it.

17   Q.   And when you were speaking to Mr. Sanft about what's

18   permitted, you were -- you were speaking about state campaign

19   finance law?

20   **A.**   Yes, specifically.

21   Q.   All right.  Thank you, Mr. Wlaschin.

22           **MR. GOTTFRIED:**  Nothing further for this witness.

23           **THE COURT:**  Thank you.  Any recross?

24           **MR. SANFT:**  No, Your Honor.  Thank you.

25           **THE COURT:**  Thank you.

*Mark Wlaschin - Redirect*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

```
 1              May I excuse this witness?
 2         MR. GOTTFRIED:  Yes, Your Honor.
 3         THE COURT:  May I excuse this witness, Mr. Sanft?
 4         MR. SANFT:  Yes, Your Honor.  Thank you.
 5         THE COURT:  Thank you.
 6              Thank you so much, sir.  Please watch your step right
 7    there.  And that one right there.  Thank you.
 8              Next witness.
 9         MR. ASKAR:  Your Honor, the United States calls
10    Mr. Thomas White.
11              He just went to use the restroom, Your Honor.  So
12    we'll have him in just a moment.
13         THE COURT:  Great.  Do we have someone waiting out
14    for him for when he does return?  Thank you.
15         MR. ASKAR:  Well, Your Honor, for the Court's
16    awareness, we have Mr. White and two more witnesses today for
17    the remainder of the Government's presentation.
18         THE COURT:  Three.
19         MR. ASKAR:  Three more witnesses today for the
20    Government's presentation.  We got one more.  But we
21    anticipate those to be relatively quick.
22         THE COURT:  Okay.  We'll probably take a break after
23    this witness.
24         MR. ASKAR:  That will work, Your Honor.
25         THE COURT:  Everybody doing all right?
```

1          Okay.  Go off the record for a second.

2      *(Pause in proceedings.)*

3          **THE COURT:**  All right.  We'll go back on.  It looks

4  like our witness is ready.

5          Hi, sir.  You're going to head right on up here.

6          **COURTROOM ADMINISTRATOR:**  Please raise your right

7  hand.

8      *(The witness is sworn.)*

9          **THE WITNESS:**  I do.

10         **COURTROOM ADMINISTRATOR:**  Thank you.  Go ahead and

11  take a seat.  And then state and spell your first and last

12  name.

13         **THE WITNESS:**  Thomas, T-h-o-m-a-s.  Last name is

14  White, W-h-i-t-e.

15                     **DIRECT EXAMINATION**

16  **BY MR. ASKAR:**

17  Q.   Good afternoon, Mr. White.

18  **A.**   Hello.

19  Q.   Could you please tell me what you do for a living.

20  **A.**   I am the business manager and secretary treasurer of

21  Laborers Local 872.

22  Q.   What is Local 872?

23  **A.**   It's a laborers union.

24  Q.   What's a labor union?

25  **A.**   So my union dispatches out workers to various projects in

1    town; concrete, demolition, drilling and blasting, mining.

2    Q.   Now, you mentioned that you are the business manager for

3    Local 872.  What does that role entail?

4    **A.**   So as the business manager, I am in charge of negotiating

5    contracts, ensuring that the members are properly dispatched

6    out to work, meeting with contractors, handling member

7    disputes, grievances.

8    Q.   Sounds like a full-time job.

9    **A.**   Yes.

10   Q.   Are you also affiliated with an organization called

11   Southern Nevada L.E.C.E.T.?

12   **A.**   Yes.  I am the chairman of Southern Nevada L.E.C.E.T.

13   Q.   What is Southern Nevada L.E.C.E.T.?

14   **A.**   So Southern Nevada L.E.C.E.T. is a labor management

15   cooperation fund which is what both labor and management

16   contractors use to promote organized labor.

17   Q.   All right.  And you mentioned your role, but could you

18   repeat that for me?  What's your role with Southern Nevada

19   L.E.C.E.T.?

20   **A.**   I am the chairman of the fund.

21   Q.   All right.  Now, whether it be in your capacity as

22   business manager for Local 872 or in your capacity as chairman

23   Southern Nevada L.E.C.E.T., are you asked to make charitable

24   contributions on behalf of those two organizations?

25   **A.**   Yes.

*Thomas White - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   Q.   What kind of charities do you tend to donate to?

2   **A.**   Well, a majority of the charities that we donate to here

3   in town, they'll have to do with schools, for instance.

4   Helping Hands of Nevada, Nevada HAND.  We donate to the -- the

5   police officers fund when -- when they needed body cams.  So

6   it's mostly schools and -- and community groups.

7   Q.   Yeah.  Makes a lot of sense.  I want to talk to you for a

8   moment, though, about the law enforcement organizations.  Is

9   that a cause that's particularly important to you personally?

10   **A.**   Yes.  I was raised by my grandfather, and he was a

11   28-year police officer in New York City.

12   Q.   Now, I'm going to ask you to look at the binders next to

13   you and pull out an Exhibit 64.  Could you do that for me?

14   Sorry.  It's the next binder I'm being informed.

15           **THE COURT:**  It's going to be this one, sir.

16           **THE WITNESS:**  Oh.  Okay.  Yes.

17   **BY MR. ASKAR:**

18   Q.   You see Exhibit 64?

19   **A.**   Yes.

20   Q.   All right.  Without describing the contents of it, is

21   Exhibit 64 an e-mail to you from somebody?

22   **A.**   Yes.

23   Q.   All right.  What's the e-mail address that sent you that

24   e-mail?

25   **A.**   Michelefiore@me.com.

*Thomas White - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1      **MR. SANFT:**  Your Honor, at this time I'd like to

2  offer Exhibit 64 into evidence.

3      *(Exhibit No. 64, offered.)*

4      **MR. SANFT:**  No objection, Your Honor.

5      **THE COURT:**  64 can come in.  You can publish.

6      *(Exhibit No. 64, received.)*

7      **MR. ASKAR:**  Thank you, Your Honor.  Give us a moment.

8  Exhibit 64's going to pop up on that screen next to you.

9  **BY MR. ASKAR:**

10 Q.  All right.  Mr. White, this is that e-mail you were just

11 telling us about; right?

12 **A.**  Correct.

13 Q.  All right.  Could you please read that e-mail to the

14 jury?

15 **A.**  We are gathering -- Dear Mr. White, Local 872, we are

16 gathering resources from our community partners to honor our

17 fallen officers Alyn Beck and Igor Soldo.  These two brave men

18 were great assets to our community and are survived by their

19 families.  We honor them for their choice to serve and protect

20 our city and the ultimate sacrifice they paid for their lives.

21 On June 8th, 2014, Officer Alyn Beck and Officer Igor Soldo

22 were gunned down and killed at Cicis Pizza during their lunch

23 break.

24      Currently we are raising $80,000 to utilize

25 Officer Beck's life-sized statue.  This beautiful statue will

*Thomas White - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    be placed in the Alyn Beck Memorial park, and its grand

2    opening scheduled is for January 31st at 10:00 a.m.  We will

3    be raising another $80,000 to be used towards Officer Soldo's

4    statue for when the -- when we break ground at Igor Soldo's

5    Memorial Park in our northwest community beginning in early

6    February 2020.

7         Please help keep their memory alive by contributing

8    to their statues and memorial parks.  Checks can be made to

9    the Future for Nevadans.  100 percent of all contributions are

10   used for this charitable event.  You will promptly receive a

11   thank-you letter and a receipt for your donation.  I would

12   like to thank you in advance for your generosity and support

13   our cause, your commitment to our community, and the people

14   that have made it a beautiful place to live.

15        With great appreciation, Michele.

16   Q.   Thank you, Mr. White.

17        Mr. White, we're going to talk in a moment here about

18   a couple of checks.  But after receiving this e-mail, were

19   checked made from Southern Nevada L.E.C.E.T. and Local 872 to

20   Future for Nevadans?

21   **A.**   Yes.

22   Q.   All right.  We're going to talk about those in a minute,

23   but I do want to make sure we're clear about something.  Was

24   the -- was part of the reason that checks were made out to --

25   from Local 872 and Southern Nevada L.E.C.E.T. this e-mail?

*Thomas White - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **A.**   Yes.

2   **Q.**   Fair to say that you relied on the representations that

3   100 percent of all contributions would be used for this

4   charitable event?

5   **A.**   Yes.

6   **Q.**   I want to pull up those checks now.  They are in evidence

7   as Exhibit 63 and Exhibit 68.  They're going to show up on the

8   screen next to you, Mr. White, so you don't have to search

9   through the binders.

10          **MR. ASKAR:**  Let's start with that first one, Heather,

11   if you don't mind.

12   **BY MR. ASKAR:**

13   **Q.**   All right.  So this is the -- a check dated -- sorry.

14   This is a check dated February 3rd, 2020.  Is that right,

15   Mr. White?

16   **A.**   Correct.

17   **Q.**   And I see it lists L.E.C.E.T. of Southern Nevada.  Is

18   that the organization we've been talking about?

19   **A.**   Yes.

20   **Q.**   And how much is that check for?

21   **A.**   $5,000.

22   **Q.**   And, again, this is the -- was this the $5,000 check made

23   out to Future for Nevadans?

24   **A.**   Yes.

25   **Q.**   And was this the check that you were talking about that

1  was made out to Future for Nevadans based on that e-mail that

2  said the money would be used for the Alyn Beck statue?

3  **A.**    Yes.

4  Q.    How is a -- a check made out from Southern Nevada

5  L.E.C.E.T.?  Is there some sort of process that you have to

6  follow?

7  **A.**    For Southern Nevada L.E.C.E.T. it would be, for instance,

8  an e-mail, like I read.  I would call up the co-chairman of

9  the fund and say we just received this request for a

10  sponsorship or a contribution, and he would give the approval

11  or not approval.  And then that would go into a meeting.

12  Because Southern Nevada L.E.C.E.T. only meets once a month and

13  sometimes a quarter -- every quarter.  So he would give the

14  approval, and then it would be ratified at the board --

15  Q.    Yeah.

16  **A.**    -- of directors.

17  Q.    Would it be fair to say that, in getting this check

18  approved, you-all relied on that e-mail that Michele Fiore

19  sent you?

20  **A.**    Yes.

21  Q.    Now, let's take a look at this next check.  This check is

22  dated February 6th of 2020; right?

23  **A.**    Correct.

24  Q.    And this check is from Laborers International Union of

25  North America Local 872; right?

*Thomas White - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   **A.**   Yes.

2   Q.   It's made out to Future for Nevadans?

3   **A.**   Yes.

4   Q.   Is that right?

5   **A.**   Yes.

6   Q.   And what's the amount for this check?

7   **A.**   $5,000.

8   Q.   And was this check, again, the check we were talking

9   about that was approved based on the e-mail from Michele Fiore

10  that the money noted would go to the Alyn Beck statue?

11  **A.**   Yes.

12  Q.   In fact, what's the memo line of the check say?

13  **A.**   Alyn Beck statue.

14  Q.   Now, I'm noticing the dates on these checks are February

15  3rd and February 6th of 2020; is that right?

16  **A.**   Correct.

17  Q.   In fact, if we could go back to Exhibit 64 for a moment.

18  What's the date on her e-mail?

19  **A.**   February 3rd.

20  Q.   Mr. White, are you aware -- I'm just asking to make sure.

21  Are you aware that Alyn Beck statue was unveiled

22  January 31st --

23  **A.**   Yes.

24  Q.   -- of 2020?

25  **A.**   Yes.

*Thomas White - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Q.   All right.  Thank you.  Now, I want to go into -- we

2    talked about why you made this donation.  Did Michele Fiore

3    ever ask you if she could use this $10,000, these two $5,000

4    checks, for her personal expenses?

5    **A.**   No.

6    Q.   Would you have encouraged the Union or Southern Nevada

7    L.E.C.E.T. to make these donations if you knew the money

8    wasn't going to be used for the Alyn Beck statue?

9    **A.**   No.

10   Q.   Were you ever contacted by Michele Fiore to say, hey, we

11   don't need this money anymore?

12   **A.**   No, I was not.

13   Q.   And were you ever contacted by Michele Fiore to ask if

14   she could use the $10,000 donated for the Alyn Beck statue for

15   any other purpose?

16   **A.**   No.

17   Q.   And were the labor union -- was Local 872 and Southern

18   Nevada L.E.C.E.T. ever reimbursed for this 10,000-dollar

19   donation?

20   **A.**   No.

21   Q.   Thank you so much, Mr. White.

22        **MR. ASKAR:**  No further questions at this time,

23   Your Honor.

24        **THE COURT:**  Thank you.

25        Cross, Mr. Sanft?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

1          **MR. SANFT:**  Yes, Your Honor.

2                        **CROSS-EXAMINATION**

3    **BY MR. SANFT:**

4    Q.   Good afternoon.  How you doing?

5    **A.**   Good afternoon.

6    Q.   Thank you for showing up here today.  Just a couple quick

7    questions.  The Future for Nevadans, is that -- as far as you

8    know, is that Michele's political action committee?

9    **A.**   I couldn't tell you yes or no.

10   Q.   Okay.  Now, in addition to that, the questions that were

11   asked by the Government was, you know, if -- if she had

12   reached out to you and asked to use the money for -- how did

13   it go?  I'm not sure how it went.  I don't think I wrote it

14   down write.

15          Let me ask you this.  We all understand, you would

16   not have allowed Michele to use the money for her own personal

17   use; right?

18   **A.**   Correct.

19   Q.   But if Michele had reached out to you and said we'd like

20   to use the money for some other charitable purpose, would that

21   have been something that you would have allowed her to do?

22   **A.**   We would have asked her to give us something in writing

23   stating what it was going to be used for.

24   Q.   Yeah.  Have you ever -- prior to this situation, ever had

25   any issues with any donations that you had given Michele with

1  regards to any of the projects she was working on?

2  A.    No.

3  Q.    And with regards to this particular issue, it wasn't

4  until you received a phone call from the -- from the

5  Government, from the FBI, that there was any type of issue

6  here with this particular donation?

7  A.    We never had an issue.

8  Q.    Okay.  And then, finally -- here's a question.  You've

9  donated to so many different charitable organizations in the

10 valley and helped up so many different people.  Have you ever

11 been reimbursed for any of your donations to any charity?

12 A.    No.  It's an accounting nightmare.

13 Q.    I would imagine.  All right.  Well, thank you.  No

14 further questions.

15          **THE COURT:**  Anything else?

16          **MR. ASKAR:**  Nothing further for Mr. White,

17 Your Honor.  We ask that he be excused.

18          **MR. SANFT:**  No objection, Your Honor.

19          **THE COURT:**  Mr. White, you are excused.  You can step

20 down.

21          **THE WITNESS:**  Thank you.

22          **THE COURT:**  Thank you so much.  Please watch your

23 step.  And watch that step right in front of the jury box,

24 too.

25          So we've got three more, two more?

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1          **MR. GOTTFRIED:**  Three more, Your Honor; all

2     relatively brief.

3          **THE COURT:**  All about that long?

4          **MR. GOTTFRIED:**  Probably.

5          **MR. ASKAR:**  If not shorter, Your Honor.

6          **THE COURT:**  Maybe we just -- let's keep going.  Let's

7     do another witness.  Let's go.  Everybody okay?

8          **A JUROR:**  Yes.

9          **THE COURT:**  If I push too far and somebody needs a

10    break, just raise your hand, and we'll go ahead and take one.

11         **MR. ASKAR:**  Thank you, all.

12         **THE COURT:**  Hi, there.  You're going to head right on

13    up here.  Come on up.  You're going to head right over here to

14    our witness stand.  You're going to meet Summer right there.

15    Please watch your step.

16         **COURTROOM ADMINISTRATOR:**  Raise your right hand.

17         *(The witness is sworn.)*

18         **THE WITNESS:**  Yes, I do.

19         **COURTROOM ADMINISTRATOR:**  Okay.  Go ahead and take a

20    seat, and then state and spell your first and last name.

21         **THE WITNESS:**  Peter Lee.

22                         **DIRECT EXAMINATION**

23    BY MR. GOTTFRIED:

24    Q.   Good afternoon, Mr. Lee.

25    **A.**   Yes.

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    Q.    Thank you for coming in today.  Could you tell the jury

2    where you reside?

3    A.    Where?

4    Q.    Where do you live, sir?

5    A.    I live in California.

6    Q.    You live in California.

7          Do you work, or are you retired?

8    A.    Right now I'm retired.

9    Q.    You're retired.  Do you own any property here in Nevada?

10   A.    Yes.

11   Q.    How many properties do you own in Nevada?

12   A.    Eight.

13   Q.    Eight.  Now, sir -- and are those rental properties?  How

14   do you use those properties?

15   A.    Rental properties.

16   Q.    You rent them out to people who live there?

17   A.    Yeah.

18   Q.    Okay.  Now, do you own the property at 6205 Red Pine

19   Court in Las Vegas?

20   A.    No, I don't.  My son did.

21   Q.    Your son owns that property?

22   A.    Yeah.  My son does, yeah.

23   Q.    Do you manage that property on behalf of your son?

24   A.    Yes.

25   Q.    And how long has your son owned the property at 6205 Red

1    Pine Court?

2    **A.**   Since 2011 or '12.

3    Q.   How did he -- how old was your son when he purchased that

4    property?

5    **A.**   Twenty-five.

6    Q.   And did you help him to -- do you help him with that

7    purchase?

8    **A.**   Yes.

9    Q.   Okay.  And was that a gift?

10   **A.**   No.

11   Q.   No?

12   **A.**   It's a loan.

13   Q.   It was a loan.

14           And so when you -- when you said that you manage that

15   property on behalf of your son, what do you do?

16   **A.**   I -- I advertise on Zillow, and I review the applicants

17   and I interview them.  And whatever the problem they have,

18   I -- I hire -- I hire the handyman to fix the problem.

19   Q.   Okay.  So you do most of the things that are -- a

20   landlord would regularly do for tenants?

21   **A.**   That's correct.

22   Q.   And you said you also find the tenants for that house?

23   **A.**   Yeah.

24   Q.   Okay.  Now, do you still -- does your son still own that

25   property?

1  **A.**   Yes.

2  Q.   Have you visit -- since you manage it, have you visited

3  the property at 6205 Red Pine Court?

4  **A.**   I visit last -- about three -- three weeks ago.

5  Q.   Okay.  And have you -- before that, how often would you

6  say that you visit the property?

7  **A.**   Very rarely.  If it's rented out, I don't visit them.

8  Maybe I drive by just to take a look.

9  Q.   But between renters maybe you would visit?

10 **A.**   Yeah.  Between renters, yes, I would probably visit the

11 property.

12 Q.   Sir, if you saw some photographs of that property, would

13 you recognize it?

14 **A.**   Yes.

15 Q.   Okay.  Sir, I'm going to ask you, there's a binder to

16 your right that -- if you could turn to Exhibit 83?  It might

17 not be -- it might be in the second or third binder.

18         **THE COURT:**  Eighty-three, sir.

19 **BY MR. GOTTFRIED:**

20 Q.   Did you find 83?

21 **A.**   Yes.

22 Q.   Can you flip through the photographs that are part of

23 Exhibit 83?

24         Are those photographs of the property that your son

25 owns at 6205 Red Pine Court?

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    **A.**    Yes.

2         **MR. GOTTFRIED:**  Your Honor, at this point I would

3    like to admit into evidence what's been marked as

4    Government's Exhibit 83.

5        *(Exhibit No. 83, offered.)*

6         **MR. SANFT:**  No objection, Your Honor.

7         **THE COURT:**  83 will come in.

8        *(Exhibit No. 83, received.)*

9         **MR. GOTTFRIED:**  And we'd ask to publish to the jury.

10         **THE COURT:**  You may.

11    **BY MR. GOTTFRIED:**

12    Q.   So, sir, just flipping through the photographs, this is

13    the property that you manage on behalf of your son?

14    **A.**    Yeah, that's correct.

15    Q.   Okay.  And how large of a property is it?

16    **A.**    Forty-four -- a little bit over 4,400 square feet.

17    Q.   4,400 square feet.

18         Do you know how many bedrooms are in it?

19    **A.**    Four bedrooms.

20    Q.   Four bedrooms.

21         What about the garage.  You know, how many cars --

22    **A.**    Three garage.

23    Q.   Three-car garage.

24         What kind of neighborhood is it in?

25    **A.**    It's gated community.  It's next to a school.

```
 1    Q.   Okay.  Gated community.
 2             Do you know what -- I know you're from California,
 3    but do you know what part of Las Vegas it's in?  If you could
 4    describe it.
 5    A.   It's on the street called Azura.
 6    Q.   Hmm?
 7    A.   No.
 8    Q.   Is it in the northwest part of the city?
 9    A.   No -- yeah.  Northwest part, yeah.
10    Q.   Okay.  Now, do you -- sir, do you recall --
11             MR. GOTTFRIED:  And, Heather, if you could just flip
12    through the photographs.
13    BY MR. GOTTFRIED:
14    Q.   Is that the inside of the property, sir?
15    A.   Yeah.
16    Q.   And if you could continue.  Is that another photograph of
17    the inside of the property?  It should be up on your screen, I
18    think.
19    A.   Oh.  Okay.
20    Q.   Is that a photograph of the kitchen?
21    A.   Yes.
22    Q.   Okay.  And that's the --
23    A.   Entrance.
24    Q.   Entrance.
25             MR. GOTTFRIED:  All right.  Thank you, Heather.
```

*Peter Lee - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **BY MR. GOTTFRIED:**

2    Q.   In 2019, who was residing at 6205 Red Pine Court?  Who

3    lived there?

4    **A.**   Fiore.

5    Q.   Is that the defendant, Michele Fiore?

6    **A.**   Yeah.

7    Q.   How long did she live there?

8    **A.**   She lived there since 2016, I believe.

9    Q.   Okay.  And were you the one -- you said you find tenants

10   for your son.  Were you the one that found Michele Fiore to

11   live there?

12   **A.**   Yeah.

13   Q.   Can you talk about how that happened, if you remember?

14   **A.**   I think I advertised through a broker.  I advertised on

15   multiple listing, and some -- she has -- I think she has a

16   broker that brought her to the property.

17   Q.   Okay.  So you advertised the listing, and she, you know,

18   responded to the advertisement?

19   **A.**   Right.

20   Q.   Did you -- did she sign a rental lease agreement for the

21   property?

22   **A.**   Yes.

23   Q.   And have you seen that document before?

24   **A.**   Yeah.

25   Q.   Could you flip, sir, to page 80 in your exhibit book --

*Peter Lee - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    or, sorry, Exhibit Number 80 in your book.  Are you at

2    Exhibit 80?

3    **A.**   Yeah.

4    Q.   And if you could just flip through the pages of

5    Exhibit 80 and make sure that you can see what the document

6    is.

7              Sir, does this appear to be the residential lease

8    agreement that Michele Fiore signed to live at the property

9    you managed at 6205 Red Pine Court?

10   **A.**   Yes.

11             **MR. GOTTFRIED:**  Your Honor, at this time I'd like

12   to -- I'd move to admit Government's Exhibit 80 into evidence.

13        *(Exhibit No. 80, offered.)*

14             **MR. SANFT:**  No objection, Your Honor.

15             **THE COURT:**  80 will come in.  You can --

16        *(Exhibit No. 80, received.)*

17             **MR. GOTTFRIED:**  And I ask to publish to the jury.

18             **THE COURT:**  You can.

19   **BY MR. GOTTFRIED:**

20   Q.   So, again, looking at the first page of the residential

21   lease agreement, you see it's entered into on the 20th of

22   November 2016; is that right, sir?

23   **A.**   Yeah.

24   Q.   And the agreement is between Eric Lee and Michele Fiore;

25   is that right, sir?

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1   A.   That's correct.

2   Q.   And is Eric Lee your son?

3   A.   Yes.

4   Q.   And then going to -- looking at the second item here, the

5   summary next to rent, what is the rent that you -- that you

6   charged Ms. Fiore to live at that property?

7   A.   The monthly rent is $2,450.

8   Q.   Okay.  Thank you, sir.

9        MR. GOTTFRIED:  You can take that down, Heather.

10  BY MR. GOTTFRIED:

11  Q.   So do you know how long Michele Fiore resided at that

12  residence when -- if -- is she still living there?

13  A.   Michele, I think she lived there for about six years.

14  Q.   About six years.  Has she -- but has she moved out?

15  A.   Right.

16  Q.   And when she was living there, did she live by herself or

17  were there other people living at the property?

18  A.   I'm not -- I'm not too sure.

19  Q.   You're not sure.

20       Okay.  Did you know if she lived there full time or

21  part time?

22  A.   I don't know.

23  Q.   Okay.  How often did you communicate with her when she

24  was a tenant?

25  A.   Very rarely.

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

```
1    Q.   Very rarely.  Only if there was a problem?
2    A.   Only when there's a problem, yeah.
3    Q.   Were there -- was there ever a problem?
4    A.   When something broke and she just call and we fix.
5    Q.   And you would send someone to fix it?
6    A.   Yeah.
7    Q.   But you weren't regularly visiting because you live in
8    California?
9    A.   No.
10   Q.   Now, were you aware what she did for a living, or did you
11   not know?
12   A.   Yes, I do.
13   Q.   What did you understand that she did for a living?
14   A.   I think she was a -- assemblyman before -- or
15   assemblywoman before, and then she was a city councilwoman.
16   Q.   Okay.  And we saw in the document, sir, her rent was
17   $2,450 a month?
18   A.   That's right.
19   Q.   Did that ever get raised, or did it stay at $2,450 for
20   the whole time she --
21   A.   It raised gradually.
22   Q.   And it raised gradually?
23   A.   Yes.
24   Q.   And did she pay her rent on time, to your knowledge?
25   A.   To my knowledge, yes.
```

*Peter Lee - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    Q.    Were you ever aware of a problem with her paying her

2    rent?

3    **A.**    No.

4    Q.    Who did she pay her rent to?  Was it you or your son?

5    **A.**    My son.

6    Q.    Okay.  And your son, does he also live in California?

7    **A.**    Yes.

8    Q.    So would she pay him in person, or do you know how she

9    would pay him?

10   **A.**    She's -- through I think a check or something.

11   Q.    Through checks or --

12   **A.**    Yeah.

13   Q.    Would she also sometimes pay with cashier's checks or

14   money orders?

15   **A.**    Yeah, I think so.  But the details I'm not sure.

16   Q.    Okay.  Now I want to show you Government's Exhibit 81

17   which is -- so if you could flip to that in your binder.

18   That's a subset of what's already in evidence as

19   Government's Exhibit 10, which are the bank records of Eric

20   Lee.

21          Are you at Exhibit 81, sir?

22   **A.**    Yeah.

23   Q.    And could you just flip through those pages and make sure

24   you see what's part of that exhibit?

25          **MR. SANFT:**  Your Honor, while Mr. Lee is looking

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

 1   through the exhibit, may we approach?

 2          THE COURT:  All right.  Sidebar.

 3      (At sidebar on the record.)

 4          THE COURT:  What's going on?

 5          MR. SANFT:  Your Honor, with regards to Government

 6   Proposed Exhibit 81, we have checks here that go into 2017.

 7          THE COURT:  Um-hum.

 8          MR. SANFT:  So I just want to make sure that I'm --

 9   that we're clear, these are checks that go back in time from

10   2018.  This starts off in January of 2017 all the way through

11   to whatever.

12          THE COURT:  Okay.

13          MR. GOTTFRIED:  Your Honor, it's our position that,

14   you know, this is admissible 404(b) evidence.  It's also part

15   of the common scheme where she continuously used money from

16   other entities to pay her rent every month beginning in

17   January 2017 and continuing through the period of time in this

18   case, and that there will be payments that are directly

19   traceable to the entities at issue in this case, Future for

20   Nevadans.

21          THE COURT:  Okay.  So hang on.

22          MR. GOTTFRIED:  It's also already in evidence.

23          And, Your Honor, I'd also like to point out that

24   these are all -- all of these checks -- images of the checks

25   are already in the evidence because they're part of

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

1    Exhibit 10, which has been stipulated and was preadmitted at

2    the beginning of trial.

3           THE COURT:  I think that they would fall under the

4    second half of my 404(b) bad-acts evidence ruling, which did

5    limit to the time frame of December 18th, 2018, through

6    February 2020.  So I understand it's already in as Exhibit 10,

7    but if you can focus with him on things that fall within

8    December 18th, 2018, through February 2020.

9           MR. GOTTFRIED:  Okay.  We're not even going to be --

10          THE COURT:  You're not even --

11          MR. GOTTFRIED:  -- really reviewing specific things

12   with him.  So I guess, you know, we can try to prepare a

13   redacted version of 81.  But, you know, while he's on the

14   stand, I'm not sure that it will happen at that -- within that

15   time frame.

16          THE COURT:  And it maybe doesn't matter so much if

17   you already have Exhibit 10 in.  Maybe you can go to -- does

18   Exhibit 10 have -- I mean, are you able to reference anything

19   that you're going to look through with him from Exhibit 10

20   instead?

21          MR. ASKAR:  Well, Your Honor, Exhibit 10 has a couple

22   thousand pages, and so things are pulled together from

23   various -- essentially from each month that it was paid.

24          MR. GOTTFRIED:  Yeah.

25          MR. ASKAR:  So one thing we can do, subject to

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1   everyone -- this is -- we're freewheeling -- is we can use

2   this exhibit without admission to just say, you know, this is

3   a subset of exhibits that are already in evidence --

4           **THE COURT:**  Yeah.

5           **MR. ASKAR:**  -- and focus on the relevant time period,

6   if that meets with the Court's approval.

7           **MR. GOTTFRIED:**  Yeah.  I mean, I'm fine with that as

8   far as only, you know, publishing a portion of it to the jury

9   without admission for, you know, and only looking at a time

10  period that's within the -- you know, the time period in this

11  case.

12          **THE COURT:**  Does that work for you, Mr. Sanft?

13          **MR. SANFT:**  Yeah, that works.

14          **THE COURT:**  Thank you.  We'll do that.

15      *(End of discussion at sidebar.)*

16  **BY MR. GOTTFRIED:**

17  Q.   Sir, did you have an opportunity to take a look at

18  those -- at that exhibit while we were at sidebar?

19  **A.**   Yes.

20  Q.   Okay.  And were those, you know, money orders, cashier's

21  checks, and personal checks that were all made out to your

22  son, Eric Lee?

23  **A.**   Yes.

24  Q.   And were they in the amount of $2,450, the rent that was

25  owed to Red Pine Court?

1   **A.**   Yes.

2   **Q.**   And did many of those instruments reference 6205 Red Pine

3   Court in the memo line?

4   **A.**   Not I've seen...

5   **Q.**   Did some of them reference 6205 Red Pine Court?

6   **A.**   Yeah, yeah.  They did.

7          **MR. GOTTFRIED:**  Your Honor, what I like to do is to

8   ask to publish at this time a portion of Government's 81,

9   which is -- again, is in evidence as Government's Exhibit 10

10  to the jury.  So if I could ask Ms. Depremio, with your

11  permission, to begin from page 24 of the document, which is a

12  check dated December 2018.

13          **MR. SANFT:**  No objection, Your Honor.

14          **THE COURT:**  All right.  Yes, we can do that.  And

15  then as you identify these pages for the witness, can you also

16  just read the Bates number at the bottom so that we can have a

17  better connection of this to Exhibit 10?

18          **MR. GOTTFRIED:**  Yes.  Can I -- Ms. Depremio, do you

19  have the Bates numbers?  Okay.  I see it.

20  **BY MR. GOTTFRIED:**

21  **Q.**   So, sir, just looking at this first check -- and we're

22  not going to go through all of them, just a couple of them --

23  is this a -- do you see what's on the screen in front of you?

24  **A.**   Oh.  Okay.

25  **Q.**   Is this a cashier's check that is paid to the order of

1    Eric Lee?

2    **A.**    Yes.

3    Q.    Is that your son?

4    **A.**    Yes.

5    Q.    And is that for the amount of $2,450.00?

6    **A.**    Yes.

7    Q.    And is the remitter that's listed on that Chase Bank

8    cashier's check, is that Michele Fiore?

9    **A.**    Yes.

10   Q.    Okay.  And that amount, $2,450, is that the amount of the

11   rent that was owed on 6205 Red Pine Court?

12   **A.**    Right.

13   Q.    And then just -- we'll just look at one more, sir.  So

14   flipping to the next page --

15       **MR. GOTTFRIED:**  And can you get the Bates stamp,

16   Heather?  So the Bates stamp number there is DOJ-0000026429.

17   **BY MR. GOTTFRIED:**

18   Q.    So, sir, do you see what's up on the screen in front of

19   you?

20   **A.**    Yes.

21   Q.    Is that a cashier's check dated January 17th, 2019?

22   **A.**    Yes.

23   Q.    Pay to the order of Eric Lee?

24   **A.**    Yes.

25   Q.    Also in the amount of $2,450?

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    **A.**   Yes.

2    Q.   And here, next to where it says remitter, it says none;

3    is that right?

4         **THE COURT:**   It's so tiny.  Maybe you can blow that up

5    a little bit so it's easier --

6    **BY MR. GOTTFRIED:**

7    Q.   The top left corner, sir.

8    **A.**   Yeah.  Okay.

9    Q.   And then on the bottom left corner you can see this is --

10   this is actually from Wells Fargo Bank, right, where the last

11   one was from Chase?

12   **A.**   Right.

13   Q.   So -- all right.  Thank you, sir.

14        **MR. GOTTFRIED:**   Heather, you can take that down.

15   **BY MR. GOTTFRIED:**

16   Q.   Sir, do you have any personal knowledge of where the

17   money came from to -- to fund these cashier's checks that were

18   used to pay for rent?

19   **A.**   No.

20   Q.   Thank you, sir.  I have nothing further for you.

21        **MR. SANFT:**   Your Honor, I have nothing for Mr. Lee.

22   Thank you.

23        **THE COURT:**   All right.  So I can excuse this witness?

24        **MR. SANFT:**   Yes, ma'am.

25        **MR. GOTTFRIED:**   Yes, ma'am.

Peter Lee - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1      THE COURT:  Thank you, sir.  You can step down.  You
2   are excused.

3      THE WITNESS:  Okay.  Thank you.

4      THE COURT:  You're welcome.  Please watch your step
5   right there, those few steps.  Thank you.  And then right
6   there, too, in front of the jury box.  Watch your step.  Thank
7   you.

8      Next witness.

9      MR. ASKAR:  Your Honor, before the Government calls
10  Cicely Hoffman, we'd just like to -- we discussed -- in an
11  attempt at expedience, we've discussed with defense counsel a
12  stipulation to the admissibility of Exhibit 82.

13   (Exhibit No. 82, offered.)

14      THE COURT:  Eighty-two?

15      MR. ASKAR:  Which is listed as Queensridge event
16  payments for Kaime/Willis wedding.

17      THE COURT:  No objection?

18      MR. SANFT:  No objection, Your Honor.

19      THE COURT:  All right.  So Exhibit 82 will come in,
20  and you can call your --

21   (Exhibit No. 82, received.)

22      MR. ASKAR:  With that, the Government would like to
23  call Cicely Hoffman, Your Honor.

24      THE COURT:  Thank you.

25      Everybody still doing okay?  All right.  Thank you.

*Cicely Hoffman - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1          And we have one more witness today after this; right?

2          **MR. ASKAR:**  That's correct.

3          **THE COURT:**  Okay.

4          **COURTROOM ADMINISTRATOR:**  Raise your right hand.

5          **THE WITNESS:**  Yep.

6      *(The witness is sworn.)*

7          **THE WITNESS:**  Yes.

8          **COURTROOM ADMINISTRATOR:**  Thank you.

9          **THE WITNESS:**  Yep.

10         **COURTROOM ADMINISTRATOR:**  Go ahead and take a seat,

11    and then state and spell your first and last name.

12         **THE WITNESS:**  Sure.  Cicely Hoffman; C-i-c-e-l-y,

13    H-o-f-f-m-a-n.

14                         **DIRECT EXAMINATION**

15    BY MR. ASKAR:

16    Q.   Good afternoon, Ms. Hoffman.

17    **A.**   Hi.

18    Q.   Thank you so much for making time for us today.

19         What do you currently do for a living?

20    **A.**   I am a wedding planner -- wedding and event planner.

21    Q.   All right.  In the winter of 2019, were you working at a

22    different job?

23    **A.**   Yes.

24    Q.   What was that job?

25    **A.**   I was the planner, lead salesman of Emerald at

1    Queensridge, which was an event venue.

2    Q.    Can you tell us a little bit about what Emerald at

3    Queensridge is besides an event venue?

4    **A.**    Oh, yeah.  Sure.  They do weddings.  Kind of

5    all-inclusive weddings and events.  So we were pretty high

6    volume, about 200 events a year, where people would come in

7    and plan everything with us for their special occasion.

8    Q.    I'm not going to ask you to go into specifics about a

9    wedding from five years ago.  So let's not worry about that

10    for a moment.

11    **A.**    Great.

12    Q.    But I do want to ask you, do you recall whether or not

13    you ever interacted with Michele Fiore?

14    **A.**    Yes, a little bit.

15    Q.    All right.  And in what context?

16    **A.**    She was the mother of a bride who got married with us.

17    Q.    All right.  I'd like to take a look at what's in evidence

18    as Exhibit 82.  It's going to come up on your screen here in

19    just a moment.

20    **A.**    Oh.  Okay.

21    Q.    Now I want to talk to you about, when someone booked a

22    wedding in 2019 at the Emerald at Queensridge, how would they

23    pay for it?

24    **A.**    Typically cash, check, or a card.

25    Q.    All right.  Would you guys send them invoices?

1    **A.**    Yes.

2    Q.    All right.  What's on the screen here?

3    **A.**    That looks like a payment receipt.

4          Oh.  Go ahead.

5    Q.    No.  Sorry.

6          What's this a payment receipt for?

7    **A.**    So this would be for the wedding -- the Kaime/Willis

8    wedding on November 15th of 2019, and that would show all of

9    the payments that they were -- that were made, their date, and

10   how they paid.

11   Q.    A moment ago you mentioned that you interacted with

12   Michele Fiore because she was the mother of the bride.  Was

13   she the mother of the bride for the Kaime/Willis wedding?  Is

14   that your recollection?

15   **A.**    Yes.

16   Q.    All right.  Now, I'm also noticing here that it lists out

17   kind of dates, amounts, and payment methods; is that right?

18   **A.**    Yes.

19   Q.    All right.  Does --

20   **A.**    Correct.

21   Q.    -- that look like what it -- you know, what we think it

22   means where on this date someone made this payment?

23   **A.**    Yes.

24   Q.    All right.  I'm also noticing a couple of these payments

25   are in cash; is that right?

*Cicely Hoffman - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1    **A.**    Yes.

2    Q.    Okay.  If someone wants to come in and make a payment

3    towards the Kaime/Willis wedding in cash, are Kaime and Willis

4    the only people that can make that payment?

5    **A.**    No.

6    Q.    All right.  How does that work?

7    **A.**    So typically someone would come into the office and just

8    say, I want to pay on a specific wedding.  We would pull that

9    file, take the payment, generate a receipt, process that

10    payment, and that was pretty much it.

11    Q.    All right.  Thank you so much, Ms. Hoffman.

12    **A.**    Oh.  You're welcome.

13          **MR. ASKAR:**  I have nothing further for this witness,

14    Your Honor.

15          **THE COURT:**  Mr. Sanft?

16          **MR. SANFT:**  Yes, Your Honor.

17                        **CROSS-EXAMINATION**

18    **BY MR. SANFT:**

19    Q.    Good afternoon, Ms. Hoffman.

20    **A.**    Good afternoon.

21    Q.    Just a couple of quick questions with regards to the

22    payment in cash.

23    **A.**    Okay.

24    Q.    So the document that we just saw that -- are you all

25    right?

1   **A.**   Yeah.  Oh, no.  It's just not on the screen anymore.

2   But, yeah, I remember it.  Go ahead.

3   **Q.**   With that particular document it just says cash on it.

4   Can you tell us who paid the cash?

5   **A.**   No.

6   **Q.**   All right.  So -- but there is documents behind there

7   about, like, say credit cards; right?  Those ones would

8   actually have the name of the person that's on the card

9   itself?

10  **A.**   Not on that document.  I -- there could have been ways of

11  generating who paid what through a card or a check.  But five

12  years ago, I couldn't remember that process.

13  **Q.**   Right.  But at the time when you were working there five

14  years ago, especially for cash, sometimes people would just

15  come in to sort of surprise the bride and groom by helping

16  them pay for their wedding sort of thing and just pay cash, is

17  that how that --

18  **A.**   Yeah.  It was usually obviously somebody related to the

19  wedding in some capacity.  But oftentimes we would have family

20  members or, you know, a bridal party or something like that

21  coming in to pay on behalf of a wedding.

22  **Q.**   Okay.  In addition to that, the price of this particular

23  wedding was $26,000 roughly?

24  **A.**   Okay.

25  **Q.**   How many weddings had you been involved in during the

*Cicely Hoffman - Cross*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1  time period that you were working for this company?

2  **A.**   I was there for eight years, and we did anywhere probably

3  between 150 and 200 events a year.

4  Q.   Okay.  And with regards to your experience in, you know,

5  sort of seeing how much money is spent for weddings, this

6  particular 26,000-dollar wedding, where does that range in the

7  totality of, you know, expenses?

8  **A.**   Probably --

9       **MR. ASKAR:**  Your Honor, at this point we'll object to

10  the relevance of that line of questioning.

11       **THE COURT:**  I'm going to give him some leeway.  I'll

12  allow it.

13       **MR. ASKAR:**  Thank you, Your Honor.

14       **THE WITNESS:**  Medium, upper medium maybe?

15  **BY MR. SANFT:**

16  Q.   Yeah.

17  **A.**   A base package was around $10,000, but upgrades were

18  pretty standard.

19  Q.   Meaning you guys would sell upgrades on --

20  **A.**   Yeah.  It was a very kind of basic package.  So once they

21  came in, we would upgrade, you know, linens and food and decor

22  and -- you know, there was a lot of stuff to spend money on

23  with a wedding.

24  Q.   But with regards to this particular wedding, based upon

25  your experience there working for about eight years, this is

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

1  about in the middle, somewhere in the middle, high middle?

2  **A.**    Probably high middle.  But it doesn't stick out as

3  something that would have been extremely extravagant.

4  Q.    Yeah.  All right.  Thank you.  I appreciate it.

5  **A.**    You're welcome.

6        **MR. ASKAR:**  Your Honor, just ask that the witness be

7  excused.  No further questions from the Government.

8        **MR. SANFT:**  No objection, Your Honor.

9        **THE COURT:**  All right.

10       **THE WITNESS:**  Great.  Thank you.

11       **THE COURT:**  Thank you so much.  You are excused.  You

12  can step down.  Please watch your step right there.

13       **THE WITNESS:**  Will do.  Thank you.

14       **THE COURT:**  And right there also.

15       **THE WITNESS:**  Okay.

16       **THE COURT:**  Thank you.

17       Next witness, Mr. Askar or Mr. Gottfried.

18       **MR. GOTTFRIED:**  It's Mr. Gottfried.  Government calls

19  George Kaime.

20       **THE COURT:**  All right.  Mr. Kaime, you're going to

21  head on up here.

22       **COURTROOM ADMINISTRATOR:**  Watch your step.  And

23  you're just going to go around here, and there's two steps.

24  Raise your right hand.

25       *(The witness is sworn.)*

*George Kaime - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1      **THE WITNESS:**  I do.

2      **COURTROOM ADMINISTRATOR:**  Thank you.  Go ahead and

3  take a seat, and state and spell your first and last name.

4      **THE WITNESS:**  George Kaime; G-e-o-r-g-e, K-a-i-m-e.

5                  **DIRECT EXAMINATION**

6  BY MR. GOTTFRIED:

7  Q.   Good afternoon, sir.

8  A.   Good afternoon.

9  Q.   Do you know the defendant in this case, Michele Fiore?

10  A.   I do.

11  Q.   How do you know her?

12  A.   I was married to her.

13  Q.   Are you still married to her?

14  A.   I am not.

15  Q.   How long were you married?

16  A.   From 1996 to 2009.

17  Q.   And how -- do you have any children with her?

18  A.   Not biological.

19  Q.   Did you adopt any of her children?

20  A.   I did.

21  Q.   What was the name of the child who you adopted?

22  A.   Savanah Marcella (phonetic).

23  Q.   In 2019, did Savanah get married?

24  A.   She did.

25  Q.   Did you pay for -- as the, you know, adopted father of

1  the bride, did you pay for a portion of the wedding?

2  **A.**   I did.

3  Q.   Did you have conversations with the defendant about who

4  was going to pay for what portion of the wedding?

5  **A.**   Yes.

6  Q.   What do you recall about those conversations?

7  **A.**   Well, it was better if we -- if we communicated by

8  e-mail.  So we did that for the most part.

9  Q.   Okay.  Did you also communicate through third parties?

10 **A.**   Yes, through Savanah.

11 Q.   Okay.  What was your understanding, based on your

12 conversations with the defendant, about who was paying for

13 what portion of the wedding?

14 **A.**   We agreed on the amount that I was going to pay.

15 Q.   And did you have an understanding of who was paying for

16 the other part of the wedding?

17 **A.**   Well, I assumed Michele.

18       **MR. SANFT:**   Objection, Your Honor.  Then calls for

19 speculation.

20       **THE COURT:**   Overruled.  Go ahead.

21 **BY MR. GOTTFRIED:**

22 Q.   Based on your conversations with the defendant, did you

23 have an understanding of who was supposed to cover the other

24 portion of the wedding?

25 **A.**   No.  That's just my assumption.

 1          **MR. SANFT:**  Objection, Your Honor.  Asked and

 2    answered.

 3          **THE COURT:**  Okay.  He's -- I think he's answered it.

 4          **MR. GOTTFRIED:**  Okay.  I was attempting to clarify to

 5    eliminate speculation, Your Honor.

 6    **BY MR. GOTTFRIED:**

 7    Q.   How much of the wedding -- do you recall how much you

 8    ultimately paid for?

 9    **A.**   I do.  It was $10,500.

10    Q.   Now, sir, I'm going to show you up on your screen what's

11    already in evidence as Government's Exhibit 82.

12          Sir, do you recognize this document that's up on the

13    screen in front of you?

14    **A.**   Yes, sir.

15    Q.   What is it?

16    **A.**   It's the invoice or the event payment schedule.

17    Q.   And does this reflect the wedding payments that were made

18    for Savanah's wedding at Emerald at Queensridge?

19    **A.**   I can only speak to the ones that I made, and there's one

20    missing on there.

21    Q.   So which -- sir, I think you have an ability to mark up

22    your screen there.  Are you able to mark which payments on

23    that -- on that exhibit you made?

24    **A.**   Yes.  Well, how do I mark it?  Is there a mouse?

25          **THE COURT:**  Hang on a second.  Summer, can we give

*George Kaime - Direct*
*2:24-cr-00155-JAD-DJA - September 26, 2024*

1   him some instructions?

2           **THE WITNESS:**  I got it marked up now.

3           **THE COURT:**  Hold on.  All right.  Let's try that now.

4           **THE WITNESS:**  We ready?

5           **THE COURT:**  Yeah.

6           **THE WITNESS:**  I did that one (indicating).  Well, the

7   screen is not perfect for me.

8           **THE COURT:**  No, it's not easy.

9           **THE WITNESS:**  So those five in the middle right

10  there.

11  **BY MR. GOTTFRIED:**

12  Q.   So just to clarify for the record, the payments that you

13  have marked, sir, that you paid for on this list, that was a

14  1,200-dollar payment on June 13th, 2019; a 1,200-dollar

15  payment on July 14th, 2019; a 1,200-dollar payment on

16  August 16th, 2019; a -- and a 1,400-dollar payment -- a

17  1,400-dollar payment on September 14th, 2019.  Are you -- did

18  you also mark the 4,000-dollar payment on October 18th, 2019,

19  or was that not yours?

20  **A.**   No, that's mine.

21  Q.   That's yours as well.

22          So those the five that -- you said there was one

23  missing.  Was there another payment you also made?

24  **A.**   It's not on here, but I made a 1,500-dollar payment in

25  November.

George Kaime - Direct
2:24-cr-00155-JAD-DJA - September 26, 2024

1    Q.   Okay.  And the five -- you said it was in November.  Do

2    you know when in November?

3    **A.**   I think it was the 15th.

4    Q.   Okay.  And was the 15th the day of the wedding?

5    **A.**   I don't recall if it was the 15th or the 16th.

6    Q.   Okay.  Was it in mid November?

7    **A.**   Yes.

8    Q.   And, sir, the five payments that you -- that are on here

9    that you said that you made, those are all listed as web

10   payments; is that correct?

11   **A.**   Yes, sir.

12   Q.   Is that how you made your payments?

13   **A.**   Yes.

14   Q.   And then some of these other payments that are listed are

15   cash payments?

16   **A.**   That's true, but I didn't make them.

17   Q.   Did you make any cash payments?

18   **A.**   No, sir.

19   Q.   Is there any particular reason why you paid by the method

20   that you did?

21   **A.**   I wanted to have good documentation.

22   Q.   You wanted to have documentation that you had paid?

23   **A.**   That I had paid, and that was the best way for me to do

24   it.

25   Q.   Why did you want to have documentation that you had paid?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

*Page 234*

1  **A.**   Well, my prior experience told me that I needed to have

2  documentation, and that was the best way for me to do it.

3  Q.   Okay.  Do you have any documentation of how the other

4  payments were made?

5  **A.**   No, I do not.

6  Q.   Did -- in your discussions with the defendant, did she

7  ever discuss where she was getting the money to pay for her

8  portion of the wedding?

9  **A.**   No, sir.

10  Q.   I want to ask you about a few names, and see whether

11  you've -- know who these folks are or whether they paid for

12  any of the wedding.  Do you know if Richard Rock paid for any

13  portion of the wedding?

14  **A.**   I do not know that.  I don't recognize the name.

15  Q.   Do you know the name William Turbay?

16  **A.**   No, sir.

17  Q.   Chad Pouliot?

18  **A.**   No, sir.

19  Q.   James Frasure?

20  **A.**   No, sir.

21  Q.   Did you attend the wedding?

22  **A.**   I did.

23  Q.   Did you meet any of these people at the wedding?

24  **A.**   I did not.

25  Q.   Have you ever heard of an organization called A Bright

1    Present Foundation?

2    **A.**    I have not.

3    Q.    Have you ever heard of a political action committee

4    called Future for Nevadans?

5    **A.**    I have not.

6    Q.    When you were married to the defendant, did she have

7    any -- was she a part of or did she manage any charity that

8    raised money on behalf of police officers?

9    **A.**    No.

10            **MR. GOTTFRIED:**  I have nothing further for this

11    witness.

12            **THE COURT:**  Mr. Sanft?

13            **MR. SANFT:**  Your Honor, I have no questions.  Thank

14    you.

15            **THE COURT:**  All right.  May I excuse this witness?

16            **MR. GOTTFRIED:**  We would ask that he be excused.

17            **THE COURT:**  Any objection, Mr. Sanft?

18            **MR. SANFT:**  No, Your Honor.  Thank you.

19            **THE COURT:**  Thank you so much, sir.  You can step

20    down.  If you could just watch your step right there, and the

21    one right in front of the jury box, too.

22            **THE WITNESS:**  Thank you.

23            **THE COURT:**  Thank you, sir.

24            All right.  If I could see counsel at sidebar for

25    some scheduling discussions.

1        **MR. ASKAR:**  Yes, Your Honor.

2        **MR. SANFT:**  Yes, Your Honor.

3    *(At sidebar on the record.)*

4        **THE COURT:**  What's tomorrow look like?

5        **MR. ASKAR:**  We tried to get a bunch of folks here or

6    shift them.  Currently I think --

7        **MR. GOTTFRIED:**  We got six folks who are listed --

8        **MR. ASKAR:**  -- six folks for tomorrow.

9        **THE COURT:**  And how long do you think they'll go

10   tomorrow?  Did you take some of them today?

11       **MR. ASKAR:**  We did take --

12       **MR. GOTTFRIED:**  Not the six --

13   *(Reporter instruction.)*

14       **MR. GOTTFRIED:**  Sorry.  Not the six that we're

15   talking about.

16       **THE COURT:**  Yeah, yeah.

17       **MR. ASKAR:**  Not of these six.  We did take some from

18   yesterday -- or from tomorrow that would have testified

19   tomorrow.  We did take some of those today.

20       So with those six, I anticipate, if they go like

21   today, maybe three hours?

22       **THE COURT:**  Okay.  I'm thinking, why don't we at

23   least tell the jury they can come at 9:00 tomorrow --

24       **MR. ASKAR:**  Yes, Your Honor.

25       **THE COURT:**  -- and let them sleep in a little bit.

```
1    And we'll see if we can knock this out in the morning.
2            MR. ASKAR:  I think that would -- I think we should
3    be able to do that, Your Honor.
4            THE COURT:  Okay.  All right.  Sounds good.  I'm
5    going to tell them 9:00.
6            MR. ASKAR:  And then we'll have -- I think we will
7    only have -- and this may be better left for tomorrow, but we
8    will only have three or four -- actually, four more on Monday.
9    So we would anticipate, if defense counsel wanted to be able
10   to call witnesses following the Rule 29, we anticipate, you
11   know, being -- having time to do so.
12           THE COURT:  Okay.
13           MR. SANFT:  We anticipated Tuesday, Your Honor, just
14   to let the Court know.
15           THE COURT:  You anticipated you'd have people here
16   Tuesday.
17           MR. SANFT:  Yes, Your Honor.
18           THE COURT:  Can you try to get some people here
19   Monday?
20           MR. SANFT:  Yes.
21           THE COURT:  Thank you.
22           All right.  I'll let everybody know we're going to
23   start at 9:00 tomorrow morning and that we'll probably push
24   through with maybe a couple breaks but probably send them home
25   instead of doing a lunch tomorrow.
```

1    **MR. ASKAR:**  That sounds great, Your Honor.

2    **MR. SANFT:**  Yes, Your Honor.

3    **THE COURT:**  Okay.

4    *(End of discussion at sidebar.)*

5    **THE COURT:**  Well, thank you for powering through

6    without an afternoon break with us today.  That's all the

7    witnesses we have for today.

8        Tomorrow, because everyone has done such a good job

9    of staying on schedule, including all of you being ready to go

10   every time we've said to come in here from a break, we're

11   going to start a little later tomorrow morning so you can

12   sleep in.  So we're going to start at 9:00 instead of 8:30.

13   So give you another half an hour tomorrow morning.  And then

14   we anticipate that we're going to be able to just work through

15   the witnesses with maybe a morning break and probably not take

16   a lunch break.  So we'll probably end early tomorrow without

17   needing to get to a lunch break.  So we're going to power

18   through in the morning so that we can just go ahead and send

19   your home instead of having the breaks and keeping you around

20   tomorrow.

21       But we are -- we're a little ahead of schedule, and

22   so I thought you might want to hear that.  But we are doing

23   well and anticipating that we will be on track, continue to

24   stay on track with the trial with the schedule that we

25   originally told you about.

1          So we're going to let you go for tonight.  Same rules

2     apply.  Don't talk about the case among yourselves or with

3     anybody else.  Don't read, view, or listen to anything about

4     the case.  Don't Google anything.  Don't do any of your own

5     independent research.  And please wait to formulate your final

6     opinions until you've heard all of the evidence and my

7     instructions of law.

8          Thank you again for all of your patience today, and

9     we'll see you tomorrow morning at 9:00.

10     *(Jury out at 2:15 p.m.)*

11          **THE COURT:**  All right.  So please make sure Mr. Sanft

12     knows who our six are up for tomorrow so he can prepare.

13          And is there anything else we need to cover tonight

14     before we conclude?

15          **MR. ASKAR:**  I don't believe so, Your Honor.

16          **MR. SANFT:**  No, Your Honor.

17          **MR. ASKAR:**  What time would you like us here

18     tomorrow?

19          **THE COURT:**  Quarter to 9:00.

20          **MR. ASKAR:**  Not a problem.

21          **THE COURT:**  And perhaps then -- so I've asked

22     Mr. Sanft to try to get witnesses ready to go on Monday

23     afternoon.  If we end up having time Monday afternoon or

24     Tuesday, maybe then we'll do some jury instruction

25     conversation, although you submitted to me joint instructions.

2:24-cr-00155-JAD-DJA • September 26, 2024

1    But that might be a good time just to kind of shore those up.

2              **MR. SANFT:**  Yes, Your Honor.

3              **MR. ASKAR:**  That sounds good, Your Honor.

4              **THE COURT:**  All right.  We're adjourned.  Have a good

5    night.

6         (Proceedings adjourned at 2:15 p.m.)

7                            --o0o--

8                    COURT REPORTER'S CERTIFICATE

9

10        I, AMBER M. McCLANE, Official Court Reporter, United

11   States District Court, District of Nevada, Las Vegas, Nevada,

12   do hereby certify that pursuant to 28 U.S.C. § 753 the

13   foregoing is a true, complete, and correct transcript of the

14   proceedings had in connection with the above-entitled matter.

15

16   DATED:  9/28/2024

17

18   /s/_____
                 AMBER McCLANE, RPR, CRR
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR