2:24-cr-00155-JAD-DJA • September 27, 2024

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:24-cr-00155-JAD-DJA
 4              Plaintiff,          )
                                    ) Las Vegas, Nevada
 5   vs.                            ) September 27, 2024
                                    ) 8:50 a.m. - 10:42 a.m.
 6   MICHELE FIORE,                 ) Courtroom 6D
                                    ) JURY TRIAL, DAY 4
 7              Defendant.          )
     _____ )  CERTIFIED COPY
 8

 9

10             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                          JURY TRIAL, DAY 4
11          BEFORE THE HONORABLE JENNIFER A. DORSEY
                 UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:  ALEXANDER B. GOTTFRIED, ESQ.
                          DAHOUD ASKAR, ESQ.
15                        U.S. DEPARTMENT OF JUSTICE
                          1301 New York Avenue NW
16                        Washington, D.C. 20001
                          (202) 368-1667
17

18   (Appearances continued on page 2.)

19

20

21   Court Reporter:      Amber M. McClane, RPR, CRR
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

2:24-cr-00155-JAD-DJA • *September 27, 2024*

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant:

 3       MICHAEL W. SANFT, ESQ.
         SANFT LAW
 4       411 East Bonneville Avenue, Suite 360
         Las Vegas, Nevada 89101
 5       (702) 497-8008

 6                       * * * * *

 7                     I N D E X
```

| Government's Witnesses: | Page |
|---|---|
| **HARRY MOHNEY** | |
| *Direct Examination by Mr. Gottfried* | 7 |
| *Cross-Examination by Mr. Sanft* | 17 |
| **BRETT TORINO** | |
| *Direct Examination by Mr. Gottfried* | 22 |
| *Cross-Examination by Mr. Sanft* | 27 |
| **ALYSSA STRUCK** | |
| *Direct Examination by Mr. Gottfried* | 29 |
| *Cross-Examination by Mr. Sanft* | 33 |
| **RONNIE COUNCIL VIA ZOOM** | |
| *Direct Examination by Mr. Askar* | 38 |
| *Cross-Examination by Mr. Sanft* | 46 |
| *Redirect Examination by Mr. Askar* | 58 |
| **TARA KRUMME** | |
| *Direct Examination by Mr. Askar* | 61 |
| *Cross-Examination by Mr. Sanft* | 70 |

```
25   / / / / /
```

2:24-cr-00155-JAD-DJA • September 27, 2024

```
1                    I N D E X   C O N T.

2                      E X H I B I T S

3    EXHIBIT NO.:      OFFERED          RECEIVED       WITHDRAWN

4    39                62               62

5    65                14               14

6    81                ---              ---              5

7    85                33               33

8                           * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

```
1          LAS VEGAS, NEVADA; FRIDAY, SEPTEMBER 27, 2024; 8:50 A.M.

2                               --o0o--

3                        P R O C E E D I N G S

4          (Outside the presence of the jury.)

5          COURTROOM ADMINISTRATOR:  This is the time set for

6    jury trial, Day 4, in Case 2:24-cr-155-JAD-DJA, United States

7    of America versus Michele Fiore.

8          Please make your appearances.

9          MR. ASKAR:  Good morning, Your Honor.  Dahoud Askar

10   here on behalf of the United States along with my colleagues.

11         MR. GOTTFRIED:  Alexander Gottfried on behalf of the

12   United States.  Also seated at counsel table today is

13   Special Agent Kyle Jaski of the FBI and, as always, Heather

14   DePremio.

15         MR. SANFT:  Good morning, Your Honor.  Michael Sanft

16   on behalf of Ms. Fiore who's present, as well as my assistant,

17   Megan Hampton.

18         THE COURT:  All right.  Good morning, everybody.

19         Mr. Askar, what do we need to address this morning?

20         MR. ASKAR:  Your Honor, very briefly, Ms. Rivera

21   notified us at the end of proceedings yesterday that it

22   appears Exhibit 81 was admitted.  Exhibit 81, to refresh Your

23   Honor's recollection, were the checks -- the individual checks

24   from Mr. Lee's account.  Your Honor had ruled that, given that

25   Exhibit 81 is a subset of Exhibit 10 and in light of concerns
```

1    about running afoul of the Court's 404 order, that we would

2    use that demonstratively instead.

3          So I don't know if the best court of action at this

4    moment is to just have that exhibit withdrawn or if there's

5    another preference, but we wanted to bring that to the Court's

6    attention.

7          **THE COURT:**  I think that's probably the best thing to

8    do, is just to have it withdrawn and note for the record that

9    it was being utilized for demonstrative purposes only.

10          So, Summer, if you can let the record reflect that

11   Exhibit 81 has been withdrawn.  It is not in evidence.  It is

12   also -- it also was a subset of Exhibit 10.  So the documents

13   themselves were already in evidence based on the parties'

14   stipulation at the beginning of trial.  Nevertheless,

15   Exhibit 81 was just used with Mr. Lee for demonstrative

16   purposes.

17      *(Exhibit No. 81, withdrawn.)*

18          **COURTROOM ADMINISTRATOR:**  Yes, Your Honor.

19          **MR. ASKAR:**  Perfect, Your Honor.

20          **THE COURT:**  All right.  Is that acceptable,

21   Mr. Sanft?

22          **MR. SANFT:**  Yes, Your Honor.  Thank you.

23          **THE COURT:**  Thank you.

24          Anything else?

25          **MR. ASKAR:**  Nothing from the Government, Your Honor.

1          **THE COURT:**  All right.  Well, we'll find out if we've

2    got all the jurors here yet.  It's only 8:52 so we probably

3    don't have everyone yet, but it's a prompt bunch so there were

4    people buzzing in just after 8:00.

5          **MR. ASKAR:**  Oh, wow.

6          **THE COURT:**  So just relax.

7          **MR. ASKAR:**  Thank you, Your Honor.

8      *(Pause in proceedings.)*

9          **THE COURT:**  All right.  Sounds like all the jurors

10   are here, so Summer's going to bring them in.

11          Who's up first this morning?

12          **MR. GOTTFRIED:**  We have Harry Mohney.

13          **THE COURT:**  Okay.  Everybody's lined up outside?

14          **MR. ASKAR:**  At least two of -- at least two of the --

15   or, excuse me, we have three witnessed lined up outside now,

16   Your Honor.

17          **THE COURT:**  Wonderful.  Are they all going to be

18   short ones?

19          **MR. GOTTFRIED:**  The first three should be short.

20          **COURTROOM ADMINISTRATOR:**  All rise.

21          **MR. GOTTFRIED:**  I'm not sure.  The next two might be

22   slightly longer.

23      *(Jury in at 9:00 a.m.)*

24          **THE COURT:**  All right.  Good morning, everyone.  Have

25   a seat.

*Harry Mohney - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1          Will the parties stipulate to the presence of the

2    jury?

3          **MR. ASKAR:**  Yes, Your Honor.

4          **MR. SANFT:**  Yes, Your Honor.

5          **THE COURT:**  All right.  Everyone, sit down.

6          And, Government, please call your next witness.

7          **MR. GOTTFRIED:**  Government calls Harry Mohney.

8          **THE COURT:**  Good morning, sir.  You're going to head

9    right on up here.

10          **THE WITNESS:**  Okay.

11          **COURTROOM ADMINISTRATOR:**  Watch your step here, and

12   you're just going to walk around here and there's two more

13   steps.  Raise your right hand.

14      *(The witness is sworn.)*

15          **THE WITNESS:**  I do.

16          **COURTROOM ADMINISTRATOR:**  Go ahead and take a seat.

17          **THE WITNESS:**  Thank you.

18          **COURTROOM ADMINISTRATOR:**  And then just state and

19   spell your first and last name.  You might just need to --

20          **THE WITNESS:**  You don't want my middle name today?

21          **COURTROOM ADMINISTRATOR:**  Not today.  You might need

22   to scoot up just a tad.

23          **THE WITNESS:**  Harry Mohney, M-o-h-n-e-y.

24                    **DIRECT EXAMINATION**

25   **BY MR. GOTTFRIED:**

```
 1   Q.   Good morning, sir.

 2   A.   Good morning.

 3   Q.   Could you tell the jury whether -- are you still working,

 4   or are you retired?

 5   A.   I'm still working.

 6   Q.   And what is it that you do for work?

 7   A.   Well, I'm all kinds of entrepreneurial.  But I have

 8   Hammered Harry's downtown.  I have Cat's Meow, a karaoke bar

 9   downtown.  But I'm mostly infamous for gentlemen's clubs.

10        THE COURT:  Sir, can I ask you to pull that

11   microphone a little closer to you?  You can stay where you're

12   seated but -- there we are.  Thank you so much.  You're a

13   little -- your voice is a little low.  So thank you so much.

14        You can continue, Mr. Gottfried.

15        THE WITNESS:  I apologize for that.

16        THE COURT:  No worries.

17   BY MR. GOTTFRIED:

18   Q.   Sir, is it fair to say that you own a number of different

19   types of businesses?

20   A.   It's fair to say.

21   Q.   And do you -- either personally or through your

22   businesses, do you give to charitable causes?

23   A.   Yes.

24   Q.   What types of charitable causes do you generally give to?

25   A.   Oh, orphans... gee, trying to think of them all.  Gee.
```

*Harry Mohney - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

 1   Foundations for different causes.  Police associations.
 2   Lion's club.  I'm trying to rattle off things off the top of
 3   my head.  Railroad museum.  I'm sure there's --
 4   Q.   Sure.
 5   **A.**   -- numerous other causes.  But yes.
 6   Q.   So, sir, you mentioned the police association.  Why is
 7   that cause important to you?
 8   **A.**   Well, without police, we have anarchy.  So, you know,
 9   it's important -- who you gonna call?  I mean, to be humorous,
10   I'm not going to call Ghostbusters.  So I need the police as
11   much as anybody else.
12   Q.   Sure.  Now, sir, do you recall or have you been made
13   aware of a check that you wrote to an organization called
14   Future for Nevadans?
15   **A.**   Yes, I have.
16         **MR. GOTTFRIED:**  And, Heather, can you bring up what's
17   already in evidence as Government's Exhibit 66?  If you could
18   blow up the check.
19   **BY MR. GOTTFRIED:**
20   Q.   So, sir, up at the top left of the check it says, Harry
21   V. Mohney Revocable Trust.  Is that -- what is that?
22   **A.**   That's my revocable trust.
23   Q.   And if you could explain to the jury, what is a revocable
24   trust?
25   **A.**   It's basically your assets in trust managed by yourself.

*Harry Mohney - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    I could revoke it at any time, and all the assets would

2    actually fall back in my personal name.  Mostly set up for

3    inheritances purposes.

4    Q.    And do you also use this trust to make the types of

5    charitable donations that we were discussing earlier?

6    **A.**    Yes.

7    Q.    Now, sir, looking at this check, what is the -- what is

8    the group or organization that this check is made out to?

9    **A.**    Future for Nevadans.

10   Q.    And what is the amount of the check?

11   **A.**    $2,000.

12   Q.    And the date on the check?

13   **A.**    11/15/19.

14   Q.    And what about -- what does the memo line say?

15   **A.**    Donation.

16   Q.    So, sir, is it fair to say this was intended as a

17   charitable donation?

18   **A.**    Correct.

19   Q.    And did you -- the signature line, your name is up at the

20   top but it says by someone else.  Can you explain who signed

21   this check?

22   **A.**    I don't write checks and haven't for numerous years.

23   Laurie Bowers in the offices back in Michigan writes all my

24   personal checks.  So she signs my name and her name.

25   Q.    Now, sir, I see the address on the revocable trust is

1  Michigan, and you said that Laurie Bowers is in Michigan as

2  well.  Do you live here in Las Vegas, or do you live in

3  Michigan?

4  **A.**  I live in Las Vegas.

5  Q.  Okay.  Do you also have business in Michigan?

6  **A.**  Yes, I do.

7  Q.  Now, sir, do you recall what it was that caused you to

8  make this donation to Future for Nevadans?

9  **A.**  To the best of my memory, somebody had approached me

10  about making a donation for some statue or tribute to a fallen

11  police officer.

12  Q.  So, sir, you said somebody approached you to ask you to

13  make a donation for a statue of a fallen police officer?

14  **A.**  Correct.

15  Q.  Now, sir, in searching your records related to that

16  check, did you find whether you maintained anything in writing

17  regarding the purpose of that check?

18  **A.**  I couldn't find anything.

19  Q.  Did anyone who worked for you find anything regarding the

20  purpose of that check?

21  **A.**  Yes.  Laurie Bowers found the -- I guess the solicitation

22  paper that I had forwarded to her to approve the donation.

23  Q.  So, sir, you said Laurie Bowers.  Is that the same person

24  who signed the check on your behalf?

25  **A.**  Yes, it is.

1   Q.   And she found -- where was that flyer located that she

2   found?

3   **A.**   In her office I believe or in her computer.  One of the

4   two.

5   Q.   Okay.  And do you know why she kept that flyer?

6   **A.**   She pretty much keeps a record of everything that has to

7   do with my account.

8   Q.   So she regularly keeps, you know, records of payments

9   made from your accounts?

10  **A.**   Yes.

11  Q.   And have you seen a copy of that flyer that she -- that

12  she kept?

13  **A.**   Yes.  I forwarded it to her.

14  Q.   You forwarded it to her.  And is that in your e-mail

15  account?

16  **A.**   I couldn't find it in my e-mail account.  I didn't know

17  if I faxed it or e-mailed it.  I assumed I e-mailed it, but I

18  couldn't find it in mine.  I'm not as computer literate as

19  everybody else is.  I'm a little, I hate to say it, old

20  school.  But you didn't ask me how old I am.

21  Q.   And I won't ask you how old you are, sir.

22  **A.**   That's kind of you.

23  Q.   Sir, do you see the binders that are located on your

24  right?

25  **A.**   Yes, I do.

1    Q.   Can you flip through the binders?  I think it may be the

2    second one, but we're looking for Exhibit 65.

3         **THE COURT:**  Actually, it's going to be in this one

4    right here.  It's the last one.  Sixty-five, sir.

5    **BY MR. GOTTFRIED:**

6    Q.   And just let me know when you get there.

7    **A.**   And is it the 65th page or --

8    Q.   I don't believe so.  But it will say Exhibit 65 in a

9    yellow box on the -- on the exhibit.

10        **THE COURT:**  There are tabs.  If you find 65 on those

11   tabs.

12        **THE WITNESS:**  Oh, okay.  The tab tells me that.  I

13   have Exhibit 65.

14   **BY MR. GOTTFRIED:**

15   Q.   You have Exhibit 65 in front of you.  Sir, is this the

16   flyer that you forwarded to your assistant, Laurie Bowers, in

17   relation to that check that we looked at?

18   **A.**   Yes, it is.

19   Q.   And do you recall, you know, having seen this flyer, you

20   know, and this flyer causing you to make that donation?

21   **A.**   I vaguely recall that.  I'm assuming one of my attorneys

22   or somebody close enough to me had called me and asked me to

23   donate for this cause.

24   Q.   So you have a recollection, sir, that someone called you

25   and asked you to donate to this cause?

1   **A.**   That would be my memory, yes.

2   Q.   And that that person also sent you this flyer?

3   **A.**   I would believe so, yes.

4        **MR. GOTTFRIED:**  Your Honor, at this point I'd ask to

5   move Government's Exhibit 65 into evidence.

6        *(Exhibit No. 65, offered.)*

7            **MR. SANFT:**  I have no objection, Your Honor.

8            **MR. GOTTFRIED:**  And ask to publish to the jury.

9            **THE COURT:**  65 will come in, and you can publish.

10       *(Exhibit No. 65, received.)*

11  **BY MR. GOTTFRIED:**

12  Q.   Sir, could you read the -- what the writing says on this

13  flyer that's on the screen in front of you?

14  **A.**   All of it?

15  Q.   Yep, the whole thing.

16  **A.**   Looks like [as read]:  Will dedicate and open the new

17  Alyn Beck park in Ward 6.  A bronze statute will be unveiled

18  in Alyn Beck's honor.  Please donate to Future Nevada's [sic]

19  PAC.  All donations will go towards our goal to reach $80,000.

20  Make checks payable to Future of -- for Nevadans, 6205 Red

21  Pine Court, Las Vegas, Nevada 89103.

22  Q.   Now, sir, before receiving this flyer, do you recall

23  knowing anything about that organization, Future for Nevadans

24  PAC?

25  **A.**   No, I've never heard of it.

1    Q.   Do you recall having ever made a donation to Future for

2    Nevadans PAC?

3    **A.**   Never.

4    Q.   Do you know the defendant in this case, Michele Fiore?

5    **A.**   No, I don't.

6    Q.   Would you have made a donation to support a political

7    action committee associated with Michele Fiore?

8    **A.**   Probably not.

9    Q.   And do you know anything -- that address that's on the

10   bottom, 6205 Red Pine Court, does that mean anything to you?

11   **A.**   Nothing, no.

12   Q.   So you said you don't know the defendant.  Is the

13   defendant the one who reached out to you and gave you this

14   flyer?

15   **A.**   No.

16   Q.   Do you have any idea of who may have been the person to

17   reach out to you?

18   **A.**   Well, if it was a donation, usually the police

19   association.  It's usually one of my attorneys or a police

20   association member.

21   Q.   Now, is one of your attorneys a gentleman named Jay

22   Brown?

23   **A.**   Yes, he is.

24   Q.   Thank you, sir.

25        **MR. GOTTFRIED:**  You can take that down, Heather.

*Harry Mohney - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    **BY MR. GOTTFRIED:**

2    Q.    Sir, based on this flyer and based on your recollection,

3    when you made this donation, did you believe that it would be

4    used to fund the Alyn Beck statue?

5    **A.**    Yes, I did.

6    Q.    Would you have given that money if you believed that it

7    would be used for Councilwoman Fiore's personal expenses?

8    **A.**    No, I wouldn't have.

9    Q.    Would you have given that money if you believed that it

10   would be used for political -- you know, Councilwoman Fiore's

11   political career?

12   **A.**    No, I wouldn't have.

13   Q.    Were you ever contacted by Councilwoman Fiore to say that

14   your donation was not needed for the statue?

15   **A.**    No, I was not.

16   Q.    Were you ever contacted by Councilwoman Fiore or anybody

17   else to ask if your money could be used for something besides

18   the statue?

19   **A.**    No, I was not.

20   Q.    And were you ever reimbursed for the donation that you

21   made to Future for Nevadans?

22   **A.**    No, I wasn't.

23   Q.    Thank you, sir.  I have no further questions for you.

24          **THE COURT:**  Cross-examination, Mr. Sanft?

25          **MR. SANFT:**  Thank you, Your Honor.

1        **CROSS-EXAMINATION**

2    **BY MR. SANFT:**

3    Q.    Good morning, Mr. Mohney.

4    **A.**    Good morning.

5    Q.    Just a couple follow-up questions for you --

6    **A.**    Pardon me, sir?

7    Q.    I'm sorry?

8    **A.**    I couldn't hear you.

9    Q.    I apologize.  Just a couple more follow-up questions for

10   you, and then we'll --

11   **A.**    Not a problem.

12   Q.    The first thing is, is when was the first time you spoke

13   to the FBI on this case?

14   **A.**    Maybe day before yesterday.

15   Q.    That was the first time you spoke to them?

16   **A.**    Yes.

17   Q.    Okay.  If I tell you that it was on September 18th of

18   this particular month and year, would that be more accurate

19   for you?

20   **A.**    December 18th?

21   Q.    Or September 18th.  I apologize.  I'm missing my dates,

22   too.

23   **A.**    What?

24   Q.    On the 18th of this month that you actually spoke to

25   the --

*Harry Mohney - Cross*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    **A.**    Eighteenth of this month?  I don't think I spoke to them

2    on the 18th.  They may have spoke to one of my attorneys, but

3    I don't believe they spoke to me personally.

4    Q.    Okay.  So your recollection is the day before yesterday

5    you had an interview with the FBI?

6    **A.**    I believe it was day before yesterday.  It could have

7    been three days ago.  But, yes, it was very recent.

8    Q.    Sure.  And I'm not trying to pin you down on anything.  I

9    just want to make sure.

10   **A.**    Oh, I have no problem.

11   Q.    Now -- and that would have been the first time you

12   actually spoke with the FBI?

13   **A.**    In my life?

14   Q.    No, no.  For this particular case.

15   **A.**    For this case?

16   Q.    I don't want to know about the rest of it.  Just on this

17   one.

18   **A.**    Well, I'm glad.  To the best of my memory, yes.

19   Q.    Okay.  Now, in speaking with the FBI, at that point you

20   were notified through the Government basically that there was

21   some issue with regards to a donation that you had made

22   towards a particular statue; right?

23   **A.**    Okay.  That was quite a line.  But, yeah, I believe

24   you're correct.

25   Q.    Yeah.  So it wasn't like you thought, wait, what happened

1  to this donation to the statue, I want to follow up on that,

2  nothing like that; right?

3  **A.**   Okay.  Again, I can't hear you very well.

4  Q.   I apologize.  It wasn't like you said, hey, you know

5  what, I want to know what happened to my 2,000-dollar donation

6  to the statue, and then followed up like that; right?  You

7  didn't do that?

8  **A.**   You mean did I call somebody to say, hey, what happened

9  to the $2,000?

10  Q.   Right.

11  **A.**   No, I didn't.  I just --

12  Q.   Now --

13  **A.**   -- assumed it went to the right place.

14  Q.   Right.  And with regards to your -- your activity with

15  charitable donations, you do a lot of these types of

16  donations?  You've shared that with us.

17  **A.**   Yes, we do.

18  Q.   Okay.  And have you ever received a reimbursement back

19  for any charitable donation you've made before in the past?

20  **A.**   No, I have not.

21  Q.   Okay.  And with regards to the remainder of the questions

22  the government asked you, had you ever been called by a

23  charitable organization and say, hey, we fulfilled this

24  particular project, we would like to take your money and

25  instead of put it into, say, the statue, we want to put it

1    into something that's another charitable sort of thing?  Have

2    you ever had that happened to you before?

3    **A.**   I don't recall that ever happening.

4    Q.   Okay.  Now, in addition to that -- I just want to make

5    sure I'm clear here.  Your recollection is that there was a

6    flyer, but you don't know how you received the flyer?

7    **A.**   I don't recall exactly how it came.  It was probably by

8    e-mail.

9    Q.   Yeah.  And with regards to your meeting with the FBI, you

10   gave them everything you had, including potentially what could

11   have been an e-mail; right?

12   **A.**   I gave them everything I could find, yes.

13   Q.   So everything with regards -- they showed you today, was

14   that the things that you gave them, which was a copy of the

15   check, as well -- or maybe -- I don't know if they gave you a

16   copy of the check.  But the flyer, for instance, and so forth,

17   you gave them all of that?

18   **A.**   Correct.

19   Q.   Okay.  I have no further questions, sir.  Thank you.

20   **A.**   I'm disappointed.

21        **MR. GOTTFRIED:**  I have nothing further for

22   Mr. Mohney.  We would ask that the witness be excused.

23        **THE COURT:**  All right.  Can I excuse this witness,

24   Mr. Sanft?

25        **MR. SANFT:**  Yes, Your Honor.  Thank you.

*Brett Torino - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    **THE COURT:**  Thank you, sir.  You can step down.  You

2    are excused.

3    **THE WITNESS:**  Thank you.

4    **THE COURT:**  Please watch your step.

5    **THE WITNESS:**  Okay.

6    **THE COURT:**  And that step right there in front of the

7    jury.

8    **THE WITNESS:**  Thank you, again.

9    **THE COURT:**  Thank you.  Have a good day, sir.

10    **THE WITNESS:**  Thank you.

11    **THE COURT:**  Next witness, Mr. Gottfried.

12    **MR. GOTTFRIED:**  Next witness, the government calls

13    Brett Torino.

14    **THE COURT:**  Hi, there.  You're going to head right on

15    up here.

16    **COURTROOM ADMINISTRATOR:**  Watch your step right here.

17    And you're just going to around here.  There's two more steps.

18    Raise your right hand.

19    *(The witness is sworn.)*

20    **THE WITNESS:**  I do.

21    **COURTROOM ADMINISTRATOR:**  Go ahead and take a seat.

22    State and spell your first and last name.

23    **THE WITNESS:**  My name is Brett Torino; B-r-e-t-t,

24    T-o-r-i-n-o.

25    **DIRECT EXAMINATION**

1    **BY MR. GOTTFRIED:**

2    Q.    Good morning, sir.

3    **A.**    Good morning.

4    Q.    How are you?

5    **A.**    I'm good.  Thank you.

6    Q.    Could you please tell the members of the jury what is it

7    that you do for a living?

8    **A.**    I'm a developer here.  I have a company based here in

9    Las Vegas.

10    Q.    You said you're a developer?

11    **A.**    Yes.

12    Q.    What type of developer?

13    **A.**    Primarily -- well, all I do here is I'm probably the

14    largest private Strip developer today.  So I develop

15    commercial properties on the Strip.

16    Q.    I'm sorry, sir, could you speak up just a little bit --

17    **A.**    Yeah, sure.  I develop commercial properties on the

18    Strip.

19    Q.    What are some of the properties that you've developed on

20    the Strip?

21    **A.**    If I go back historically, I owned the whole block across

22    from CityCenter at one point.  I own two commercial properties

23    on each side of Harmon and Las Vegas Boulevard, so where

24    Crystals and Cosmopolitan is.  And then I'm currently in

25    escrow to buy a large parcel next to the Fontainebleau in

*Brett Torino - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

```
 1    front of the Convention Center.  So that's primarily what I
 2    do.
 3    Q.   And you said you got a company here in Las Vegas.  What
 4    is -- what is the name of that company?
 5    A.   Torino Companies.
 6    Q.   Torino Companies?
 7    A.   Um-hum.
 8    Q.   What is BPS Management Services?
 9    A.   These properties that we have, have many entities.  So
10    BPS is one of several entities on a property that we own on
11    the northeast corner of Harmon and the Strip.
12    Q.   Okay.  And what is your role, if any, with BPS Management
13    Services?
14    A.   I believe I'm manager or one of the managers.  It's an
15    LLC.
16    Q.   Okay.  It's an LLC.  And you have a managerial role
17    with --
18    A.   I do --
19    Q.   -- that LLC?
20    A.   -- yes.  That's correct.
21    Q.   Sir, either -- do you regularly make donations to
22    charitable causes?
23    A.   I own a foundation.  I mean, I've run a foundation here
24    for 30 years.  So I have to say yes.
25    Q.   What type of work does your foundation do?
```

1   **A.**   I have a ranch where we do camps for kids with critical

2   illnesses.

3   Q.   And in addition to that, the work that your foundation

4   does, do you give to other charities as well?

5   **A.**   I do.

6   Q.   And is that in your personal capacity, or do you also do

7   that through your companies?

8   **A.**   Both.

9   Q.   Both.  Have you made charitable donations through BPS

10  Management Services?

11  **A.**   I do.

12  Q.   Why do you feel that it's important to make charitable

13  donations, you know, through your businesses?

14  **A.**   I have partners in some of the projects that I own, and I

15  always feel that they should bear some of freight when I do

16  things.  I spend a lot of money through my foundation that I

17  don't ask my partners for contributions.  But on this, you

18  know, I felt it was a fair thing to do.

19  Q.   Now, sir, are you the person who authorizes donations

20  from BPS Management?

21  **A.**   I'm one of them that could, sure.

22  Q.   Now, in December of 2019, did BPS Management make a

23  donation to a statue of Officer Alyn Beck?

24  **A.**   As to the date, I'm somewhat fuzzy.  But that would be

25  yes.

 1          **MR. GOTTFRIED:**  Heather, can you please put up on the

 2    screen what's already in evidence as Government's Exhibit 52?

 3    If you could blow that up?

 4    **BY MR. GOTTFRIED:**

 5    Q.    Sir, do you see the check that's up on the screen in

 6    front of you?

 7    **A.**    I do.

 8    Q.    And the name at the top left over there, BPS Management

 9    Services, that's one of your companies?

10    **A.**    It is.

11    Q.    And the -- the date of that check, what's the date of

12    that check?

13    **A.**    December 30th, '19.

14    Q.    And who is the check made out to?

15    **A.**    A -- it looks like A Bright Present Foundation.

16    Q.    Is that an organization that you have any familiarity

17    with outside this particular donation?

18    **A.**    The donation I'm aware of.  But in terms of the

19    organization beyond that, I don't.

20    Q.    Do you know how you would have learned where to direct

21    your donation to?

22    **A.**    I couldn't specifically tell you, but I could have either

23    read something about it or I could have heard it from somebody

24    I'm involved with politically.  I --

25    Q.    Okay.

1    **A.**    -- can't tell you specifically but --

2    Q.    Sir, do you know the defendant in this case, Michele

3    Fiore?

4    **A.**    I don't.

5    Q.    So you would not have spoken with her directly regarding

6    this donation?

7    **A.**    No, no.

8    Q.    But you may have spoken with someone who you said that --

9    who you're involved with politically?

10    **A.**    That's right.

11    Q.    Now, who -- what signature is on the bottom right there?

12    **A.**    That's mine.

13    Q.    That's your signature?

14    **A.**    It is.

15    Q.    So you -- you authorized this check?

16    **A.**    I did.

17    Q.    And when you authorized this check, where did you

18    believe -- you know, how did you believe that your money was

19    going to be used?

20    **A.**    I believed it was going to be used for a statue that was

21    honoring a fallen police officer.

22    Q.    Now, when you made this donation, would you have made

23    this donation if you believed it would be used for Michele

24    Fiore's personal expenses?

25    **A.**    No.

 1   Q.   Would you have believed -- would you have made this

 2   donation if you thought it would be used for Michele Fiore's

 3   political career?

 4   **A.**   No.

 5   Q.   Were you ever contacted by Michele Fiore to say that your

 6   donation was no longer needed for the statue?

 7   **A.**   No, we've never spoken.

 8   Q.   Were you ever contacted by Michele Fiore or anyone else

 9   to ask if she could use the donation for something besides the

10   statue?

11   **A.**   No.

12   Q.   And were you or your company ever reimbursed for the

13   donation that you made to the statue?

14   **A.**   No.

15   Q.   Thank you, sir.  That's all the questions I have for you

16   this morning.

17   **A.**   Okay.

18          **THE COURT:**  Mr. Sanft, cross-examination?

19          **MR. SANFT:**  Yes, Your Honor.

20                       **CROSS-EXAMINATION**

21   **BY MR. SANFT:**

22   Q.   I just have one question for you, Mr. Torino.

23   **A.**   Yes, sir.

24   Q.   Were you aware that the statue was actually built?

25   **A.**   No.

1          **MR. SANFT:**  No further questions, Your Honor.

2          **MR. GOTTFRIED:**  Nothing further for Mr. Torino.  We

3   would ask that he be excused.

4          **THE COURT:**  May I excuse this witness, Mr. Sanft?

5          **MR. SANFT:**  Yes, Your Honor.  Thank you.

6          **THE COURT:**  All right.  Thank you so much, sir.  You

7   can step down.  You're excused.

8          **THE WITNESS:**  Thank you, Judge.

9          **THE COURT:**  Please watch your step.  And particularly

10  that one right there in front of the jury box.

11         **THE WITNESS:**  Appreciate that.

12         **THE COURT:**  Thank you.

13         Next witness, Mr. Gottfried.

14         **MR. GOTTFRIED:**  Government's next witness is Alyssa

15  Struck.

16         **THE COURT:**  Hi, there.  You're going to head right on

17  up here.

18         **COURTROOM ADMINISTRATOR:**  Just watch your step here.

19         **THE WITNESS:**  Thank you.

20         **COURTROOM ADMINISTRATOR:**  And you'll just go around.

21  Please raise your right hand.

22     *(The witness is sworn.)*

23         **THE WITNESS:**  I do.

24         **COURTROOM ADMINISTRATOR:**  Go ahead and take a seat,

25  and state and spell your first and last name.

1          **THE WITNESS:**  Alyssa Struck.  That's A-l-y-s-s-a,

2     S-t-r-u-c-k.

3                     **DIRECT EXAMINATION**

4     **BY MR. GOTTFRIED:**

5     Q.   Good morning.

6     **A.**   Good morning.

7     Q.   Could you tell the jury where it is that you work?

8     **A.**   Plastic Surgery Vegas.

9     Q.   Plastic Surgery Vegas.  What -- it might be

10    self-explanatory, but what type of business is that?

11    **A.**   A cosmetic surgery office.

12    Q.   It's an office that provides cosmetic surgery?

13    **A.**   Um-hum.

14    Q.   What is your role there?

15    **A.**   I'm a custodian of records.  I do our HR, and I manage

16    our front office staff.

17    Q.   Okay.  Do you have a formal title?

18    **A.**   Administrative supervisor.

19    Q.   Okay.  So you're not personally providing cosmetic

20    surgery services.  You're more of an administrative role?

21    **A.**   Yes.

22    Q.   Now, when a client comes in for treatment, does your

23    company keep records associated with that treatment?

24    **A.**   Yes.

25    Q.   Do you do that for all clients and all treatments?

1    **A.**    Yeah.

2    Q.    What type of records do you keep?

3    **A.**    I mean, medical, financial records.

4    Q.    And when you say financial records, what are you talking

5    about?

6    **A.**    I guess it would just be you have a service and then you

7    pay for it, and so we have a record of that.

8    Q.    So you have records of payments made by clients for

9    services?

10   **A.**    Yes.

11   Q.    Do you have records of, I guess, invoices or bills for --

12   for clients?

13   **A.**    Yep.

14   Q.    What's the purpose of those records?

15   **A.**    As a business, I guess just to have a record and show

16   what people have had done and paid for.

17   Q.    Can you tell us how those records are generated?

18   **A.**    A patient calls.  They schedule an appointment.  That

19   enters into our system, kind of puts a date stamp.  They have

20   the service, they check out, they pay for it, it's put into --

21   Q.    Is there someone who is manually inputting that

22   information into the system?

23   **A.**    Right.  That's then input into a system that collects all

24   of that information.

25   Q.    Okay.  And is that done at the time that, you know,

1    someone makes an appointment or makes a payment?

2    **A.**    Yes.

3    Q.    Do the -- I want to talk to you about some of the

4    information that the records show.  Do they show the date of a

5    procedure?

6    **A.**    Yep.

7    Q.    Do they show who the provider was of that procedure?

8    **A.**    Yes.

9    Q.    Do they give a description of the type of procedure that

10    was provided?

11    **A.**    Yep.

12    Q.    Do they show how much that procedure cost?

13    **A.**    Yes.

14    Q.    And how much was paid for the procedure?

15    **A.**    Yes.

16    Q.    Do they also provide -- do patients have accounts with

17    your -- with your company?

18    **A.**    Describe accounts.

19    Q.    If someone comes in and they're a regular client of your

20    business, do they have, you know -- are -- is there a record

21    that's kept for those -- that one particular client?

22    **A.**    Yes, yes.

23    Q.    And, ma'am, in February of 2021, was your office served

24    with a subpoena for documents from a grand jury sitting in the

25    district of Nevada?

 1    **A.**    Yes.

 2    Q.    And did that subpoena request all records from

 3    January 2017 until February 2021 pertaining services that were

 4    provided to or paid for by Michele Fiore?

 5    **A.**    Yes.

 6    Q.    Did you provide records in response to that subpoena?

 7    **A.**    Yes.

 8    Q.    Were those records created during the regular course of

 9    your business by a person with knowledge of the information

10    contained in those records?

11    **A.**    Yes.

12    Q.    Have you reviewed -- had a chance to review those records

13    prior to coming in and testifying today?

14    **A.**    Yeah.

15         **THE COURT:**    Can you keep your voice up for us?

16    You're kind of soft-spoken.    Thank you.

17         **THE WITNESS:**    Yes.

18    **BY MR. GOTTFRIED:**

19    Q.    And are those records that you reviewed, you know, a true

20    and accurate record of services that were provided to Michele

21    Fiore and payments that were received by her?

22    **A.**    Yes.

23    Q.    Ma'am, you're going to have a binder located on your

24    right.    There's a few of them.    It should be the last one.    If

25    you could flip to Exhibit 85.

1      **THE COURT:**  It's going to be this one.

2      **THE WITNESS:**  Okay.  Okay.

3    **BY MR. GOTTFRIED:**

4    Q.   Are you there?

5    **A.**   Yep.

6    Q.   If you could just flip through quickly.  Are these the

7    records that your office provided in response to that

8    subpoena?

9    **A.**   Yeah -- yes.  Correct.

10      **MR. GOTTFRIED:**  Your Honor, at this point government

11   moves Exhibit 85 into evidence.

12     *(Exhibit No. 85, offered.)*

13      **MR. SANFT:**  No objection, Your Honor.

14      **THE COURT:**  85 will come in.

15     *(Exhibit No. 85, received.)*

16      **MR. GOTTFRIED:**  No further questions for this

17   witness.

18      **THE COURT:**  Mr. Sanft, any cross?

19      **MR. SANFT:**  Just a couple questions, Your Honor.

20                   **CROSS-EXAMINATION**

21   **BY MR. SANFT:**

22   Q.   Good morning.

23   **A.**   Hi.

24   Q.   Just a couple questions, if I could.

25      The record that you are talking about here, it's --

1    you're not the doctor; right?

2    **A.**    No.

3    Q.    All right.  And so these are medical procedures that are

4    performed on a patient; right?

5    **A.**    Correct.

6    Q.    And you're just here to say like, hey, these are things

7    that are paid for of work that was done through your office?

8    **A.**    Correct.

9    Q.    Okay.

10          **MR. SANFT:**  No further questions.  Thank you.

11          **MR. GOTTFRIED:**  Nothing further for this witness from

12   the government.  We ask that Ms. Struck be excused.

13          **THE COURT:**  All right.  Can I excuse this witness,

14   please?

15          **MR. SANFT:**  Yes, Your Honor.

16          **THE COURT:**  Thank you, Ms. Struck.  You can step

17   down.  You are excused.  You can leave that right there.

18   We'll take care of it.

19          **THE WITNESS:**  Thank you.

20          **THE COURT:**  Thank you.  Watch your step.  And that

21   step right there in front of the jury box.

22          **THE WITNESS:**  Thank you.

23          **THE COURT:**  Thank you.

24          Mr. Askar?

25          **MR. ASKAR:**  Your Honor, at this time we just ask for

1    a very brief break in between the government's final two

2    witnesses for the day.

3         **THE COURT:**  All right.  Well, we are going to take an

4    early morning break, and I -- are we waiting on some witnesses

5    to get here?

6         **MR. ASKAR:**  We have a witness that is here.  And

7    then, Your Honor, we're just going to work with Ms. Rivera to

8    see what we can do about the technology.

9         **THE COURT:**  Got it.  Okay.

10        So -- and just so the jury's aware, our next witness

11   will appear by Zoom; is that right?

12        **MR. ASKAR:**  I believe that's our intention,

13   Your Honor.  We may switch things up a little bit if we need

14   to, but that's our current intention.

15        **THE COURT:**  All right.  Fantastic.  So do we need

16   just a ten-minute break right now then or --

17        **MR. ASKAR:**  I think that would be great, Your Honor.

18        **THE COURT:**  Okay.  So it will be about a ten-minute

19   break.  You remember the rules.  Don't talk about the case

20   among yourselves or with anybody else.  Don't read, view, or

21   listen to anything about the case.  Don't conduct any of your

22   own research, and please wait to formulate your opinions until

23   you've heard all of the evidence.

24        We'll see you in about ten minutes.

25        *(Jury out at 9:34 a.m.)*

1    **THE COURT:**  All right.  We're going to try to hook up
2    the Zoom.  Is that what we're going to do?
3    **MR. ASKAR:**  That's exactly right, Your Honor.
4    **THE COURT:**  And, Mr. Sanft, before you step out, let
5    me just confirm:  Everyone has agreed this witness may appear
6    by Zoom; right?
7    **MR. SANFT:**  Yes, Your Honor.
8    **THE COURT:**  Thank you.
9    **MR. ASKAR:**  Thank you, Your Honor.
10    **THE COURT:**  We're off record.
11    *(Recess at 9:35 a.m., until 9:45 a.m.)*
12    **THE COURT:**  All right.  Are we ready to bring the
13    jury back?
14    **MR. ASKAR:**  Yes, Your Honor.
15    **THE COURT:**  Let's do that.  All right.  Ms. Council,
16    we're going to bring the jury back in, and then we'll go ahead
17    and introduce you and swear you in.  Okay?
18    **THE WITNESS:**  All right.
19    *(Pause in proceedings.)*
20    **COURTROOM ADMINISTRATOR:**  All rise.
21    *(Jury in at 9:46 a.m.)*
22    **THE COURT:**  Welcome back.  Welcome back.  Will the
23    parties stipulate to the presence of the jury?
24    **MR. ASKAR:**  Yes, Your Honor.
25    **MR. SANFT:**  Yes, Your Honor.

1          **THE COURT:**  All right.  Everyone have a seat.

2          Our next witness is appearing by Zoom.  So just

3    formally, Mr. Askar, call your next witness for us.

4          **MR. ASKAR:**  Your Honor, the United States calls

5    Ms. Ronnie Council to the stand.

6          **THE COURT:**  All right.  And she is with us --

7          **COURTROOM ADMINISTRATOR:**  Oh, we lost her.

8          **THE COURT:**  -- was with us by video.  She's having

9    some challenges because she seems to be in a location where

10   the hurricane has impacted power.  So we may have to go in and

11   out with her from time to time, but we'll figure out a way

12   through this.  So please bear with us with these technical

13   difficulties.

14          I assume she's been told, if she drops off, she

15   should just keep trying to reconnect?

16          **MR. ASKAR:**  Yes, Your Honor.

17          **MR. GOTTFRIED:**  We're having someone try to contact

18   her.

19     *(Pause in proceedings.)*

20          **MR. ASKAR:**  All right, Your Honor.  If it's okay with

21   the Court, we'll give this another minute or two.  And if that

22   isn't working, to make sure we're being respectful of

23   everyone's time, we'll call another witness and figure out

24   what we can do with Ms. Council moving forward.

25          **THE COURT:**  Thank you.  We'll give it another minute,

1    see if she can connect.  I promise it was working before

2    you-all came back in.

3              **MR. ASKAR:**  That's why we took the break.

4        *(Pause in proceedings.)*

5              **THE COURT:**  Any luck reaching her?

6              **MS. PRASAD:**  Your Honor, she is attempting to log

7    back in.

8              **THE COURT:**  All right.  We'll give it another minute.

9              **COURTROOM ADMINISTRATOR:**  Okay.  There she is.

10             **THE WITNESS:**  Can you guys hear me?

11             **THE COURT:**  We can.  Hello.

12             **THE WITNESS:**  I have no idea what happened.

13             **THE COURT:**  That's okay.  If it's happens again, just

14   continue to try to reconnect.  Okay?

15             **THE WITNESS:**  Okay.  Thank you.

16             **THE COURT:**  All right.  Summer's going to swear you

17   in.  Can you raise your right hand, please?  Summer.

18       *(The witness is sworn.)*

19             **THE WITNESS:**  Yes.

20             **COURTROOM ADMINISTRATOR:**  Thank you.

21             **THE COURT:**  Please inquire, Mr. Askar.

22             **MR. ASKAR:**  Thank you, Your Honor.

23                        **DIRECT EXAMINATION**

24   BY MR. ASKAR:

25   Q.   All right.  Ms. Council, could you please tell the

*Ronnie Council - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    members of the jury, what do you do for a living?

2    **A.**    I'm a political consultant.  We do campaign work and

3    fundraising.

4    Q.    All right.  And do you own a company that does this work?

5    **A.**    Yes, I do.

6    Q.    And what's the name of that company?

7    **A.**    Two companies.  One is Organized Karma, and the other is

8    Alchemy.

9    Q.    All right.  I want to talk to you about Alchemy

10   Associates.  But first I do want to make clear, I understand

11   you're in a place where there's a -- you're receiving, you

12   know, quite a bit of interference from the hurricane; is that

13   right?

14   **A.**    Yes.  We have no power, no Internet, and we had to

15   evacuate our farm because it flooded, so...

16   Q.    All right.  Well, I'm very sorry to hear that.  I

17   appreciate you appearing with us here today.

18   **A.**    Okay.

19   Q.    We can try to be, again, as efficient as possible.  Let's

20   talk about Alchemy.

21   **A.**    Okay.

22   Q.    In your capacity as the owner of Alchemy Associates, the

23   manager of Alchemy Associates, do you know the defendant,

24   Michele Fiore?

25   **A.**    Yes.

1    Q.   Do you also have a personal relationship with Michele

2    Fiore?

3    **A.**   Yes.

4    Q.   All right.  Could you tell us --

5    **A.**   We have attended, like -- sorry.

6    Q.   No, you're fine.  Could you tell us what the nature of

7    your personal relationship with Michele Fiore is.

8    **A.**   We haven't talked in a while, but she attended my

9    wedding.  I attended her daughter's wedding.  We had a work

10   relationship.  We -- but we didn't hang out on a regular

11   basis.  But we would, you know, talk and go to dinner every

12   few months, stuff like that.

13   Q.   Okay.  Well, so now that we've covered the personal

14   relationship, let's talk about the professional relationship.

15   **A.**   Okay.

16   Q.   What was the nature of the work that Alchemy did for

17   Michele Fiore?

18   **A.**   Fundraising.

19   Q.   Fundraising for what?

20   **A.**   For her political stuff, her political PACs as well as

21   the campaigns that she had.

22   Q.   All right.  Do you charge for your fundraising services?

23   **A.**   Yes, I do.

24   Q.   All right.  Do you tend to make up some kind of contract

25   that says, you know, you'll pay this amount every month or so?

*Ronnie Council - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    **A.**    Informally, yes, we have agreements.  Sometimes on paper;

2    sometimes verbal.

3    Q.    Okay.  When you have these agreements with people to do

4    their political fundraising, do you agree on exactly which

5    entities you're going to fundraise for?

6    **A.**    We agree what type.  I mean, if it's a political

7    campaign, and that's what we did for Michele, then we -- it

8    sometimes -- the agreement may be for, you know, her City

9    Council but we sometimes will do fundraising for the PAC as

10   well, the political PAC.

11   Q.    Got it.  And when you say PAC, that's political action

12   committee; right?

13   **A.**    Correct.  Correct.

14   Q.    All right.  If there was going -- so you mentioned, you

15   know, if they're in the same kind of vicinity, so a PAC and

16   campaign you might fundraise together for.  If there was a

17   charity --

18   **A.**    Correct.

19   Q.    -- would you fundraise -- would that require a separate

20   agreement?

21   **A.**    Normally, yes.  We have worked for other charities, and

22   it's a different -- you pay -- the pay scale's a little

23   different.

24   Q.    Got it.  And, you know, for folks who want to use your

25   company to fundraise for them, do you want them to tell you

Ronnie Council - Direct
2:24-cr-00155-JAD-DJA - September 27, 2024

1    what entities they plan on using your company for?

2    **A.**    Yes.

3    Q.    All right.  And so you mentioned that you fundraised for

4    Michele Fiore's campaign.  Is that to the best of your

5    knowledge --

6    **A.**    Correct.

7    Q.    What would you -- was the name of that campaign Future --

8    or Fiore for Nevada?

9    **A.**    Yes, one of them.  Yes.

10   Q.    All right.  You mentioned that you fundraised for her

11   political action committee.  Was the name of that political

12   action committee Future for Nevadans?

13   **A.**    Yes.

14   Q.    All right.  Are you familiar with A Bright Present

15   Foundation?

16   **A.**    I am now.

17   Q.    All right.  Before speaking to the FBI or me, were you

18   familiar with A Bright Present Foundation?

19   **A.**    No.

20   Q.    All right.  Fair to say that Michele Fiore never asked

21   you to use your political fundraising company to raise money

22   for that organization?

23   **A.**    Her and I never discussed that.

24   Q.    All right.  Now, I want to talk to you about Contribution

25   & Expense Reports.  What are those?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR

Ronnie Council - Direct
2:24-cr-00155-JAD-DJA - September 27, 2024

1    **A.**    Okay.  They are where, for a campaign, you list all your

2    contributions and you list all of your expenses, and it's a

3    reporting mechanism.

4    Q.    All right.

5    **A.**    For PACs and campaigns.

6    Q.    Did Alchemy Associates -- did Alchemy Associates assist

7    Michele Fiore in the preparation of Contribution & Expense

8    Reports?

9    **A.**    She would provide us with the information, and we would

10   input it into the form on the Secretary of State site.

11   Q.    Okay.  I want to make sure we break that down for a

12   moment.  You said that she would provide you the information?

13   **A.**    Correct.

14   Q.    Is it your understanding that Alchemy Associates did not

15   have access to Michele Fiore's bank records or receipts?

16   **A.**    We did not have access.

17   Q.    Okay.  So you essentially received information from

18   Michele Fiore and then used that to input it into a form on

19   the Secretary of State's website, is that --

20   **A.**    Correct, correct.

21   Q.    Would you ask Michele Fiore to review it to make sure it

22   was accurate before you -- it was filed?

23   **A.**    Yes.

24        **MR. SANFT:**  I apologize, Your Honor.  May we

25   approach?

*Ronnie Council - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1          **THE COURT:**  Okay.  Sidebar.  We're going to take a

2     quick sidebar, Ms. Council.  Just hang there with us.

3          *(At sidebar on the record.)*

4          **THE COURT:**  What's going on?

5          **MR. SANFT:**  Your Honor, just really quickly.  The

6     line of questioning right now proffered by the government I

7     think infers potentially anything that goes before the statue.

8     I didn't want to object to it on the record because I wanted

9     to make sure that we were clear that, if we were talking

10    specifically in terms of time and date, I didn't hear time and

11    date yet -- which, in my opinion, would infer that somehow

12    this goes back in time.  I just want to make sure that we keep

13    it towards the Court's ruling with regards to the time

14    periods.

15         **MR. ASKAR:**  Your Honor, I don't plan to ask

16    Ms. Council to go through any C&E dates; just largely that

17    this was her practice when Alchemy Associates assisted the

18    defendant in preparing C&Es.

19         **THE COURT:**  Okay.  Is that satisfactory then if he's

20    not talking about dates right now?

21         **MR. SANFT:**  Well, I --

22         **THE COURT:**  He's not going to get any exhibits in

23    with her either.

24         **MR. SANFT:**  No.  But I guess my concern is, is that

25    if it's not articulated at some point during the course of the

1    direct examination -- I mean, I could do it on cross, but I

2    just think it just leads the jury in a position that they

3    believe that somehow this may have been a common practice

4    during the entire time that they've known each other, and I

5    don't want that.

6            **MR. ASKAR:**  Your Honor, I don't think that the fact

7    that Michele Fiore provided the information for contribution

8    and expenses returns afoul of your 404 ruling.  It's not an

9    other act within the meaning of 404 that would be used to

10   demonstrate anything other than this was the practice and how

11   they prepared C&Es.  If -- you know, if there's -- if the

12   implication is that the inference that this was how she

13   prepared C&Es in the past is somehow a bad act, I -- one, it's

14   not something I plan to address with this witness, nor is it,

15   I think, a concern that we need to worry about in kind of

16   limiting the specific time frame here.

17           **THE COURT:**  Okay.  I'm inclined to agree at this

18   point.  I'll keep this in mind, and certainly you will, too,

19   in the event that this starts to become an issue with respect

20   to specific transactions.

21           **MR. SANFT:**  Yes, ma'am.  Thank you.

22           **THE COURT:**  Thank you.

23           **MR. ASKAR:**  Thank you, Your Honor.

24       *(End of discussion at sidebar.)*

25           **THE COURT:**  You can continue your inquiry, Mr. Askar.

1          **MR. ASKAR:**  Thank you, Your Honor.

2     **BY MR. ASKAR:**

3     Q.   So, Ms. Council, I want to make sure I understand this.

4          So once you've input the information into the

5     Secretary of State's website based on the information that

6     Michele Fiore provides you --

7     **A.**   Um-hum.

8     Q.   -- was she provided an opportunity to then, you know,

9     essentially give final approval before it's filed?

10    **A.**   Yeah.  We -- we send a draft and ask for approval before

11    it's submitted.

12    Q.   All right.  Ms. Council, with that, actually, I have no

13    further questions for you.  So now Mr. Sanft is going to have

14    an opportunity to ask you some questions, and then we'll see

15    where we go from there.  Thank you very much.

16    **A.**   Okay.

17          **THE COURT:**  Mr. Sanft?

18                **CROSS-EXAMINATION**

19    **BY MR. SANFT:**

20    Q.   Good morning, Ms. Council.

21    **A.**   Good morning.

22    Q.   Some my name's Michael Sanft.  I represent Michele.  Just

23    a couple of follow-up questions for you, if I could.

24    **A.**   Okay.

25    Q.   There was a question with regards to whether or not you

1    had done any work for any charitable -- or any charities for

2    Michele.  That -- of course the answer is no?

3    **A.**   Correct.

4    Q.   Now, with regards to the political action committee that

5    she had, you were aware, of course, that this was a community

6    outreach political action committee?

7    **A.**   Correct.

8    Q.   And as a result of the political -- or the community

9    outreach, you were helping her with regards to fundraising

10   through the political action committee?

11   **A.**   Correct.

12   Q.   Now, your experience with Ms. Fiore is that, during the

13   time period, specifically around the time we're talking about

14   with the statue here, you had observed Ms. Fiore conducting

15   business as usual as a politician?

16   **A.**   Correct.

17   Q.   Now, one of the things is -- of course, is that also

18   involved community outreach-type of events?

19   **A.**   Yes.

20          **MR. ASKAR:**  Objection, Your Honor.

21          **THE COURT:**  What's the objection?

22          **MR. ASKAR:**  At this point can we move to sidebar,

23   Your Honor?

24          **THE COURT:**  All right.  We're going to take another

25   quick sidebar.  We'll be with you in just a minute,

*Ronnie Council - Cross*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    Ms. Council.

2           **THE WITNESS:**  Okay.

3       *(At sidebar on the record.)*

4           **THE COURT:**  Mr. Askar.

5       **MR. ASKAR:**  Your Honor, Mr. Sanft's questioning

6    regarding community events runs afoul of the Court's 404(b)

7    good acts ruling and it's in the government's omnibus motion

8    by trying to solicit community events that are not

9    demonstrably related to the funds at issue here.  Mr. Sanft is

10   attempting to demonstrate that Ms. Fiore had good character,

11   that she did events in the community.  It runs directly afoul

12   of the Court's ruling of the omnibus motion.

13          **THE COURT:**  Mr. Sanft, is that what you're doing?

14      **MR. SANFT:**  No, Your Honor.

15          **THE COURT:**  What's going on?

16      **MR. SANFT:**  If the Court would recall the first line

17   of questioning with regards to Ms. Council, I framed it within

18   the time period of the statue to make sure that we were in

19   that time period.  Our position is, is that Ms. Fiore was

20   using the funds that the government is alleging was for other

21   personal purposes but she was reallocating funds to be used in

22   the other things that she was doing, the other charitable work

23   she was doing as a city councilwoman.  And so as a result, I

24   think I can get into that questioning because I'm

25   demonstrating basically that she was using activities and the

*Ronnie Council - Cross*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1  money that she was using for those activities came from the

2  money that was fundraised for the statue, which is my entire

3  theory of my defense -- you're welcome -- but that's literally

4  where I'm going with that.

5        So as a result, I'm not asking for prior to the

6  statue.  I'm talking about her experience from the time of the

7  statue forward.

8        **THE COURT:**  Okay.  I'm going to give you some leeway

9  on this.  Make it clear we're talking -- make the time frame

10  clear, please.

11        **MR. SANFT:**  Yes, ma'am.

12        **THE COURT:**  Let's see where this goes.

13        **MR. SANFT:**  Yep.

14     *(End of discussion at sidebar.)*

15        **THE COURT:**  You can proceed, Mr. Sanft.

16        **MR. SANFT:**  Thank you, Your Honor.

17  **BY MR. SANFT:**

18  Q.   Ms. Council, we haven't lost you yet?

19  **A.**   I'm here.

20  Q.   All right.  And I appreciate you still being there.

21        Now, the -- I want to make sure I'm clear as to the

22  time period that I'm talking about.  This is during the time

23  of the Alyn Beck statue, which I don't know if you recall.

24  Are you aware of when the groundbreaking ceremony was for the

25  park for the Alyn Beck statue?

Ronnie Council - Cross
2:24-cr-00155-JAD-DJA - September 27, 2024

1    **A.**    I know nothing about the statue at all or any of that.

2    Q.    Okay.  I'm going to just represent to you it's from

3    December of 2018 is when the Alyn Beck statue was -- the

4    groundbreaking had occurred.

5          But let me ask you some questions based upon from

6    that time period forward.  Your understanding, though, was

7    that Michele's -- was a prolific fundraiser during this time

8    period forward?

9    **A.**    Absolutely.  Correct.

10   Q.    Okay.  And you were aware that, unlike your other

11   clients, she was constantly fundraising money, you know, from

12   that time period forward all the time?

13   **A.**    Correct.

14   Q.    Now, in addition to that, with regards to her home, at

15   the time that you knew her living in her home, that particular

16   home wasn't, say, as opulent or it wasn't extravagant based

17   upon your history with Michele.  Fair?

18   **A.**    Fair.

19   Q.    Okay.  Meaning that prior to her -- based upon your --

20   your personal interaction with Michele, prior to her living

21   there, she was actually -- she had her own business and so

22   forth, and she actually had very sort of --

23         **MR. ASKAR:**  Objection, Your Honor, to the relevance

24   of this line of questioning.

25         **THE COURT:**  I'm a little more concerned that we don't

1  have a foundation for it.  She hasn't laid a foundation for

2  knowing anything about --

3         **MR. SANFT:**  Okay.

4         **THE COURT:**  -- the defendant's home or lifestyle.

5         **MR. SANFT:**  Sure.

6  **BY MR. SANFT:**

7  Q.  Let me ask you this --

8         **THE COURT:**  So let's try that.

9         **MR. SANFT:**  Yes, Your Honor.

10 **BY MR. SANFT:**

11 Q.  So, Ms. Council, how long have you known Michele Fiore?

12 **A.**  Ten years at least.

13 Q.  Okay.  And the work that you've done for Michele Fiore,

14 did that just involve her being a city councilwoman?

15 **A.**  No.

16 Q.  Okay.  What other work did you do within your job or

17 your -- your company for Michele besides her being on the City

18 Council?

19 **A.**  It was specifically fundraising, and she was an

20 assemblywoman.  And it was on and off.  We didn't work

21 consistently for all those years for her.  There would be

22 different times and -- but it was on and off.

23 Q.  Right.

24 **A.**  It was always political, political fundraising.

25 Q.  Right.  And with regard to that political fundraising,

1    fair to say that typically it's seasonal; right?  I mean, it

2    sort of ebbs and flows depending on what time of the term

3    we're talking about usually; right?

4    **A.**    Correct.

5    Q.    Okay.

6    **A.**    Correct.

7    Q.    But with regards to Michele, you had mentioned earlier

8    and shared with us that you had actually been to her

9    daughter's wedding, Michele had been to your wedding, and so

10   forth, so you had more than just the business relationship

11   with Michele?

12   **A.**    Correct.

13   Q.    Would it be fair to say that you two are friends?

14   **A.**    Yes.

15   Q.    And even now, as we're sitting here today, you're still

16   friends with Michele Fiore?

17   **A.**    We have not talked for quite awhile.  We did text, but we

18   haven't text for a while.  But yes.

19   Q.    Okay.  And with regards to your relationship with Michele

20   Fiore, you've had opportunities during the time that you've

21   known her as a friend to be to her home?

22   **A.**    Yes.

23   Q.    Not just for business purposes but for personal purposes

24   or friend purposes?

25   **A.**    It was very rare.  I have -- most of the time was work

1  related, somehow work related, whether it was, you know, for

2  an event or -- I may have -- when she lived in her other home,

3  I went there because she gave me some saddles for my horse.

4  Q.   Okay.

5  **A.**   So that was not work related.

6  Q.   I see.  So with regards to the previous home that you had

7  been in, can you describe for us a little bit about what that

8  home was in terms of what your recollection was about that

9  home?

10  **A.**   Very large property.  Very, very fancy.  Very expensive.

11  And the part of town it was in, surrounded by other very nice

12  homes.

13  Q.   And do you know -- do you know how that home -- I mean,

14  do you know at the time what Michele was doing in terms of her

15  work, like, besides being an assemblywoman?

16  **A.**   I -- she owned her own business.  I think it was a --

17  like a home health care, I believe.  That was a long time ago,

18  so...

19  Q.   Okay.  Now, in -- so fast-forward now to what we're

20  talking about, which is from the time of December of 2018 on,

21  is that the same home that she was living in at the time of --

22  the end of 2018 and on?

23  **A.**   No.  No.

24  Q.   Okay.  And with regards to the time that she was living

25  in this bigger home, was she on the City Council at the time?

*Ronnie Council - Cross*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1   **A.**   I don't -- I don't know in that -- when she moved from

2   the one house to the other.  I don't know.

3   Q.   That's fair.  I appreciate you being accurate with us.

4        Now, let me ask you this.  The -- at the time that

5   you were working with Michele, there was some discussion here

6   about you would do her C&Es for her.  Those C&Es are filed on

7   a quarterly basis?

8   **A.**   I'm not -- honestly, I'm not sure.

9   Q.   Okay.

10  **A.**   I think so.

11  Q.   All right.  And -- and with regards to the C&Es in terms

12  of the information you receive, it's the information that

13  the -- that the client gives you that you then input into a

14  form online for the state of Nevada?

15  **A.**   Correct.

16  Q.   Okay.  Now, in terms of your role with Michele, fair to

17  say that you weren't necessarily someone who advised her as to

18  what to do.  You helped her with what she wanted you to do.

19  Fair?

20  **A.**   Fair.

21  Q.   Meaning that, if she had projects or things that she

22  wanted to get done, she would ask you for help on those

23  projects, and then you would charge her accordingly?

24  **A.**   I wouldn't say projects.  I mean, we only did

25  fundraising.

1    Q.    Yeah.

2    **A.**    So specifically for fundraising.  And like I said before,

3    it was always a political action committee or for one of her

4    campaigns.

5    Q.    And with regards to Michele's activity as -- as a -- as a

6    politician, from December of 2018 forward, she was very active

7    with regards to her role as the city councilwoman for Ward 6?

8    **A.**    Yes.

9    Q.    Okay.  Can you describe for us a little bit about what

10    kind of activity we're talking about here?

11    **A.**    Specifically she was very good about having community

12    events for the residents in her ward.  She would have, you

13    know, the Christmas parties and dinners and different events

14    to bring the community together.

15    Q.    Okay.  Did she have any, like, really, you know,

16    elaborate events like, say, black-tie affairs over at the Wynn

17    or anything like that?

18    **A.**    Not that I know of, but I don't know that she did not.  I

19    wasn't a part of it.

20    Q.    Sure.  We're just asking for your personal knowledge,

21    ma'am.

22    **A.**    No, not that I know of.

23    Q.    And during the time of the COVID pandemic, was she still

24    active in terms of her outreach to her constituents in Ward 6?

25         **MR. ASKAR:**  Okay.  Your Honor?

1          **THE WITNESS:**  I believe so.  I mean --

2          **MR. ASKAR:**  At this time --

3          **THE COURT:**  Hold on just a second.  We have an

4    objection.  The objection?

5          **MR. ASKAR:**  I'd like to renew the objection given

6    that we're now exiting the temporal scope we're talking about.

7    I believe we're now exiting February 2020.

8          **THE COURT:**  Mr. Sanft?

9          **MR. SANFT:**  I think it stills falls in line with

10   regards to activity she was doing even beyond that moment,

11   Your Honor.  I can expand a little bit more at sidebar, but

12   the idea would be is that she was still performing what she

13   was doing during that --

14         **THE COURT:**  I'm going to let you ask and get an

15   answer to this last question that you did, but I think beyond

16   that, temporally I think we're -- we're outside the scope.

17         **MR. SANFT:**  Yes, ma'am.

18         **THE COURT:**  If you can go ahead and reask that

19   question so that she can provide us a complete answer?

20         **MR. SANFT:**  Yes, ma'am.

21   BY MR. SANFT:

22   Q.   All right.  Ronnie, are you there?

23   **A.**   Yes.

24   Q.   All right.  Let me ask you this question.  So with

25   regards to during the time period -- and we're talking, you

1  know, the start of the COVID pandemic, around that time

2  period, she was still active in terms of her outreach to her

3  constituents in Ward 6?

4  **A.**   Yes.

5  **Q.**   Now, in addition to that, we had talked a little bit

6  about not hanging out on a regular basis.  Fair to say that,

7  during the time period that we're talking about, which is,

8  once again, December of 2018 until February of 2020, during

9  this time period, your relationship with Michele Fiore, you

10  didn't see anything that would have been considered to be

11  unusual about her; right?

12  **A.**   No.

13  **Q.**   Any issues with regards to financial problems?  Did she

14  ever, you know, share with you as a friend, hey, you know, I

15  don't know if I'm going to be able to make my bills, or

16  anything along those lines?

17  **A.**   We never discussed stuff like that, so no.

18  **Q.**   All right.  And in that time period as well, you also had

19  hired Michele's daughter as part of -- one of the employees in

20  your company; is that right?

21  **A.**   I don't know exactly -- I don't know the time period, but

22  yes.

23  **Q.**   Okay.  And that person is Sheena Siegel?

24  **A.**   Correct.

25  **Q.**   All right.  And with regards to Sheena Siegel, can you

1    describe for us a little bit about the kind of work that she

2    did for you?  Was she a hard worker, or was she there just

3    because her mom set her up with a job?

4    **A.**   No, she was -- she was a hard worker.

5    Q.   All right.  And she -- I apologize.  Go ahead.

6    **A.**   Go ahead.  She was a hard worker.

7    Q.   Okay.

8           **MR. SANFT:**  Your Honor, I have no further questions.

9           **THE COURT:**  Anything else, Mr. Askar?

10          **MR. ASKAR:**  Briefly, Your Honor.

11                         **REDIRECT EXAMINATION**

12   **BY MR. ASKAR:**

13   Q.   Ms. Council, Mr. Sanft asked you questions about

14   Ms. Fiore's PAC and community outreach.  Were you aware that

15   the PAC didn't change its purpose to community outreach until

16   February 28th of 2020?

17   **A.**   No, I wasn't.  I -- when I say community outreach --

18   Q.   No, miss --

19   **A.**   -- I know that --

20   Q.   Ms. Council, I completely understand.  I just want to

21   make sure we're -- I just want to make sure we're clear.  You

22   were not aware that the PAC changed its purpose to community

23   outreach until February 28th --

24   **A.**   No.

25   Q.   -- of 2020?

*Ronnie Council - Redirect*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    **A.**    No.

2    **Q.**    Were you aware that before that the PAC's purpose was to

3    raise funds and educate Nevadans?  Nevadans, excuse me.

4    **A.**    I wasn't sure.  To me it's the same, you know?  It was

5    for her residents specifically.

6    **Q.**    Yeah.

7    **A.**    So educate -- I wasn't really aware what her PAC exactly

8    was.

9    **Q.**    That makes perfect sense.

10            Now I want to talk to you about Mr. Sanft's questions

11   concerning, you know, her lifestyle before December of 2018.

12   Were you aware that Ms. Fiore started running for political

13   office in 2010?

14   **A.**    I believe so.

15   **Q.**    And then Mr. Sanft also talked to you about, you know,

16   you just helping Ms. Fiore input the information into the C&E

17   documents on the State -- Secretary of State's website; right?

18   **A.**    Correct.

19   **Q.**    Okay.  And as you mentioned earlier, did you have access

20   to Ms. Fiore's personal -- did you have access to Ms. Fiore's

21   political action committee or campaign bank accounts?

22   **A.**    Never.

23   **Q.**    Now, I'm not asking about any other specific clients or

24   even all your clients, but do some of your clients give you

25   access to their accounts so that you can use their bank

1    records to input the information accurately?

2    **A.**    Yes.

3    Q.    Thank you.

4         **MR. ASKAR:**  No further questions.

5         **THE COURT:**  Anything else, Mr. Sanft?

6         **MR. SANFT:**  No, Your Honor.

7         **THE COURT:**  All right.  So can we excuse Ms. Council?

8         **MR. ASKAR:**  Please, Your Honor.

9         **THE COURT:**  All right.  Ms. Council, we're going to

10   go ahead and disconnect with you.  Thank you so much.  Good

11   luck with the hurricane.

12        **THE WITNESS:**  Thank you.

13        **THE COURT:**  Next witness, Mr. Askar.

14        **MR. ASKAR:**  Your Honor, at this time the government

15   calls Ms. Tara Krumme.  And, Your Honor, we anticipate that

16   this will be our last witness for the day.

17        **THE COURT:**  All right.  Hi.  You're going to head

18   right on up here.

19        **COURTROOM ADMINISTRATOR:**  Just walk around here.

20   Raise your right hand.

21       *(The witness is sworn.)*

22        **THE WITNESS:**  Yes.

23        **COURTROOM ADMINISTRATOR:**  Go ahead and take a seat.

24   And then just state and spell your first and last name.

25        **THE WITNESS:**  Tara Krumme.  Spell my last name?

1    K-r-u-m-m-e.

2                      **DIRECT EXAMINATION**

3    **BY MR. ASKAR:**

4    Q.   Good morning, Ms. Krumme.

5    **A.**   Good morning.

6    Q.   What do you do for a living, Ms. Krumme?

7    **A.**   I fundraise for political candidates.

8    Q.   And what company do you work for?

9    **A.**   Alchemy.

10   Q.   In your capacity as a political fundraiser for Alchemy,

11   have you ever worked with the defendant?

12   **A.**   Yes.

13   Q.   Ballpark the time period.  Do you remember around when

14   you worked with the defendant, Michele Fiore?

15   **A.**   2018 to 2021.

16   Q.   Great.  And what sort of work did you do with the

17   defendant, Michele Fiore?

18   **A.**   We fundraised for her PAC and for her City Council

19   account.

20   Q.   Okay.  You mentioned you fundraised for her PAC.  Was

21   that the Future for Nevadans PAC?

22   **A.**   Yes.

23   Q.   And then you mentioned the campaign.  Would that be Fiore

24   for Nevada?

25   **A.**   Yes.

*Tara Krumme - Direct*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1  Q.   Now, Ms. Krumme, I want to talk a little bit about the

2  services that Alchemy Associates -- that Alchemy Associates

3  provides.  Could you turn to that -- in that binder to

4  Exhibit 39?  Actually, you know what, Ms. Krumme?  One moment.

5       **MR. ASKAR:**  Your Honor, I'm realizing right now

6  defense counsel has stipulated to the admissibility of this

7  document.  So I'm going to actually just move in Exhibit 39 so

8  that we can pull it up on the screen with the Court's

9  permission.

10      *(Exhibit No. 39, offered.)*

11      **MR. SANFT:**  That is correct, Your Honor.

12      **THE COURT:**  All right.  It can come in, and you can

13  just put it on the screen.  So it will be -- in a second it

14  will be over there to your left.

15      *(Exhibit No. 39, received.)*

16 **BY MR. ASKAR:**

17 Q.   All right.  Ms. Krumme, on Exhibit 39 that's on your

18 screen over there, in the "To" line, is that the campaign we

19 were talking about?

20 **A.**   Yes.

21 Q.   And could you talk us through -- and you can read the

22 document if you'd like.  But could you talk us through what

23 the services that Alchemy Associates would provide to Michele

24 Fiore's campaign or political action committee based on this

25 document?

1    **A.**   Basically we would facilitate making phone calls.  We

2    would, you know, provide a list for her, and we would sit down

3    and say, hey, this is who you're calling.  And, I mean, we

4    would reach out to these people if they -- or if they said

5    that they would contribute, we would follow up.  We would send

6    e-mails.  We basically were just there to facilitate her

7    making the phone calls.

8    Q.   Okay.  Now, let's break that down a little bit.  You said

9    you're there to facilitate making phone calls and you're

10   providing people to call.  When you say we're facilitating

11   phone calls, does that mean facilitating calls to potential

12   donors?

13   **A.**   Yes.

14   Q.   So you're reaching out to people that Alchemy or

15   Ms. Fiore have identified to donate to the campaigns; is that

16   how that works?

17   **A.**   Yes.

18   Q.   And then you mentioned you're providing her names and

19   numbers?

20   **A.**   Yes.

21   Q.   Would you then be present while she was making some of

22   these phone calls?

23   **A.**   Yes.

24   Q.   From December of 2018 through about February of 2020, do

25   you ever recall Ms. Fiore asking her political donors about

1    the Alyn Beck statue?

2    **A.**    I can definitively say once I can remember.  I don't --

3    but other than that...

4    Q.    Okay.  So you're saying you remember about one time --

5    **A.**    Yeah.

6    Q.    -- from December of 2018 to February of 2020 her using

7    Alchemy -- her using an Alchemy donor, excuse me --

8    **A.**    Yes.

9    Q.    -- to fundraise for the Alyn Beck statue?

10    **A.**    (Nods head up and down.)

11    Q.    About how many calls would Michele Fiore make in a given

12    week?  I know it's going to vary but ballpark.

13    **A.**    Probably about 50 to 75 -- it just depends on who

14    answers, who doesn't; if you get a lot of voice mails, if not.

15    But, I mean, she would make the normal amount, about 50 calls,

16    70.

17    Q.    So about 75 -- 50 to -- let's go with 50.

18    **A.**    Um-hum.

19    Q.    Fifty calls a week for December 2018 to February of 2020?

20    I'm not even going to try and do that math.  But in all of

21    those phone calls you remember one time she asked about the

22    Alyn Beck statue?

23    **A.**    One time that I was paying attention, yeah.

24    Q.    Totally fair.

25          Let's talk a little bit about --

1    **MR. ASKAR:**  And, Heather, we can remove Exhibit 39.

2    Thank you so much.

3    **BY MR. ASKAR:**

4    Q.    Let's talk a little bit about C&E Reports.

5    **A.**    Um-hum.

6    Q.    What are Contribution & Expense Reports?

7    **A.**    It's basically just a document that gets uploaded to the

8    Secretary of State which would allow everyone basically to see

9    what contributions you received within the time frame and what

10   expenditures you made within that same time frame.

11   Q.    And did you assist in the filing of Michele Fiore's

12   Contribution & Expense Reports --

13   **A.**    Yes.

14   Q.    -- for her campaign and political action committee?

15   **A.**    Yes.

16   Q.    All right.  Can you walk us through what that process

17   looks like?

18   **A.**    Like when I filed her report?

19   Q.    Yeah.

20   **A.**    Well, when I filed -- she would -- they would send over

21   basically a spreadsheet and say, hey, will you upload this?

22   And we would go through and upload, find addresses, things

23   that were just miscellaneously missing.

24   Q.    Okay.  Let's walk through that piece by piece.  When you

25   say they would send over a spreadsheet, who's "they"?

1    A.    Sheena -- well, Sheena typically, and then Michele would

2    review it.

3    Q.    Okay.  So you mentioned Sheena.  Who is Sheena?

4    A.    Sheena is Michele's daughter.

5    Q.    And so Sheena or Michele would send you over a

6    spreadsheet?

7    A.    Well, typically it would be Sheena.

8    Q.    Okay.  So Sheena would send you over a spreadsheet?

9    A.    Yeah.

10   Q.    And then what would you do with that spreadsheet?

11   A.    I would make sure it had all the information that it

12   needed to have, and then I would upload it.  And once you

13   upload it, you get a document that basically is, like, the

14   mock document that would be the final.  And I would send it

15   over and wait for approval to post.

16   Q.    Okay.  Who would you send it over to?

17   A.    Sheena and Michele.

18   Q.    All right.  And who has final approval over C&E Reports

19   before they're filed?

20   A.    The candidate, so Michele.

21   Q.    Now, you mentioned again that they sent you over these

22   spreadsheets.  Does that mean that in order to input the

23   information into the C&Es, you kind of have to rely on the

24   accuracy of the spreadsheet?

25   A.    Yes.

1   Q.   Were you ever given access to the political action

2   committee or the campaign bank accounts?

3   **A.**   No.

4   Q.   Have you assisted other clients in your work at Alchemy?

5   **A.**   Yes.

6   Q.   Do any of those other clients give you access to -- and I

7   want to be really clear.  I'm not asking specifics about each

8   client or for any names, but do any of the other clients give

9   you access to the bank accounts so that you can put that

10  information in directly from the receipts?

11  **A.**   Typically we -- we are either signers on the bank or we

12  set up their bank account with them, that way we just --

13  everyone kind of can see what's going on.

14  Q.   But that wasn't the case for Michele Fiore's political

15  action committee or campaign; right?

16  **A.**   Well, it was established before she came to us, so yes.

17  Q.   Now, I also want to talk about an organization called

18  Hamlet Events with you for a moment.  Are you familiar with

19  Hamlet Events?

20  **A.**   Like, do I know whose it is or?  I became aware of it,

21  yes.

22  Q.   What is -- who -- who is -- let me ask that question

23  better.

24       What is Hamlet Events to the best of your knowledge?

25  **A.**   It was an event coordinating/planning service, I guess.

1    Q.    And who runs Hamlet Events?

2    **A.**    I believe it was Sheena.

3    Q.    And that's the same Sheena you were talking about a

4    moment ago, Michele Fiore's daughter?

5    **A.**    Yes.

6    Q.    All right.  Ms. Krumme, you've -- how long have you been

7    with Alchemy?

8    **A.**    About 10, 12 years.

9    Q.    In the 10 to 12 years you've been at Alchemy, are you

10    aware of any other political candidate or political action

11    committee that used Hamlet Events besides Michele Fiore?

12    **A.**    No.

13    Q.    Now I want to talk to you about an organization called A

14    Bright Present Foundation.  Do you know what that organization

15    is?

16    **A.**    I didn't until recently.

17    Q.    Until recently.  Do you mean when me and the FBI came and

18    spoke to you?

19    **A.**    Yes.

20    Q.    Would it be fair to say then that in the time that you

21    spent fundraising for Michele Fiore's political action

22    committee and campaign, that you weren't asked to fundraise

23    for A Bright Present Foundation?

24    **A.**    Correct.  Well, not to my knowledge.

25    Q.    Not to your knowledge?

1    **A.**    Right.

2    **Q.**    And would it also be fair to say that, if you were to be

3    asked to fundraise for A Bright Present Foundation, is it your

4    understanding that that would have to be discussed and

5    approved by the owner of Alchemy Associates, Ronnie Council?

6    **A.**    Yes.

7    **Q.**    All right.  I want to put up something that's in evidence

8    as Exhibit 89.  Do you see Exhibit 89 on the screen?

9    **A.**    Yes.

10    **Q.**    Now, Exhibit 89 is dated December 6th of 2019; right?

11    **A.**    Um-hum.

12    **Q.**    And it's for $3,350; right?

13    **A.**    Yes.

14    **Q.**    And it's a check from A Bright Present Foundation, Inc.;

15    right?

16    **A.**    Yes.

17    **Q.**    And it's made out to Alchemy?

18    **A.**    Um-hum.

19    **Q.**    And during this period of time, I just want to make sure

20    we're clear, it's -- to the best of your knowledge, A Bright

21    Present Foundation had not received any services from Alchemy

22    Associates under your work for Michele Fiore; right?

23    **A.**    Yeah, not to my knowledge.

24    **Q.**    Thank you so much, Ms. Krumme.  I have nothing further.

25            **THE COURT:**  Mr. Sanft?

1          **MR. SANFT:**  Yes, Your Honor.

2                          **CROSS-EXAMINATION**

3     **BY MR. SANFT:**

4     Q.    Hello, Ms. Krumme.

5     **A.**    Hello.

6     Q.    Have we ever met before?

7     **A.**    No.

8     Q.    All right.  I'm just going to ask you some follow-up

9     questions here, and it should be relatively short.

10          First question is, is that during the time period

11    we're talking about, which would have been from December of

12    2018 to about February or January of 2020 --

13    **A.**    Um-hum.

14    Q.    Is that a "yes"?

15    **A.**    Yes.

16    Q.    Okay.  During that time period, that's the time period

17    you're talking about here in terms of what you recall was

18    happening with your interaction with Michele Fiore?

19    **A.**    Yes.

20    Q.    Okay.  You were aware, though, that there was negative

21    publicity surrounding Michele in terms of, like, criticisms

22    from, like, the Review-Journal, for instance, for some of her

23    spending and so forth?

24    **A.**    Yes.

25    Q.    Specifically there were articles that were written about

*Tara Krumme - Cross*
*2:24-cr-00155-JAD-DJA - September 27, 2024*

1    reviews on the C&Es and then questions that were asked about

2    those --

3    **A.**    Yes.

4    Q.    -- those expenditures?

5          And that obviously was a concern to Michele?

6    **A.**    Yes.

7    Q.    Now, one of the things that you had talked about, you had

8    said that you had heard Michele make one phone call, I guess,

9    in furtherance of fundraising for the statue?

10   **A.**    Yes.

11   Q.    Did you ever -- during this time period, ever make calls

12   to either ask for sort of like a general fund sort of thing

13   that may have included the statue in it?

14   **A.**    No.

15   Q.    And in the meantime, as you had recalled, the document

16   that the government had put up --

17           **MR. SANFT:**  Can we put up that document again?

18           **MR. ASKAR:**  Which one?

19           **MR. SANFT:**  The letter.

20       *(Conferring amongst counsel.)*

21   **BY MR. SANFT:**

22   Q.    The government showed you this -- this contract.

23           **MR. SANFT:**  And, for the record, this is

24   Government's Exhibit 39.  Heather, can you turn to the next

25   page?

1    **BY MR. SANFT:**

2    Q.   Now, this is a contract specifically for a certain thing;

3    right?  Meaning, this particular contract that the government

4    showed you is a contract that said I'm running for office, and

5    it looks like here she would have been running for Las Vegas

6    City Council Ward 6?

7    **A.**   Um-hum.

8    Q.   Is that a "yes"?

9    **A.**   Yes.

10   Q.   Okay.  And I'm just pointing, just for the record, to the

11   terms on the second page, to the second paragraph about a win

12   bonus if Michele wins and becomes ward -- the Ward 6

13   councilwoman.

14   **A.**   Yes.

15   Q.   Okay.  All right.  And with regards to that, fair to say

16   that every time Alchemy Associates was working on something,

17   they had to have had a contract for whatever they're working

18   on?

19   **A.**   Yes.

20   Q.   Okay.  So, for instance, they had one for the political

21   action committee for Michele, as far as you know?

22   **A.**   As far as I know.

23   Q.   Yeah.

24   **A.**   It was formed prior to me.

25   Q.   Sure.  And I want to make sure.  Maybe I'm being a little

1    bit unfair here.  You're not part of the creation of this

2    particular contract; right?

3    **A.**    Right, not at that time.

4    Q.    Right.  This would have been something that would have

5    been done by Ronnie Council or somebody else?

6    **A.**    Yes.

7    Q.    Okay.  But in terms of your personal knowledge, there was

8    no such contract for the charity that we're talking about

9    here, A Bright Present, was there?

10   **A.**    Correct.

11   Q.    Okay.  So, as a result, you wouldn't have been working on

12   it anyhow?

13   **A.**    Right.

14   Q.    Okay.  I have no further questions.  Thank you.

15         **MR. ASKAR:**  Your Honor, we ask that the witness be

16   excused.

17         **MR. SANFT:**  No objection, Your Honor.

18         **THE COURT:**  All right.  Thank you.  You can step

19   down.  Please watch your step right there.  And then the one

20   right in front of the jury box.  Thank you.

21         Is that our last witness for the day?

22         **MR. ASKAR:**  (Nods head up and down.)

23         It is, Your Honor.

24         **THE COURT:**  Well, we have great news for you.  That

25   is the last witness we have for the day, so we are going to

2:24-cr-00155-JAD-DJA • September 27, 2024

1    end court early today.  Excuse me.

2           We will resume on Monday morning at 8:30 again.  So

3    we're going back to our normal schedule.  And so if we can

4    have you-all ready to be in your seats at 8:30 so that we can

5    pick up with our next set of witnesses.

6           Mr. Askar?

7           **MR. ASKAR:**  Your Honor, just for the Court and the

8    jurors' attention, there may be some increased security at the

9    courthouse on Monday.  So to the extent folks are concerned

10   about timing, we just want to flag that.

11          **THE COURT:**  Yeah.  Maybe give yourself a few extra

12   minutes to get here on Monday.  Thank you for that

13   information.

14          All right.  So over the weekend, please remember the

15   rules.  Don't talk about the case among yourselves or with

16   anybody else.  Don't read or view or listen to anything about

17   this case.  Don't conduct any of your own research.  Don't

18   Google anything that you've thought about while you've been

19   sitting here.  And please wait to formulate your final

20   opinions until you have heard all of the evidence and my

21   instructions of law.

22          We appreciate all of your time and attention this

23   week, and we will see you in these seats again at 8:30 on

24   Monday.  Thanks, everybody.

25          *(Jury out at 10:37 a.m.)*

```
 1              THE COURT:  We'll try to get you a breakfast pizza
 2    next week.
 3              A JUROR:  Woo-hoo.
 4              THE COURT:  Have a good weekend.
 5              A JUROR:  You, too.
 6              THE COURT:  Have a good weekend.
 7              A JUROR:  Thank you, Your Honor.
 8              THE COURT:  Summer, go ahead and shut the door.
 9              All right.  Let's talk about that Monday schedule.
10    Are we going all day Monday?  Where does the government think
11    they're going to be at on Monday?
12              MR. ASKAR:  Your Honor, we anticipate calling five to
13    six witnesses on Monday.  We believe that we -- you know, as
14    long as the Court won't hold us exactly to it, we believe that
15    we should be able to rest our case-in-chief sometime around
16    1:00 o'clock.
17              THE COURT:  Okay.  Mr. Sanft, do you think you're
18    going to be able to get some witnesses here on Monday in the
19    event that there is some time?
20              MR. SANFT:  Yes, Your Honor.  I think I could get at
21    least one, maybe two.
22              THE COURT:  Okay.  Fantastic.  And based on where
23    we're at right now, where are we looking at for closing about?
24    Mr. Sanft?
25              MR. SANFT:  My -- my understanding would be is that
```

1    we would probably be done with our case-in-chief by Wednesday

2    morning.  So, like, by the time of the break for the jury for

3    the 30-minute break.  I think we should be done by that point

4    on Wednesday.

5            **THE COURT:**  Okay.  Well, then I will start making

6    sure I have a solid draft of jury instructions so that we can

7    do our charge conference before we get to that point.

8            Is there anything else then that I need to address

9    today before we send everybody home?

10           **MR. ASKAR:**  I don't believe at this moment,

11   Your Honor.

12           **MR. GOTTFRIED:**  I just wanted to clarify.  For the

13   charge conference, are we looking at that Monday or Wednesday?

14           **THE COURT:**  Sure.

15           **MR. GOTTFRIED:**  Okay.  All right.

16           **THE COURT:**  I don't -- I don't know which day.  It's

17   going to depend, and I'll just kind of shove it in wherever we

18   got time --

19           **MR. GOTTFRIED:**  Okay.

20           **THE COURT:**  -- the first time we do.  It's still a

21   little early for it right now.  I think we need to let the

22   defense probably do some -- some -- maybe get a witness on.

23   We'll see.  And -- we'll see; right?  So I'll make sure that

24   you-all have drafts of them before we have a charge conference

25   so that we have an intelligent conversation and you've had an

1    opportunity to thoughtfully consider all of the instructions

2    before we talk about them.

3        **MR. ASKAR:**  Thank you, Your Honor.

4        **THE COURT:**  Again, the fact that you've all submitted

5    joint proposed instructions makes it a lot easier.  So that's

6    where we're at.  But I will -- in fact, I got time today, so

7    I'll work on some of that today.

8        **MR. ASKAR:**  Thank you, Your Honor.

9        I think the only other thing, you know, we anticipate

10    potentially some supplementary briefing even -- we are going

11    to attempt to talk to defense counsel after this to try and

12    get a better sense of some of the witnesses on defense

13    counsel's list so that we can make intelligent arguments to

14    the Court ahead of time about their potential relevance or

15    otherwise.

16        **THE COURT:**  Got it.  And just number wise, not name

17    wise, how many witnesses are you anticipating about?

18        **MR. SANFT:**  Six, maybe seven.  One of the witnesses

19    is not currently on our list, but we would be intending at

20    some point on calling Special Agent Jaski in our case-in-chief

21    if he is not called on Monday.

22        **THE COURT:**  Okay.  All right.  Anything else,

23    Mr. Sanft?

24        **MR. SANFT:**  Your Honor, the other special agent that

25    we would be calling that we have subpoenaed and we believe

2:24-cr-00155-JAD-DJA • September 27, 2024

 1    will be here Wednesday to testify would be Special Agent Cody

 2    Fryxell who was the originating special agent on this case.

 3            THE COURT:  Recognizing the limitations of my motion

 4    in limine order; right?

 5            MR. SANFT:  Yes, ma'am.

 6            THE COURT:  Okay.  All right.  Anything else we need

 7    to address today, Mr. Sanft?

 8            MR. SANFT:  No, Your Honor.

 9            THE COURT:  All right.  Well, have a good weekend,

10    everybody.  Let's plan to be back in here and ready to raise

11    any issues by 8:15, if there are any.  And then we'll bring

12    the jury back in at 8:30 and start with our witnesses.

13            MR. ASKAR:  Thank you, Your Honor.

14            MR. GOTTFRIED:  Thank you, Your Honor.

15            MR. SANFT:  Thank you, Your Honor.

16            THE COURT:  Thanks, everybody.  Have a good weekend.

17        *(Proceedings adjourned at 10:42 a.m.)*

18                         --o0o--

19              COURT REPORTER'S CERTIFICATE

20        I, AMBER M. McCLANE, Official Court Reporter, United
      States District Court, District of Nevada, Las Vegas, Nevada,
21    do hereby certify that pursuant to 28 U.S.C. § 753 the
      foregoing is a true, complete, and correct transcript of the
22    proceedings had in connection with the above-entitled matter.
      DATED:  12/5/2024
23

24                              */s/* *Amber M. McClane*
      /s/_____
25                              AMBER McCLANE, RPR, CRR

                UNITED STATES DISTRICT COURT
                 Amber McClane, RPR, CRR