CLARK HILL PLLC
PAOLA M. ARMENI
Nevada Bar No. 8357
Email:  parmeni@clarkhill.com
GIA N. MARINA
Nevada Bar No. 15276
Email: gmarina@clarkhill.com
1700 South Pavilion Center Drive, Suite 500
Las Vegas, Nevada 89135
Tel:  (702) 862-8300

*Attorneys for Defendant, Michele Fiore*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>vs.<br><br>MICHELE FIORE,<br><br>                              Defendant. | CASE NO. 2:24-cr-00155-JAD-DJA<br><br>**DEFENDANT MICHELE FIORE'S MOTION FOR A NEW TRIAL** |

M9636\503106\280747252.v3

# TABLE OF CONTENTS

I.      STATEMENT OF RELEVANT FACTS .............................................................1

II.     LEGAL ARGUMENT.................................................................................6

    A.      Legal Standard .................................................................................6

    B.      Ms. Fiore is Entitled to a New Trial Because She was Denied a
        Fair Trial When the Government Not the Court Determined That
        Sheena Siegel's Immunity Agreement was Breached and the
        Consequences Thereof Leading to the Invocation of Her Fifth
        Amendment Privilege and Ultimately the Striking of Her Entire
        Testimony ........................................................................................7

        1.     Ms. Fiore Has a Constitutional Right to a Fair Trial ...................7

        2.     Ms. Fiore Was Denied a Fair Trial When Ms. Siegel's
                Testimony was Stricken Prior to a Court Determination on
                Whether Her Immunity Agreement Was Breached and If It
                was Breached What Was The Consequences of the Breach.......................8

    C.      Due to a Culmination of Errors, Ms. Fiore was Deprived of Her
        Right to a Fair Trial........................................................................14

        1.     The Court Erred In Excluding Evidence As To The Full
                Breadth Of The Investigation........................................................14

        2.     Defendant's Motion for New Trial Should Be Granted Due
                To The Court's Erroneous Admission Of Nicole Beck's
                Testimony. .................................................................................17

        3.     Ms. Fiore's Motion For New Trial Should Be Granted For
                Erroneous Jury Instructions. .........................................................21

    D.      Due To Ineffective Assistance of Counsel, Ms. Fiore Was
        Deprived Of Due Process And Is Entitled To A New Trial. ...............23

        1.     A New Trial Should Be Granted Due To Ineffective
                Assistance Of Counsel For Failure To Object To, Or Move
                To Exclude, Witnesses Who Lacked Personal Knowledge. ...................23

                a.     Testimony of Peter Lee.................................................24

                b.     The Testimony of Other Donors Lack Personal
                      Knowledge of Ms. Fiore As The Person Soliciting
                      Donations. .........................................................26

                c.     Testimony of Joseph Lombardo....................................27

i

2.      Ms. Fiore Should Be Granted A New Trial For Ineffective Assistance of Counsel For Failure To Introduce Exculpatory Evidence. ..............................................29

        a.      Counsel's Failure Fell Below An Objective Standard of Reasonableness................................................29

        b.      The Deficient Performance Prejudiced Ms. Fiore. ........31

3.      Failure to File A Pretrial Motion To Dismiss Based On Vindictive or Selective Prosecution Constitutes Ineffective Assistance Of Counsel. ..............................................32

        a.      The Motion to Dismiss Would Have Been Meritorious...............................................................32

        b.      Counsel's Performance Was Deficient And Prejudiced Ms. Fiore.............................................36

4.      Ms. Fiore's Motion for New Trial Should Be Granted For Ineffective Assistance of Counsel For Failure To File A Motion To Suppress. ..............................................37

        a.      The Motion to Suppress Would Have Been Meritorious...............................................................38

        b.      Counsel's Performance Was Deficient And Prejudiced Ms. Fiore.............................................42

III.    CONCLUSION.............................................................43

M9636\503106\280747252.v3

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Cagle v. Davis, E.D.Tenn*.
5
   1980, 520 F.Supp. 297, affirmed 663 F.2d 1070 ........................................................6

6

*California v. Trombetta*,
   467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)..........................................15

7

*Cantu v. United States*,
8
   No. CV1400219MMMJCGX, 2015 WL 12743881 (C.D. Cal. Apr. 6, 2015) .......................21

9

*Chambers v. Mississippi*,
   410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).........................................7, 15
10

11

*Chapman v. California*,
   386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)..................................................18

12

*Charles Alan Wright*, Fed. Prac. & Pro. § 553 at 245 (1982).................................................6

13

*Crane v. Kentucky*,
14
   476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).........................................15

15

*Denham v. Deeds*,
   954 F.2d 1501 (9th Cir. 1992) ..........................................................................8
16

17

*Duncan v. Ornoski*,
   528 F.3d 1222 (9th Cir.2008) ...................................................................29, 31

18

*Est. of Brown v. Lambert*,
19
   478 F. Supp. 3d 1006 (S.D. Cal. 2020)..............................................................6

20

*Garner v. Hutchings*,
21
   No. 215CV02430JCMDJA, 2021 WL 2651806 (D. Nev. June 28, 2021) ...........................22

22

*Hart v. Gomez*,
   174 F.3d 1067 (1999)....................................................................................29

23

*Houserman v. Comtech Telecommunications Corporation*,
24
   519 F.Supp.3d 863 (2021) ...............................................................................18

25

*Howe v. State*,
   916 P.2d 153, 112 Nev. 458 (1996)....................................................................38
26

27

*Jones v. Wood*,
   114 F.3d 1002 (9th Cir.1997) .......................................................................30

28

M9636\503106\280747252.v3

*Kastigar v. United States*,
406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) ............................................... 9

*Kimmelman v. Morrison*,
477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ..................................... 36, 37

*Kyles v. Whitley*,
514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ....................................... 16

*Lewis v. Davis*,
No. 1:03-CV-06775-LJO-SAB, 2018 WL 4024811 (E.D. Cal. Aug. 20, 2018),
*aff'd sub nom. Lewis v. Andes*, 95 F.4th 1166 (9th Cir. 2024) ............................. 24

*Lord v. Wood*,
184 F.3d 1083 (9th Cir.1999) ................................................................................ 29

*Los Angeles Times Commc'ns, LLC v. Dep't of Army*,
442 F. Supp. 2d 880 (C.D. Cal. 2006) ................................................................... 24

*Mapp v. Ohio*,
367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) ....................................... 39

*Cotton ex rel. McClure v. City of Eureka, Cal.*,
860 F. Supp. 2d 999 (N.D. Cal. 2012) .................................................................. 22

*Medina v. State*,
122 Nev. 346, 143 P.3d 471 (2006) ...................................................................... 21

*Murray v. Schriro*,
745 F.3d 984 (9th Cir. 2014) ................................................................................ 37

*New Jersey v. Portash*,
440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) .......................................... 11

*Nix v. Whiteside*,
475 U.S. 157 (1986) .............................................................................................. 27

*In re Oliver*,
333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948) ............................................... 15

*Reynoso v. Giurbino*,
462 F.3d 1099, 1112 (9th Cir. 2006) ..................................................................... 29

*Rios v. Rocha*,
299 F.3d 796 (9th Cir.2002) ................................................................................. 29

*In re Search of Google Email Accounts*
*identified in Attachment A*, 92 F.Supp.3d 944 (2015) .......................................... 38

*Silverman v. United States,*
  365 U.S. 505 [81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961)..........................................38

*Strickland v. Washington,*
  466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)........................................29, 30, 37, 38

*U.S. v. Haischer,*
  780 F.3d 1277 (2015).............................................................................................18

*U.S. v. Lopez,*
  762 F.3d 852 (2014)...............................................................................................24

*United States v. Alston,*
  974 F.2d 1206 (9th Cir.1992) ..................................................................................6

*United States v. Anderson,*
  970 F.2d 602 (9th Cir. 1992) .................................................................................10

*United States v. Andrade,*
  993 F. Supp. 2d 1269 (D. Nev. 2014).......................................................................6

*United States v. Armstrong,*
  517 U.S. 456, 116 S.Ct. 1480 (1996).................................................................33, 34

*United States. v. Barnes,*
  749 F.Supp.2d 1124 (2010) ...................................................................................38

*United States v. Bausch,*
  No. 214CR00399KJDGWF, 2016 WL 3360668, at *2 (D. Nev. May 13,
  2016), report and recommendation adopted, No. 214CR00399KJDGWF, 2016
  WL 3360654 (D. Nev. June 9, 2016)....................................................................9, 10

*United States v. Beltran,*
  No. 217CR00205APGGWF, 2018 WL 6046176 (D. Nev. Nov. 19, 2018) ...........10

*United States v. Bustamante,*
  687 F.3d 1190 (9th Cir. 2012) ...............................................................................18

*United States v. Carrillo,*
  709 F.2d 35 (9th Cir.1983) ......................................................................................9

*United States v. Crosby,*
  75 F.3d 1343 (9th Cir. 1996) .............................................................................15, 16

*United States v. Eliason,*
  3 F.3d 1149 (7th Cir.1993) .......................................................................................9

*United States v. Fitch,*
  964 F.2d 571 (6th Cir.1992) .....................................................................................9

v

*United States v. Gage,*
   No. 2:07-CR-039-2-JLQ, 2008 WL 11451382 (D. Nev. Apr. 30, 2008) .................................8

*United States v. Garza-Juarez,*
   992 F.2d 896 (9th Cir.1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126
   L.Ed.2d 688 (1994) ...........................................................................................................33

*United States v. Gerrans,*
   477 F.Supp.3d 1035 (2020) ...............................................................................................37

*United States v. Gilbert,*
   266 F.3d 1180 (9th Cir. 2001) ...........................................................................................33

*United States v. Groves,*
   571 F.2d 450 (9th Cir. 1978) .............................................................................................33

*United States v. Hooton,*
   662 F.2d 628 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71
   L.Ed.2d 873 (1982) ...........................................................................................................33

*United States v. Irvine,*
   756 F.2d 708 (9th Cir.1985) .......................................................................................10, 11

*United States v. James,*
   257 F.3d 1173 (10th Cir. 2001) .........................................................................................36

*United States v. Kurzer,*
   534 F.2d 511 (2d Cir.1976)........................................................................................10, 11

*United States v. Lord,*
   711 F.2d 887 (9th Cir. 1983) .........................................................................................9, 12

*United States v. Mark,*
   795 F.3d 1102 (9th Cir. 2015) .......................................................................................9, 10

*United States v. McDonald,*
   576 F.2d 1350 (9th Cir. 1978) ...........................................................................................26

*United States v. Miguel,*
   87 Fed. Appx. 67 (9th Cir. Jan. 30, 2004) (Unpub. Disp.) ...............................................21

*United States v. Motley,*
   655 F.2d 186 (9th Cir. 1982) .............................................................................................33

*United States v. Ness,*
   652 F.2d 890 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71
   L.Ed.2d 113 (1981)............................................................................................................33

*United States v. Nguyen,*
   565 F.3d 668 (9th Cir.2009) ..............................................................................................18

vi

*United States v. Packwood,*
    848 F.2d 1009 (9th Cir.1988) ............................................................................9

*United States v. Pelletier,*
    898 F.2d 297 (2d Cir.1990).................................................................................9

*United States v. Plummer,*
    941 F.2d 799 (9th Cir. 1991) ............................................................................10

*United States v. Primero,*
    No. 217CR00205APGGWF, 2018 WL 6055560, at *5 (D. Nev. June 12,
    2018), <u>report and recommendation adopted sub nom.</u>......................................10

*United States v. Rettig,*
    589 F.2d 418 (9th Cir.1978)..............................................................................41

*United States v. Reyes,*
    510 F. Supp. 150 (D. Ariz. 1981) ....................................................................6, 7

*United States v. Ruesga-Martinez,*
    534 F.2d 1367 (9th Cir. 1976) ..........................................................................33

*United States v. Sager,*
    227 F.3d 1138 (9th Cir. 2000) ..........................................................................16

*United States v. SDI Future Health, Inc.,*
    568 F.3d 684 (9th Cir. 2009) ............................................................................38

*United States v. Sedaghaty,*
    728 F.3d 885 (9th Cir. 2013) ..........................................................39, 40, 41, 42

*United States v. Sellers,*
    906 F.3d 848 (9th Cir. 2018) ............................................................................33

*United States v. Sinigaglio,*
    942 F.2d 581 (9th Cir.1991) .............................................................................32

*United States v. Verrusio,*
    803 F.2d 885 (7th Cir.1986) ...............................................................................9

*United States v. Wendfeldt,*
    58 F. Supp. 3d 1124 (D. Nev. 2014)..................................................................42

*United States v. Wilson,*
    639 F.2d 500 (9th Cir. 1981) ............................................................................33

*United States v. Yazzie,*
    59 F.3d 807 (9th Cir.1995) ...............................................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

M9636\503106\280747252.v3

*Washington v. Texas*,
388 U.S. 14; 87 S. Ct. 1920, 1923 (1967)................................................................8

*Weg v. United States*,
450 F.2d 340 (9th Cir.1971), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2057, 32
L.Ed.2d 349 (1972)................................................................9

*Wong Sun v. United States*,
371 U.S. 471 (1962)................................................................39

**Statutes**

18 U.S.C. § 1343................................................................1, 2

18 U.S.C. § 1349................................................................1, 2

18 U.S.C. § 6002................................................................*passim*

18 U.S.C. § 6003................................................................8, 11, 12

**Rules**

ABA Rules of Professional Conduct, rule 3.3................................................................27, 28

Fed. R. Civ. P. § 59................................................................13

Fed. R. Crim. Proc. § 33................................................................6

Fed. R. Crim. Proc. § 33(a)................................................................6, 37

Fed. R. Crim. Proc. § 52(b)................................................................21

Fed. R. Crim. Proc. § 59................................................................21

Fed. R. Crim. Proc. § 59(a)(1)(A)................................................................21

Fed. R. Evid. § 403................................................................17, 18, 21

Fed. R. Evid. § 602................................................................24

Fed. R. Evid. § 613................................................................29

**Constitutional Provisions**

Nev. Const. art. I, § 18................................................................38

U.S. Const. amend. IV................................................................38, 39

U.S. Const. amend. V................................................................*passim*

U.S. Const. amend. VI................................................................7, 29, 38

M9636\503106\280747252.v3

**CERTIFICATION:  This document is timely filed.**

Defendant Michele Fiore's Motion for New Trial should be granted. Ms. Fiore was denied her right to a fair trial guaranteed by the United States Constitution when: (1) the government unilaterally determined that Sheena Siegel breached her agreement and the consequences thereof. The immunity agreement follows the principles of contract law. As a result, the government needed to prove by a preponderance of the evidence a material breach and thereafter, the court should have the made the determination of the breach and the consequences of a breach. Which here would have resulted in no finding of a material breach and even if a breach was determined, 18 U.S.C. 6002 would not have allowed the remedy to be an abrogation of the agreement. (2) a cumulation of errors occurred which included: the exclusion of evidence related to the investigation, the admission of the Nicole Beck's testimony which was cumulative and unfairly prejudicial because its sole purposes was to invoke an emotional response and the failure to give the complete Ninth Circuit Jury Instruction on Conspiracy was prejudicial to Ms. Fiore as it eliminated her ability to argue that under the law, Ms. Siegel could not have been a co-conspirator and (3) trial counsel for Ms. Fiore failed to file pretrial motions: motion to dismiss for selective/vindictive prosecution and a motion to suppress, failed to exclude and/or object to witnesses for lack of personal knowledge, and failed to introduce exculpatory evidence.

For all these reasons, the Court should vacate Ms. Fiore's verdict and grant a new trial because the interest of justice so requires.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF RELEVANT FACTS

On July 16, 2024, the grand jury returned a true bill and an Indictment was filed charging Ms. Fiore with one count of Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349) and four counts of Wire Fraud (18 U.S.C. § 1343).[1] Ms. Fiore pled not guilty to all counts on July 19, 2024.[2]

---

[1] *See* ECF No. 1.
[2] *See* ECF No. 9.

1

On August 20, 2024, the grand jury returned a Superseding Indictment charging Ms. Fiore with one count of Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349) and six counts of Wire Fraud (18 U.S.C. § 1343).[3] On September 9, 2024, Ms. Fiore pled not guilty to all counts.[4]

On September 3, 2024, the government filed its Omnibus Motion in *limine*, to preclude forms of argument designed to elicit jury nullification and preclude Fiore's vindictive- or selective-prosecution "defense" among other issues.[5] On the same day, Ms. Fiore filed her Motion in *limine* to exclude government's intended use of evidence identified in its 404(b) notice[6] and a Motion in *limine* to exclude government's references and/or inclusion of Alyn Beck's family and/or widow to testify in this case.[7]

On September 18, 2024, the Court entered its Order Granting in Part and Denying in Part the parties' Motions in *limine*.[8] In pertinent part, the Court granted the government's motion to preclude Fiore's vindictive- or selective-prosecution "defense"; granted the government's motion to preclude the defense from encouraging jury nullification..[9] As to Ms. Fiore's motions, the Court denied her motion to exclude Nicole Beck's testimony "because her testimony is probative, and the defense has not established that it would be unfairly prejudicial"[10] and denied Ms. Fiore's motion to exclude evidence of other bad acts on the basis that those acts aren't similar enough to the offenses charged, "because their common theme is sufficiently similar under the law."[11]

Trial commenced on September 24, 2024[12] with jury selection. The second day of trial resumed on September 25, 2024.[13] The parties made opening statements and the following

---

[3] *See* ECF No. 19.
[4] *See* ECF No. 41.
[5] *See* ECF No. 29.
[6] *See* ECF No. 30.
[7] *See* ECF No. 31.
[8] *See* ECF No. 51.
[9] *Id.* at 29.
[10] *Id.* at 30:12-14.
[11] *Id.* at 30:15-17.
[12] *See* ECF No. 82.
[13] *See* ECF No. 87.

2

witnesses testified for the Government: (1) Nicole Beck; (2) Brian Hanlon; (3) Michael Barnes; (4) Douglas Smith; (5) Elizabeth Stavola; and (6) David Chesnoff.

On September 26, 2024, the third day of trial resumed.[14] The following witnesses testified for the Government: (1) Jay Brown; (2) Robert Groesbeck; (3) Robert Richardson; (4) Shauna Bakkedahl; (5) Tami Montes; (6) Mark Wlaschin; (7) Thomas White; (8) Peter Lee; (9) Cicely Hoffman; and (10) George Kaime.

On September 27, 2024, day four of trial resumed[15] and the following witnesses testified for the Government: (1) Harry Mohney; (2) Brett Torino; (3) Alyssa Struck; (4) Ronnie Council; and (5) Tara Krumme.

Day five of trial took place on September 30, 2024,[16] and the following witnesses testified for the Government: (1) Joseph Lombardo; (2) Peter Palivos; (3) Chris Armstrong; and (4) Sandra Harris. The Government rested, and the defense called (1) Kyle Jaski; and (2) Sheena Siegel. Ms. Siegel, the daughter of Ms. Fiore, was an integral defense witness who, unbeknownst to the Court at the time of her taking the stand, had a Testimonial Use Immunity Agreement in place with the United States Attorney's Office, specifically AUSA Steven Myhre, since at least February 1, 2023, as an unindicted co-conspirator.[17] On July 16, 2024, Ms. Siegel testified before the grand jury in part,



---

[14] *See* ECF No. 60.
[15] *See* ECF No. 88.
[16] *See* ECF No. 90.
[17] *See* **Exhibit A,** Immunity Agreement.
[18] *See* **Exhibit B**, Portions of Grand Jury Transcript, at 5:16-23.
[19] *Id.* at 12:5-11.
[20] *Id.* at 13:19-16-25.
[21] *Id.* at 21:5-9.
[22] *Id.* at 14:13.



As the Government did not call Ms. Siegel in its case in chief, the defense called her to illustrate a large part of the defense's theory – that the FBI investigation was sloppy and shoddy work – as well as illicit testimony that the funds (a large part of which was cash) were spent on charitable efforts.[30][31] The following day, Ms. Siegel's testimony was resumed, and she provided a considerable amount of testimony on direct examination as to the different charitable events she assisted her mother with and how much the events cost.[32]

On October 1, 2024, day six of trial commenced.[33] The defense called the following witnesses: (1) Caryn Minowsky; (2) Timothy Johnson; (3) Sheena Siegel; (4) Jorge Lopez; and (5) Cody Fryxell. The Government conducted cross-examination of Ms. Siegel and for the first time while testifying, showed her documentary evidence in the form of a check and asked her if it was

---

[23] *See* **Exhibit B**, at 15:19-25.
[24] *Id.* at 16:1-3.
[25] *Id.* at 16:4-9.
[26] *Id.* at 20:7-13.
[27] *Id.* at 21:15-20.
[28] *Id.* at 24:4-12.
[29] *Id.* at 25:21-25; 26:1-2.
[30] *See* ECF No. 90, at 190-226.
[31] Which the Government argued was completely proper. Indeed, in closing arguments, the Government made a distinction that the funds donated by Mr. Lombardo for the creation of the Beck statue, which were funds donated to him to run for sheriff, was fine. "[T]here is a pretty big difference between taking leftover money from a political campaign and giving it to what you think is a charity…." *See* ECF No. 93, at 62:17-25; 63:1-10.
[32] *See* ECF No. 91, at 33-86.
[33] *Id.*

4

her mother's signature on the bottom right.[34] Ms. Siegel testified that it could have been her mother's signature, or it could have been hers.[35] Rather than asking any follow up question for clarification, government counsel inquired, "Are you – are you admitting to a federal crime here in court today?"[36] The defense objected, to which the government responded, "I think it's a relevant question," and the Court requested a sidebar.[37] The jury was excused and after colloquy, the parties agreed to present other witnesses to give Ms. Siegel the opportunity to speak to a lawyer.[38] Ms. Siegel's testimony resumed later in the day in the presence of the jury, and Ms. Siegel, on the advice of counsel, asserted her Fifth Amendment privilege.[39] The parties requested another sidebar, and defense counsel moved for a mistrial due to the government's improper questioning and the prejudicial effect to Ms. Fiore's defense,[40] which was denied.[41] Ms. Siegel was excused and the Court took the matter under advisement as to whether it would be striking Ms. Siegel's testimony or provide a limiting instruction to the jury.[42]

On October 2, 2024, day seven of trial commenced[43] and cross examination of Sheena Siegel continued outside the presence of the jury.[44] Ultimately, over the defense's objection, Ms. Siegel's testimony and all exhibits introduced through her testimony was stricken from the record.[45] The Government then argued (for the first time) in closing statements that Ms. Siegel "was an instrumental part of [] her mother's scheme. She was a co-conspirator."[46]

---

[34] *See* ECF No. 91, at 94:2-8.
[35] *Id.* at 94:9-11.
[36] *Id.* at 94:19-20.
[37] *Id.* at 94:21-25.
[38] *Id.* at 98:4-18.
[39] *Id.* at 119-120.
[40] *Id.* at 121-123.
[41] *Id.* at 125:13-14.
[42] *See* ECF No. 98, at 129:16-22.
[43] *See* ECF No. 92.
[44] *Id.* at 34-52.
[45] *Id.* at ECF No. 92, at 12-17.
[46] *See* ECF No. 93, at 65:16-18.

On October 3, 2024, the parties presented their closing arguments and submitted the case to the jury.[47] The jury returned a verdict, unanimously finding Ms. Fiore guilty of all seven counts.[48]

## II.    LEGAL ARGUMENT

### A.    Legal Standard

Pursuant to Federal Rule of Criminal Procedure 33, the court may vacate a judgment and grant a new trial "if the interest of justice so requires."[49] A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal.[50]

> The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.[51]

If the verdict is of questionable validity, additional evidence of relatively "minor importance" may be sufficient to create a reasonable doubt.[52] Indeed, the district court has a **duty** to set aside the verdict of the jury, **even though supported by substantial evidence**, wherein, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.[53]

Additionally, the object of a motion for new trial is twofold: to give the trial court the chance to correct errors in the proceedings if any, and to preserve such errors for appeal.[54]

> Rulings of the court in the conduct of the trial on matters resting in its discretion are not ground for a new trial, unless substantial injustice is shown to have resulted therefrom. There may not have been such an abuse of discretion as to require a new trial; but, where the court is properly of the opinion that it exercised its discretion unwisely, it may grant a new trial; and if the court is convinced that it committed error, the mere fact that its erroneous rulings are not specifically labelled, in the

---

[47] *See* ECF No. 93.
[48] *Id.* at 148-149.
[49] Fed.R.Crim.P. 33(a); *United States v. Andrade*, 993 F. Supp. 2d 1269, 1276 (D. Nev. 2014).
[50] *See* 3 Charles Alan Wright, Fed. Prac. & Pro. § 553 at 245 (1982).
[51] *United States v. Andrade*, 993 F. Supp. 2d 1269, 1280 (D. Nev. 2014)(citing *United States v. Alston,* 974 F.2d 1206, 1211 (9th Cir.1992)).
[52] *Cagle v. Davis, E.D.Tenn.*1980, 520 F.Supp. 297, affirmed 663 F.2d 1070.
[53] *Est. of Brown v. Lambert*, 478 F. Supp. 3d 1006 (S.D. Cal. 2020).
[54] *United States v. Reyes*, 510 F. Supp. 150, 153 (D. Ariz. 1981).

M9636\503106\280747252.v3

1  motion for new trial, as an abuse of discretion does not take away from it the right
2  and duty to grant a new trial.[55]

**B.   Ms. Fiore is Entitled to a New Trial Because She was Denied a Fair Trial When the Government Not the Court Determined That Sheena Siegel's Immunity Agreement was Breached and the Consequences Thereof Leading to the Invocation of Her Fifth Amendment Privilege and Ultimately the Striking of Her Entire Testimony**

Ms. Fiore was denied a fair trial. She has a constitutional right to present witnesses to establish a defense. Sheena Siegel was a defense witness. Ms. Siegel's immunity agreement was erroneously withdrawn, forcing her to invoke her fifth amendment privilege. This caused the Court to strike her entire testimony violating Ms. Fiore's constitutional right to compulsory and due process. The striking of Ms. Siegel's testimony was extremely prejudicial to Ms. Fiore for two reasons: (1) Ms. Siegel supported Ms. Fiore's theory of defense. She could establish that monies collected were in fact utilized for charitable events in contradiction to the Government's position that all money was used for personal reasons[56] and (2) the Government only identified Ms. Siegel as the co-conspirator when they knew she would assert her Fifth Amendment privilege in front of the jury[57] and then again after her testimony was stricken.[58] For this reason, as well as the other reasons cited, Ms. Fiore is entitled to a new trial.

**1.   Ms. Fiore Has a Constitutional Right to a Fair Trial**

The right to present witnesses "has long been recognized as essential to due process." [59] The Sixth Amendment guarantees defendants the fundamental right to have witnesses challenge

---

[55] *United States v. Reyes*, 510 F. Supp. 150, 153 (D. Ariz. 1981).

[56] The Government drew a distinction between using money donated to a campaign for charitable reasons versus using charity money for personal expenses. ECF No. 93:63.

[57] After the Government withdrew the immunity agreement, the Government asked Ms. Siegel if she conspired with her mom to defraud donors who gave money for the Beck statute which on advice of counsel asserted her privilege. ECF 91:120:20-22. ABA Standards Relating to the Administration of Criminal Justice, Standard 3-5.7(c) of the Prosecution Function advises that prosecutors should not call a witness in the presence of the jury who the prosecutor knows will claim a valid privilege not to testify.

[58] In closing, the Government argued that a conspiracy requires two people and Person A is Sheena Siegel. ECF No. 93:65.

[59] *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973).

7

the testimony of prosecution witnesses.[60]   A trial court should safeguard defendant's right to present her story to the jury.[61]

In *Washington v. Texas*[62] the Supreme Court reaffirmed this fundamental right as follows:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

> ## 2.   Ms. Fiore Was Denied a Fair Trial When Ms. Siegel's Testimony was Stricken Prior to a Court Determination on Whether Her Immunity Agreement Was Breached and If It was Breached What Was The Consequences of the Breach.

Sheena Siegel's immunity agreement was improperly withdrawn because (1) the Court never decided whether Ms. Siegel violated the immunity agreement; (2) even if the Court had decided that Ms. Siegel violated the agreement, the consequences for violating the agreement would have been new criminal charges not withdrawal of the agreement; and (3) the prosecutors had no standing to null and void an agreement that they were not a party to.

A prosecutor may secure immunity for a witness pursuant to 18 U.S.C. §§ 6002[63]–6003.[64] Pursuant to section 6003, the witness is compelled to testify over the privilege against self-

---

[60] *United States v. Gage*, No. 2:07-CR-039-2-JLQ, 2008 WL 11451382, at *2 (D. Nev. Apr. 30, 2008).

[61] *Denham v. Deeds*, 954 F.2d 1501, 1503–04 (9th Cir. 1992).

[62] 388 U.S. 14, 18; 87 S. Ct. 1920, 1923 (1967).

[63] Section 6002 provides, in pertinent part:
[T]he witness may not refuse to comply with [an order issued under this part] on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

[64] Section 6003 provides, in pertinent part:
(a) [T]he United States district court ... shall issue ... upon the request of the United States attorney ... an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination ....
(b) A United States attorney may ... request an order under subsection (a) of this section when in his judgment—

1  incrimination in return for immunity.[65]  Thus, an immunized witness may not refuse to answer a

2  question by asserting the fifth amendment privilege.[66] This immunity is referred to as "use

3  immunity."[67] A grant of immunity is only constitutional if the immunity awarded is equal to the

4  constitutional protection it supplants.[68]

5      Immunity pursuant to 18 U.S.C. §§ 6002–6003 is memorialized in an agreement. Because

6  immunity agreements implicate due process rights,[69]  the government cannot unilaterally declare

7  an immunity agreement void.[70] While the burden to establish the existence of the agreement is on

8  the witness, the government bears the burden by a preponderance of the evidence to establish a

9  breach of the immunity agreement.[71]  The breach must be material.  "Not every untruthful

10 statement would constitute a breach. Rather, to establish breach, the government must prove

11 material untruthful statements amounting to a "material and substantial breach."[72] And then a

12 judicial determination must be made that the agreement was in fact breached.[73]

13     A cooperation-immunity agreement is a contract and therefore subject to contract law

14 standards.[74] The scope and consequences of the immunity are governed by the terms of the

15 agreement." [75] The trial court should apply contract principles to determine if a contract was

---

16 (1) the testimony or other information from such individual may be necessary to the public
17 interest; and

(2) such individual has refused or is likely to refuse to testify or provide other information on the
18 basis of his privilege against self-incrimination.

19 [65] *United States v. Lord*, 711 F.2d 887, 889–90 (9th Cir. 1983).
   [66] *Id.* at 890.

20 [67]  *Weg v. United States,* 450 F.2d 340, 341 (9th Cir.1971), *cert. denied,* 406 U.S. 962, 92 S.Ct.
   2057, 32 L.Ed.2d 349 (1972).

21 [68] *Kastigar v. United States,* 406 U.S. 441, 449, 92 S.Ct. 1653, 1659, 32 L.Ed.2d 212 (1972).

22 [69] *United States v. Bausch*, No. 214CR00399KJDGWF, 2016 WL 3360668, at *2 (D. Nev. May
   13, 2016), report and recommendation adopted, No. 214CR00399KJDGWF, 2016 WL 3360654

23 (D. Nev. June 9, 2016).
   [70] *United States v. Verrusio,* 803 F.2d 885, 888 (7th Cir.1986)

24 [71]  *United States v. Mark*, 795 F.3d 1102 (9th Cir. 2015).

   [72]  *United States v. Fitch,* 964 F.2d 571, 574–75 (6th Cir.1992). *United States v. Packwood,* 848
25 F.2d 1009, 1012 (9th Cir.1988) (information that was merely incomplete and not actually false
   held not a breach of a plea agreement which literally provided that false information constitutes
26 breach).

27 [73] *United States v. Eliason,* 3 F.3d 1149, 1153 (7th Cir.1993)).
   [74] *United States v. Carrillo,* 709 F.2d 35, 36–37 (9th Cir.1983).

28 [75] *United States v. Pelletier,* 898 F.2d 297, 301 (2d Cir.1990).

9

formed, whether the facts prove a breach of the contract, the reasonable interpretation of the agreement as a whole and the surrounding circumstances.[76] The government must "bear responsibility for any lack of clarity"[77] in the agreement.

Both Ninth Circuit, as well as the District of Nevada precedent indicate that courts should determine if a person has immunity and if so whether the immunity agreement has been breached. *See United States v. Plummer*,[78] (remanded back to the district court to decide if the immunity agreement had been breached. *United States v. Mark*, 795 F.3d 1102, 1105 (9th Cir. 2015)(district court held a hearing to determine if immunity agreement was breached. Appeals court reversed the trial court and remanded with directions to dismiss the Indictment after finding not enough evidence of breach); *United States v. Bausch*,[79] (district court held evidentiary hearing and found no agreement of informal immunity); *United States v. Primero,*[80] (district court determined after a hearing no grant of immunity and even if immunity was granted there was a breach of the agreement).

Once the Court decides a breach has occurred, then the Court must then interpret the contract to decide implications of that breach. In *United States v. Irvine,*[81] the Defendant argued that the *Kurzer* case was applicable because even if Irvine did breach the agreement the government could only prosecute him for perjury or obstruction not for the offense to which he received immunity. The Ninth Circuit acknowledged that the appeals court in *Kurzner* rejected the Government's contention that, Kurzer forfeited his immunity by lying to the Government while immunized," noting that "the ordinary remedy for the Government when an immunized witness lies or fails to cooperate fully is a prosecution for perjury or for contempt, rather than

---

[76] *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991).

[77] *United States v. Anderson*, 970 F.2d 602, 607 (9th Cir. 1992).

[78] 941 F.2d 799, 802–03 (9th Cir. 1991).

[79] No. 214CR00399KJDGWF, 2016 WL 3360668, at *2 (D. Nev. May 13, 2016), report and recommendation adopted, No. 214CR00399KJDGWF, 2016 WL 3360654 (D. Nev. June 9, 2016).

[80] No. 217CR00205APGGWF, 2018 WL 6055560, at *5 (D. Nev. June 12, 2018), report and recommendation adopted sub nom. United States v. Beltran, No. 217CR00205APGGWF, 2018 WL 6046176 (D. Nev. Nov. 19, 2018).

[81] 756 F.2d 708, 710 (9th Cir.1985).

10

abrogation of the immunity agreement and use of the information truthfully given by the immunized witness to prosecute him for other offenses."[82] However, the Ninth Circuit found *Kurzer* inapplicable because Irvine's source of immunity unlike Kurzer was neither section 6003 or the Fifth Amendment.[83] That is because when a person is given use immunity the testimony itself and any "fruits" thereof may not be used against the witness in any criminal case except a prosecution for perjury arising out of the testimony. [84] The immunity statute explicitly prohibits the use of immunized testimony "except in a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." [85]

Here, the Court never determined whether a contract existed, whether it was breached and the reasonable interpretation of the agreement. There would have been no dispute that Ms. Siegel was granted immunity pursuant to sections 18 USC 6002 and 6003.[86] Likewise, there would have been no dispute that the United States Attorney for the District of Nevada, not the Department of Justice was the party to the immunity agreement.[87] Therefore, attorneys for DOJ had no standing to null and void Ms. Seigel's immunity agreement and the record is deplete of any evidence to suggest that the United States Attorney's office made that decision. Even if the decision had been made by the United States Attorney's office, the law is clear, that they alone cannot decide that the agreement was breached. Rather, that decision was for the court to determine.

The government never proved that the immunity agreement was materially breached by a preponderance of the evidence. Neither defense counsel nor Ms. Siegel's counsel were given an opportunity to challenge the alleged breach. If they had they would have been able to argue that a material breach did not occur. The alleged breach was due to Ms. Siegel testifying that a signature

---

[82] *United States v. Irvine*, 756 F.2d 708, 711 (9th Cir. 1985)  citing *United States v. Kurzer,* 534 F.2d 511, 518 (2d Cir.1976).
[83] *Id*. at 711.
[84] *New Jersey v. Portash,* 440 U.S. 450, 451–52, 99 S.Ct. 1292, 1293–94, 59 L.Ed.2d 501 (1979).
[85] 18 U.S.C. § 6002.
[86] Exhibit A, Immunity Agreement.
[87]  ECF No. 91:153, ECF No. 92:12.

on a check could have been hers or her mom's (Ms. Fiore).[88] Counsel could have argued that this was the first time Ms. Siegel was shown a check while testifying and upon seeing it truthfully responded.[89]  Regardless of who signed the check, Ms. Siegel also testified that Ms. Fiore was the sole signatory on the bank account during cross examination[90] and the government admitted that Ms. Siegel testified at the grand jury that ██████████████████████████ ████.[91] Instead of asking that question, the government proceeded to accuse Ms. Siegel of a federal crime and then used that as a basis to unilaterally void her immunity agreement.[92]  Perhaps this is not completely shocking as the government had been vying to catch Ms. Siegel in a lie.

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

    The government made this statement after Ms. Siegel was granted immunity and before she testified before the grand jury.[93]

    Further, the Court didn't even know about the immunity deal until the Assistant Federal Public Defender[94] advised the Court that such deal existed.[95]  And even then, nobody advised the Court or defense counsel that the government withdrew the immunity agreement before Ms. Siegel was put back on the stand for further cross examination and asserted her Fifth Amendment right[96]

---

[88] ECF No. 91:93-94.

[89] *See generally* Exhibit B, Portions of Grand Jury Transcript, wherein Ms. Siegel was not shown any checks.

[90] ECF No. 91:91.

[91] ECF No. 91:113:15.

[92] ECF No. 91: 154.

[93] **Exhibit C,** 6/26/2024 Electronic Monitoring.

[94] The Court had to appoint the Federal Public Defender as the Government chose to ask the following question to Ms. Siegel: Are you admitting to a federal crime here today in court? ECF No. 91: 94:19-22.

[95] ECF No. 91:125:12-1.

[96] *United States v. Lord*, 711 F.2d 887, 891–92 (9th Cir. 1983)(remanded for an evidentiary hearing to determine whether the prosecutor intentionally distorted the fact-finding process by deliberately causing a defense witness to invoke his fifth amendment privilege. If the district court finds such prosecutorial misconduct by a preponderance of the evidence,[3] it should enter a judgment of acquittal for the defendant unless the prosecution invokes 18 U.S.C. §§ 6002–6003 by asking the district court to extend use immunity to the defense witness for a new trial).

M9636\503106\280747252.v3

in front of the jury.[97] This prompted a defense motion for mistrial that was denied.[98] Thereafter, the Court struck Ms. Siegel's testimony completely recognizing the severe sanction but feeling that it was the only option in light of the circumstances.[99] This caused extreme prejudice to Ms. Fiore.[100]

Even if the court would have determined a breach occurred, the remedy would not have been an abrogation of the agreement. The language of the immunity agreement itself supports that any ambiguity should be read in favor of Ms. Fiore. The immunity agreement states in pertinent part:

[redacted][101]

Ms. Siegel's agreement limited the remedy to prosecution for perjury related charges not the original accusations in which she received immunity. More importantly, like *Kunzer*, Ms. Siegel had statutory immunity. Therefore, even if Ms. Siegel did breach her immunity agreement, which she did not, the remedy would not have been an abrogation of the agreement but a possible prosecution for perjury or obstruction pursuant to 18 U.S.C. 6002.

A new trial is justified when a significant error could have affected the outcome of the trial.[102] The failure of the court to decide if Ms. Siegel breached the immunity agreement and the consequences of that breach significantly altered the path of Ms. Fiore's trial. Had the agreement not be withdrawn, Ms. Siegel would not have been forced to invoke her right against self-incrimination. With no invocation of the privilege, there would have been no reason to strike Ms.

---

[97] ECF No. 91:119-120.
[98] ECF No. 122:8, 125-126:12-1
[99] ECF No. 92:56.
[100] As discussed infra, Ms. Siegel was a crucial witness for the defense theory. Further, the Government did not identify Ms. Siegel as the co-conspirator until after Ms. Siegel invoked the privilege of self-incrimination in front of the jury and her testimony was struck. See generally Government's opening never identifying who the co-conspirator is and then in closing specifically naming Ms. Siegel.  ECF No. 82 and ECF No. 93.
[101] Exhibit A, Immunity Agreement.
[102] FRCP 59.

13

Siegel's testimony as she would have been subject to complete and meaningful cross-examination. Therefore, the jury would have heard testimony that would have supported the defense theory of the case, namely that the donated money was used for charitable events.

**C.    Due to a Culmination of Errors, Ms. Fiore was Deprived of Her Right to a Fair Trial**

Numerous errors deprived Ms. Fiore of a fair trial. The Court excluded evidence as to the full scope of the investigation that directly supported her theory of defense. The admission of Ms. Beck's testimony was error as it was more prejudicial than probative as it elicited an emotional response and did not provide any testimony that was not provided by other government witnesses. Further, the jury was not instructed on the pattern instruction on conspiracy which would have allowed viable arguments as to whether a conspiracy could have even existed.

**1.    The Court Erred In Excluding Evidence As To The Full Breadth Of The Investigation.**

The Court double-downed on excluding evidence related to vindictive or selective prosecution, as well as any reference or inference that the investigation in this case was a concerted effort to deny Ms. Fiore due process when it limited the testimony of Special Agent Fryxell. Indeed, the Court ruled:

> To the extent that the defense intended to offer Agent Fryxell to inquire about the full breadth of the investigation, including surveillance or video surveillance on the defendant and Ms. Siegel's homes or to get into what crimes were charged and why or how much evidence was seized and what might be implied by the size of that haul, those lines of inquiry are precluded.[103]

> Permitting the defense here to inquire into the broad scope of the investigation generally or the methods or manner of investigation, like surveillance, would have no purpose but to inflame the jury and confuse the issues, and that risk would be substantially greater than any probative value of that testimony.[104]

---

[103] *See* ECF No. 91, at 6:11-17.
[104] *Id.* at 7:8-13.

14

1    The opposite was true. In effect, striking all testimony and evidence of the Government's

2    motives in the underlying prosecution and its failures in its investigation denied Ms. Fiore the right

3    to a fair trial.

4    "[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a

5    complete defense.'"[105] "The right of an accused in a criminal trial to due process is, in essence, the

6    right to a fair opportunity to defend against the State's accusations."[106] "'A person's right to

7    reasonable notice of a charge against him, and an opportunity to be heard in his defense--a right to

8    his day in court--are basic in our system of jurisprudence....'"[107]

9    In *United States v. Crosby*,[108] the Court was tasked with determining whether exclusion of

10    evidence, which mainly concerned third party culpability, was an abuse of discretion. A large part

11    of the defense theory of admission in the case was to show the inadequacy of the police

12    investigation.[109] In addition to arguing that the prosecution's evidence did not prove that the

13    defendant had committed the crime, the defendant also claimed that the police investigation was

14    sloppy and that a more thorough investigation would have exonerated him.[110] However, because

15    the defendant was barred from introducing evidence that would explain away his participation in

16    the offense, the defendant could not fully argue his sloppy investigation theory.[111] While he could

17    point out what the police had not done, **he could suggest no exculpatory evidence the police**

18    **might have found had they conducted a more thorough investigation**.[112] "The excluded

19    evidence would have lent support to the defendant's theory that someone else beat [the purported

20    victim] and undermined the prosecutor's claim that a more thorough investigation would have

21    turned up nothing of value."[113] The Court concluded that "[t]he excluded evidence added no new

22

23    [105] *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting
      *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)).

24    [106] *Chambers*, 410 U.S. at 294, 93 S.Ct. 1038.

      [107] *Id*. (quoting *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

25    [108] 75 F.3d 1343, 1349 (9th Cir. 1996).

      [109] 75 F.3d 1343, 1349 (9th Cir. 1996).

26    [110] 75 F.3d 1343, 1349 (9th Cir. 1996).

      [111] *Id.*

27    [112] *Id.* (emphasis added).

28    [113] *Id.* at 1348.

15

issues to the case, as it dovetailed neatly with defendant's theory that someone else had committed the crime and that he was merely the victim of sloppy investigation." Further, "when evaluated in context…the evidence improperly excluded…bore a direct relationship to Crosby's defense that someone else had committed the crime; it helped develop Crosby's claim that he was prejudiced by sloppy police work; it cast doubt on Dorothy's testimony that Crosby had punched her on the night of the assault." Thus, finding that the error was not harmless, the Court reversed the decision.[114]

Similar holdings have been reached in the Ninth Circuit. In *United States v. Sager*,[115] the Court agreed with the defendant that the district court committed plain error and abused its discretion by instructing the jury not to "grade" the investigation holding: "To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information."[116] As aptly stated by the Court, "[d]etails of the investigatory process potentially affected Inspector Morris's credibility and, perhaps more importantly, the weight to be given to evidence produced by his investigation."[117] The Court even recognized that while defense counsel "may have been fishing for flaws, [] it is obvious that he cast his bait in a promising pond."[118]

Here, it was highly relevant to allow Ms. Fiore to probe into the constraints, or lack thereof, of the investigation into her which lasted several years. In addition to having meritorious arguments related to vindictive or selective prosecution, more fully detailed below, Ms. Fiore should have been allowed to inquire into the full breadth of the investigation to show that law enforcement was not interested in exculpatory evidence and specifically suppressed the same. The

---

[114] 75 F.3d 1343, 1350 (9th Cir. 1996).

[115] 227 F.3d 1138, 1145 (9th Cir. 2000).

[116] *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000); *see also Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[w]hen ... the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it.") *see also id*. at 442 n. 13, 115 S.Ct. 1555 (discussing the utility of attacking police investigations as "shoddy").

[117] 227 F.3d 1138 at 1145.

[118] *Id.*

16

exclusion of testimony related to the FBI's shoddy investigation limited the ways Ms. Fiore could impeach those witnesses on the stand. The exclusion of this testimony was improper and highly prejudicial to Ms. Fiore. Indeed, the exclusion allowed the Government to go unquestioned, leaving the jury to believe that anyone involved in law enforcement is truthful and always correct.

**2.   Defendant's Motion for New Trial Should Be Granted Due To The Court's Erroneous Admission Of Nicole Beck's Testimony.**

On September 3, 2024, the defense filed its Motion in *limine* to Exclude Government's References and/or Inclusion of Alyn Beck's Family and/or Widow to Testify In This Case.[119] Ms. Fiore argued, in pertinent part, that inclusion of Alyn Beck's widow as a witness, who does not have personal information regarding the purchase or fundraising of a statue in honor of her husband, would be unduly prejudicial as the Government had witnesses who could testify to the purpose of the statue in question without evoking the predictable emotional response of a widow.[120]

The Government argued in its Response that Ms. Beck's testimony "is critical in helping the jury understand the context of how the park came into being and what it was intended to signify" and that "Beck is perhaps the only living witness who can offer testimony about the history of the project before Fiore came onto the scene several years after Officer Beck's death."[121] Further, the Government argued that Beck's testimony would also shed light on Fiore's state of mind and intent.[122] The admission of Beck's testimony was error which significantly prejudiced Ms. Fiore.

The standard for a pretrial motion to exclude a witness's testimony as prejudicial is primarily governed by Federal Rule of Evidence 403. This rule allows the Court to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

---

[119] *See* ECF No. 31.
[120] *Id.*
[121] *See* ECF No. 43, at 4-6. (The Government failed to file its Response on pleading paper and as such, only page numbers are cited).
[122] *See* ECF No. 43, at 4-6.

17

cumulative evidence.[123] "Unfair prejudice" refers to an undue tendency to suggest a decision in an improper basis, often an emotional one.[124] "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart from its judgment as to his guilt or innocence of the crime charged.*"[125]

Confrontation clause errors are subject to the harmless error analysis.[126] The United States Supreme Court has explained that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."[127] Under this standard, the government bears the burden of proving that a Confrontation Clause error is harmless beyond a reasonable doubt.[128] In evaluating whether a Confrontation Clause violation is harmless, the Court considers a variety of factors, including the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.[129]

The testimony given by Ms. Beck and transforming her into a real "victim" only served the purpose of inflaming the emotional response of the jury. Ms. Beck testified that she was married to fallen LVMPD Officer Alyn Beck, who was killed in the line of duty in June of 2014.[130] Following her husband's death, councilman Steve Ross spoke to her about renaming the park to

---

[123] *See* FRE 403; *see also Houserman v. Comtech Telecommunications Corporation*, 519 F.Supp.3d 863 (2021).
[124] *U.S. v. Haischer*, 780 F.3d 1277 (2015)
[125] *United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir.1995) (emphasis in original) (internal quotation mark omitted).
[126] *United States v. Bustamante*, 687 F.3d 1190, 1195 (9th Cir. 2012).
[127] *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
[128] *United States v. Nguyen*, 565 F.3d 668, 675 (9th Cir.2009).
[129] *United States v. Bustamante*, 687 F.3d 1190, 1195 (9th Cir. 2012).
[130] *See* ECF No. 87, at 43:22-25; 44:1-6.

18

memorialize her husband.[131] Ms. Beck spoke to Chris Armstrong with Olympia Companies and Mr. Hanlon, the sculptor, to ensure the likeness of the statue was similar to that of Alyn Beck.[132]

Ms. Beck testified to and authenticated a photograph of people whom attended the opening ceremony, including former Sheriff Lombardo, Michele Fiore, Mayor Carolyn Goodman and former Government Steve Sisolak.[133] She further testified to and authenticated a photograph of the groundbreaking of the park and attendees including former sheriff Joseph Lombardo, Alyn's father Ronnie Beck, Nicole Beck, Mayor Carolyn Goodman, Ms. Fiore, Gary from Olympia Companies and Lieutenant Sasha Larkin.[134] After the statue was complete, Ms. Beck attended a dedication ceremony in January of 2020[135] and authenticated a photo of the finished statue.[136] Ms. Beck also authenticated a photograph of plaques that are on the park wall, donated by Garry Goett, president of Olympia Companies.[137] Ms. Beck also authenticated video of a speech Ms. Fiore gave at the dedication ceremony, speaking about how her first goal as councilwoman was the Alyn Beck park.[138]

As the defense argued in its pretrial motion,[139] Ms. Beck was not aware of a nonprofit organization called A Bright Present Foundation, never heard of a political action committee called Future for Nevadans and was not aware of any efforts by Ms. Fiore to raise money for the park or the statue.[140] Indeed, she had no knowledge of how the statue was going to be financed or who was paying for the park.[141]

Ms. Beck's testimony was not "probative" as the Government suggested, as Ms. Beck did not obtain any knowledge directly related to the charges in which Ms. Fiore was indicted, no

---

[131] *See* ECF No. 87, at 44:12-23.
[132] *Id.* at 56:19-25; 57:21-25; 58:1-7.
[133] *Id.* at 62:1-9; *see also* Government's Exhibit 13.
[134] *Id.* at 54:1-25; 55:1-4.
[135] *Id.* at 58:25; 59:1-7; *see also* Government's Exhibit 14A.
[136] *Id.* at 59:9-15; *see also* Government's Exhibit 15.
[137] *See* ECF No. 87 at 60:4-13; 60:16-23; *see also* Government's Exhibit 16.
[138] *Id.* at 63:15-25; 64:1-14.
[139] *See* ECF No. 31.
[140] *Id.* at 64:24-25; 65:1-15.
[141] *Id.* at 67:9-18; 69:12-23.

19

knowledge as to her efforts, if any, into soliciting donations for the statue, or any information pertinent for the jury. Indeed, her testimony was cumulative of other witnesses' testimony at the time of trial and the only basis for her testimony was to gain an emotional advantage over the jury. Indeed, sculptor Brian Hanlon testified referring to Ms. Beck as "the widow"[142] and acknowledged that Officers Beck and Soldo were executed while eating lunch.[143] [144] Chris Armstrong, Executive Vice President of Olympia Companies[145] testified about the creation of the park and the change to rename the park to Alyn Beck Park.[146] Armstrong also testified as to the conversations he had with Ms. Beck to get photos of her late husband to ensure that the statue was in his likeness.[147] Thus, the Government's assertion that "Beck is perhaps the only living witness who can offer testimony about the history of the project before Fiore came onto the scene several years after Officer Beck's death"[148] was patently false and it knew it.

Indeed, Ms. Beck was not even necessary to authenticate photograph exhibits of the ceremonies that took place for the Beck park and statue and the dedication of plaques and the statue itself. As Ms. Beck testified, Mr. Lombardo is included in those photographs[149] and testified that he was present at the same.[150] Regarding the photos of the statue itself as well as plaques at the park, these could have been authenticated through the sculptor, Brian Hanlon, or through Gary Goett who made the donation.[151] Finally, regarding the recording of the speech Ms. Fiore gave at the dedication ceremony, Mr. Lombardo testified to the same, advising that Ms. Fiore was going to make an effort to have two statues made in the likeness of both fallen officers.[152]

---

[142] *See* ECF No. 31, at 84:20.

[143] *Id.* at 81:18-20.

[144] Several other witnesses testified to the execution-style murder of the Officers. For example, David Chesnoff testified that the officers "were mortally wounded in the line of duty." *See* ECF No. 87, at 264:17-18.

[145] *Id.* at 51:18-20.

[146] *Id.* at 53:11-17.

[147] *Id.* at 58:14-25; 59:1-2.

[148] *See* ECF No. 43, at 4-6. (The Government failed to file its Response on pleading paper and as such, only page numbers are cited).

[149] *See* Government's Exhibits 13 and 14.

[150] *See* ECF No. 90, at 9:21-25; 10:1-18.

[151] *See* Government's Exhibits 15 and 16.

[152] *See* ECF No. 90, at 11:24-25; 12:1-7.

Ms. Beck's testimony was clearly not needed and was only offered for emotional effect. Indeed, as anyone would expect, Ms. Beck was emotional on the stand.[153] Importantly, none of the cumulative testimony she offered was in dispute, and should have been excluded under Rule 403, as it had "little incremental value"[154] and "did not add any material fact that the prosecution had not already presented."[155] And, the error to not exclude Ms. Beck was not harmless. Indeed, she was freely able to testify to her husband's death and how much she loved him, as well as her feelings as to the prospect of a statue of him in front of the park.[156] Ms. Beck started the trial on an emotional note as the first government witness and testified to facts that were also testified to by other government witnesses. Despite the government's initial argument as to her relevance, it is belied by the other testimony that they elicited at trial. As a result, Ms. Beck's testimony was cumulative and more prejudicial than probative. It should not have been allowed.

### 3. Ms. Fiore's Motion For New Trial Should Be Granted For Erroneous Jury Instructions.

The parties submitted their proposed jury instructions on October 3, 2024, including a *modified* proposed joint jury instruction for the elements of conspiracy to commit wire fraud.[157] The modified instruction left out crucial elements.

Under Federal Rule of Criminal Procedure 52(b), a plain error that affects substantial rights may be considered even if it was not brought to the court's attention.[158] Further, pursuant to Federal Rule of Criminal Procedure 59, a court may grant a new trial after a jury trial for *any reason* that has historically justified such as a grant in federal court, including erroneous jury instructions.[159]

---

[153] *See* ECF No. 87, at 56:5-8 (Government counsel directing Ms. Beck to tissues and advising to let him know if she needed a moment).
[154] *Cantu v. United States*, No. CV1400219MMMJCGX, 2015 WL 12743881, at *6 (C.D. Cal. Apr. 6, 2015); *see also United States v. Miguel,* 87 Fed. Appx. 67, 68 (9th Cir. Jan. 30, 2004) (Unpub. Disp.).
[155] *Medina v. State*, 122 Nev. 346, 355, 143 P.3d 471, 477 (2006).
[156] *See* ECF No. 87:7-25; 88:1-4.
[157] *See* ECF No. 69, at 2-3.
[158] *See* Fed.R.Crim.Pro. 52(b).
[159] *See* Fed.R.Crim.Pro. 59(a)(1)(A).

21

While pattern or model jury instructions generally do not constitute authoritative precedent,[160] the Ninth Circuit has consistently held that erroneous jury instructions, as well as the failure to give adequate instructions, are grounds for a new trial.[161] In evaluating whether a particular jury instruction was erroneous, the court must consider the jury instructions as a whole, and whether they fairly and adequately cover the issues presented, correctly state the law, and are not misleading.[162]

Here, the Ninth Circuit jury instruction on conspiracy would have supported the theory of defense – that there was no agreement to do something illegal.   Without the essential context and law, the jury was only provided that a conspiracy "is an agreement by two or more persons to commit an unlawful act….Every member of the conspiracy becomes the agent or partner of every other member."[163] The portions included in the Ninth Circuit instruction read:

> For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.
>
> One becomes a member of a conspiracy by knowingly participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  Furthermore, one who knowingly joins an existing conspiracy is as responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

While the jury was instructed that the "Government does not have to prove that all the people named in the indictment were members of the plan,"[164] it did not advise the jury that they "must find that there was a plan to commit at least one of the crimes alleged in the indictment," or

---

[160] *Garner v. Hutchings*, No. 215CV02430JCMDJA, 2021 WL 2651806, at *10 (D. Nev. June 28, 2021).
[161] *See e.g. Cotton ex rel. McClure v. City of Eureka, Cal.,* 860 F. Supp. 2d 999 (N.D. Cal. 2012).
[162] *Id.*
[163] *See* ECF No. 69, at 3-4.
[164] *See* ECF No. 69, at 3:21-22.

that "one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator." Further, importantly, the instruction did not state anything about merely associating with one or more persons who are conspirators (here, Ms. Fiore's own daughter) or that merely knowing that a conspiracy exists does not thereby make someone a conspirator. Especially considering the striking of Ms. Siegel's testimony, combined with the Government's first-time acknowledgement of Ms. Siegel being the co-conspirator in closing arguments, this error was extremely prejudicial and could have affected the outcome of trial. Indeed, Ms. Siegel necessarily having to assert her Fifth Amendment privilege in front of the jury coupled with the Government's aspersion that it was her who was a co-conspirator left the jury no other choice with the instruction it was given, as Ms. Fiore necessarily had to have someone who conspired with her.[165] This error warrants reversal.

### D. Due To Ineffective Assistance of Counsel, Ms. Fiore Was Deprived Of Due Process And Is Entitled To A New Trial.[166]

Trial counsel was ineffective when he failed to file various pretrial motions to include a Motion to Dismiss and a Motion to Suppress. Additionally, counsel failed to object to or move to exclude trial witnesses for lack of personal knowledge. Lastly, counsel failed to introduce exculpatory evidence. These inactions render counsel's performance deficient and prejudice Ms. Fiore as she was deprived of a fair trial.

#### 1. A New Trial Should Be Granted Due To Ineffective Assistance Of Counsel For Failure To Object To, Or Move To Exclude, Witnesses Who Lacked Personal Knowledge.

Several witnesses in this trial had no basis for their testimony, as it lacked the requisite foundation and personal knowledge required by the Federal Rules of Evidence. Failure of counsel

---

[165] By naming Ms. Siegel as the "co-conspirator" after she took the 5th on the stand created a presumption that Fiore conspired with Siegel, as the elements require two or more persons.

[166] To the extent the government argues in response to this Motion or the Motion for Judgment of Acquittal that any of the current defense arguments have been waived, this should be included in the cumulation of errors.

23

to object to a witness's lack of personal knowledge can constitute ineffective assistance of counsel if it falls below an objective standard of reasonableness and prejudices the defendant.[167]

According to Federal Rule of Evidence 602, a witness may testify to a matter **only** if evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter.[168] Personal knowledge includes opinions and inferences grounded in observations and experience, and witnesses are not permitted to speculate, guess, or voice suspicions.[169] Generally, the rule requires that a witness's testimony be based on events perceived by the witness through one of the five senses.[170]

### a.    *Testimony of Peter Lee*

On September 26, 2024, witness Peter Lee testified for the government.[171] Peter testified that he owned eight rental residential rental properties in Nevada[172] and he loaned his son money to purchase a property located at 6205 Red Pine Court, Las Vegas, Nevada ("the residence") around 2011 or 2012.[173] While his son owned the subject property, Peter managed the property by advertising on Zillow, reviewing applicants and conducting interviews, and hiring a handyman to fix any issues.[174] Ms. Fiore lived at the residence beginning in 2016 until at least 2019.[175] The government introduced Exhibit 80 to Peter by leading the witness and asking, "does this appear to be the residential lease agreement that Michele Fiore signed to live at the property…?"[176] The defense had no objection and Exhibit 80 was admitted into evidence, which as represented by the government, is the residential lease agreement between **Eric** Lee and Michele Fiore.[177] Peter was

---

[167] *Lewis v. Davis*, No. 1:03-CV-06775-LJO-SAB, 2018 WL 4024811, at *35 (E.D. Cal. Aug. 20, 2018), *aff'd sub nom. Lewis v. Andes*, 95 F.4th 1166 (9th Cir. 2024).
[168] *See* FRE 602.
[169] *U.S. v. Lopez*, 762 F.3d 852 (2014).
[170] *Los Angeles Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880 (C.D. Cal. 2006).
[171] *See* ECF No. 60, at 205-223.
[172] *Id.* at 206:11-17.
[173] *Id.* at 206:18-25; 207:1-13.
[174] *See* ECF No. 60 at 207:14-21.
[175] *Id.* at 211:1-8.
[176] *See* ECF No. 60, at 211:25; 212:1-10.
[177] *Id.* at 212:14-25.

not sure if Ms. Fiore lived alone at the residence, or with someone else, as he communicated with Ms. Fiore "very rarely."[178]

The government also inquired into the amount of rent Ms. Fiore paid to live at the residence and Peter testified that Fiore paid rent to his son, who lives in California.[179] Peter was uncertain how Fiore paid her rent and testified that he believed she paid by "I think a check or something."[180] Peter was uncertain whether Fiore paid her rent with cashier's checks or money orders and when asked, stated: "Yeah, I think so. But the details I'm not sure."[181] This testimony was akin to the information Peter purportedly gave to agents in his first interview conducted on January 27, 2021, wherein he advised that Eric Lee was the one who dealt with the rent payments, and he was unsure exactly what method was used to pay and thought it was a form of wire transfer.[182]

Despite the apparent lack of personal knowledge as to the rent Ms. Fiore paid for the residence or the method of payment utilized, the Government introduced Exhibit 81[183] and after no objection by the defense, improperly questioned the witness about the bank records, inquiring, "And were those, you know, money orders, cashier's checks, and personal checks that were all made out to your son, Eric Lee?"[184] and "And were they in the amount of $2,450, the rent that was owed to Red Pine Court?" and "And did many of those instruments reference 6205 Red Pine Court in the memo line?"[185] These questions were improper of this witness due to a lack of foundation and lack of requisite personal knowledge. Indeed, they were clearly not even his bank records.

This testimony was certainly prejudicial to Ms. Fiore, as the Government was able to create an inference, through the improper witness, that Ms. Fiore was expending personal funds utilizing cashier's checks or money orders to pay rent, purportedly using donations and campaign

---

[178] ECF No. 60, at 213:16-25.
[179] *Id.* at 215:4-7.
[180] *Id.* at 215:8-15.
[181] *Id.* at 215:13-15.
[182] *See* **Exhibit D,** 1/27/2021 Interview of Peter Lee. (DOJ 002175-2176)
[183] Which portions of had already been admitted as part of Exhibit 10. *See* ECF No. 60, at 216:22-25; 217:1-1-2.
[184] *See* ECF No. 60, at 218:20-23.
[185] *Id.* at 218:24-25; 219:1-3.

M9636\503106\280747252.v3

contributions which were not to be used for her personal benefit. This testimony should have been objected to and the Government should have been forced to present the correct witness – presumably **Eric** Lee – to testify to the details of payments received from Ms. Fiore and/or an entity she controls, when, and what form the payment was received. The Government was aware that its witness was outside of subpoena power and improperly skirted its efforts without a showing that Eric Lee was unavailable as a witness.

### b. The Testimony of Other Donors Lack Personal Knowledge of Ms. Fiore As The Person Soliciting Donations.

Several other witnesses testified at trial without requisite personal knowledge, yet the defense failed to object to the line of questioning or responses elicited. This failure significantly prejudiced Ms. Fiore. Indeed, several purported donors testified that they had either no direct knowledge of Ms. Fiore and/or that their donations were solicited from someone other than Fiore. "Mere involvement in an unsavory, fly-by-night scheme is not sufficient to establish knowing participation in a scheme to defraud."[186]

Robert Groesbeck testified that on December 27, 2019, he received an email with the subject, "A Bright Present Foundation Inc./Officer Alyn Beck" from a long-time friend of his, Jay Brown.[187] The email iterated that "Sheriff Lombardo and Councilwoman Fiore are looking to raise $80,000 to honor Alyn Beck."[188] The Government inquired of Mr. Groesbeck whether he had any recollection of any conversations with Fiore about this topic, to which Groesbeck responded, "No."[189]

Harry Mohney testified that he made a charitable donation of $2,000 to Future for Nevadans on November 15, 2019.[190] Mr. Mohney could not recall what caused him to make the donation, and testified that it was "one of my attorneys or somebody close enough to me had called

---

[186] See United States v. McDonald, 576 F.2d 1350, 1359 (9th Cir. 1978) (internal citations omitted).
[187] See ECF No. 60, at 43:9-25; 44:1-25; 45:1-4; see also Trial Exhibit 50.
[188] See Trial Exhibit 50.
[189] See ECF No. 60, at 46:23-25.
[190] See ECF No.88, at 10:7-18.

26

me and asked me to donate for this cause."[191] He further testified that he does not know Michele Fiore[192] and it was not Ms. Fiore who reached out to him to request a donation.[193] Similarly, David Chesnoff testified that Ms. Fiore has never asked him to donate to a charity that he is aware of.[194] He never had a conversation with Ms. Fiore.[195]

CEO and owner of Community Ambulance, Robert Richardson, received a phone call from Jay Brown, whom he is close with.[196] Mr. Brown told Richardson that there was a "good cause that's coming out" and Richardson "jumped on board."[197] While Richardson has met Ms. Fiore "a couple times," he was clear that she did not personally ask him to make a donation.[198] Witness Brett Torino could not even specify how he learned where to direct his donation to, as he did not know Ms. Fiore and never spoke with her about the donation.[199]

For the two witnesses, Groesbeck and Richardson that testified that Brown contacted them for a donation, there was no testimony from Brown that he did so at the request of Michele Fiore. Therefore, lacking in the Government's case in chief is any evidence that Michele Fiore elicited or directed these donations.  Allowing numerous witnesses to testify about donations that the Government could not prove was at the behest of Ms. Fiore was error and should have been objected too.

### c.    *Testimony of Joseph Lombardo*

According to the Supreme Court, an attorney must not advocate or tolerate a client's false testimony and has a duty to prevent and disclose frauds upon the court.[200] This duty is reinforced by the American Bar Association's Model Rule 3.3, which requires a lawyer to take reasonable

---

[191] *See* ECF No.88, at 13:21-23.
[192] *Id.* at 15:4-5.
[193] *Id.* at 15:12-15. p
[194] *See* ECF No. 87, at 264:6-7.
[195] *Id.* at 270:18-21.
[196] *See* ECF No. 60, at 18-25.
[197] *Id.* at 56:25; 57:1-2.
[198] *See* ECF No. 60 at 58:13-17.
[199] *See* ECF No. 88, at 25:20-25; 26:1-7.
[200] *See Nix v. Whiteside*, 475 U.S. 157 (1986).

27

remedial measures if they know that testimony elicited from a client is false.[201] Neither the Government, nor the defense , took any steps to correct or withdraw the contradictory statements made by witness Joseph Lombardo.

On September 30, 2024, the Government called Joseph Lombardo, who testified that he had "been informed by Michele Fiore and also Garry Goett…that they were planning to break ground and build a park…in honor of Alyn Beck."[202] Mr. Lombardo further testified that Ms. Fiore "conveyed to me that she was going to make the attempt to raise money to have the statues made and eventually placed."[203] When asked if he recalled who it was that asked him to donate to Future for Nevadans for the Alyn Beck statue, Mr. Lombardo testified, "That would have been Michele Fiore."[204] "And I don't recall how that conversation took place. It was either – either text messages or phone call because I would have had to have received the address…."[205]

However, this testimony is contradictory to the information Mr. Lombardo provided to law enforcement and trial attorneys Gottfried and Askar on July 11, 2024. Mr. Lombardo advised that ███████████████████████████████████████████████████████████████████.[206] Indeed, Mr. Lombardo provided that ████████████████████████████████████████████████.[207]

Neither the prosecution nor the defense attempted to correct this testimony. While the written "302" interview could not be used to impeach Mr. Lombardo,[208] Government counsel could have and should have corrected this contradictory testimony.[209] Furthermore, defense

---

[201] *See* ABA Model Rule 3.3.
[202] *See* ECF No. 90, at 9:7-11.
[203] *Id.* at 12:14-16.
[204] *See* ECF No. 90 at 14:24-25; 15:1.
[205] *Id.* at 15:6-9.
[206] *See* **Exhibit E,** 7/11/2024 Interview of Joseph Lombardo.
[207] *Id.*
[208] Although there was audio from other government witness interviews, the defense never received an audio recording of Mr. Lombardo's interviews.
[209] It is similarly concerning that the Government was purportedly unaware that its witness, ████ ██████ had been convicted of a federal crime. Indeed, while the Government proffered a *Giglio* letter (*see* **Exhibit F)** ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

1   counsel could have and should have used Special Agent Jaski, who was present for said interview

2   of Mr. Lombardo, to contradict the testimony given at the time of trial pursuant to Federal Rule of

3   Evidence 613.[210] This failure prejudiced Ms. Fiore, as other witnesses had testified that they were

4   unaware of Ms. Fiore and/or was never solicited for a donation by Ms. Fiore, which goes to the

5   heart of the purported "scheme" she was accused of creating.

6           **2.    Ms. Fiore Should Be Granted A New Trial For Ineffective Assistance
            of Counsel For Failure To Introduce Exculpatory Evidence.**

7

8           Significant exculpatory evidence exists that was not presented in this trial on behalf of Ms.

9   Fiore. Counsel's failure to investigate and present exculpatory evidence at trial can be considered

10  deficient performance to sustain an ineffective assistance of counsel claim.[211] The Sixth

11  Amendment right to counsel guarantees not only assistance, but effective assistance of counsel.[212]

12  For judicial economy, Ms. Fiore incorporates the law included *supra* regarding the standard for

13  ineffective assistance.

14          ***a.    Counsel's Failure Fell Below An Objective Standard of
            Reasonableness.***

15

16          Counsel's failure to investigate evidence may constitute deficient performance. The failure

17  to investigate is "especially egregious when a defense attorney fails to consider potentially

18  exculpatory evidence."[213] "When an attorney fails to examine potentially exculpatory evidence,

19

---

20  ████████████████████████████

21  ████████████████████████████

22

[210] Under the Federal Rules of Evidence, the primary rule governing contradiction of a witness is
23  Rule 613, which allows a party to impeach a witness by questioning them about prior statements
    that are inconsistent with their current testimony on the stand
24  [211] *See Hart v. Gomez*, 174 F.3d 1067 (1999).
    [212] *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);
25  *Duncan v. Ornoski,* 528 F.3d 1222, 1233 (9th Cir.2008).
    [213] *Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir.2002); *see also Reynoso v. Giurbino,* 462 F.3d
26  1099, 1112 (9th Cir. 2006); *Lord v. Wood,* 184 F.3d 1083, 1093 (9th Cir.1999) ("A lawyer who
    fails to investigate, and to introduce into evidence, information that demonstrates his client's
27  factual innocence, or that raises sufficient doubts as to that question to undermine confidence in
    the verdict, renders deficient performance.").
28

29

although he repeatedly assured the petitioner of his intention to do so, the *Strickland* presumption that the failure is 'sound trial strategy' is surmounted."[214]

Here, defense counsel failed to present exculpatory evidence at the time of trial that Ms. Fiore regularly handled transactions in cash, which she received from income separate and apart from the income she received in her various state positions, including when she was councilwoman during the subject time. Indeed, Ms. Fiore's tax returns were included in discovery and would have supported other sources of income. Sheena Siegel could have testified ████████████████████ ████████████████████████████████████████████████████████████████████████████. Siegel testified to this information before the grand jury[215] and provided the same information to FBI agents in an interview on February 14, 2023.[216] Siegel also stated ████████████████ ███████████████████████████████████████.[217]

Further, the defense could have questioned Special Agent Fryxell about cutting off communication with a witness about this information. Indeed, on January 28, 2021, Agent Fryxell interviewed Ronni Council, ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████"[218] ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████"[219] Tellingly, the Government did not want to entertain any exculpatory evidence that would render its case null. Indeed, it *knew* Ms. Fiore had cash in the house at the time the search warrant

---

[214] *Jones v. Wood,* 114 F.3d 1002, 1011 (9th Cir.1997).

[215] *See* **Exhibit B,** Portions of Grand Jury Transcript, at 28:17-20 ("Like, she's had – she has other, like, out-of-town sort of gigs that she does, consulting stuff, so she got cash from there is what I understand.").

[216] *See* **Exhibit G,** 2/14/2023 Interview of Sheena Siegel.

[217] *See* **Exhibit H,** 7/10/2024 Interview of Sheena Siegel.

[218] *See* **Exhibit I,** Recording of Interview of Ronni Council; *see also* **Exhibit J,** Transcript of Recording.

[219] *See* **Exhibit I,** Recording of Interview of Ronni Council; *see also* **Exhibit J,** Transcript of Recording.

was executed, allowed Ms. Fiore to go into the house to get cash, yet never searched nor seized the cash.[220]

Defense counsel certainly had other witnesses it could call to the stand to demonstrate that Ms. Fiore regularly conducted her business utilizing cash, dating all the way back to 2012. Indeed, ██████████████, who was hired for some time to be Ms. Fiore's personal assistant and look after Fiore's two daughters, provided information to the Government to this effect.[221] ███████████ ████████████████████████████████████████████████████████████.[222] ████████████████████████████████████████████.[223]

When Ms. Siegel's testimony was stricken, there were other options to present maybe not the same, but similar information to the jury that Ms. Fiore had utilized cash in the regular course of not only conducting her business but living her life. Instead, no information was presented to the jury at all, which significantly prejudiced Ms. Fiore.

### b.    The Deficient Performance Prejudiced Ms. Fiore.

The Ninth Circuit has repeatedly held that failing to investigate and introduce evidence that demonstrates a client's factual innocence or raises sufficient doubt to undermine confidence in the verdict constitutes deficient performance.[224] "When defense counsel merely believes certain testimony *might* not be helpful, no reasonable basis exists for deciding not to investigate."[225]

The government effectively examined several witnesses specifically related to cash transactions and whether cash was generally used in accepting donations or making payments.[226] Cash was a large part of the purported "scheme" in this case, which cannot be traced. Thus, the government used circumstantial evidence of timing of checks written versus cashed to

---

[220] *See* **Exhibit K,** 2/9/2021 Summary of Execution of Search Warrant.
[221] *See* **Exhibit L,** Interview of ██████████████.
[222] *Id.*
[223] *Id.*
[224] *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008).
[225] *Id.*
[226] *See e.g.* ECF No. 90, at 13:14-25; 85:24; 88:14; 89:15-19 ("[W]e're talking about tens of thousands of dollars from Michele Fiore's charity and political action committee that are taken to cash."); 98:19-20; 101:12-20; 102:4-5 ("Can you walk us through what those cash withdrawals you saw were?"); 132:12-15; 213:5-9; 224:8-10.

31

circumstantially show that the funds received as donations were being spent to Ms. Fiore's personal benefit. Despite evidence to rebut this presumption, or at an absolute minimum, create a reasonable doubt, defense counsel failed to introduce this information for the jury's consideration. The trial in this matter certainly would have been different had the crux of the government's case been properly rebuffed to show that the monies received to be used for the statue were not in fact used for personal use, but rather, were used for other charitable purposes. Ms. Fiore should be granted a new trial to introduce this evidence to a jury.

### 3. Failure to File A Pretrial Motion To Dismiss Based On Vindictive or Selective Prosecution Constitutes Ineffective Assistance Of Counsel.

Somehow, in anticipation of the defense arguing that the government vindictively or selectively targeted or prosecuted Fiore for her political beliefs or affiliations,[227] the government filed a motion in *limine* to preclude such "defense."[228] In its Order, the Court held that "the proper procedure for asserting [the theory of vindictive prosecution] is to file a pretrial motion to dismiss….The deadline to do that was August 19, 2024, and Fiore neither filed such a motion nor asked to extend the deadline to do so."[229]

Defense counsel's failure to file a pretrial motion to dismiss based on vindictive or selective prosecution constitutes ineffective assistance of counsel and warrants a new trial, as the motion would have been meritorious and failure to file such motion significantly prejudiced Ms. Fiore from maintaining her defense.

#### a. The Motion to Dismiss Would Have Been Meritorious.

"To establish a prima facie case of prosecutorial vindictiveness, a defendant must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such."[230] "Evidence indicating a realistic or reasonable likelihood of vindictiveness may give rise to a

---

[227] Which is probative of the Government acknowledging the same.
[228] *See* ECF No. 29.
[229] *See* ECF No. 51, at 19:16-23; 20:1-2.
[230] *United States v. Sinigaglio,* 942 F.2d 581, 584 (9th Cir.1991).

presumption of vindictiveness on the government's part."[231] Once a presumption of vindictiveness has arisen, the burden shifts to the prosecution to show that "independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its decisions."[232] While most vindictive prosecution cases involve re-indictment of a defendant, the mere filing of an indictment can support a charge of vindictive prosecution.[233]

The Ninth Circuit has recognized that the "appearance of vindictiveness rule is a prophylactic rule designed both to protect the present defendant from vindictiveness and to prevent a chilling of the exercise of rights by other defendants in the future."[234] To establish a presumption of vindictiveness, the defendant need not show "that the prosecutor acted in bad faith" or that he "maliciously sought" the more severe charges.[235] "In all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant."[236]

On the other hand, to prove a claim of selective prosecution, one must show "that others similarly situated have not been prosecuted and that the allegedly discriminatory prosecution was based on an impermissible motive."[237] As the Ninth Circuit has recognized, there is "[l]ittle substantive difference … between selective prosecution and vindictive prosecution."[238] In the selective prosecution context, "statistical evidence of differential treatment is ostensibly available."[239] For instance, comparing who was arrested with who was prosecuted, or the

[231] *See United States v. Garza-Juarez,* 992 F.2d 896, 903 (9th Cir.1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994).

[232] *United States v. Hooton,* 662 F.2d 628, 634 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982); *see also Garza-Juarez,* 992 F.2d at 906.

[233] *Hooton,* 662 F.2d at 634.

[234] *United States v. Motley,* 655 F.2d 186, 188 (9th Cir. 1982) (internal quotations & citations omitted).

[235] *United States v. Groves,* 571 F.2d 450, 453 (9th Cir. 1978); *see also United States v. Ruesga-Martinez,* 534 F.2d 1367, 1369 (9th Cir. 1976).

[236] *United States v. Gilbert,* 266 F.3d 1180, 1187 (9th Cir. 2001).

[237] *United States v. Ness,* 652 F.2d 890, 892 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981).

[238] *United States v. Wilson,* 639 F.2d 500, 502 (9th Cir. 1981).

[239] *See United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (citing to *United States v. Armstrong*, 517 U.S. 456, 461, 116 S.Ct. 1480, 1485 (1996).

M9636\503106\280747252.v3

demographics of those prosecuted in state and federal courts for the same crime, may evince differential treatment of similarly situated individuals.[240]

The instant prosecution was brought solely out of animus for Ms. Fiore, which stemmed from her outspoken position on the Cliven Bundy case (including being named as a defense witness), which was prosecuted by AUSA Steven Myhre and resulted in a mistrial due to prosecutorial misconduct,[241] her political affiliation, and her involvement in the "badlands" litigation which "was not even in her ward." Indeed, it is clear from a comprehensive review of the approximate 90,000 pages of discovery offered in this case that Ms. Fiore became the target of law enforcement at the encouragement of AUSA Steven Myhre, whose name, as argued by prior defense counsel, is repeated abundantly throughout the investigation into Ms. Fiore.[242] There are communications in 2022 between Mr. Myhre and the DOJ confirming that ████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████.[243] Further, the initial paperwork from the Indictment lists Myhre as one of two attorneys involved in the case,[244] but then he is removed from the same paperwork associated with the Superseding Indictment filed on August 20, 2024.[245] Indeed, one of the first, if not the first person interviewed in this investigation was Ms. Fiore herself – all related to her involvement in the prosecutions related to the Bundy ranching family.[246] Several witnesses were also interviewed regarding Ms. Fiore's involvement with the litigation because the badlands

---

[240] *See United States v. Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (citing to *United States v. Armstrong*, 517 U.S. 456, 461, 116 S.Ct. 1480, 1485 (1996).

[241] On December 20, 2017, the Honorable Judge Navarro granted a mistrial in the *Bundy* case for egregious prosecutorial misconduct. *See* 2:16-CR-00046-GMN-NJK, ECF No. 3041. Thereafter, she dismissed the case with prejudice on January 8, 2018. *Id.* at ECF No. 3117. On July 3, 2018, the Court denied reconsideration. *Id.* at ECF No. 3273.

[242] *See* ECF No. 45, at 5:16-19.

[243] *See* **Exhibit M,** 8/8/2022 Electronic Communication.

[244] *See* ECF No. 1-1.

[245] *See* ECF No. 19-1, Defendant Information Relative to a Criminal Action.

[246] *See* **Exhibit N,** 7/3/2018 Interview of Michele Fiore; **Exhibit O,** 6/28/2018 Interview of Michele Fiore; **Exhibit P,** 6/28/2018 Interview Summary & Email Correspondence from Michele Fiore.

34

development was not in her ward[247] and a confidential human source reported on the same, questioning Ms. Fiore's motives behind her involvement.[248]

On March 16, 2020, in a dishonest effort to request additional surveillance of Ms. Fiore in an investigation which yielded no dispositive evidence since September of 2019, ███████████ ████████████████████████████████████████████████████████████████████████ ██████.[249] Indeed, this classification change came before the application for search warrant and ostensibly before the Government had any proof that Ms. Fiore had committed a crime.[250] Further, the overwhelming evidence in this case demonstrates that law enforcement had no idea *what* they were investigating and expended a considerable amount of time engaging in a fishing expedition to find *anything* to prosecute Ms. Fiore. The fishing expedition included ██████████████ ███████████████████████,[251] ████████████████████████████████[252] ████████████████████████████████████████████,[253] █████████████████,[254] ██████████████,[255] t██████████████████ ████████████████,[256] ████████████████[257] ███████████ ████████████████████████████████████████████████

---

[247] *See* **Exhibit Q,** Interview of ███████████; *see also* **Exhibit R,** Interview of ███████████.
[248] *See* **Exhibit S,** 11/8/2021 CHS Reporting Document; *see also* **Exhibit T,** 9/5/2021 CHS Reporting Document; *see also* **Exhibit U,** 5/12/2021 CHS Reporting Document.
[249] *See* **Exhibit V**, 10/16/2020 Physical Surveillance Request.
[250] *See* **Exhibit W**, Application for Search Warrant dated January 21, 2021.
[251] *See* **Exhibit X,** 9/24/2020 Electronic Communication ████████████████████
[252] *See* **Exhibit Y,** 10/12/2021 Interview of ████████████████████ ████████████████████████████████
[253] *See* **Exhibit Z,** 6/16/2020 CHS Reporting Document ████████████████████
[254] *See* **Exhibit AA,** 10/21/2021 Interview of ████████████████████
[255] *See* **Exhibit BB,** 9/5/2021 CHS Reporting Document (Stating Fiore should admit to having tax liens as the liens are public record); *see also* **Exhibit CC,** 3/4/2022 CHS Reporting Document (Stating there was a rumor that ██████████████████████████
[256] *See* **Exhibit Y,** 10/12/2021 Interview of ███████████ *see also* **Exhibit U,** 10/4/2021 Lab Request for Latent Prints and DNA.
[257] *See* **Exhibit R,** Interview of ███████████

35

1    source incorrectly reported that ████████████████████████████████

2    ████████████████████████████████████████████████████████████.[258]

3        Thus, there is ample evidence to support the Defendant's theory that she was vindictively

4    or selectively prosecuted. The Motion had merit and should have been filed.

### b.    Counsel's Performance Was Deficient And Prejudiced Ms. Fiore.

7        "[A] single, serious error may support a claim of ineffective assistance of counsel."[259]

8    Defense counsel understood the basis and underlying argument for vindictive or selective

9    prosecution but failed to utilize the appropriate procedural mechanism (a motion to dismiss) to

10   effectively argue such basis before the Court. By the time the defense raised the theory, which was

11   (and oddly) raised by the Government, the deadline for dispositive motions had passed.

12       Ms. Fiore was significantly prejudiced by the failure to file a motion to dismiss on this

13   basis, as she clearly had some evidence of discriminatory effect and discriminatory intent, which

14   could have given Ms. Fiore an opportunity to obtain discovery on the issues which would either

15   have supported a motion to dismiss, or if unsuccessful, support her theory at the time of trial that

16   a less than subpar investigation took place because the prosecution was vindictive and law

17   enforcement was not interested in exculpatory evidence. While the discovery standard applicable

18   to selective prosecution claims in federal court is rigorous, it is "less stringent" than that required

19   to prove a selective prosecution claim on the merits.[260] As one court observed, "defendants need

20   not establish a prima facie case of selective prosecution to obtain discovery on these issues."[261]

21   The failure to file the correct motion was not counsel strategy, it was error, which objectively fell

22   below the standard of reasonably effective assistance of counsel. Despite the defense utilizing the

23   improper procedural vehicle, the vindictiveness of the prosecution in this case went to the heart of

24   Ms. Fiore's defense and seriously affected the fairness, integrity, and public reputation of the

---

[258] *See* **Exhibit EE,** 10/12/2022 CHS Reporting Document.
[259] *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).
[260] *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001).
[261] *Id*.

36

proceedings, as Ms. Fiore was stymied from discrediting law enforcement's failures in their investigation of her, as well as concerted efforts taken to charge her, and the jury placed improper weight on the testimony received into evidence. For this reason alone, Ms. Fiore should be granted a new trial.

### 4. Ms. Fiore's Motion for New Trial Should Be Granted For Ineffective Assistance of Counsel For Failure To File A Motion To Suppress.

A Motion to Suppress should be considered if there are issues with a warrant obtained by law enforcement to search and seize a defendant's property. Ms. Fiore's counsel did not file a suppression motion, which would have affected the outcome of the proceedings, by excluding all evidence upon which the charges are based.

Federal Rule of Criminal Procedure 33(a) has been interpreted to include claims of ineffective assistance of counsel, provided the motion is filed within the appropriate timeframe.[262] While a failure to file a motion to suppress does not *automatically* constitute ineffective assistance of counsel,[263] the claim of ineffective assistance can be considered if the defendant demonstrates that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.[264] A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial.[265] "The relevant question is whether no competent attorney would think a motion to suppress would have failed."[266]

If the Court determines that a motion to suppress would have been meritorious, the Court must then consider whether failure to file such a motion constituted ineffective assistance of counsel.[267] In order to prevail on an ineffective assistance of counsel claim, the petitioner has the burden of proving two elements. "First, the defendant must show that counsel's performance was deficient," meaning that counsel was not functioning as "the 'counsel' guaranteed the defendant

---

[262] *United States v. Gerrans*, 477 F.Supp.3d 1035 (2020).
[263] *See Kimmelman v. Morrison*, 477 U.S. 365 (1986).
[264] *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014).
[265] *Id.*
[266] *Id.*
[267] *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

37

by the Sixth Amendment."[268] "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[269]

### a.    The Motion to Suppress Would Have Been Meritorious.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and that "no Warrants shall issue, but upon probable cause." Article I, Section 18 of the Nevada Constitution similarly provides, "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause...." This language unequivocally establishes that at the very core of both constitutions stands the right of a person to retreat into his or her own home and be free from unreasonable governmental intrusion.[270] "The Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."[271]

The Fourth Amendment requires that warrants particularly describe the place to be searched and the items to be seized to prevent general, exploratory rummaging in a person's belongings.[272] "'The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized.'"[273] This particularity requirement ensures that search warrants do not become general warrants, which are prohibited by the Fourth Amendment.[274] "[T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers as opposed to physical objects, and that given the danger of coming across papers that are not authorized to be seized, responsible officials, including judicial officials,

---

[268] *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[269] *Id.* at 689, 104 S.Ct. 2052.
[270] *Silverman v. United States,* 365 U.S. 505, 511 [81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).
[271] *Howe v. State,* 916 P.2d 153, 159, 112 Nev. 458, 466 (1996).
[272] *United States. v. Barnes,* 749 F.Supp.2d 1124 (2010).
[273] *United States v. SDI Future Health, Inc*., 568 F.3d 684, 702 (9th Cir. 2009) (citation omitted).
[274] *In re Search of Google Email Accounts identified in Attachment A*, 92 F.Supp.3d 944 (2015).

must take care to assure that [searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy."[275]

The exclusionary rule, a judicially created doctrine, prevents the police who have acquired evidence because of a Fourth Amendment violation from submitting this tainted and illegally seized evidence in a court of law.[276] The main purpose of the exclusionary rule is to deter government officials from benefiting from the violation of an individual's Fourth Amendment rights.[277] The effect of the Fourth Amendment exclusionary rule is to exclude not only evidence seized pursuant to a Fourth Amendment violation, but also to exclude all derivative evidence obtained as a result of that particular Fourth Amendment violation.[278] Evidence is also inadmissible under the exclusionary rule if the evidence is derived from information acquired in an illegal search and seizure.[279]

Here, the Affidavit in Support of the Search Warrant incorporated into the warrant by reference, s███████████████████████████████████████ ("PAC") ████████████████████████████████████████████[280] ████ ████████████████),[281] █████████████████" █████ █████████[282] █████████████████.[283] ████████ ████████████████████████.[284] ████████ ████████████████████████████████████ ████████████████████████████"[285] ████████ ████████████████████████████████████████████

---

[275] *United States v. Sedaghaty*, 728 F.3d 885, 914 (9th Cir. 2013) (internal citations omitted).
[276] *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081 (1961).
[277] *Id.* at 655-56.
[278] *Wong Sun v. United States*, 371 U.S. 471, 484 (1962).
[279] *Wong Sun v. United States*, 371 U.S. 471, 484 (1962). at 487-88.
[280] *See* **Exhibit W,** Affidavit in Support of Application for Search Warrant, at 13:15-21.
[281] *Id.* at 13:22-24; 14:1-4.
[282] *Id.* at 14:6-9.
[283] *Id.* at 14:15-23.
[284] *Id.* at 15:4-9.
[285] *Id.* at 19:13-17.

39



███████████████.[286] I███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████,[287]████████

████████████████,[288]███████████████████████████████,[289]

██████████████████████████████,[290]███████████████████

████████████████,[291]

Based upon the purported probable cause detailed relating to the entities *supra*, Attachment B to the Affidavit authorized the search and seizure forthwith of "████████████

████████████████████████████████████████████████████

████████████████████████████ ████████████████████████

████████████████████████████████████████████████████

████████████████████."[292] Nowhere in the Attachment does it authorize the seizure of documents related to A Bright Present Foundation, despite the Government knowing about such entity, ███████████████████████████[293] Despite the curtailed warrant describing the documents to seize, an entire binder of documents labeled on the front in clear letters "A Bright Present Foundation" was illegally seized.[294] Without the seizure of this particular binder, the Government would not have even known about the subject statue or the donations made for the same.

The case of *United States v. Sedaghaty*[295] is on point here, which was a tax fraud case that was transformed into a trial on terrorism. Pirouz Sedaghaty (known as Pete Seda) allegedly falsified a 2000 charitable organization tax return to conceal his support of an independence

---

[286] *See* **Exhibit W**, at 22:14-16.
[287] *Id.* at 16:1-24; 17:1-2.
[288] *Id.* at 17:3-19.
[289] *Id.* at 17:20-24; 18:1-18.
[290] *Id.* at 19-22.
[291] *Id.* at 22-29.
[292] *Id.* at 56.
[293] *Id. generally.*
[294] *See* ECF No. 90, at 196:19-25; 197:1-19; *see also* Government's Trial Exhibit 58.
[295] 728 F.3d 885, 891 (9th Cir. 2013).

40

movement in Chechnya.[296] Following his convictions for tax violations, Seda challenged a host of rulings, including the breadth of computer and other documents seized pursuant to a warrant.[297] The central issue at trial was whether the errors on a tax form 990 were willful.[298]

Pursuant to a search warrant authorizing the seizure of financial records and communications related to the preparation of the 2000 tax return, government agents searched Seda's home.[299] "The government emerged from the search, however, with much more: news articles, records of visits to various websites…photographs…and other documents that were introduced at trial as evidence of Seda's desire to fund the Chechen mujahideen."[300] "Even if the affidavit is understood to describe evidence 'relevant' to the violations, that does not authorize the far flung scope of the agents' search. Relevance, of course, is not the standard; the language of the warrant controls."[301] The Court also commented on the dissent, which suggests that all of the evidence illegally seized was required to establish *mens rea*, stating "[b]ut it is not authorized by the warrant. Upon failing to find evidence of willfulness…the government should not be able to comb through…plucking out new forms of evidence that the investigating agents may have decided may be useful, at least not without obtaining a new warrant."[302]

> The search warrant here was properly issued and clearly stated the locations to be searched and the items that could be seized. The government agents responsible did not minimize intrusions on privacy, however, but instead seized papers and records beyond those the warrant authorized….Unlike cases where the magistrate judge erred in filling out the warrant but the government reasonably relied on the judge's approval, here the magistrate judge properly authorized the warrant but the agents did not follow it.[303]

---

[296] 728 F.3d 885, 891 (9th Cir. 2013).

[297] *Id.*

[298] *Id.* at 895.

[299] *Id.* at 910.

[300] *Id.*

[301] 728 F.3d 885, 891 (9th Cir. 2013) at 913 (internal citations omitted).

[302] *Id.* at 913.

[303] *Id.* at 914 (citing *United States v. Rettig,* 589 F.2d 418, 423 (9th Cir.1978)) (concluding that although the warrant was sufficiently particular, the executing "agents did not confine their search in good faith to the objects of the warrant, and that while purporting to execute it, they substantially exceeded any reasonable interpretation of its provisions").

41

The Court, "particularly troubled by the cumulative effect of these errors, which resulted in admitting evidence illegally seized while denying Seda both material impeachment evidence and potentially exculpatory evidence," concluded that the errors were prejudicial and reversed and remanded for a new trial.[304]

The same is true here. The execution of the search warrant in this case did not follow the guidelines of the warrant and impermissibly went outside of the limited bounds the warrant was based on. Thus, a suppression motion would have been meritorious and such motion should have been filed by defense counsel.

### b. Counsel's Performance Was Deficient And Prejudiced Ms. Fiore.

Counsel's performance was deficient for not filing a Motion to Suppress and the deficiency significantly prejudiced Ms. Fiore. Indeed, as the Motion was meritorious, the illegally seized evidence would have been suppressed. Importantly, this single binder illegally seized by agents completely nullified the entire case the FBI and prosecution had been building for years, which focused on the misappropriation of campaign and PAC funds and *nothing* to do with a statue, donations for a statue or a non-profit corporation controlled by Ms. Fiore. The *only* way the Government was able to garner *any* verdict against Ms. Fiore was based on the illegally seized binder. The failure to not file a suppression motion was not counsel strategy; it was a large misstep which could have thrown out the Government's case.[305]

//

//

//

//

---

[304] *United States v. Sedaghaty*, 728 F.3d 885, 914 (9th Cir. 2013).

[305] *See United States v. Wendfeldt*, 58 F. Supp. 3d 1124 (D. Nev. 2014) (Defense counsel's deficient performance in failing to move to suppress evidence from illegal search following traffic stop prejudiced defendant, and thus constituted ineffective assistance; motion would have successfully resulted in suppression of inculpatory evidence, and failure to move to suppress was not reasonable trial strategy, since there was no indication that counsel even considered the possibility of the motion).

42

1

## III.    CONCLUSION

2    On any single one of the detailed bases alone, or due to a cumulative effect of the errors

3   which ultimately denied Ms. Fiore the right to a fair trial, Ms. Fiore's jury verdict should be

4   reversed and she should be entitled to a new trial.

5   Dated this 31st day of January, 2025.

CLARK HILL PLLC

6

7     /s/ Paola M. Armeni, Esq.

8   PAOLA M. ARMENI
    Nevada Bar No. 8357

9   GIA N. MARINA
    Nevada Bar No. 15276

10  1700 South Pavilion Center Drive, Suite 500
    Las Vegas, Nevada 89135

11  Tel:  (702) 862-8300

12
    *Attorneys for Defendant, Michele Fiore*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

M9636\503106\280747252.v3

## CERTIFICATE OF SERVICE

The undersigned, an employee of Clark Hill PLLC, hereby certifies that on the 31st day of January, 2025, I served a copy of the **DEFENDANT MICHELE FIORE'S MOTION FOR A NEW TRIAL** via the Court's CM/ECF electronic filing system addressed to all parties on the e-service list.

Alexander Byrne Gottfried     alexander.gottfried@usdoj.gov

Dahoud Askar     Dahoud.Askar@usdoj.gov, heather.depremio2@usdoj.gov

_/s/ Tanya Bain_____
An employee of CLARK HILL PLLC

M9636\503106\280747252.v3