JOHN D. KELLER
Acting Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice
DAHOUD ASKAR
Trial Attorney, Public Integrity Section
1301 New York Ave. NW, 10th Fl.
Washington, DC 20005
202-368-1667
Email: Dahoud.Askar@usdoj.gov
ALEXANDER GOTTFRIED
Trial Attorney, Public Integrity Section
1301 New York Ave. NW, 10th Fl.
Washington, DC 20005
202-615-1286
Email: Alexander.Gottfried@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MICHELE FIORE, <br><br> Defendant. | Case No. 2:24-cr-00155-JAD-DJA <br><br> **Government's Response to Defendant's Motion for Judgment of Acquittal (ECF No. 96)** |

The United States of America, by and through John Keller, Acting Chief, United States Department of Justice, Public Integrity Section, and Alexander Gottfried and Dahoud Askar, Trial Attorneys, hereby files this response in opposition to the defendant's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c). For the reasons stated by the Court in denying the defendant's motion for acquittal under Rule 29(a), as well as those elaborated below, the Court should not set aside the jury verdict in this case and the defendant's motion should be denied.

1

**Procedural History**

On July 16, 2024, a federal grand jury in the District of Nevada returned an indictment against the defendant, charging her with one count of conspiracy to commit wire fraud and four counts of wire fraud. (ECF No. 1.) The charges stemmed from allegations that the defendant defrauded charitable donors, soliciting contributions for a statue of a fallen police officer while intending to spend their money on herself and her family. On August 20, 2024, the grand jury returned a superseding indictment charging the defendant with two additional counts of substantive wire fraud. (ECF No. 19.) On October 3, 2024, following eight days of trial, the defendant was unanimously found guilty by a jury of all charges in the indictment. (ECF No. 73.)

After the withdrawal of trial counsel, defendant's current counsel was appointed and was granted multiple extensions of the 14-day deadline to file post-trial motions by the Court. (ECF Nos. 78, 79, 84, 94.) On January 31, 2025, the defendant filed a Motion for Acquittal and a Motion for New Trial. (ECF Nos. 96, 97.) This response follows.[1]

**Relevant Legal Standard**

After a jury returns a guilty verdict, a "court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c). A judgment of acquittal is only warranted if the "evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Courts reviewing a motion for judgment of acquittal under Rule 29(c) apply the same test as they do in evaluating a challenge to the sufficiency of the evidence. *United States v. Ladum*, 141 F.3d 1328, 1337 (9th Cir. 1998). When considering a motion for judgment of acquittal, courts must determine

---

[1] The government will respond separately to the defendant's Motion for New Trial, which raises issues other than the sufficiency of the evidence. On January 31, the defendant also filed a Motion for Leave to File Excess Pages and a Motion to Seal Portions of its Motion for New Trial. (ECF Nos. 98, 101.) The government defers to the Court on the latter two motions.

whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hursh*, 217 F.3d. 761, 767 (9th Cir. 2000). This is a two-step process: "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010). "Second, . . . the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The "question is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion." *Nevils*, 598 F.3d at 1165. "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010). "[A]ny conflicts in the evidence are to be resolved in favor of the jury's verdict*." United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000). For the reasons discussed below, Fiore cannot overcome the substantial burden of showing the evidence presented at trial was inadequate to sustain her conviction.

To prove wire fraud under 18 U.S.C. § 1343, the government needed to prove the following elements beyond a reasonable doubt[2]: 1) The defendant knowingly participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false and fraudulent pretenses, representations, or promises; 2) The statements or representations made as part of the scheme were material; 3) The defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and 4) the defendant used, or caused

---

[2] ECF No. 70 (Jury Instructions); Ninth Circuit Pattern Criminal Jury Instruction 15.35 (Wire Fraud); *United States v. Holden*, 908 F.3d 395, 399-401 (9th Cir. 2018), *as amended on denial of reh'g* (9th Cir. 2018); *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020).

to be used, an interstate wire communication to carry out or attempt to carry out an essential element of the scheme.

To prove conspiracy to commit wire fraud under 18 U.S.C. § 1349, the government needed to prove the following elements beyond a reasonable doubt:[3] 1) two or more persons, in some way or manner, agreed to accomplish a common and unlawful plan to commit wire fraud; and 2) the defendant knew the unlawful purpose of the plan and willfully joined in it. As outlined below, the government produced more than enough evidence at trial to allow a rational juror to find that the government carried its burden as to every element of the charges in the indictment.

## The Government's Evidence

The government's evidence at trial included the testimony of twenty-five witnesses, as well as more than one hundred exhibits, which included bank records, invoices, photographs, e-mails, and campaign finance reports. In sum and substance, the government proved at trial the following:

Alyn Beck was an officer with the Las Vegas Metropolitan Police Department who was killed in the line of duty on June 8, 2014.[4] Based on the efforts of Councilman Steven Ross and Beck's wife Nicole, the Las Vegas City Council voted to memorialize Officer Beck by naming a new park in his honor in Ward 6.[5] At the December 2018 groundbreaking of Alyn Beck Memorial Park, the defendant, new Ward 6 Councilwoman Michele Fiore, proposed the creation of a statue of Officer Beck to be placed in front of the park.[6] The

---

[3] ECF No. 70 (Jury Instructions).
[4] *See* ECF No. 87, (Direct Examination of Nicole Beck) at 44:1-3.
[5] *Id*. at 44:12-23.
[6] *Id*. at 49:7-9.

defendant did not discuss the idea with Nicole Beck prior to proposing the creation of the statue.[7]

From July 2019 until February 2020, the defendant promised prospective donors to her political action committee, as well as to her Section 501(c)(3) charity, that she would use their donations to fund the statue of Officer Beck. The donors that the defendant personally solicited included then-Sherriff Joseph Lombardo (Count 2)[8], entrepreneur Elizabeth Stavola (Count 3)[9], attorneys Jay Brown (Count 4)[10] and Peter Palivos (Count 5)[11], and union representative Tommy White (Counts 6 and 7)[12].

The defendant's solicitations were made both orally and in writing. The defendant's written solicitations included a letter sent to Stavola stating that she was "raising $80,000 to be utilized for Officer Beck's life-sized statue" and promising that "100% of donations are used for this charitable event," and an e-mail to LIUNA Local 872 making an identical promise.[13] In addition to those whom the defendant solicited personally, she caused donations to her organizations to be solicited by Jay Brown, who reached out to others to donate to what he believed to be a charitable cause based on the misrepresentations made to him by the defendant.[14]

In total, eleven donors testified at trial who donated to the defendant's PAC or charity; all eleven testified that they donated to help fund the Alyn Beck statue.[15] The victims

---

[7] *Id.* at 55:13-15.
[8] *See* ECF No. 90, at 14:24 – 15:1.
[9] *See* ECF No. 87, at 247:23 – 248:5.
[10] *See* ECF No. 60, at 14:2-18.
[11] *See* ECF No. 90, at 43:3-24.
[12] *See* ECF No. 60, at 196:20 – 200:20.
[13] GX 45A (Solicitation Letter found in search warrant); GX 64 (Email to Local 872).
[14] *See* ECF No. 60, at 20:2 – 27:2; GX 50 (Email to Groesbeck).
[15] *See* ECF No. 87, at 250:17 – 251:23 (Direct Testimony of Elizabeth Stavola), 265:13 – 266:25 (Direct Testimony of David Chesnoff); ECF No. 60, at 11:3 – 15:19 (Direct Testimony of Jay Brown), 43:5 – 48:23 (Direct Testimony of Robert Groesbeck), 55:18 –

further testified that they would not have given the money to cover the defendant's personal expenses; that the defendant never asked them if they could use the money for a purpose other than the Beck statue; and that they were never reimbursed for their donations.[16] The defendant had the opportunity to cross examine each of these donors; no donor stated they gave for any purpose besides the Beck statue.

The government proved at trial that the defendant could not have obtained the funds from the checks written to her PAC or charity without causing the transmission of an interstate wire. The government introduced into evidence the checks that the defendant received from the charged victims and others.[17] Both the defendant's PAC and charity banked with Bank of Nevada; the government presented evidence from bank representative Mike Barnes that showed that the clearing of each check at the Bank of Nevada resulted in an interstate wire transfer.[18] When the payee deposits a check into their account at the Bank of Nevada, the bank processes the check by scanning it and creating an electronic image, scanning into software with servers in Arkansas and transmitting it to the Electronic Check Clearing House Organization, located in Texas.

The government also showed that neither the defendant, her PAC or charity contributed any money to the Alyn Beck statue.[19] Instead, the government showed that the statue was paid for in full by Olympia Companies, the same developer that built Alyn Beck

---

59:18 (Direct Testimony of Bill Richardson); 95:10 – 101:6 (Direct Examination of Tami Montes); ECF 88, at 9:12 – 16:22 (Direct Examination of Harry Mohney), 24:22 – 27:14 (Direct Examination of Brett Torino); ECF No. 90, at 9:4 – 16:17 (Direct Examination of Joseph Lombardo), 42:17 – 44:18 (Direct Examination of Peter Palivos).
[16] Id.
[17] GX 42 (Stavola Check); GX 46 (Brown Checks); GX 47 (Palivos Checks); GX 62 (Lombardo Check); GX 68 (LIUNA Check).
[18] *See* ECF No. 87, at 117:8 – 128:9 (Direct Examination of Mike Barnes)
[19] ECF No 90 at 80 (Direct Examination of Forensic Accountant Sandra Harris)

Memorial Park.[20] The jury heard from sculptor Brian Hanlon, who testified about the checks that he received from KAG Propety (an Olympia Companies subsidiary) in payment for his work on the statue.[21] Hanlon also discussed his written contract with Ninety-Five Management (another Olympia subsidiary), signed in August 2019, well before the defendant solicited the majority of her fraudulent donations.[22] Hanlon testified that he never received any money from the defendant and was not aware that she was raising money for the statue.[23] The jury also heard from Chris Armstrong of Olympia Companies, who explained that he had discussed with the defendant Olympia's plans to pay for the statue prior to the unveiling, and that he was similarly unaware of any fundraising efforts by the defendant related to the statue.[24]

The jury also heard the testimony of a forensic accountant who examined the bank records of the defendant's PAC, charity, and other organizations, as well as the defendant's personal bank records and those of members of her family.[25] The records showed that no money from the defendant's accounts went toward the statue; instead, the majority of the money went to accounts controlled by the defendant, her daughter Sheena Siegel, or to cash.[26] Analysis of those records further showed that some funds were subsequently used for the defendant's personal expenses, including rent, plastic surgery, and the wedding of her daughter Savannah Kaime. Several of the ultimate recipients of these stolen funds testified

---

[20] GX 19-25 (Contract for the Alyn Beck Statue and Payments to Brian Hanlon).
[21] *See* ECF No. 87, at 87:15 – 96:18 (Direct Examination of Brian Hanlon); GXs 20-25.
[22] GX 19 (Contract for Statue).
[23] *See* ECF No. 87, at 96 (Direct Examination of Brian Hanlon).
[24] *See* ECF No. 90, at 55:13 – 57:11 (Direct Examination of Chris Armstrong).
[25] Id., at 80:8 – 121:20 (Direct Examination of Sanda Harris); GXs 1-9.
[26] GX 103 (Financial Analysis Presentation).

and authenticated records at trial.[27] The owner and an employee of Alchemy Associates, a political fundraising company paid by the defendant's charity, testified that money they received was not in exchange for any services provided by the charity but was consistent with payment of the defendant's other political fundraising bills.[28] Financial analysis also showed that the defendant frequently spent donors' money as soon as it came into her accounts, that she used donor money to pay bills that she had no other way to pay, and that the defendant never kept enough money in her accounts to pay for the statue.[29]

## Argument

The evidence presented at trial was sufficient to allow a rational trier of fact to find the essential elements of wire fraud and conspiracy to commit wire fraud. As to the first element, the evidence showed that Fiore made false promises to each of the charged victims. These victims – Elizabeth Stavola, Jay Brown, Tommy White, Peter Palivos, and Joseph Lombardo – were different from each other in many ways, including their relationship to the defendant. But on this point, their testimony was consistent and unanimous: the defendant promised them she would spend their money on the Alyn Beck statue. Their testimony was corroborated not only by each other and by the testimony of the uncharged victims, but also by documentary evidence – by the checks they wrote and by the multiple written solicitations from Fiore that were entered into evidence at trial.

---

[27] *See* ECF No. 60, at 223:18 – 226:12 (Direct Examination of Cicely Hoffman), 206:18 – 221:19 (Direct Examination of Peter Lee); ECF No. 88, at 29:7 – 33:15 (Direct Examination of Alyssa Struck)
[28] *See* ECF No. 88, at 38:25 – 46:11 (Direct Examination of Ronnie Council), 61:6 – 69:23 (Direct Examination of Tara Krumme).
[29] Id.

The defendant argues in her motion that "there is evidence that Jay Brown not Ms. Fiore requested a donation from Joseph Lombardo." However, Lombardo testified at trial that Fiore solicited the donation:

> "Q. Now, sir, do you recall who it was that asked you to donate to Future for Nevadans for the Alyn Beck statue?
>
> A. That would have been Michele Fiore."[30]

Similarly, the defendant argues that "Count 5 cannot stand as Mr. Palivos donated the money with the intention that it be used for veterans, homeless or law enforcement."[31] What Mr. Palivos actually said at trial was, "So Ms. Fiore had told me that she was doing *a memorial for a fallen police officer*, and I don't remember the name. And she asked me if I would *contribute to that cause*, and because helping police officers, especially fallen police officers, is very important to us, I said yes."[32] (emphasis added.)

Finally, the defendant argues that the donation from LECET, signed by Tommy White, could not have been for the statue because the memo line says "sponsorship." But in his trial testimony, White clearly stated that the contribution was for the Alyn Beck statue and indicated that "sponsorship" was synonymous with "contribution."[33]

The evidence was also clear that the defendant's promises were false – she did not spend 100% of donor money on the Alyn Beck statue.[34] She did not spend *any* money on the Alyn Beck statue.[35] The statue was paid for in full by Olympia Companies.[36] The defendant didn't pay the sculptor, she didn't reimburse Olympia, and she didn't offer any money to

---

[30] ECF No. 90, at 14:24 – 15:1 (Direct Examination of Joseph Lombardo).
[31] ECF No. 86.
[32] ECF No. 90, at 43:20-24 (Direct Examination of Peter Palivos).
[33] *See* ECF No. 60, at 200:4-16 (Direct Examination of Tommy White).
[34] ECF No. 90 at 80 (Direct Examination of Forensic Accountant Sandra Harris); GX 103 (Financial Analysis Summary Charts).
[35] *See* ECF No. 87, at 87:15 – 96:18 (Direct Examination of Brian Hanlon); GXs 20-25.
[36] *Id.*

Officer Beck's family.[37] The defendant's claim at trial – mostly unsupported – that she spent *some* donor money on community events in her ward is not a legal defense to wire fraud; it doesn't make her false promises true. And the government proved through financial analysis – despite the fact that the defendant sought to obscure her spending by using cash and conduit entities – that she spent a significant amount of donor money on herself and her family, including to pay for rent, plastic surgery, and her daughter's wedding.[38]

To the second element of wire fraud, materiality, each of the charged donors testified clearly and explicitly that Fiore's false promises were the only reason they donated to Future for Nevadans or A Bright Present Foundation.[39]

In her motion, the defendant claims that the government failed to prove the third element of wire fraud, that the defendant acted with the intent to defraud (that is, the intent to deceive and cheat). In disputing that this element was met, the defendant relies exclusively on the testimony of Chris Armstrong that the initial plan for payment of the statue was for the cost to be divided between Olympia Companies and the City of Las Vegas. This argument is unavailing. First of all, Michele Fiore is not the City of Las Vegas. A Bright Present Foundation and Future for Nevadans are not the City of Las Vegas. Even if the defendant believed at some point that the City of Las Vegas was going to cover some portion of the statute, that would not require the defendant to engage in private fundraising. Indeed, the testimony at trial was that the City of Las Vegas (not the defendant) ended up paying the

---

[37] *Id.*
[38] ECF No. 90 at 80 (Direct Examination of Forensic Accountant Sandra Harris); GX 103 (Financial Analysis Summary Charts).
[39] *See* ECF No. 87, at 250 (Direct Testimony of Elizabeth Stavola), ECF No. 60, at 11 (Direct Testimony of Jay Brown), at 200 (Direct Examination of Tommy White) ECF No. 90, at 9 (Direct Examination of Joseph Lombardo), at 42 (Direct Examination of Peter Palivos).

cost of the Igor Soldo statue. At no point during this process did Fiore tell Chris Armstrong – or Brian Hanlon, or Nicole Beck – that she was privately fundraising for the statue.

Secondly, while Armstrong could not recall precisely when he told the defendant that Olympia was covering the entire cost of the statue, he was certain that it was before February 2020. There is written proof that Michele Fiore was still privately soliciting contributions for the statue from Local 872 in February 2020, after Armstrong told her Olympia was paying for the entire statue.[40] If the defendant knew she was making false promises to Local 872 in February, there is every reason to believe she had the intent to defraud when she made the same promises in the preceding eight months. Olympia's contract with Brian Hanlon to pay for the entire statue was executed as early as August 2019, a fact which the defendant was in a good position to know based on her role as City Council member for Ward 6, the site of Alyn Beck Memorial Park.

The strongest evidence of the defendant's present intent to defraud comes from the analysis of her bank accounts. The evidence presented at trial showed that the defendant never had enough money in either Future for Nevadans or A Bright Present Foundation to pay for the statue, or even to pay for half the statue, despite receiving close to $80,000 in charitable donations. Frequently, she spent the money on the same day or shortly after it came in. She sometimes spent the money on bills that a review of her accounts showed that she had no other way to pay. She was not saving the money to pay for the statue. The circumstantial evidence suggests – and the jury properly concluded -- that her intent was never to pay for the statue.

The final element of substantive wire fraud is that the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential

---

[40] GX 64.

element of the scheme. While the defendant appears to acknowledge the use of interstate wires to clear the victims' checks, she disputes that the wires were in furtherance of her scheme.

The defendant attempts to distinguish her case from *United States v. Jinian*[41] and analogize it to *Kann v. United States*[42], in an effort to claim that her cashing of checks or causing checks to be cashed is insufficiently connected to the defendant's fraud scheme to constitute an act "in furtherance of the scheme."[43] The defendant's reliance on *Kann* to make this point is misguided because the Court in *Kann* was clear that the checks at issue in that case were incidental or collateral to the scheme because the defendants had already diverted the funds from the company they were defrauding.[44] The Court in *Kann* went further, explaining that "[t]he case is to be distinguished from those where the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud."[45]

In the instant case, the defendant did not have possession of the fruits of the fraud until she initiated the check clearing process.[46] The defendant ignores the testimony of Mr. Barnes, who explained that the clearing of the checks was a necessary step to provide the defendant access to the funds authorized by those checks.[47] The clearing of the checks and the subsequent transfer of funds between accounts was essential for the scheme to be completed, because it was required for the defendant to receive the fraudulently solicited funds. As the court in *Jinian* acknowledged, "[t]he process of check clearing may form the

---

[41] 725 F.3d 954 (9th Cir. 2013).
[42] 323 U.S. 88 (1944). It is noteworthy that *Kann* was decided was before the modern age of electronic banking and indeed before 18 U.S.C. § 1343 was enacted in 1952.
[43] *See* ECF No. 96, at 7.
[44] *Kann*, 323 U.S at 90.
[45] *Id.*
[46] *See* ECF No. 87 at. 119-128.
[47] *Id.*

factual basis for wire fraud."[48] The scheme and fraud was not completed until the money left the victims' bank accounts and entered the defendant's accounts.

The Ninth Circuit has comprehensively addressed the sufficiency of check clearing as an act in furtherance of wire fraud. For example, in *United States v. Williams*, the Court noted that "Williams wrote checks to Clymer to pay him for his role in the fraud, which was 'part of the execution of the scheme as conceived by [Williams] at the time," and sufficient to sustain a wire fraud conviction.[49] In *United States v. Lo*, the Court found that deeds that were mailed after the defendant had been paid her fee from a loan that was funded as the result of her fraud were sufficient to be part of "the execution of the scheme as conceived by the perpetrator."[50] The court in *Lo* explained that for the mailing to have been in furtherance of Lo's scheme, it "need not be an essential element of the scheme. Rather, it is sufficient if the mailing is 'incident to an essential part of the scheme.'"[51]

The defendant's claim that the interstate nature of the wire was not foreseeable is immaterial to the analysis necessary in this case. The Ninth Circuit Pattern Jury Instructions for wire fraud state in pertinent part that, "It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate [or foreign] in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and an interstate [or foreign] wire communication must have actually occurred in furtherance of the scheme."[52] As the court stated in *Jinian*, jurisdictional elements do not require the same level of culpability as other elements, and the

---

[48] *Jinian* 725 F.3d at 962.
[49] 673 F. App'x 620, 623 (9th Cir. 2016) (internal citations omitted).
[50] 231 F.3d 471, 478 (9th Cir. 2000)
[51] *Id.*
[52] Model Crim. Jury Instr. 9th Cir. 15.35 (2022 ed. Revised June 2024); *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020).

interstate requirement is a solely jurisdictional requirement, so "the government is not required to prove under 18 USC 1343 that the interstate nature of the wire was reasonably likely or foreseeable."[53]

The process of check clearing always requires communication between two banks,[54] so the use of a wire, of some electronic processing to clear the check, in general was foreseeable to the defendant. That is certainly the case with this defendant, who has a wealth of experience in fundraising and dealing with the deposit and cashing of donation checks.[55] The wire in fact traveled across state lines as established by Mr. Barnes's testimony.[56] That evidence satisfies the final element of wire fraud.

Finally, sufficient evidence was presented to prove that the defendant conspired to commit wire fraud. The same evidence described above that shows that she is guilty of substantive wire fraud also proves that she "agreed to accomplish . . . an unlawful plan to commit wire fraud" and that she "knew the unlawful purpose of the plan and willfully joined it." The evidence also showed that the defendant agreed with at least one other person – namely, her daughter Sheena Siegel – to accomplish that plan.

The defendant claims that the government argued that Siegel was a co-conspirator "for the first time" in closing arguments.[57] However, Siegel was identified (although not by name) as a co-conspirator in the indictment months before trial. The indictment states that "Person A, an individual who resided in the State of Nevada, is a relative and co-conspirator of FIORE who received a portion of the fraudulent proceeds and served as a conduit to conceal the means and methods of FIORE's fraud by receiving payment from entities

---

[53] 725 F.3d at 965.
[54] ECF No. 87 at 122.
[55] *See* GX 103.
[56] ECF No. 87 at 122.
[57] ECF No. 96 at 11:15-16.

controlled by FIORE and spending those proceeds to benefit the conspirators."[58] Anyone familiar with the facts of the case, including the defendant, would immediately be able to discern that "Person A" could only be Siegel.[59]

The evidence presented at trial showed that Siegel was a member of the conspiracy. As stated above, the bank records showed that Siegel (both personally and through her business Hamlet Events) received hundreds of thousands of dollars from Fiore's organizations, including her PAC and charity.[60] The evidence showed that Siegel used some of that money to pay her mother's expenses, including her rent.[61] Paperwork filed with the Nevada Secretary of State showed that Siegel was on the Board of Directors of A Bright Present Foundation, which the evidence at trial showed was a wholly fraudulent organization.[62] Ronnie Council testified that Siegel was employed by Alchemy, the company that helped prepare Fiore's campaign finance filings.[63] Siegel's name was also at the top of the letter stating that "100%" of donations to ABPF would be used for the Alyn Beck statue, one of the primary instruments of the fraud scheme.[64] The evidence presented in the government's case in chief was more than sufficient to find that Siegel was a member of the conspiracy without considering Siegel's own stricken testimony.

---

[58] ECF No. 30.
[59] Indeed, undersigned counsel informed defendant's trial counsel that Person A was Siegel in their first conversation after the defendant's initial appearance.
[60] GX 103 (Financial Analysis Presentation); GX 6 (Hamlet Events bank records); GX 8 (Siegel personal bank records).
[61] GX 10 (Lee Bank Records).
[62] GX 32 (SOS Records – ABPF).
[63] *See* ECF No. 88, at 57:18-24 (Direct Examination of Ronnie Council).
[64] GX 45A (Solicitation Letter found in execution of Search Warrant).

**Conclusion**

For the foregoing reasons, the Court should deny the defendant's motion for judgment of acquittal.

DATED this 14th day of February.

Respectfully submitted,

JOHN D. KELLER
Acting Chief, Public Integrity Section
U.S. Department of Justice

_/s/_____

Alexander Gottfried and Dahoud Askar
Trial Attorneys