JOHN D. KELLER
Acting Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice
DAHOUD ASKAR
Trial Attorney, Public Integrity Section
1301 New York Ave. NW, 10th Fl.
Washington, DC 20005
202-368-1667
Email: Dahoud.Askar@usdoj.gov
ALEXANDER GOTTFRIED
Trial Attorney, Public Integrity Section
1301 New York Ave. NW, 10th Fl.
Washington, DC 20005
202-615-1286
Email: Alexander.Gottfried@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>v.<br><br>MICHELE FIORE,<br><br>          Defendant. | Case No. 2:24-cr-00155-JAD-DJA<br><br>**Government's Response to Defendant's Motion for New Trial (ECF No. 99)** |

      The United States of America, by and through John D. Keller, Acting Chief, United States Department of Justice, Public Integrity Section, and Alexander Gottfried and Dahoud Askar, Trial Attorneys, hereby files this response in opposition to the defendant's motion for a new trial under Federal Rule of Criminal Procedure 33. For the reasons stated below, the defendant's motion should be denied.

**Procedural Background**

On July 16, 2024, a federal grand jury in the District of Nevada returned an indictment against the defendant, charging her with one count of conspiracy to commit wire fraud and four counts of wire fraud. (ECF No. 1.) The charges stemmed from allegations that the defendant defrauded charitable donors, soliciting contributions for a statue of a fallen police officer while intending to spend that money on herself and her family. On August 20, 2024, the grand jury returned a superseding indictment charging the defendant with two additional counts of substantive wire fraud. (ECF No. 19.) On October 3, 2024, after eight days of trial, the defendant was unanimously found guilty by a jury of all charges in the indictment. (ECF No. 73.)

Following the withdrawal of trial counsel, defendant's current counsel was appointed and was granted multiple extensions of the 14-day deadline to file post-trial motions by the Court. (ECF Nos. 78, 79, 84, 94.) On January 31, 2025, the defendant filed a Motion for Acquittal and a Motion for New Trial. (ECF Nos. 96, 97.) This response follows.[1]

**Relevant Legal Standard**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In reviewing a motion for a new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). Nonetheless, a motion for a new trial is to be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimental*, 654 F.2d 538, 545 (9th

---

[1] The Government responded separately to the defendant's Motion for Judgment of Acquittal (ECF No. 103). The Government incorporates its recitation of the evidence admitted at trial from that motion herein.

Cir. 1981). A trial court may grant a motion for new trial where, in its judgment, "a serious miscarriage of justice may have occurred." *United States v. Alston*, 974 F.2d 1206, 1211–12. (9th Cir. 1992). For the reasons discussed below, the verdict was supported by the evidence, no miscarriage of justice occurred, and Fiore should not be granted a new trial.

## Argument

### A. Siegel Immunity Agreement

Prior to being prosecuted for the wire fraud offenses charged in the indictment, the defendant was investigated for allegations of campaign finance fraud by the United States Attorney's Office for the District of Nevada (USAO)[2]. On or around February 1, 2023, the United States Attorney for the District of Nevada entered into an immunity agreement with Sheena Siegel, who was believed to be a co-conspirator of the defendant and to possess relevant knowledge of the defendant's actions and state of mind.[3] A copy of that immunity agreement was provided to the defendant in discovery in July 2024.[4] Ms. Siegel testified before the Grand Jury on July 16, 2024, after the USAO had separated from this prosecution[5]. On September 30, 2024, the defendant called Ms. Siegel to testify in her case-in-chief.[6] After testifying on direct examination over the course of two days, the government's cross-examination of Ms. Siegel began.[7] At the opening of the government's cross-examination, Ms. Siegel claimed for the very first time that she wrote and signed some of the checks from her mother's charity and political action committee accounts.[8] Siegel

---

[2]  The USAO concluded that investigation without bringing charges in January 2024. The Public Integrity Section and its undersigned attorneys joined the instant investigation in March 2024.

[3] *See* AE 1 (Siegel's Signed Informal Immunity Agreement).

[4] *See* ECF No. 92, at 12:5-8.

[5] *See* AE 2 (Siegel's Grand Jury Testimony).

[6] *See* ECF No. 90 at 190 and ECF No. 91 at 33-86.

[7] *Id.*

[8] *See* ECF No. 91 at 94:2-20.

made this claim after acknowledging that her mother was the sole authorized signer on these accounts.[9] Ms. Siegel's claim was flatly inconsistent with her prior testimony before the grand jury, in which she testified that she did not act on her own with respect to expenditures by the defendant's organizations and that the defendant was the one who signed checks from the defendant's PAC.[10]

In response to Siegel's trial testimony, which ran directly contrary to Ms. Siegel's grand jury testimony[11], the government attempted to clarify Ms. Siegel's answer while highlighting for the jury the lack of credibility of Ms. Siegel's claim by asking "Are you admitting to a federal crime here in court today?"[12] The intent of the question was decidedly not to incriminate Ms. Siegel but to point out the absurdity of her testimony and invite her

---

[9] *See* ECF No. 91 at 90-91.

[10] AE2 p25-26 "Q: So is it fair to say that … when you were making an expense for one of your mother's organizations, your mother would … either tell you how to spend the money or … she would at least be aware of and would agree with how you were spending the money?

A: Yeah.

Q. Okay, Was there ever a time when that wasn't the case? Did you ever go out on your own using, you know, the PAC's money and spend it without telling your mother how you were spending it?

A: That would have been insane. No. Sorry."

p27 "Q: Okay. And you've already told us about the PAC, Future for Nevadans. Your mother was a signatory, you were not?

A. Yeah.

Q. If there was any expense coming from the PAC, your mother would have to write a check?

A. Yeah."

[11] *Id.*

[12] *See* ECF No. 91 at 94:19-20. Forging someone else's signature on a check from their account without authorization would likely violate multiple federal statutes, including 18 U.S.C. § 1344 (Bank Fraud) and 18 U.S.C. §1028A (Aggravated Identity Theft).

to clarify.[13] The defendant objected to that question, and after argument was heard at sidebar, the Court excused the jury and appointed counsel for Ms. Siegel.[14]

After consulting with her newly appointed counsel[15], Ms. Siegel communicated to the Court through counsel that she was concerned that truthful answers could expose her to criminal liability and exercised her Fifth Amendment right to answer no further questions on cross examination.[16] The defendant did not object. That evening, the Government filed a motion asking for all of Ms. Siegel's testimony to be stricken since the Government was unable to cross examine a witness who testified extensively on direct examination.[17] The defendant objected to the striking of the witness's testimony but did not object to Ms. Siegel's assertion of her Fifth Amendment privilege.[18] The defendant now claims that she is entitled to a new trial because Ms. Siegel's informal immunity agreement was deemed to have been breached without the involvement of the Court.[19]

The essential factor necessary to determining whether striking Ms. Siegel's testimony was appropriate is whether her invocation of her Fifth Amendment privilege was proper. Since the defendant did not object to Ms. Siegel's assertion of her Fifth Amendment

---

[13] The government would have next impeached Ms. Siegel with her grand jury testimony, but there was no opportunity to do so given the defendant's objection and the stoppage of trial.

[14] *Id.* at 94-98. As the government noted on the record, Ms. Siegel was already represented by counsel, Charles Kelley, in connection with her appearance in front of the grand jury. Unfortunately, Mr. Kelley was out of state and not present when the defendant called Ms. Siegel to testify.

[15] Before making this decision, Ms. Siegel's new counsel asked the Government about whether her inconsistent testimony had placed her informal immunity agreement at risk. After consulting with supervisors in Washington DC, government counsel concluded that it did, and communicated that to counsel.

[16] *Id.* at 117-119.

[17] *See* ECF No. 65.

[18] *See* ECF No. 92 at 6-11; *see also* ECF No. 91 at 118.

[19] *See* ECF 99 at 19.

privilege, the Court should apply plain error review.[20]  As the Ninth Circuit explained in *United States v. Depue ,* the "general requirements of plain error review are familiar enough. Plain error is (1) error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, the reviewing court has the discretion to grant relief so long as the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"[21]

The defendant conflates statutory immunity, which is granted through a court order under 18 U.S.C. 6002-6003, with the informal immunity agreement at issue in this case.[22] Under Siegel's immunity agreement, she was required to provide truthful testimony. Her apparent decision to contradict her own previous sworn testimony created a significant likelihood that she had violated that agreement. The issue at the crux of this Court's decision to strike the testimony is whether Ms. Siegel's invocation was proper.[23]. As the Ninth Circuit recognized in *United States v. Dudden.*[24] where an immunized witness has not been forced to testify and "so has not claimed the Fifth Amendment privilege against self-incrimination, the Government can grant the [witness] varying degrees of immunity in an informal agreement."[25] That is what happened in this case and the contours of that informal agreement were provided in the regular course of discovery.[26]

---

[20] *See United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019).

[21] *Id.* (internal citations omitted).

[22] *See* ECF No. 99, at 8.

[23] As a threshold matter, the Defendant argues that the Department of Justice Public Integrity Section is not a party to the immunity agreement and that the agreement is solely between Ms. Siegel and the USAO. Because the Public Integrity Section not being considered a party to this informal immunity agreement would moot the argument that it is bound by it, this motion assumes *arguendo* that the informal immunity agreement applied until breached by Ms. Siegel.

[24] *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995)

[25] *Id.* (It bears noting that the jurisprudence cited by the Government and the defendant on the violation of immunity agreements bears on the ability of the Government to bring charges after the fact, an issue distinct from the central problem here; whether Ms. Siegel had a good faith belief that her testimony may incriminate her).

[26] AE 1 (Siegel's Signed Informal Immunity Agreement).

1   The crux of the post-trial issue the defendant raises is whether, following Ms. Siegel's

2   breach of her informal immunity agreement, Ms. Siegel had a good faith basis to believe that

3   her testimony may incriminate her.[27] If she had a good faith basis to believe that her

4   testimony may incriminate her, then her invocation of her Fifth Amendment privilege

5   against self-incrimination is appropriate, and the striking of her testimony following

6   extensive direct examination and little to no meaningful opportunity to cross examine her is

7   also appropriate.[28]

8   As the Court is well aware, an entire day of proceedings was devoted to an in-depth

9   inquiry into whether Sheena Siegel's testimony might incriminate her.[29] She had the

10  opportunity to consult with counsel while faced with each and every aspect of the

11  examination the Government intended to offer and through counsel, articulated the basis

12  upon which her good faith belief rested.[30] She had testified incompatibly with her grand jury

13  testimony at that stage of the proceeding and the Government intended to continue to ask a

14  wide range of questions surrounding the misconduct perpetrated by the Defendant and her

15  daughter.[31]

16  At trial, the Government articulated a well-grounded position that the informal

17  immunity agreement they had with Ms. Siegel had been breached by her lying.[32] The

18  immunity agreement was premised on Ms. Siegel's "agreement to testify truthfully" and did

19  not extend to any "false, incomplete, or misleading" statements she made.[33] Whether or not

20  she could ultimately be prosecuted for substantive crimes related to the wire fraud conspiracy

21

22  [27] *See United States v. Vavages*, 151 F.3d 1185, 1192 (9th Cir. 1998).
     [28] *Id.*

23  [29] *See* ECF No. *92.*
     [30] *See Id.* at 33-51.

24  [31] *Id.*
     [32] *See* ECF No. 91 at 117-119.
     [33] AE 1 (Siegel's Signed Informal Immunity Agreement).

with her mother, on the face of the agreement Ms. Siegel could *certainly* be prosecuted for perjury, either based on statements made in the grand jury or at trial. Once the Government made its position clear on the breach of the immunity agreement, Ms. Siegel had a good faith belief that further testimony placed her at risk of incriminating herself, making her invocation of her privilege against self-incrimination wholly appropriate. A witness cannot make themselves subject to direct examination and then shield themselves from cross-examination with their Fifth Amendment rights; the defendant's strong desire for her testimony notwithstanding.[34] The Court appropriately struck Ms. Siegel's testimony following her invocation on cross-examination.[35]

## B. The Court Properly Limited Special Agent Fryxell's Testimony

The defendant mixes her arguments concerning selective prosecution and the proper limiting of Special Agent Fryxell's testimony to imply that these decisions magnify one another.[36] The defendant argues that she was denied the right to a fair trial because the Court refused to permit any evidence "of the Government's motives in the underlying prosecution and its failures in its investigation."[37] Because the defendant's spurious selective or vindictive prosecution arguments are discussed *infra*, this section focuses the defendant's objections to the Court's limitations on the scope of Special Agent Fryxell's examination.

---

[34] *See United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("An accused's right to compulsory process to secure the attendance of a witness does not include the right to compel the witness to waive his fifth amendment privilege.")

[35] While the defendant now asserts that the Government only "revealed" that Ms. Siegel was the unindicted co-conspirator after her testimony was stricken, this is belied by the trial record leading up to her testimony which established exactly how instrumental Ms. Siegel was to the defendant's fraud scheme, as well as grand jury records establishing the Government's position that Ms. Siegel was the unindicted co-conspirator. *See* (AE 2 and *e.g.,* ECF No. 90. At 88:6-16.

[36] ECF No. 99 pg. 14-15.

[37] *Id.*

A brief review of the record demonstrates that the defendant was permitted to examine a number of witnesses on alleged deficiencies in the Government's investigation.[38] The defendant's complaint is that there were limitations on the scope of her examination in one of the four examinations she conducted of witnesses affiliated with the FBI, the others being Special Agents Smith and Jaski and forensic accountant Sandra Harris.[39] To support her claim that the limitations placed upon her examination of Special Agent Fryxell were excessive, the defendant cites to *United States v. Crosby* and *United States v. Sager*.[40]

In *Crosby*, the Ninth Circuit found the lower court erred in prohibiting the defendant from noting potential exculpatory evidence that could have been found in a search by law enforcement.[41] In contrast, the defendant here was permitted to note potentially exculpatory evidence which could have been found during the search of her residence and did so repeatedly.[42] In *Sager,* the Court found that the trial judge erred by instructing the jury not to "grade" the investigation.[43] That isn't the issue here either. The jury was presented again and again with the defendant's theory that the investigation and the FBI were deficient.[44] They simply rejected it.

There is another significant point of distinction between the cited cases and the instant one that the defendant fails to acknowledge. In both *Crosby* and *Sager*, the issues surrounded the examinations of witnesses sponsored by the Government. Here, the limitations placed

---

[38] *See, e.g.,* ECF No. 87, at 145 (Testimony of Agent Douglas Kyle Smith), ECF No. 90, at 80 (Testimony of Forensic Accountant Sandra Harris), ECF 90 at 173 (Testimony of Agent Kyle Jaski), ECF No. 91, at 132 (Testimony of Agent Cody Fryxell), ECF 93, at 76 (Defense Closing Arguments).
[39] *See Id.*
[40] *See* ECF No. 99, at 15-16.
[41] *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996).
[42] *See* ECF No. 87, at 205-206.
[43] *United States v. Sager 227 F.3d 1138, 1145 (9th Cir. 2000).*
[44] *See e.g.* ECF No. 87, at 34 (Defense's Opening Statement), at 205 (Cross-examination of Douglas Smith).

on the examination of Special Agent Fryxell were limitations placed on a witness the defendant called to the stand herself. As the government argued during trial, calling Special Agent Fryxell for the primary and express purpose of impeaching his credibility would not have been appropriate.[45]

"A defendant's right to present evidence in support of [her] defense. . . is not without limits."[46] As this Court noted in its pretrial order, "'[w]hile the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence' that is irrelevant, lacking in foundation, or when 'its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'"[47] The Court placed common sense guard rails on Special Agent Fryxell's testimony to ensure that the defendant could examine him on the integrity and nature of the FBI's investigation within the bounds of the applicable rules and law.

### C. The Court correctly admitted Nicole Beck's testimony as relevant and not unfairly prejudicial.

On September 3, 2024, prior to trial, the defendant moved *in limine* to exclude the testimony of Nicole Beck, the surviving spouse of Officer Alyn Beck, under Federal Rule of Evidence 403. (ECF No 31.) The Court denied that motion on September 18, finding that Beck's expected testimony was material and that its probative value was not substantially outweighed by a risk of unfair prejudice. (ECF No. 51, at 16-17) Beck testified at trial and her testimony was consistent with the proffer provided by the Government and relied upon

---

[45] *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990).
[46] *United States v. Espinoza-Baza*, 647 F.3d 1182, 1188 (9th Cir. 2011).
[47] *See* ECF No. 51, at 21 quoting *United States v. Espinoza-Baza*, 647 F.3d at 1189.

by the Court in its order; there were no surprises.[48] During her testimony, Beck offered background about the development of her late husband's memorial, much of which no other witness was in a position to give[49]. Among other things, Beck testified to the following:

The effort to memorialize Officer Beck by renaming a park after him was undertaken by Councilman Steven Ross in 2014, years before Michele Fiore was elected.[50] After the City Council voted to rename the park in 2015, Mrs. Beck remained involved in the process of developing the park, working with Ross and a private developer called Olympia Companies.[51] Beck never met Michele Fiore until the groundbreaking ceremony for Alyn Beck Memorial Park in December 2018.[52] Prior to her public speech at the groundbreaking, Fiore had never discussed her idea to create a statue with Beck or asked Beck's feelings about the idea.[53] In the months between the groundbreaking ceremony and the unveiling of the statue, Fiore did not directly communicate with Beck.[54] Beck was not aware of any private fundraising efforts by Michele Fiore.[55] Beck never received any payment from Michele Fiore.[56] While there were other witnesses at trial who attended the unveiling ceremony, such as Brian Hanlon and Joseph Lombardo, no witness other than Beck had personal knowledge of the facts outlined above.[57]

---

[48] *See* ECF No. 43, at 2-3 (Government's Response to Defendant's Motion in Limine to Exclude Testimony of Nicole Beck).

[49] The defendant inveighs that the Government's assertion that Beck would provide testimony that no other witness could was "patently false and it knew it." However, as detailed above, the record shows that this was true.

[50] *See* ECF No. 87, at 44. (Direct Examination of Nicole Beck)

[51] *Id.,* at 45-47.

[52] *Id.,* at 484.

[53] *Id.,* at 55-56.

[54] *Id.,* at 58.

[55] *Id.,* at 64-65.

[56] *Id.,* at 65.

[57] The defendant's motion references some items in Beck's testimony, such as the authentication of photographs, that overlapped with other witnesses' testimony. There is

The testimony given by Beck at trial was not unfairly prejudicial. As the Court noted in its order denying the defendant's motion in limine, "the fraud scheme that Fiore is accused of naturally lends itself to some emotional testimony. Given that Fiore chose this backdrop for her alleged fraud, it cannot be said that the prejudice from those sympathy-inducing details is unfair, let alone substantially so."[58] The "alleged" fraud referred to in the pretrial order was proven beyond a reasonable doubt at trial. The Government took steps at trial to minimize prejudice and avoid sensationalizing Beck's testimony; for instance, Beck was not asked to recount the events associated with her husband's murder and the examination focused on the facts relevant to the defendant's fraud scheme.[59]

Moreover, the probative value of Beck's testimony was high. Her testimony provided critical insight into the defendant's state of mind, and formed a key part of the Government's argument that Fiore had the intent to defraud her donors at the time that she made false promises about fundraising for the Alyn Beck statue.[60] The defendant argues that Beck lacked direct knowledge about Fiore's fundraising efforts; but that is exactly the point that the Government sought to illustrate. The fact that Fiore never told Beck about her efforts to raise money for the statue helped demonstrate consciousness of guilt. As the Government argued at trial, if Fiore believed she was doing a charitable deed by raising money for the statue, she would have wanted to make Alyn Beck's widow aware of her efforts. The fact that she did not tell Nicole Beck that she was raising money for her husband's memorial indicates that she knew she was doing something wrong that she wanted to conceal.

---

nothing improper about that and it does not take away from the fact that each witness testified to facts that the others could not.

[58] ECF No. 51, at 17.

[59] ECF No. 87, at 44.

[60] ECF No. 93, at 74-75 (Government Closing Argument)

As the Government further argued, the fact that Fiore never consulted Mrs. Beck about her feelings about the statue, and the fact that she rarely interacted with her throughout the process, suggested that Fiore's true motive was not to honor Beck's husband, but rather to find an angle that would help her raise money from sympathetic donors and enrich herself and her family. Without Beck's testimony, the Government would not have had a factual basis to make these arguments. Because Beck's testimony was relevant and not substantially more prejudicial than probative, the defendant's motion for a new trial based on the admission of Beck's testimony should be denied.

**D.    The Joint Jury Instructions Accepted by the Court Were Legally Sufficient**

The defendant now argues that that the joint jury instruction on conspiracy to commit wire fraud was legally deficient and should form the grounds for a new trial. In evaluating whether a particular jury instruction was erroneous, the court must consider the jury instructions as a whole, and whether they "fairly and adequately cover the issues presented, correctly state the law, and are not misleading."[61] The defendant is correct that a plain error review is appropriate here and is unable to cite any authority that would hold the modified version of the model jury instructions as clearly erroneous under the standard laid out in *Duran v. City of Maywood*.[62] Instead, the defendant now objects that she believes the model instructions for conspiracy would have better supported her defense theory than the joint instructions.[63] This is not grounds to find these joint instructions as legally deficient.

The defendant also claims that the jury was not instructed that they "must find that there was a plan to commit at least one of the crimes alleged in the indictment."[64] The joint

---

[61] *Duran v. City of Maywood* 221 F.3d 1127, 1130 (9th Cir. 2000)
[62] *Id.*
[63] *See* ECF No. 99, at 22.
[64] *See Id.*

jury instructions noted in relevant part that "[f]or the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt: in order to find someone guilty of wire fraud: First, two or more persons, in some way or manner, agreed to accomplish a common and unlawful plan to commit wire fraud, as charged in the indictment".[65]

The Joint Jury Instructions fairly and adequately explained to the jury the elements of 18 U.S.C. § 1349, conspiracy to commit wire fraud, they were clear and concise and not misleading, and those joint instructions correctly stated the law. The defendant's argument following conviction that a different instruction might have assisted in her theory of case presentation is immaterial to the jury instruction's legal sufficiency. The Court properly instructed the jury on conspiracy to commit wire fraud.

**E. Ineffective Assistance of Counsel**

Finally, the defendant makes six arguments for a new trial which she frames as ineffective assistance of counsel claims. The defendant argues that her trial counsel was ineffective for: 1) failing to object to lack of personal knowledge during the testimony of Peter Lee; 2) failing to object to lack of personal knowledge with respect to donors who were not directly solicited by Fiore; 3) failing to "correct" the allegedly false testimony of Governor Joseph Lombardo; 4) failing to introduce supposedly "exculpatory" evidence that Fiore "regularly handled transactions in cash"; 5) failure to file a motion on vindictive or selective prosecution; and 6) failure to file a motion to suppress evidence recovered during the search of Fiore's residence.

"Counsel's performance is constitutionally infirm if it falls below an objective standard of reasonableness and there is a reasonable probability that, but for the inadequate

---

[65] *See* ECF No. 70 (emphasis added).

representation, the result of the proceeding would have been different." *United States v. Anderson*, 850 F.2d 563, 565 (9th Cir. 1988); *citing Strickland v. Washington*, 466 U.S. 668, 690-91, 80 L. Ed. 2d 674; *United States v. Schaflander*, 743 F.2d 714, 717-18 (9th Cir. 1984). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Guzman v. Runnels*, 174 Fed.Appx. 408, 409 (9th Cir. 2006) *quoting Murtishaw v. Woodford,* 255 F.3d 926, 951 (9th Cir. 2001).

"Generally, ineffective assistance of counsel claims are more properly raised by collateral attack on the conviction under 28 U.S.C. § 2255." [66]"[W]hen a claim of ineffective assistance of counsel is first raised in the district court … the district court may, and at times should, consider the claim at that point in the proceeding."[67] However, the decision of whether to review the claim is best left to the discretion of the district court.[68]

The court should exercise its discretion to decline to review the defendant's ineffective assistance of counsel claims at this stage, because the record is not sufficiently developed to decide the claims. Evaluating an ineffective assistance of counsel claim requires determining not only what an attorney did but *why* it was done.[69] In order to accept the defendant's claims and order a new trial, the Court would need to develop a record as to why trial counsel made the strategic choices that he did and whether they were a product of a thorough investigation of law and facts. This record cannot be fully developed unless the defendant takes steps to open her case for review, including waiving attorney-client privilege, which she has not done.

If the Court does review the defendant's ineffective assistance claims, the Government notes that Mr. Sanft was an able and effective advocate for the defendant, well

---

[66] *United States v. Swaid*, 458 Fed. Appx. 676, 679 (9th Cir. 2011).
[67] *United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) (quoting *United States v. Brown*, 623 F.3d 104, 113 (2d Cir. 2010)).
[68] *United States v. Singh*, 979 F.3d 697, 730-32 (9th Cir. 2020) (internal citations omitted).
[69] *See United States v. Pope*, 841 F.2d 954, 958 (9th Cir. 1988).

exceeding the Constitutional standard for adequacy. The strategic choices that counsel made were reasonable within the options available to him based on the facts and the law. As argued below, despite her Monday morning quarterbacking of the alleged errors identified in the defendant's motion, the outcome of the trial would not have changed if counsel made different choices.

   1.   *The defendant was not prejudiced by counsel's failure to object to the testimony of Peter Lee.*

The defendant argues that counsel was ineffective for failing to object to lack of personal knowledge to the testimony of Peter Lee. Lee was the property manager of 6205 Red Pine Court, which was owned by Lee's son and which Lee had helped him purchase.[70] Lee described the property that he managed and identified photographs for the jury.[71] He explained that Michele Fiore lived at the property during the period of the conspiracy and that he was the one who found her as a tenant.[72] Lee testified to what the defendant's rent was, which he was familiar with based on the residential lease agreement.[73] Finally, Mr. Lee reviewed a subset of bank records relating to 6205 Red Pine Court that were already entered into evidence.[74]

First, the defendant was not prejudiced by counsel's decision not to object to Mr. Lee's testimony because an objection to lack of personal knowledge would not have been sustained. Counsel appears to misinterpret Lee's occasionally limited English proficiency as a lack of knowledge of the facts. Lee was the property manager at 6205 Red Pine Court and was in a good position to know the facts to which he testified. When he didn't know or was unsure of an answer, he stated that. When he knew an answer, he provided it. "Evidence to

---

[70] *See* ECF No. 60, at 206 (Direct Examination of Peter Lee).
[71] *Id.,* at 206-209; GX 83.
[72] *Id.*.
[73] *Id.,* at 212-213; GX 80.
[74] Id., at 218-219. GX 10.

prove personal knowledge may consist of the witness's own testimony." Federal Rule of Evidence 602.

Secondly, even if Lee's entire testimony was stricken from the record, it would not have affected the outcome of the proceeding. Even if no evidence were presented at trial regarding the defendant's rental payments, there was still more than enough evidence to convict her of wire fraud. The Government had no legal burden to prove what the defendant did with the proceeds of her fraud scheme. But even still, there was plenty of evidence beyond Lee's testimony that the defendant used charity and PAC money to pay her rent. The bank records to which Mr. Lee testified showing the rental payments were already in evidence, and they were explained to the jury during the testimony of the forensic accountant.[75] Evidence that Ms. Fiore lived at the property and photographs of the residence were admitted through Special Agent Douglas Smith.[76] Finally, in the event that the Peter Lee's testimony was stricken, the Government could have called Eric Lee in the alternative.[77] The defendant cannot articulate how counsel's failure to object prejudiced her in any way.

   2. *The defendant was not prejudiced by failing to object to the testimony of donors not directly solicited by Fiore.*

As discussed in the Government's response to the defendant's Rule 29 motion, the Government's evidence included both donors who were personally solicited by the defendant (the charged victims) as well as donors who were solicited by others. The Government never hid this fact – it never claimed that Fiore acted alone, but argued that she acted in concert

---

[75] *See* GX 10; GX 101; ECF No. 90, at 80 (Direct Examination of Sandra Harris).
[76] *See* ECF No. 87, at 145-149 (Direct Examination of Douglas Smith); GX 59.
[77] The defendant claims without evidence that "[t]he Government was aware that its witness was outside of subpoena power and improperly skirted its efforts without a showing that Eric Lee was unavailable as a witness." This is a perplexing assertion and it isn't true – the Government subpoenaed and prepared Eric Lee for trial and the Government could have called him as a witness if necessary, as it did many out-of-state witnesses.

with others, including both willing co-conspirators (Sheena Siegel) and unwitting participants such as Jay Brown.[78] Nevertheless, the defendant argues that "[a]llowing numerous witnesses to testify about donations that the Government could not prove was at the best of Ms. Fiore was error and should have been objected too [sic]." Those objections would not have been meritorious, and failure to make them did not prejudice the defendant.

The Government did not ask the uncharged donors to testify about matters outside their personal knowledge, nor did they do so. The Government did not ask these witnesses whether the defendant was the originator of the false promises that were made to them or the ultimate recipient of their donations. This was proved through other means. The bank records, Secretary of State business records, and financial analysis showed that every donation to Future for Nevadans and A Bright Present Foundation financially benefitted the defendant. The testimony of Jay Brown, the letter he received from Fiore, and the e-mail he sent to Robert Groesbeck proved that Mr. Brown was repeating false promises made to him by Fiore that he believed to be true.

Fiore caused those misrepresentations by Jay Brown (and thus caused the donations by Groesbeck and other uncharged victims), just as she caused Jay Brown to donate to A Bright Present Foundation in the first place. When you tell a lie to one person (or to several people, as Fiore did), you lose control over who else may hear it and how far it may spread. The defendant did not correct the record when she received donations made based on false promises. She spent them. Every donation by every victim in this case was ultimate caused by Michele Fiore's lies, and every donation was fraudulently converted to her own purposes. Even striking the testimony of all the uncharged donors would not have changed the verdict as to the charged counts, so the defendant was not prejudiced by their testimony.

---

[78] *See* ECF No. 93, at 44 (Government Closing Arguments).

3.  *The defendant was not prejudiced when trial counsel failed to accuse Governor Lombardo of committing perjury.*

In her motion, the defendant audaciously asserts that Governor Joseph Lombardo gave false testimony at trial and that defense counsel was ineffective for failing to "correct" this alleged falsehood.[79] However, there is absolutely no basis for the claim that Lombardo was untruthful, and accusing him of lying under oath is a strategy that almost certainly would have backfired if implemented.

The "false" statement that the defendant alleges Lombardo made at trial is that Michele Fiore had asked him to donate to Future for Nevadans for the Alyn Beck statue.[80] The defendant argues this statement was "contradictory" because an FBI 302 from a pretrial interview with Lombardo stated that after the defendant first told him she would be raising money for the Alyn Beck statue, he could not recall whether she had "re-contacted" him about the donation.[81] In the same interview, Lombardo remembered discussing the donation with Jay Brown, but could not recall whether Brown had reached out to him or if he had reached out to Brown to "check with him" about the donation. The FBI 302 of an earlier interview with Lombardo from December 2022 stated, "Lombardo was initially contacted by Michele Fiore and asked to donate to the purchase of the Alyn Beck statue, but he did not authorize the donation until Jay Brown contacted him."

---

[79] The defendant also implies that the Government, and possibly defense counsel, should be subject to disciplinary sanctions for "tolerating" his alleged falsehood.

[80] *See* ECF No. 97, at 37.

[81] The defendant falsely implies that the Government has withheld an audio recording of the interview, misleadingly stating that "[a]lthough there was audio from other Government witness interviews, the defense never received an audio recording of Mr. Lombardo's interviews." While *some* donor interviews were recorded, this was the exception and not the rule. The Government did not record any of its interviews with Governor Lombardo.

The defendant's claim of a contradiction is incorrect for two reasons. First, an FBI 302 is not a statement by Lombardo. It is a statement by the FBI agent who wrote the report.[82] Lombardo never saw the FBI 302s of his interviews and never adopted those statements. Secondly and more importantly, there is *no contradiction* between the statements in the 302s and the statement that Lombardo made on the stand under oath. Importantly, in both interviews Lombardo stated that Michele Fiore had spoken to him about donating for a statute of Officer Beck. In the first interview, he plainly stated that the defendant asked him to donate; in the other interview, he reportedly could not recall if she had personally reached out a second time after first discussing it with him at the groundbreaking. This is an extremely thin basis from which to allege that a contradiction or falsehood occurred.

It is not at all uncommon or improper for a witness's recollections to change slightly over time, or even to improve after having an opportunity to reflect. In December 2022, during the interview closest in time to the events of the case, Lombardo had a clear memory that Fiore directly and personally asked him to donate to the statue. In July 2024, after having not thought about these events for some time, he could not immediately recall exactly when or how many times he had spoken to her. By the time he gave his trial testimony in September, Lombardo had had the opportunity to focus on the events of this case and refresh his recollection. Lombardo's statement under oath at trial that Fiore asked him to donate to the statue is consistent with his own previous statements and with all the other available evidence. The Government attempting to force him to "withdraw" his statement would not have been appropriate or warranted.

---

[82] *See,* e.g. *Palermo v. United States*, 360 U.S. 343 (1959) (summaries of an oral statement by a witness are not the witness's own words under the Jencks Act)

Attempting to "correct" the record by accusing Lombardo of lying at trial would not have been an effective strategy. The defendant acknowledges that the 302 could not have properly been used to "impeach" Lombardo.[83] But even making the accusation through another witness would have run the risk of undermining the defense's credibility and alienating the jury. Governor Lombardo is a 34-year veteran law enforcement officer with a sterling reputation for trustworthiness and integrity. It cannot be said that the defendant was prejudiced by failing to call him a liar.

    *4.  Failure to introduce additional evidence of the defendant's pattern of cash transactions was not ineffective assistance of counsel*

The defendant argues that trial counsel was ineffective for failing to introduce additional evidence of the defendant's practice of "generally handling transactions in cash."[84] The defendant notes potential additional witnesses or pieces of evidence trial counsel could have used to demonstrate that the defendant regularly had access to and used cash for a variety of transactions.[85]

The defendant mistakenly argues that this evidence would have been exculpatory and that failure to introduce it somehow prejudiced her case.[86] The defendant was not charged with converting donations to cash. She was charged with wire fraud and conspiracy to commit wire fraud for asking for donations and promising that 100% of those donations would go to a memorial for Officer Alyn Beck while intending to use none of those funds for that purpose.[87]

---

[83] *See* ECF No. 97, at 28.
[84] *See* ECF No. 99, at 30.
[85] Id.
[86] Id. at 31.
[87] *See* ECF No. 19 (Superseding Indictment)

At trial, the defendant tried, unsuccessfully, to argue that she merely used the money she had solicited for a separate charitable purpose.[88] Her argument now seems to be that she could have further developed evidence of her pattern and practice of cash transactions to support her claim that the money was used for a separate charitable purpose. Tellingly, the defendant is not claiming that she could trace the exact donations she was convicted of defrauding to specific cash transactions; merely that she would have demonstrated to the jury that she regularly handled cash. If the defendant had presented additional evidence of the defendant's pattern of handling cash, it would have enhanced the Government's argument that she had cashed the checks she had received for the Alyn Beck statue to use in some manner other than her solicited purpose, the construction of the Alyn Beck statue. The defendant was not prejudiced because she wasn't able to provide irrelevant information about her routine use of cash.

5. *The defendant was not prejudiced by trial counsel's failure to file a meritless vindictive or selective prosecution motion.*

The defendant also argues that trial counsel was ineffective for failing to file a motion to dismiss the indictment based on vindictive or selective prosecution. The defendant has alleged throughout this prosecution that she is being unfairly targeted by the Government, even falsely claiming during pretrial litigation that she was designated by the FBI as a "domestic terrorist."[89] Just as the Court properly precluded the defendant from making these arguments to the jury at trial, a pretrial motion to dismiss the indictment on that basis would have been similarly unsuccessful.[90]

---

[88] *See, e.g.,* ECF 87, at 260 (Cross-examination of Elizabeth Stavola).
[89] *See* ECF No. 45
[90] The defendant begins her argument by suggesting that the mere act of the Government filing a motion to preclude improper arguments about vindictive prosecution is "probative" of the Government acknowledging it harbored such animus. This makes no sense, and would

Proving a vindictive or selective prosecution claim requires meeting a very steep burden. "In our criminal justice system, the Government retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 124 (1979) (same). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *United States v. JDT*, 762 F.3d 984, 996 (9th Cir. 2014) (quoting *Wayte*, 470 U.S. at 607.)

Courts are prohibited from reviewing a prosecutor's charging decision "absent a prima facie showing that it rested on an impermissible basis, such as gender, race or denial of a constitutional right." *United States v. Palmer*, 3 F.3d 300, 305 (9th Cir. 1993). To prove a selective prosecution claim, a defendant must show "discriminatory effect and discriminatory intent." *United States v. Armstrong*, 517 U.S. 456, 468 (1996). Specifically, the defendant bears the burden to "demonstrate that (1) other similarly situated individuals have not been prosecuted and (2) his prosecution was based on an impermissible motive." *United States v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007) The defendant must introduce "clear evidence" to overcome the presumption that a prosecutor has acted lawfully, and any such evidence is viewed "in the light most favorable to the Government." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999); *Armstrong*, 517 U.S. at 464.

---

be akin to arguing that the defendant filing a motion for acquittal is an "acknowledgment" of her guilt.

Here, the defendant fails to provide *any* evidence to meet this burden, either that the Government acted on an impermissible motive or that similarly situated individuals have not been prosecuted.[91] There is no allegation that the Government charged the defendant based on "gender, race or denial of a constitutional right." *Palmer*, 3 F.3d at 305. Instead, the defendant's claim rests on her longstanding fixation with an individual prosecutor at the United States Attorney's Office (which neither tried this case nor made the charging decision[92]) and his imagined personal vendetta against her. This case was not brought because of the defendant's "political affiliation" – the Public Integrity Section routinely brings cases against corrupt public officials of both parties. This case was brought because the defendant perpetrated a serious fraud scheme, something that was found unanimously by a jury beyond a reasonable doubt. Had the defendant made a vindictive or selective prosecution motion, it would have rightly been denied.

6. *The defendant was not prejudiced by trial counsel's decision not to file a motion to suppress evidence lawfully seized pursuant to a valid search warrant.*

Finally, the defendant argues that counsel was ineffective because he failed to move to suppress evidence seized pursuant to search warrant executed at the defendant's residence at 6205 Red Pine Court. The defendant does not appear to argue that the warrant itself was unlawful; instead, she claims that agents improperly seized documents related to A Bright Present Foundation that were subsequently introduced at trial.[93] However, the defendant

---

[91] Here, a "similarly situated" individual would be someone who defrauded charitable donors out of tens of thousands of dollars for her personal gain.

[92] The defendant notes that the AO-257 form accompanying the July indictment lists "Name of Asst U.S. Attorney" as "S.MYHRE – ALEXANDER GOTTFRIED." This was a purely clerical/administrative designation to enable the Public Integrity Section to reserve grand jury time in the District of Nevada; neither Mr. Myhre nor any other AUSA played a substantive role in the investigation or prosecution of the defendant after January 2024.

[93] GX 45 (ABPF documents found during search warrant)

was not prejudiced by counsel failing to file a motion to suppress[94] because (a) the ABPF documents were properly seized pursuant to the search warrant; and (b) even if suppressed, there was more than sufficient independent evidence of the defendant's fraudulent solicitations introduced at trial such that suppression of the ABPF documents would not have changed the outcome of the trial.

The search warrant against Fiore's residence detailed an intricate wire fraud and money laundering scheme involving the theft of political contributions made to Fiore's campaign and PAC over a period of several years, as well as Fiore's use of conduit entities to conceal or disguise the fraudulent nature of the scheme's proceeds.[95] As argued at trial, this scheme was separate from the charity fraud scheme charged in the indictment, but it involved overlapping entities and evidence. For instance, both schemes involved the fraudulent use of Future for Nevadas to raise money from donors, and both schemes involved the use of the same conduit entities to launder the proceeds of Fiore's frauds. As referenced in the search warrant affidavit, A Bright Present Foundation was one of the entities that Fiore used to move funds around, along with her for-profit companies Truth in Politics and Politically off the Wall.[96]

As such, the seizure of the ABPF binder was authorized by the search warrant, which permitted the seizure of, among other things, "all documents relating to the scheme to defraud as set forth in the affidavit," "all documents related to any financial transaction

---

[94] It is also likely that defense counsel made a strategic choice not to file a motion to suppress because he wanted to argue that the execution of the search warrant (which he called a "raid") demonstrated the FBI's bias and "sloppiness." This was an argument that he made the centerpiece of his defense.. Indeed, the defense called multiple FBI witnesses to the stand in an attempt to illustrate this point. If the Government did not present evidence seized from the search warrant, the defense likely would not have been permitted to make these arguments to this extent.

[95] Defense Exhibit W (Search Warrant Affidavit) p16

[96] *Id.* at 29-31

arising from the scheme to defraud," and "all documents related to the proceeds of the scheme to defraud[.]" As agents were aware at the time of the execution of the search warrant, ABPF was involved in self-dealing financial transactions with Fiore's other organizations, including her campaign, PAC, and for-profit companies. While agents may not have yet been aware that ABPF was itself a vehicle for another fraud scheme, it was certainly relevant to the investigation of the original fraud scheme as they sought to understand the nature and purpose of those self-dealing transactions. The seizure was permitted under the search warrant.

Even if the defendant had successfully moved to suppress the ABPF binder, the pertinent evidence that was found in the binder was also provided by other sources. The business records found in the binder were separately provided and authenticated by the Nevada Secretary of State.[97] ABPF bank records were separately provided and authenticated by the Bank of Nevada.[98] Multiple witnesses testified to receiving a version of the solicitation letter found in the binder.[99] And while the letter was important evidence, it was but one of several false written solicitations related to the Alyn Beck statue introduced at trial, including the flyer admitted through Harry Mohney and the e-mail from Fiore to Local 872 using language virtually identical to what was in the letter.[100] Between these written solicitations and the testimony of each of the charged victims about Fiore's oral solicitations, there was overwhelming evidence that Fiore made false promises about the Beck statue independent of the letter recovered in the search warrant. It is pure hyperbole to suggest, as the defendant does, that "[th]e *only* way the Government was able to garner *any* verdict against Ms. Fiore

---

[97] *See* ECF 60, at 63 (Direct examination of Shauna Bakkedahl).
[98] GX 1
[99] *See* ECF 87, at 248 (Direct examination of Elizabeth Stavola); ECF 60, at 12-14 (Direct examination of Jay Brown).
[100] GX 65; GX 64.

was based on the illegally seized binder." Binder or no binder, the result would have been the same: guilty on all charges.

## Conclusion

For the foregoing reasons, the Court should deny the defendant's motion for a new trial.

DATED this 14th day of February.

Respectfully submitted,

JOHN D. KELLER
Acting Chief, Public Integrity Section
U.S. Department of Justice

_/s/_____

Alexander Gottfried and Dahoud Askar
Trial Attorneys