# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

United States of America,

    Plaintiff

v.

Michele Fiore,

    Defendant

Case No.: 2:24-cr-00155-JAD-DJA

**Order Denying Motions for Acquittal and New Trial**

[ECF Nos. 96, 97, 99]

*\*\*sealed information redacted\*\**

Former Las Vegas Councilwoman Michele Fiore was found guilty of fleecing donors out of tens of thousands of dollars that she told them would be used for a memorial statue of a fallen police officer whose senseless killing had impacted the local community. During the eight-day trial, the jury heard from a veritable who's who of Nevada business and politics, who wrote checks to Fiore's charitable organization or her political action committee in reliance on her promise that 100% of the donations would be used to fund the statue. But the evidence showed that a development company paid for the statue, and not a dime of the money that Fiore raised was used for that purpose. Instead, each check was quickly converted to cash and spent on Fiore's personal expenses like rent, cosmetic procedures, and her daughter's wedding.

With her sentencing on six counts of wire fraud and one count of conspiracy to commit wire fraud looming, Fiore moves for acquittal, contending that there was insufficient evidence to convict her. But the law gives great deference to jury verdicts, so the standard for setting one aside for insufficient evidence is high: the court must find that the evidence, when viewed in the light most favorable to the prosecution, could not have supported the verdict for any rational juror. And the ample evidence of Fiore's fraud scheme prevents her from meeting that burden. Fiore separately moves for a new trial, arguing that her right to present witnesses in her defense

was violated, court errors concerning jury instructions and the admission of evidence deprived her of a fair trial, and her trial counsel provided constitutionally deficient representation. The trial judge may vacate a judgment of conviction and retry the case with a new jury if the interests of justice so require. But Fiore has not shown that these circumstances were erroneous—let alone of the caliber that merits a new trial. So I deny the motions.

### Background[1]

In July 2024, a grand jury indicted Fiore on four wire-fraud counts and one count of conspiracy to commit that fraud with a co-conspirator identified only as "Person A."[2] The government soon filed a superseding indictment, adding two more wire-fraud charges.[3] Fiore invoked her right to a speedy trial, and a jury was empaneled on September 24, 2024, just 70 days after she was first indicted.[4]

**A.    After Fiore suggests commissioning a statue of Alyn Beck in 2018, a private developer agrees to pay the full cost of the statue.**

The government's case against Fiore revolved around her scheme to capitalize on a community tragedy. On June 8, 2014, Las Vegas Metropolitan Police officers Alyn Beck and Igor Soldo were gunned down while they were on their lunch break in Northeast Las Vegas. Beck and his family lived in Las Vegas's Ward 6, and Steven Ross was that ward's

---

[1] The facts in this section are a summary of the evidence introduced at trial that is relevant to Fiore's motions for acquittal or a new trial. Though I do not include a summary of every witness who testified or every argument by counsel, I reviewed and considered the entire record when analyzing Fiore's arguments here.

[2] ECF No. 1.

[3] ECF No. 19.

[4] *See* ECF Nos. 53, 83.

councilperson at the time of the shooting.  Beck's widow Nicole[5] testified at trial that she and Ross worked together to rename a nearby future park after her late husband.[6]

In 2017, Michele Fiore was elected to the Ward 6 seat, replacing Ross as its councilperson.[7]  Nicole recalled meeting Fiore at the December 2018 groundbreaking of the Alyn Beck Memorial Park, during which Fiore spoke and shared an idea that she came up with "that morning" to commission a statue of Beck and add it to the park.[8]  Nicole testified that Fiore never discussed that idea with her before announcing it and that she never talked to Fiore directly about the statue after that.[9]  But Nicole did communicate with Olympia Companies, the developer that was building the park.  At one point, Olympia reached out to Nicole for photos of her husband to give the sculptor, Brian Hanlon.[10]  Olympia and Hanlon sought Nicole's input on Hanlon's initial sketch of the statue—Fiore was not involved in that call.[11]  Nicole testified that she was unaware that Fiore was purportedly raising money for her late husband's statue.[12]

Sculptor Hanlon testified that he was hired by Olympia in the summer of 2019 to create the Beck statue.[13]  He discussed details about when the statue would be ready for installation with members of Fiore's staff and had a meeting with Fiore in January 2020, but that was the

---

[5] Because Alyn and Nicole Beck share the same last name, I refer to Ms. Beck as Nicole throughout this order.  No disrespect is intended by doing so.

[6] ECF No. 87 at 44:12–45:17.

[7] ECF No. 43 at 2.

[8] ECF No. 87 at 48:11–49:16.

[9] *Id.* at 56:9–15; 58:15–22; 64:19–23.

[10] *Id.* at 56:19–57:14.

[11] *Id.* at 58:10–14.

[12] *Id.* at 65:4–15.

[13] *Id.* at 75:7–76:25.

1  extent of his interaction with Fiore concerning the Beck statue.[14]  Hanlon testified that he was

2  paid a total of approximately $90,000 for the statue, the dedication plaques that were placed at

3  the park, and his travel to and from Las Vegas.[15]  Olympia's Vice President Chris Armstrong

4  testified that Olympia paid for the statue and that the contract memorializing that agreement was

5  signed in August 2019.[16]  Although at one point Olympia and the City of Las Vegas had

6  discussed splitting the cost between them, sometime between the fall of 2019 and February 2020,

7  Armstrong informed the City that Olympia would donate the full cost "as a gesture," and Fiore

8  was part of those conversations.[17]  Hanlon testified that he had also made a statue of Officer

9  Soldo, which was paid for by the City of Las Vegas, but that piece had not yet been unveiled at

10  the time of trial.[18]

11

12  **B.    Despite Olympia's promise to pay for the Beck statue, Fiore solicits donations for it between July 2019 and February 2020.**

13          The government questioned 11 witnesses who testified that they made donations to

14  Fiore's political action committee (PAC) or charity based on representations that those funds

15  would be used to pay for the Beck statue.  Five of those witnesses testified to the donations that

16  formed the basis of the six wire-fraud counts charged in the superseding indictment.

17

18

19

20
_____

21  [14] *Id.* at 80:10–84:10.

    [15] *Id.* at 95:18–24.

22  [16] ECF No. 90 at 55:11–17.

23  [17] *Id.* at 56:16–57:21.

    [18] ECF No. 87 at 85:21–86:8.

*1.*    ***Count 2: the Lombardo campaign's $5,000 donation to Fiore's PAC on July 16, 2019***[19]

Joseph Lombardo is now the Governor of Nevada, but in 2019 he was the Clark County Sheriff. Lombardo testified that, in July 2019, he donated $5,000 from his Lombardo for Sheriff political campaign to Fiore's PAC, "Future for Nevadans" (FFN).[20] The check's memo line indicates that it was for the "Alyn Beck statue."[21] Lombardo testified that Fiore asked him for the donation.[22] He recalled that she told him that "she was proactively raising money for the statues of both Igor and Alyn and . . . was asking for a donation for the statues."[23] He couldn't recall how that conversation came about, but he was certain that Fiore spoke to him about donating.[24] Lombardo also testified that he would not have donated to Fiore had he believed that the money would be used to finance her political career or personal expenses.[25]

*2.*    ***Count 3: Elizabeth Stavola's $5,000 donation to Fiore's charity on October 28, 2019***

Elizabeth Stavola testified that she gave $5,000 to Fiore's charitable entity, "A Bright Present Foundation" (ABPF), in October 2019.[26] She recalled that she had "received a flyer and a call" from Fiore soliciting the donation, but she no longer had a copy of the flyer and didn't

---

[19] The government charged Fiore with conspiracy in count 1 of the superseding indictment. Counts 2–7 each allege a separate wire-fraud charge. *See* ECF No. 19.

[20] ECF No. 90 at 13:1–14:15; Gov't Ex. 62 (Lombardo's check to FFN).

[21] ECF No. 90 at 14:20–23; Gov't Ex. 62 (cleaned up).

[22] ECF No. 90 at 14:24–15:1.

[23] *Id.* at 15:4–6.

[24] *Id.* at 15:6–14.

[25] *Id.* at 15:19–24.

[26] ECF No. 87 at 247:11–22; Gov't Ex. 42 (Stavola's check to ABPF).

recall how she received it.[27]  The government showed her a letter on ABPF letterhead seeking

donations for the statue and promising that "100% of all contributions" would be used for the

statue and memorial parks.[28]  The letter was signed by Fiore and identified Sheena Siegel,

Fiore's daughter, as an officer of ABPF.[29]  Stavola recognized that letter as the flyer she

received.[30]  On cross-examination, defense counsel tried to sow doubt about whether Stavola

actually received the letter, implying instead that the FBI showed it to her when she was

interviewed as part of this investigation and that their questioning gave her a false memory of

receiving it.[31]  Stavola steadfastly insisted that she remembered receiving the letter.[32]  Testimony

from FBI agent Douglas Smith established that the letter the prosecution showed Stavola had

been found in a binder seized during a search of Fiore's home.[33]  No witnesses were able to give

the FBI their copy of the letter.

### 3.    Count 4: Jay Brown's $26,700 donation to Fiore's charity on December 3, 2019

Local lawyer Jay Brown testified that Fiore approached him about donating to the Beck

statue in late 2019.[34]  He tendered $26,700 dollars in three checks to ABPF in December 2019.[35]

In February 2020, Fiore wrote checks to Brown totaling $16,700 from the ABPF account, so

---

[27] ECF No. 87 at 248:2–250:2.

[28] Gov't Ex. 45A.

[29] *Id.*

[30] ECF No 87 at 249:13–250:2.

[31] *Id.* at 255:1–257:18.

[32] *Id.* at 255:10–21, 256:4–9.

[33] *Id.* at 165:5–17.

[34] ECF No. 60 at 14:13–18.

[35] *Id.* at 17:22–18:25; Gov't Ex. 46 (Brown's checks to ABPF).

Fiore ultimately retained just $10,000 of his donation.[36]  Brown also testified to receiving the ABPF donation-solicitation letter; indeed, the version found in Fiore's home was addressed to "Jay."[37]

Brown testified that he also solicited donations for the statue.  The government questioned him about an email he sent to attorney Robert Groesbeck in which he wrote that "Sheriff Lombardo and Councilwoman Fiore are looking to raise $80,000 to honor Alyn Beck."[38]  Some of the language in Brown's email was identical to verbiage contained in the ABPF letter.[39]  Brown testified that Lombardo didn't ask him to help raise money; instead it was likely that Fiore had.[40]

### 4. Count 5: Peter Palivos's $2,500 donation to Fiore's charity on January 21, 2020

Attorney Peter Palivos testified that he donated $2,500 to ABPF[41] based on a conversation with Fiore, in which she said that "she was doing a memorial for a fallen police officer . . . and she asked [him] if [he] would contribute to that cause."[42]  He averred that he wouldn't have donated to Fiore or her charity had he believed that the money would go to another purpose.[43]  On cross-examination, Palivos testified that he couldn't recall exactly where

---

[36] ECF No. 60 at 27:7–29:3; Govt. Ex. 41. The ABPF checks to Brown don't indicate whether they were meant to be a return of his donation or a payment for some other purpose.

[37] ECF No. 60 at 12:10–13:7.

[38] Gov't Ex. 50.

[39] *Compare* Gov't Ex. 50 *with* Gov't Ex. 45A; ECF No. 60 at 25:13–26:4.

[40] ECF No. 60 at 24:18–25.

[41] Gov't Ex. 47 (Palivos's check to ABPF).

[42] ECF No. 90 at 43:20–22.

[43] *Id.* at 43:25–44:8.

1  or when his conversation with Fiore occurred and that he didn't receive a flyer soliciting

2  donations for the statue.[44]

3

4       ***5.***      ***Counts 6 and 7: Laborers Local 872 and L.E.C.E.T.'s $10,000 donation to Fiore's PAC in February 2020***

5       Thomas White testified that he donated to Fiore's PAC in his capacity as business

6  manager and secretary-treasurer of Laborers Local 872 (a labor union) and Southern Nevada

7  L.E.C.E.T. (a "labor management cooperation fund" used to "promote organized labor").[45]

8  White received an email on February 3, 2020, from the email address michelefiore@me.com,

9  seeking donations for the Beck statue.[46]  That email informed White that Fiore was "raising

10  $80,000 to be utilized for Officer Beck's life-sized statue" and that Fiore would later raise

11  another $80,000 for a future statue of Officer Soldo.[47]  Using language almost identical to the

12  solicitation letter that Stavola received, the email informed White that "100% of all contributions

13  [would be] used for this charitable event."[48]  White testified that he wrote two checks for $5,000

14  each to FFN—one from Local 872 and one from L.E.C.E.T.—to help fund the statue.[49]  The

15  memo line on the Local 872 check stated that the money was for the "Alyn Beck Statue"; the

16  L.E.C.E.T. check's memo line said only "sponsorship."[50]  Regardless, White testified that he

17  wrote both checks based on the email he got from Fiore.[51]

18

---

19  [44] *Id.* at 45:20–46:13.

  [45] ECF No. 60 at 194:20–195:16.

20  [46] Gov't Ex. 64 (Fiore's email to White).

21  [47] ECF No. 60 at 197:24–198:6; Gov't Ex. 64.

  [48] ECF No. 60 at 198:9–10; Gov't Ex. 64.

22  [49] ECF No. 60 at 198:17–199:4; Gov't Ex. 63 (White's checks to FFN).

23  [50] *See* Gov't Ex. 63.

  [51] ECF No. 60 at 200:17–19, 201:8–10.

### 6.    *The government questions six other witnesses about similar donations.*

The government presented the testimony of six other witnesses who were also induced to donate to Fiore for the purpose of building the Beck statue as evidence of Fiore's modus operandi and intent to defraud.[52]  Between November 2019 and January 2020, those witnesses wrote checks to ABPF or FFN:

- Attorney David Chesnoff donated $5,000 to ABPF in December 2019;[53]

- Attorney and businessman Robert Groesbeck donated $5,000 to ABPF in December 2019;[54]

- Robert Richardson, CEO of a private ambulance service in Southern Nevada, donated $2,500 to ABPF in January 2020;[55]

- Tami Montes donated $2,500 to ABPF on behalf of The Siegel Group in December 2019;[56]

- Business owner Harry Mohney donated $2,000 to FFN in November 2019;[57] and

- Developer Brett Torino donated $2,500 to ABPF in December 2019.[58]

---

[52] This other-bad-acts evidence was the subject of pretrial motions in limine.  I restricted the government to presenting evidence of other acts that occurred between December 18, 2018, the date Fiore announced her idea for the Beck statue, and February 2020, when the scheme allegedly ended.  ECF No. 83 at 10–17.  Fiore does not challenge that determination in her acquittal or new-trial motion.  *See* ECF Nos. 96, 97.

[53] *See generally* ECF No. 87 at 263–70 (Chesnoff's testimony); Gov't Ex. 53 (check from Chesnoff's law firm to ABPF).

[54] *See generally* ECF No. 60 at 41–51 (Groesbeck's testimony); Gov't Ex. 51 (check from Groesbeck's company MM Development Company, Inc. to ABPF).

[55] *See generally* ECF No. 60 at 52–62 (Richardson's testimony); Gov't Ex. 56 (check from Richardson's company Community Ambulance to ABPF).

[56] *See generally* ECF No. 60 at 91–104 (Montes's testimony); Gov't Ex. 48 (check from The Siegel Group to ABPF).

[57] *See generally* ECF No. 88 at 7–20 (Mohney's testimony); Gov't Ex. 66 (check from Harry V. Mohney Revocable Trust to FFN).

[58] *See generally* ECF No. 88 at 22–28 (Torino's testimony); Gov't Ex. 52 (check from Torino's business BPS Management Services to ABPF).

1  Groesbeck and Richardson donated in response to solicitations by Jay Brown.[59]  Mohney

2  received a flyer seeking donations, payable to FFN, for a bronze statue of Alyn Beck and

3  donated because of that flyer.[60]  Chesnoff, Torino, and Montes did not say who solicited their

4  donations.

5  **C.**    **The government follows the money to show that none of the donated funds were spent on their intended purpose.**

6

7    *1.    Several witnesses testified about payments that Fiore made during the relevant time period.*

8        The government sought to show that Fiore spent this money that she received from her

9  donors exclusively on her personal expenses.  It introduced testimony from Peter Lee, the

10  property manager for the home that Fiore rented, to show that she paid $2,450 per month for

11  rent, usually via money order or check.[61]  A representative from a plastic-surgery business

12  authenticated records showing that Fiore paid some of her bills from the relevant time period in

13  cash.[62]  Alyssa Struck, a wedding planner who assisted with the wedding of Fiore's daughter

14  Savanah Kaime-Willis, authenticated records of cash payments for that wedding.[63]  George

15  Kaime, one of Fiore's ex-husbands, testified that the $10,500 he contributed to Savanah's

16  wedding was paid electronically and not in cash.[64]

17

18  [59] ECF No. 60 at 44–47, 56–57.

19  [60] *See* Gov't Ex. 65; ECF No. 88 at 11:21–13:23.

    [61] ECF No. 60 at 205–21 (Lee's testimony).

20  [62] ECF No. 88 at 29–34 (Alyssa Struck's testimony on behalf of Anson, Edwards, & Higgins, a plastic-surgery office); *see also* Gov't Ex. 85 (plastic-surgery company's payment records).

21  [63] ECF No. 60 at 223–29 (Cicely Hoffman's testimony on behalf of event venue Emerald at Queensridge); Gov't Ex. 82 (payment records for the Kaime-Willis wedding).

22

23  [64] ECF No. 60 at 230–36.  The defense called Fiore's other ex-husband Timothy Johnson, who also testified that he donated $5,000 in cash to the Kaime-Willis wedding.  ECF No. 91 at 28–32. The government established that the donations from Fiore's ex-husbands did not account for the cash payments that it contended Fiore made.  *See* Gov't Ex. 82 (showing a payment that matched

Two representatives from Alchemy Associates, a political-consulting and fundraising company, testified that Alchemy performed services for Fiore's PAC and political campaigns, but not for her charitable foundation.[65]  One of the Alchemy representatives, Tara Krumme, testified that part of her role was to "facilitate" Fiore's fundraising calls; she recalled that, on at least one occasion, Fiore made calls seeking donations for the Beck statue.[66]  Krumme testified that Alchemy helped Fiore prepare contribution-and-expense reports for her PAC and political campaigns and that Siegel would send Alchemy spreadsheets tracking those expenses to prepare for filing with the State of Nevada.[67]  Krumme also testified that some of Alchemy's bills to Fiore were paid by ABPF though it wasn't contracted to do work for that charitable organization.[68]

### 2.    The FBI's forensic accountant testifies that Fiore could not have covered her personal bills without using money from her charity and PAC accounts.

The FBI's forensic accountant Sandra Harris testified about the voluminous banking records for Fiore's charitable and PAC accounts as part of the government's comprehensive follow-the-money proof.  She testified that $77,000 was deposited into ABPF's bank account during the relevant time period.  Of that amount, $37,000 went to Siegel or her party-planning company Hamlet Events; $7,375 was paid to Alchemy Associates; around $5,000 paid for various constituent services; $16,7000 was refunded to Jay Brown; and the rest was cashed,

---

Johnson's testimony that he gave $5,000 in cash, which was separate from the $4,500 payment the government accused Fiore of making); ECF No. 60 at 234:8–18 (George Kaime's testimony, establishing that he donated via web payment, not cash).

[65] ECF No. 88 at 42:3–23.

[66] *Id.* at 63:1–64:23.

[67] *Id.* at 65–66.

[68] *Id.* at 69.

1    transferred to Fiore's other political and business accounts, or given to individuals not associated

2    with the Beck statue.[69]  Of the funds in Fiore's account tied to FFN from December 2018

3    through February 2020, $109,960 was paid to Siegel, $10,750 was paid to Hamlet Events, almost

4    $10,000 was given to Fiore's other daughter Savanah, and the rest was cashed or transferred to

5    Fiore's other bank accounts.[70]  In total, Siegel personally received $132,590 from Fiore's

6    political and charity accounts, and Siegel's company Hamlet Events received an additional

7    $34,550.[71]

8        Harris testified that Siegel immediately cashed most of the checks she received from FFN

9    and ABPF.[72]  Then—either the same or the next day—Siegel would pay for Fiore's personal

10   expenses in cash.  For example, Harris showed that Lombardo's $5,000 check to FFN was

11   deposited on July 16, 2019, and later that day a check for the same amount from FFN to Siegel

12   with the memo line "Back to School" was cashed.  On the same day, a money order was

13   purchased and used to pay Fiore's rent.[73]  Stavola's $5,000 check was deposited into ABPF the

14   day before a check signed with Fiore's name was written to Hamlet Events for $4,500 from the

15   ABPF account.  A few days later, $4,500 in cash was withdrawn from the Hamlet account, and

16   the following day a $4,500 cash payment was made to Savanah's wedding venue.[74]

---

[69] ECF No. 90 at 83:21–87:15; *see also* Gov't Ex. 103 (demonstrative exhibit summarizing voluminous banking records).

[70] ECF No. 90 at 88:11–89:1; Gov't Ex. 103 at 5.

[71] Gov't Ex. 103 at 11.  On a contribution-and-expense report for Future for Nevadans, Fiore listed $92,000 in payments to Hamlet Events, but that didn't cover the full number of payments to Siegel or her business.  ECF No. 90 at 104:5–24.

[72] ECF No. 90 at 89:2–14.

[73] Gov't Ex. 103 at 14; ECF No. 90 at 105:22–107:21.

[74] ECF No. 90 at 108:19–111:23.

Harris testified to several similar instances in which a donation was deposited into Fiore's charity or PAC account, only to be withdrawn in a check to Siegel and immediately cashed, shortly followed by a cash payment for a Fiore personal expense.[75]  Harris also confirmed that, for each cash payment or transfer to another account, Fiore didn't have enough money in any of her bank accounts to cover those expenses without dipping into the donated funds.[76]

During closing arguments, the prosecution relied on Harris's accounting to show that none of the money in Fiore's accounts was spent on the Beck statue or related events.[77]  The prosecution also argued that the forensic accounting showed that Fiore never intended to pay for the Beck statue with donated funds because those funds got spent almost as soon as they were received.[78]  And it maintained that the consistent and immediate movement of funds from Fiore's accounts to Siegel showed that Fiore and Siegel conspired to defraud donors in order to pay Fiore's personal bills.[79]

---

[75] *See generally id.* at 80–121.

[76] *See, e.g., id.* at 93:1–94:25 (Fiore couldn't cover bills from Alchemy Associates without tapping into her ABPF account); 107:25–108:18 (Fiore couldn't cover rent without using her FFN or ABPF account); 112:2–7 (Fiore couldn't give $4,500 to her daughter's wedding without using her FFN or ABPF account); 120:8–25 (Fiore couldn't repay Jay Brown without using donated funds from L.E.C.E.T. or Laborers Local 872); *see also* Gov't Ex. 103.

[77] *See generally* ECF No. 93 at 37–75, 128–39.

[78] *Id.*

[79] *Id.* at 65–66, 69–70.

**D.    The defense calls Fiore's daughter (and unindicted co-conspirator) Sheena Siegel in its case-in-chief, but cross-examination is cut short when Siegel invokes the Fifth Amendment.**

***1.    Siegel testifies as a defense witness about the charitable events that she helped Fiore organize.***

Despite Siegel being Fiore's alleged co-conspirator, the government didn't call Siegel in its case-in-chief.  Siegel was instead called as the defense's second witness.  On direct examination, Siegel testified to her roles working for Alchemy Associates, managing ABPF, and assisting with FFN.[80]  She averred that she created the binder of documents related to ABPF that was seized at Fiore's home in 2021 and had been introduced into evidence by the government.[81]  She explained that she was responsible for ensuring that the charity complied with the rules for 501(c)(3) organizations and that she kept information for how to do so in that binder.[82]  She also testified that she created the letter soliciting Beck-statue donations that the FBI found in her ABPF binder, but it was a "rough draft" and she didn't recall if that letter was actually sent to any donors.[83]

Siegel testified about her practice of using cash to pay for various charitable endeavors and noted that she would "save the receipts" of purchases she made for those endeavors and store them at Fiore's home.[84]  She claimed that she used cash because it was convenient and asserted that Fiore kept cash in her home to pay "her bills or any sort of personal things that she

---

[80] ECF No. 90 at 192:14–195:12.

[81] *Id.* at 197:4; Gov't Exs. 45, 58.

[82] ECF No. 90 at 200:13–24.

[83] *Id.* at 216:6–14.

[84] *Id.* at 210:11, 212:20–22.

needed."[85]  Siegel stated that she was always the one to pick up donor checks and deposit them into Fiore's accounts.[86]  Siegel asserted that she used the cash to buy gifts for constituents (blankets, backpacks, toys, etc.) and plan community events.[87]  And she confirmed the existence of several invoices from Hamlet Events charging Fiore's PAC for various expenses related to community events—though none of those invoices was issued or paid during the time period that the donor checks that formed the basis of Fiore's charges were written.[88]  She explained that she and Fiore ceased operating ABPF because COVID shifted the scope of their work and it was simpler to use Fiore's PAC.[89]  She also testified that she and Fiore shut down the charity after the FBI executed the search warrant on Fiore's home.[90]

### 2.    *Siegel's cross-examination is derailed after the government asks if she had just admitted to a federal crime.*

On cross-examination, the prosecution asked Siegel a series of questions intended to show that she was the recipient of large sums of money originating from Fiore's charity and PAC accounts.[91]  Siegel responded that she did receive checks from Fiore's accounts, but they never made it into her personal checking account because she would immediately cash those checks. The exchange that brought Siegel's testimony to an abrupt halt went like this:

> Prosecutor: Ma'am, is this a check written from Future of Nevadans, your mother's political action committee, to you personally for $1,500?

---

[85] *Id.* at 213:14–19, 223:21–25.

[86] *Id.* at 220:11–221:24.

[87] ECF No. 91 at 42–61.

[88] *Id.* at 83–86; Gov't Ex. 34 (containing invoices from June 2018 through September 2019).

[89] ECF No. 91 at 79:3–7.

[90] *Id.* at 79:7–8.

[91] *Id.* at 89–94.

Siegel: Yes.

Prosecutor: And there's no memo line on that check, is there?

Siegel: No.

Prosecutor: Is that your mother's signature on the bottom right?

Siegel: It could have been hers.  It could have been mine.

Prosecutor: You said that could have been yours?

Siegel: Yes.

Prosecutor: So you might have written that check to yourself from your mother's PAC account?

Siegel: Correct.

Prosecutor: Is that legal?

Siegel: No.

Prosecutor:  Can you please go to the next—sorry.  Are you—are you admitting to a federal crime here in court today?

Defense counsel:  Objection, Your Honor.
. . .
Prosecutor: I think it's a relevant question.[92]

### 3.    *The court appoints counsel for Siegel after it appears that she admitted to forging her mother's signature on checks, and the parties reveal for the first time that Siegel has an immunity agreement.*

Concerned that Siegel may have just incriminated herself, I called counsel to sidebar and asked whether she needed a lawyer.[93]  I was then informed, for the first time, that Siegel already had a lawyer who had represented her during FBI interviews and her grand-jury testimony in this

---

[92] *Id.* at 94:1–24.

[93] *Id.* at 95:2.

16

case, but he was out of the district during her trial testimony.[94]  So I appointed a lawyer for Siegel to ensure that her right against further self-incrimination would be protected.[95]

When asked what the government intended to ask Siegel next, the government expressed its intention to impeach her with grand-jury testimony in which "she testified that her mother was the only person who could write checks from the PAC, that she could not write checks from the PAC, and that she never made any expenses without authorization because that would be 'insane.'"[96]  The prosecutor also assured the court that it was "never [his] intention to elicit incriminating testimony" from Siegel because he expected that her "answer would be consistent with her previous sworn testimony, which is that all the money that she received was from her mother and her mother was the sole signatory on that account . . . ."[97]

While the court was preparing to call Siegel back to the stand for that questioning, her newly appointed counsel sought "one clarification . . . in order to provide full advice to Ms. Siegel."[98]  He asked whether "the immunization deal that she had previously signed would still be in effect for any questions that were not about the checks and the PAC.  Because if the immunization deal is in jeopardy and she can be facing charges as a co-conspirator, then any questions that the prosecutor may ask would incriminate her as a co-conspirator."[99]

This was the first time that anyone told the court that Siegel had an immunity agreement related to this case.  The prosecutor asserted that he needed to discuss with his superiors whether Siegel's immunity deal was still intact in light of her conflicting testimony, so I paused the

---

[94] *Id.* at 95:3–11; 97:19–98:2.

[95] *Id.* at 98:4–10.

[96] *Id.* at 112:5–9 (quoting ECF No. 99-2 at 27:7 (Siegel's sealed grand-jury testimony)).

[97] *Id.* at 112:21–113:1.

[98] *Id.* at 114:7–8.

[99] *Id.* at 114:7–14.

proceedings for the government to have that discussion and inform Siegel's appointed counsel of the answer.[100]  When the proceedings resumed all parties said they were ready to proceed and, outside of the presence of the jury, Siegel confirmed that she had been able to consult with her appointed lawyer about her Fifth Amendment right and was comfortable proceeding with her testimony.[101]  So the jury was called back in, and the government resumed its cross-examination.

But at the first question: "[D]id you have authorization to write checks from your mother's political action committee, Future for Nevadans?," Siegel pled the Fifth.[102]  She asserted her right against self-incrimination in response to two more questions, then the prosecutor asked if it was her "intention to plead the Fifth in response to any question [he] might ask [her]," to which she responded "yes."[103]  After a few more questions, to which Siegel unremittingly invoked her right against self-incrimination, questioning turned back to defense for re-direct.  Fiore's trial counsel then asked Siegel, "are you going to be pleading the Fifth completely through this whole thing?"[104]  Siegel asked to speak to her counsel, and the government asked for a sidebar.

### 4.    The government moves to strike Siegel's testimony, and the defendant moves for a mistrial.

Noting that this was "uncharted territory," the government asked that Siegel's testimony on direct be struck because it would be "patently unfair" for her to answer all of the defense's

---

[100] *Id.* at 114:16–25.

[101] *Id.* at 116:9–117:8.

[102] *Id.* at 119:13–17.

[103] *Id.* at 119:20–120:4.

[104] *Id.* at 120:20–21.

extensive questions but not the government's.[105]  The defense volleyed with its own motion for a mistrial, arguing that Siegel's invocation of the Fifth Amendment "basically inferr[ed] to this jury . . . that somehow Michele Fiore is guilty of something."[106]  Fiore's trial counsel also contended that the government's federal-crime question was "highly improper" and caused the court to appoint counsel and Siegel to plead the Fifth.[107]  He asserted that the prosecutor should have warned that he was preparing to ask questions that could implicate a witness so the court could resolve any issues outside the presence of the jury, but he failed to do so.[108]  Defense counsel also argued that Siegel "was actually the government's main witness" and that he "anticipated they were going to call her."[109]  When they didn't, he chose to do so instead, but was "equally as unprepared" to deal with the potential of her inconsistent testimony.[110]

The government responded that its question was the product of surprise, as it expected Siegel to repeat her grand-jury testimony establishing that Fiore was in sole control of her PAC and charity checkbooks.[111]  It also pointed out that Siegel was Fiore's own witness, not the government's, noting that she was on the government's witness list only in anticipation of having to call her as a rebuttal witness if Fiore testified.[112]  I denied the defense's motion for a mistrial, reasoning that "the way the government has characterized the way that this came down is

---

[105] *Id.* at 121:15–25 (cleaned up).

[106] *Id.* at 122:8–17.

[107] *Id.* at 122:18–22.

[108] *Id.* at 123:4–13.

[109] *Id.* at 126:5–7.

[110] *Id.* at 126:9–14.

[111] *Id.* at 124:4–10.

[112] *Id.* at 129:2–4.

1  accurate, that it was a surprise response or surprising in that it was inconsistent with her prior

2  testimony to the grand jury."[113]  And I took the government's motion to strike under advisement.

3

4  ### 5.    Siegel is called back to the stand so the court can determine whether her blanket invocation of her right against self-incrimination was proper.

5  When trial resumed the next day, I called Siegel back to determine whether there was any

6  possibility of rehabilitating her testimony and, if there wasn't, to determine whether she had

7  properly invoked her Fifth Amendment right.  Neither party sought this extra colloquy: the

8  government maintained that Siegel's invocation was proper because her immunity agreement

9  became "null and void" after the government determined that she "committed perjury either in

10  this court or in the grand jury," because her agreement was "conditional on her full cooperation

11  and her truthful" testimony.[114]  Because the agreement was null and void, the government

12  contended, it was proper for Siegel to invoke her right against self-incrimination because she was

13  a co-conspirator in the crimes that the government would be questioning her about, and she no

14  longer had the benefit of an immunity agreement to insulate her exposure to criminal liability for

15  those crimes.[115]  Defense counsel agreed that further questioning wasn't necessary and that

16  Siegel appeared to be properly advised of her rights.[116]

17  But out of an abundance of caution, I directed the government to ask Siegel the questions

18  it had planned to ask during cross-examination to determine if she would plead the Fifth to every

19  topic it anticipated asking Siegel about.  Those categories included:

20  • Transfers from bank accounts connected to Fiore's PAC, businesses, and personal
     funds;

21

22  [113] *Id.* at 125:13–17.

   [114] *Id.* at 154:7–20.

23  [115] *Id.* at 154:21–25.

   [116] *Id.* at 156:4–13.

- Siegel's involvement in preparing campaign-finance reports;

- The use of Siegel's entity Hamlet Events to evade campaign-finance laws;

- Whether Siegel used funds from Fiore's PAC and charity accounts for Fiore's personal expenses;

- The source of funds related to the community events that Siegel testified about on direct examination;

- Funds, expenditures, and ledgers related to ABPF, as well as the solicitation of donations to that entity for the Alyn Beck statue; and

- Siegel's grand-jury testimony in this case.[117]

To each topic, Siegel unfailingly pled the Fifth, and her counsel represented that each invocation was based on Siegel's good-faith belief that, because the prosecution had revoked her immunity agreement, she could be charged with wire fraud and campaign-finance violations if she answered the questions.[118] At no point did any party request that the court make a finding about Siegel's breach of the immunity agreement or the proper remedy for that breach.

### 6. *Finding that Siegel's blanket invocation was proper, the court strikes her testimony because no other remedy would cure the government's inability to cross-examine her.*

When the methodical inquiry into Siegel's invocation concluded, the government renewed its motion to strike, contending that it was deprived of the opportunity to test the witness's bias and the truthfulness of her direct testimony because she pled the Fifth about "five minutes into what . . . likely would have been a cross that lasted several hours."[119] Without meaningful cross-examination, the government argued, Siegel's testimony on direct couldn't

---

[117] ECF No. 92 at 55:15–56:1.

[118] *Id.* at 34:23–50:15.

[119] *Id.* at 52:13–53:2, 6:1–2.

stand.[120]  Fiore's defense counsel responded that the government had a "duty" to make the court

aware of Siegel's immunity agreement and the potential that she may wander into off-limits

territory during questioning.[121]  He also took issue with the way the government's questioning

went down.  As he characterized the exchange, rather than simply impeaching Siegel with her

inconsistent testimony, the government asked an inflammatory question that prompted Siegel's

invocation.[122]  Defense counsel opposed striking Siegel's testimony because the government

"created this mess" and it would be fundamentally unfair to "reward" the prosecutors for doing

so.[123]  The government maintained that Siegel was a defense witness who the government didn't

call or have a duty to protect, and it noted that Fiore's counsel had access to Siegel's immunity

agreement through discovery and was thus aware of it.[124]  Neither side nor Siegel's counsel

suggested any alternative remedy that could have preserved Siegel's testimony.

I ultimately granted the government's motion to strike, finding that Siegel had refused to

testify to non-collateral matters and that, without meaningful cross-examination, her testimony

on direct could not be deemed reliable.[125]  I also made the finding that Siegel's blanket

invocation was proper because she had a good-faith basis to believe that her answers to any of

the questions that the government asked could be used as the basis for wire-fraud and conspiracy

---

[120] *Id.* at 52:16–21, 6:11–22; *see also* ECF No. 65 (government's mid-trial motion to strike Siegel's testimony).

[121] ECF No. 92 at 8:2–21.

[122] *Id.* at 9:1–10:19.

[123] *Id.* at 9:19, 10:20–24, 53:6–9.

[124] *Id.* at 11:3–12:6.

[125] *Id.* at 53:17–57:16 (citing *Denham v. Deeds*, 954 F.2d 1501, 1502 (9th Cir. 1992); *United States v. Seifert*, 648 F.2d 557, 562 (9th Cir. 1980); *United States v. Vavages*, 151 F.3d 1185, 1192 (9th Cir. 1998)).

1  charges.[126]  So Siegel was excused, and the jury was instructed to disregard the entirety of her

2  testimony.[127]

3

**E.**     **With Siegel's testimony stricken, the defense theory centers on the FBI's sloppy investigation.**

5      Fiore presented several other witnesses in her defense case.  She called FBI agent Cody

6  Fryxell to testify about the investigation into her and the evidence that the agents collected (and

7  didn't collect) at the scene.[128]  Fiore's counsel pursued a similar theme when cross-examining

8  the government's FBI witness Douglas Smith, scrutinizing the FBI's collection of receipts in the

9  home and how they chose the items to photograph and seize during their search.[129]  And he

10 elicited testimony indicating that the search warrant authorizing the search sought evidence of

11 wire fraud and money laundering, but at the time they weren't specifically looking for evidence

12 related to criminal activity concerning donations for the Alyn Beck statue.[130]  He further

13 attempted to undermine the FBI's follow-the-money proof by eliciting testimony that forensic

14 accountant Harris didn't closely analyze any receipts or invoices found in Fiore's home and

15 didn't know if Fiore had unaccounted-for cash in her home that may have been used to pay for

16 various expenses.[131]

17  _____

[126] *Id.*

[127] *Id.* at 91:10–16.

[128] *See generally* ECF No. 91 at 132–90.

[129] ECF No. 87 at 171–222, 232–37.

[130] *Id.* at 232–36.

[131] ECF No. 90 at 131–42.  On redirect, Harris testified that she did review the receipts seized from Fiore's home and that none of those receipts showed that Fiore paid for the Alyn Beck statue.  *Id.* at 138:1–15.  Fiore also introduced testimony showing that some of the money in th ABPF account paid for spa treatments for a constituent who was battling cancer.  ECF No. 91 at 24–26.  Fiore's ex-husband also testified that he made some of the payments for Fiore's daughter's wedding.  *Id.* at 29–30.

During closing arguments, Fiore's trial counsel asked the jury to probe the FBI's actions in this case and also to consider the evidence that was not collected or presented during the government's case.[132]  He argued that the government "failed to do a complete and unbiased investigation" of the defendant,[133] suggesting that the government didn't collect "results of the crime" from Fiore's house, like "purchases" showing that Fiore spent donor money on lavish items.[134]  He also lambasted the government's failure to introduce receipts of Fiore's cash transactions, arguing that the government's case didn't definitively trace the cash that was taken out of Fiore's accounts.[135]

Fiore's trial counsel also questioned whether the letter that the government relied on to show that Fiore solicited these donations was actually circulated to anyone, since the only copy the government introduced was found in a binder taken from Fiore's home.[136]  He suggested that the witnesses who testified to receiving a letter were merely victims of suggestibility and false memory because the government later showed it to them during FBI interviews.[137]  And he criticized the government's failure to introduce a handwriting expert to testify that the signature shown on several letters and checks in this case actually belonged to Fiore.[138]

---

[132] ECF No. 93 at 76–127.

[133] *Id.* at 82:18–19.

[134] *Id.* at 84:4–5.

[135] *Id.* at 93:17–94:3.

[136] *Id.* at 89:10–90:10.

[137] *Id.* at 90:11–20, 91:5–92:19.

[138] *Id.* at 90:21–91:4.

**F.     Convicted on all counts, Fiore now moves for acquittal or a new trial.**

After about two hours of deliberation, the jury convicted Fiore on all counts.[139]  She now moves for acquittal, arguing that the government did not present sufficient evidence to convict her of any charge.[140]  And she alternatively moves for a new trial, contending that the court erred by striking Siegel's testimony and making other evidentiary decisions that affected her defense, that the jury instruction on conspiracy was deficient, and that her trial counsel was constitutionally ineffective.[141]  The court heard oral argument on both motions on March 10, 2025.[142]

## Discussion

**A.     Fiore's conviction on each count is supported by sufficient evidence, so her motion for acquittal is denied.**

Federal Rule of Criminal Procedure 29 permits a court to overturn a jury's guilty verdict if "the evidence is insufficient to sustain a conviction."[143]  In reviewing the sufficiency of evidence at trial, courts must "view the evidence in the light most favorable to the prosecution" and ask only "whether any rational trier of fact could have found the defendant guilty of each element of the crime beyond a reasonable doubt."[144]  "The hurdle to overturn" a jury verdict on

---

[139] *Id.* at 148–49; ECF No. 73.

[140] ECF No. 96.

[141] Fiore's publicly available motion redacts some information contained in the FBI's investigative documents that were not introduced at trial.  ECF No. 97.  The unredacted version is filed under seal at ECF No. 99.  I cite to both interchangeably.

[142] ECF No. 115 (minutes of oral-argument proceedings).

[143] Fed. R. Crim. P. 29(a).

[144] *United States v. Heller*, 551 F.3d 1108, 1113 (9th Cir. 2009) (cleaned up).

an insufficient-evidence challenge "is high."[145]  "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."[146]

### 1.    Sufficient evidence supports the jury's verdict on all six wire-fraud counts.

To prove wire fraud under 18 U.S.C. § 1343, the government must show beyond a reasonable doubt that (1) "the defendant knowingly participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises;" (2) "the statements or representations . . . were material;" (3) "the defendant acted with the intent to defraud, that is, the intent to deceive and cheat;" and (4) "the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme."[147]  Fiore contends that the government didn't meet its burden to show that her use of the wires was "in furtherance of" the alleged scheme as a matter of law, that the evidence presented on four of the counts wasn't sufficient to show that she had a specific intent to defraud at the time the donors wrote their checks, and that three of the counts weren't sufficiently connected to her representations about the Beck statue to support a conviction.[148]

### a.    Fiore's use of the wires was a necessary step to perpetuate her scheme.

Fiore first argues that the government didn't sufficiently show that she used an interstate wire communication to perpetuate her scheme.[149]  "The federal [wire] fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the [wires] is a

---

[145] *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

[146] *United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995), *cert. denied*, 517 U.S. 1157 (1996).

[147] ECF No. 70 at 4 (jury instruction #4).

[148] ECF No. 96.

[149] *Id.* at 5–8.

part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law."[150]  "A wire communication is in furtherance of a fraudulent scheme if it is incident to the execution of the scheme, meaning that it need not be an essential element of the scheme, just a step in the plot."[151]  To determine whether the wire-communication element has been met, "the relevant question at all times is whether a wire is part of the execution of the scheme as conceived by the perpetrator at the time, not whether the defendant, prior to the wiring, had obtained all the money [s]he expected to get."[152]  The government must also demonstrate that it was "reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme."[153]

The government relied on the bank's process for clearing checks to establish the use-of-wires element at trial.  Michael Barnes of Western Alliance Bank—a "holding company of about five banks" in the western region that includes the Bank of Nevada, which housed Fiore's PAC and charity accounts—supplied that process.[154]  He explained that, when a customer brings in a check to be deposited, the teller scans the check into "an electronic process" that sends the check to a quality-assurance department; it then moves into a check-processing software that is located in Arkansas; and it is then "presented into a clearinghouse" in Texas that credits back the bank

---

[150] *Kann v. United States*, 323 U.S. 88, 95 (1944) (discussing identical requirements to prove mail fraud).

[151] *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (cleaned up).

[152] *Id.* at 961 (cleaned up).

[153] ECF No. 70 at 5 (jury instructions); *see also United States v. Garlick*, 240 F.3d 789, 794 (9th Cir. 2001) (holding that "one 'causes' use of the mails or wire communications [if] such use can reasonably be foreseen, even though not specifically intended" (cleaned up)).

[154] ECF No. 87 at 116:7–11.

for the amount on the check.[155]  In its closing arguments, the prosecution argued that "every time the defendant deposited one of those six donor checks into her bank account, that caused an interstate wire submission to be sent, which would satisfy" the use-of-the-wires element.[156]  It also theorized that the defendant could have reasonably foreseen this use of the wires because, "in today's age of electronic banking, we all know, when we deposit a check, that there's going to be an electronic wire [transmission] that results from that."[157]

Fiore contends that banker Barnes's testimony was insufficient to establish the use-of-the-wires element based on two cases: the Supreme Court's 1944 opinion in *Kann v. United States*[158] and the Ninth Circuit's 2013 opinion in *United States v. Jinian*.[159]  In *Kann*, the defendants used a local bank to cash checks received through fraud.[160]  The World War II era process for check clearing described in *Kann* was that once the defendants received the funds, the bank "became the owner of the check" and mailed it to the drawee bank in a different state to collect those funds.[161]  The High Court opined that the bank's mailing was not in furtherance of the defendants' fraudulent scheme because, by the time the banks took steps to settle their accounts, "[t]he scheme in each case had reached fruition.  The persons intended to receive the money had received it irrevocably," and it "was immaterial to them, or to any consummation of

---

[155] *Id.* at 119:13–120:16, 124:1–4.  Barnes clarified that checks between Bank of Nevada accounts move through the check-processing software in Arkansas but do not go to the Texas clearinghouse.  *Id.* at 127:3–23.

[156] ECF No. 93 at 42:2–5.

[157] *Id.* at 42:9–12.

[158] *Kann*, 323 U.S. 88.

[159] *Jinian*, 725 F.3d 954.

[160] *Kann*, 323 U.S. at 93–94.

[161] *Id.* at 94.

the scheme, how the bank [that] paid or credited the check would collect from the drawee bank."[162]

Fiore argues that the government's case against her proved no more than what was rejected in *Kann*: to her, all that mattered happened at the teller window.[163]  But it's difficult to analogize to an 81-year-old case grounded in a check-clearing process that has little similarity to the modern banking system.  Based on the explanation that banker Barnes supplied, it appears that today's interstate process of clearing a check begins before money is available for withdrawal.[164]

But even if the process hadn't evolved so significantly, Fiore's case is materially distinguishable from *Kann* for the separate and legally pivotal reason that her fraud was not complete when the donor's checks were deposited into her ABPF or FFN accounts.  Her scheme involved a second transaction: another check was issued that caused those deposited funds to be moved out of her accounts and handed to Siegel, who cashed the check (making the funds largely untraceable) and used that cash to pay for Fiore's personal expenses.  The government proved that Fiore's vision of her fraud—donor check in; funds transferred; cash out—required the bank to use the wires to clear the checks that furthered that fraud.[165]  Fiore's scheme didn't "reach fruition" until the donors' checks were processed and the funds were transferred and then cashed out by Fiore's co-conspirator, Siegel.  These extra steps in Fiore's plot distinguish this

---

[162] *Id.*

[163] ECF No. 97 at 6–7.

[164] *See* ECF No. 87 at 119:13–121:4, 122:12–25.

[165] *See* ECF No. 103 at 12 ("The clearing of the checks and the subsequent transfer of funds between accounts was essential for the scheme to be completed, because it was required for the defendant to receive the fraudulently solicited funds.").

1  case from *Kann*, as Fiore's scheme was not complete when she deposited her checks, but rather

2  required the bank's deposit process to then convert the funds to less traceable forms.

3        The *Jinian* case doesn't compel a different conclusion.  In *Jinian*, the defendant

4  fraudulently convinced his employer's finance manager that he was authorized "to receive

5  compensation in excess of his annual salary and to draw advances on that compensation."[166]  The

6  finance manager began writing him "multiple, small-denomination checks instead of a single,

7  lump-sum payment" as part of his ongoing scheme to defraud his employer of more than $1.5

8  million.[167]  The Ninth Circuit held that each check clearing the bank's wire process was a step in

9  the defendant's plot because his "ability to perpetuate his scheme without interruption for two

10  years was dependent upon the successful completion of the check-clearing process for each

11  [company] check Jinian deposited into his" bank account.[168]  The *Jinian* panel found that the

12  defendant's use of the wires was sufficient for a second reason too: the defendant's plot—

13  involving several smaller checks rather than a deposit of one large sum—depended on the

14  continued concealment of his deception through the uninterrupted clearing of his checks.[169]

15        Fiore attempts to distinguish *Jinian* by pointing out that the donor checks "were

16  legitimate checks that would have never been able to be dishonored because the amount of the

17  check had been authorized."[170]  She repeated this line of reasoning at oral argument, contending

18  that, because the checks weren't themselves fraudulent, "there would have been nothing in the

19  clearing of the check process that would have let anybody know about the fraud or conceal the

20

---

21  [166] *Jinian*, 725 F.3d at 959.

   [167] *Id.*

22  [168] *Id.* at 962 (cleaned up).

23  [169] *Id.* at 964.

   [170] ECF No. 96 at 8.

1    fraud or do anything to further the fraud."[171]  But Fiore hasn't shown that the checks themselves

2    need to be fraudulent to support a finding that she used the wires in furtherance of her scheme.

3    Indeed, the Supreme Court has precluded that requirement, noting in *Schmuck v. United States*

4    that "innocent" use of the wires that "contain[s] no false information" may be sufficient to satisfy

5    this element.[172]  The government just needs to show that the use of the wires is part of the plot as

6    contemplated by the defendant at the time, and the prosecution met that burden here.  Fiore's

7    scheme to turn donor checks into untraceable cash depended on "the successful completion of

8    the check-clearing process" for her scheme to reach fruition, which is all that *Kann* and *Jinian*

9    require.

10        Fiore also argues that she didn't know that wires would be used in these transactions

11   because she used a local bank and checked the box "no" for domestic wire transfers on her

12   account-origination forms.[173]  But banks use the wires for more than just "wire transfers," as

13   banker Barnes testified.[174]  And while Fiore used a local bank, she could reasonably foresee that

14   her donors would use different banks and that, to process a check, the banks would have to

15   reconcile the amounts transferred between them.  I thus conclude that the government met its

16   burden to prove that Fiore used the wires in furtherance of her scheme and that she could have

---

[171] *See generally* ECF No. 115 (minutes of oral-argument proceedings).

[172] *Schmuck v. United States*, 489 U.S. 705, 715 (1989); *see also United States v. Hasson*, 333 F.3d 1264, 1272 (11th Cir. 2003) (interpreting *Schmuck* to mean that the information transmitted by the wires need not "include any misrepresentation" to be part of the scheme to defraud).

[173] ECF No. 96 at 5, 7.  The government appears to interpret Fiore's argument to suggest that Fiore didn't foresee that the wire communications would be interstate in nature, and it correctly points out that the interstate element is jurisdictional and does not require a showing that the defendant knew the wire communication would cross state lines.  ECF No. 103 at 13.  I don't read Fiore's argument to suggest otherwise, and Fiore clarifies in her reply that she does not deny the interstate nature of the wire communication—she only disputes that the wire communication was in furtherance of the scheme.  ECF No. 109 at 2.

[174] *See generally* ECF No. 87 at 116–144.

1    reasonably foreseen that use. Fiore is thus not entitled to acquittal based on the argument that the

2    government didn't sufficiently prove the use-of-the-wires element of the wire-fraud charges.

3

         **b.**     ***There was abundant evidence that Fiore intended to defraud four of her***

4                    ***donors when they wrote their checks.***

5        Fiore next contends that the evidence of her intent to defraud was insufficient on four of

6    the six counts. To prove intent to defraud, the government must show that the defendant

7    intended to "deceive *and* cheat" her victims.[175] A defendant intends to deceive when she

8    "make[s] false statements or utilize[s] other forms of deception . . . ."[176] A defendant intends to

9    cheat if she aims to "deprive a victim of money or property by means of those deceptions."[177]

10   The government must prove both,[178] but the specific intent to defraud "may be established by

11   circumstantial evidence" and "inferred from misrepresentations made by the defendant[] . . . ."[179]

12       Fiore contends that the evidence at trial was insufficient to show that she intended to

13   deceive the donors behind counts 2–5.[180] She notes that each of those counts stemmed from

14   checks written before February 2020, but she maintains that the government proved only that she

15   knew that Olympia would be paying the full cost of the statue "sometime before February

16

17      _____

18   [175] *United States v. Miller*, 953 F.3d 1095, 1098 (9th Cir. 2020).

     [176] *Id.* at 1101.

19   [177] *Id.*

20   [178] *Id.*

     [179] *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (first quoting *United States v.*

21   *Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003), then citing *United States v. Lothian*, 976 F.2d 1257, 1267–68 (9th Cir. 1992)).

22   [180] ECF No. 96 at 8–9. In her motion, Fiore applies this argument to counts 2–6. She clarifies in

23   her reply brief that the argument applies only to counts 2–5, so I limit my consideration to those counts. ECF No. 109 at 4 n.19. Counts 2–5 pertain to donations made by Lombardo, Stavola, Brown, and Palivos.

2020."[181]  She extrapolates from that testimony that, before February, "there was still a perception that the statue needed to be funded by the City," so any solicitation Fiore made before then "would not have been false."[182]

This theory relies on a misstatement of the trial testimony of Olympia's vice president, Chris Armstrong, who supplied the date framework.  Armstrong testified that he told Fiore and the City that Olympia would pay for the Beck statue sometime between "the end of fall" in 2019 and the park's grand opening on January 31, 2020.[183]  On cross-examination, Armstrong reiterated that the conversation took place "before February of 2020."[184]  Though he couldn't recall the exact date, the jury could reasonably infer from his testimony that the conversation occurred any time between the fall of 2019 and January 31, 2020.

Regardless, Armstrong's testimony wasn't the only evidence the government relied on to prove Fiore's intent to deceive and cheat.  The evidence at trial established that, even when it was not a guarantee that Olympia would pay the full cost of the statue, at no point was it contemplated that Fiore herself (or her charity or her PAC) would foot any of the bill. Armstrong testified that, though he and City officials had previously discussed splitting the cost, that split would have been with the City—not Fiore herself.[185]  Sculptor Hanlon testified that the statue of the other officer was paid for by the City, not Fiore.[186]  And the testimony from those involved in the planning and execution of the Alyn Beck memorial park (Armstrong, Hanlon,

---

[181] ECF No. 96 at 8.

[182] *Id.* at 9.

[183] ECF No. 90 at 57:17–21.

[184] *Id.* at 73:20–23.

[185] *Id.* at 57:3–5 (Armstrong testifying that Fiore never indicated that "she would privately fundraise for the statue" during conversations with the City and Olympia concerning how the statue would be funded).

[186] ECF No. 87 at 85:25–86:9.

and Nicole Beck) established that Fiore never told them that she would pay for the statue or that she was fundraising for that purpose.[187]  A rational trier of fact could infer from Fiore's failure to inform those individuals of her plan that she intentionally withheld that information from the people most likely to sniff out her fraud.

There was also circumstantial evidence that Fiore never intended to save donor funds to pay for the Beck statue, but rather deceived her donors so that she would have cash on hand. Forensic accountant Harris testified that Fiore used the funds obtained from each donor check to pay for personal expenses within days of receiving them and that she didn't have other funds available to cover those expenses.[188]  So a rational trier of fact could have found from this evidence that Fiore's statue solicitations were fraudulent from the jump.  I thus conclude that there was sufficient evidence that Fiore intended to deceive and cheat her donors, and I deny her acquittal motion as to that argument.

### c.     *Donors Lombardo, Palivos, and White established that they donated because of Fiore's false representations.*

Fiore next argues that "Counts 2, 5, and 6 could not be proven beyond a reasonable doubt" because the evidence didn't prove that she made a false representation on count 2 or that the donors relied on misrepresentations about funding the Beck statue on counts 5 and 6.[189] None of these contentions has merit.

Count 2 concerns Lombardo's July 2019 donation.  Fiore contends that a summary of one of Lombardo's prior conversations with the FBI suggests that his donation was solicited by Jay

---

[187] *Id.* at 65:4–15 (Nicole Beck testimony), 96:6–18 (Hanlon testimony); ECF No. 90 at 57:3–5 (Armstrong testimony).

[188] *See generally* ECF No. 90 at 80–121.

[189] ECF No. 96 at 9.

Brown, not Fiore.[190]  As I explain *infra*,[191] this is a very loose reading of the notes of FBI interviews.  And when Lombardo was asked at trial who solicited his donation, his answer left no room for interpretation:

> Q:    [Prosecutor] Now, sir, do you recall who it was that asked you to donate to Future for Nevadans for the Alyn Beck statue?
>
> A:    [Lombardo] That would have been Michele Fiore.[192]

Lombardo's unequivocal testimony is sufficient evidence that Fiore personally solicited his donation.

Count 5 concerns the donation of Peter Palivos.  Fiore argues that this count cannot stand because Palivos "donated the money with the intention that it be used for veterans, [the] homeless, or law enforcement" and the government did not prove that the money wasn't used for any of those purposes.[193]  This is another misstatement of trial testimony:

> Q:    [Prosecutor] What did Michele Fiore tell you in order to get you to write this check to A Bright Present Foundation?
>
> A:    [Palivos] So Ms. Fiore had told me that she was doing a memorial for a fallen police officer . . . and she asked me if I would contribute to that cause.  And because helping

---

[190] *See id.* (suggesting that, "as argued in the motion for a new trial, there is evidence that Jay Brown not Ms. Fiore requested a donation from Joseph Lombardo" (cleaned up)); ECF No. 99 at 36–37 (arguing that the evidence suggesting that Brown solicited Lombardo's donation came from a "written 302 interview" of Lombardo).

[191] *See infra* at pp. 66–67.

[192] ECF No. 90 at 14:24–15:1.

[193] ECF No. 96 at 9 (citing ECF No. 90 at 46).  The testimony Fiore relies on stems from Palivos's cross-examination, during which Fiore's trial counsel asked Palivos whether he characterized his donation as one to benefit "veterans, and the homeless and law enforcement" during a prior interview with the FBI.  ECF No. 90 at 46:22–25.  Palivos responded that he "d[idn't] remember the specific conversation" but that he recalled referencing "that I was asked about donating money for this police matter."  *Id.* at 47:1–3.

police officers, especially fallen police officers, is very
important to us, I said yes.[194]

Palivos also agreed that he wouldn't have given the money "if [he] thought it would be used for some other purpose besides what [Fiore] told [him] when [he] made this donation."[195]  From his testimony, a rational trier of fact could conclude that Fiore made a false representation about the memorial and that Palivos donated in reliance upon it.  So there was sufficient evidence to support Fiore's conviction on count 5.

Fiore lastly contends that count 6—based on a check from L.E.C.E.T—may not have been for the Alyn Beck statue because Thomas White, who signed the check, wrote "sponsorship" on the check's memo line, while he wrote "Alyn Beck Statue" on the memo line of the check he wrote Fiore on behalf of Laborers Local 872.[196]  Although this memo-line ambiguity doesn't reveal much about the impetus for the L.E.C.E.T. donation, White's testimony did.  He testified that he issued the L.E.C.E.T check based on representations in an email he received from Fiore's email address, promising that 100% of the contributions would be used for the fallen-officer memorial.[197]  Fiore doesn't explain how this unambiguous testimony that White donated based on Fiore's email representations and that he wouldn't have issued either check if he "knew the money wasn't going to be used for the Alyn Beck statue" could be interpreted any other way.[198]  So I conclude that the donor testimony as to counts 2, 5, and 6

---

[194] ECF No. 90 at 43:18–24.

[195] *Id.* at 44:5–8.

[196] ECF No. 96 at 9–10.

[197] ECF No. 60 at 198–200.

[198] *See id.* at 198–200, 202.

1  sufficiently proved that each donor gave Fiore money based on her representations that the funds

2  would be used for the Beck statue.

### 2. The government presented sufficient evidence of a conspiracy to commit wire fraud.

5  Fiore next contends that, even if there was sufficient evidence to support her underlying

6  wire-fraud convictions, the government didn't prove beyond a reasonable doubt that she

7  conspired with someone else to commit fraud.[199]  To show a conspiracy between two people, the

8  government need not present evidence of an explicit agreement to commit fraud.[200]  "Inferences

9  of the existence of such an agreement may be drawn if there be concert of action, all the parties

10  working together understandingly, with a single design for the accomplishment of a common

11  purpose."[201]  The agreement may be inferred from circumstantial evidence, and "once evidence

12  of a conspiracy is established, only a slight connection between the defendant and the conspiracy

13  is necessary to convict the defendant of knowing participation in the conspiracy."[202]  Of course,

14  "mere association with members of a conspiracy" will not suffice.[203]  The government must

15  show, through direct or circumstantial evidence, that there was an "agreement to accomplish a

16  specific illegal objective . . . ."[204]

---

[199] ECF No. 96 at 10–12.

[200] *Sullivan*, 522 F.3d at 976 ("The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." (cleaned up)).

[201] *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996) (cleaned up).

[202] *Id* (cleaned up).

[203] *Id.*

[204] *Id.*

Fiore contends that the government didn't show that there "was *any* agreement between [her] and at least one other person to commit wire fraud."[205]  She asserts that the only mention of a co-conspirator was by the prosecutor during closing arguments, who stated that Sheena Siegel "was an instrumental part of [] her mother's scheme."[206]  She contends that "simply calling Ms. Siegel a co-conspirator was not sufficient" to prove a conspiracy.[207]

Unfortunately for Fiore, that's far from all the government did to show Siegel's part in this scheme.  Though the government did not call Siegel to testify or explicitly state that she was the unindicted co-conspirator until closing arguments, the government provided extensive evidence of Siegel's role in the fraudulent conduct.  The evidence introduced through forensic accountant Harris's testimony demonstrated that Siegel was a crucial part of the scheme to convert donor checks to cash so that the money could be used for Fiore's personal purposes.[208]  The government also provided evidence of Siegel's involvement in the false representations that caused donors to write their checks.  Siegel's name was on the top of one of the "primary instruments of the fraud scheme": the letter from ABPF seeking donations for the statue.[209]  She was also on the board of directors for ABPF, an entity that the government showed was created

---

[205] ECF No. 96 at 11.

[206] ECF No. 93 at 65:16–18.  The government pushes back on this characterization, stating that the indictment provided information that would make everyone familiar with the case aware that Siegel was the co-conspirator "Person A" listed in the indictment.  But Fiore's focus is on what the *jury* knew throughout trial, not whether Fiore or her counsel understood who the co-conspirator might be when she was charged.  I limit my consideration to the evidence presented to the jury at trial, as I must when evaluating sufficiency-of-the-evidence claims, and the jury wasn't given a copy of the indictment.

[207] ECF No. 96 at 11.

[208] *See supra* at pp. 11–13.

[209] ECF No. 103 at 15.

and used almost exclusively for the purpose of collecting donor funds from the fraudulent scheme and moving money between Fiore's various entities.[210]

This evidence detailing Siegel's intimate involvement with Fiore's charity and PAC accounts, her many withdrawals of money from those accounts, and her use of those funds to pay Fiore's personal bills is sufficient to draw the reasonable inference that Siegel and Fiore agreed to seek and use donor funds for an illicit purpose. The government presented sufficient evidence to show that this fraud scheme took two people: either Fiore or Siegel deposited the donor checks in Fiore's PAC or charity account, Fiore signed checks to Siegel or Siegel's company from those accounts, Siegel cashed those checks, and Siegel paid Fiore's bills. And both mother and daughter were associated with the misrepresentations that caused the donors to part with their money: Siegel from her name placed prominently on the header of the ABPF solicitation letter, and Fiore from her signature on that letter and the phone calls and emails through which she solicited the donations that numerous witnesses testified about. This was not a case in which the jury could infer from the evidence presented only that Siegel had a mere association with the defendant by virtue of kinship. The evidence overwhelmingly created the inference that Siegel and Fiore were in league with each other to perpetuate the fraudulent scheme from its very beginning.

The Ninth Circuit has upheld jury verdicts on similar circumstantial evidence of a conspiratorial agreement. In *United States v. Sullivan*, a Ninth Circuit panel found sufficient evidence of a conspiracy between two defendants that both misrepresented material facts to

---

[210] *See* Gov't Ex. 32 (showing that ABPF was incorporated in July 2019, which was when Fiore began soliciting donations for the statue); Gov't Ex. 103 (summarizing ABPF's bank records, consisting almost entirely of donations for the statue); ECF No. 90 at 83–87 (Harris's testimony concerning the ABPF bank records).

1   siphon funds from their company to their personal accounts.[211]  That one defendant "authorized

2   the illicit transfers" and the other defendant had knowledge of those transfers was sufficient to

3   support the jury's verdict on conspiracy to commit mail and wire fraud.[212]  And in *United States

4   v. Pelisamen*, another panel found that evidence that the defendant and his co-conspirator both

5   signed requests for fraudulent cashier's checks and that they were "frequently in touch by phone"

6   on the days the checks were written was sufficient to support a jury verdict for wire-fraud

7   conspiracy.[213]  Here, the presence of both co-conspirators' names on the letter seeking donations

8   and the exchange of funds between Fiore and Siegel are similarly sufficient to support Fiore's

9   conspiracy conviction.

10      In sum, plentiful evidence supports the jury's conclusion that Fiore was guilty of making

11   false representations to each of the donors behind the six wire-fraud counts, with the intent to

12   deceive and cheat them out of funds that she promised would be spent on the Beck statue.  And

13   the government's robust showing of Siegel's involvement in that scheme is sufficient to support

14   the verdict on the conspiracy charge.  So I deny Fiore's motion for acquittal.

15   **B.    Fiore's allegations of error do not warrant a new trial.**

16      Fiore contends in a separate motion that, even if the court concludes that sufficient

17   evidence supports the jury's verdict, she should be granted a new trial.[214]  Federal Rule of

18   Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate

19   any judgment and grant a new trial if the interest of justice so requires."[215]  "If the court

20

21   [211] *Sullivan*, 522 F.3d at 976.

22   [212] *Id.*

    [213] *United States v. Pelisamen*, 641 F.3d 399, 409–10 (9th Cir. 2011).

23   [214] ECF Nos. 97, 99.

    [215] Fed. R. Crim. P. 33(a).

1    concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the

2    evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of

3    justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues

4    for determination by another jury."[216]  "A motion for a new trial is directed to the discretion of

5    the district judge."[217]

### 1.    Striking Siegel's defense testimony did not deprive Fiore of her right to present a complete defense.

8        Fiore contends that striking Siegel's direct testimony deprived her of the right to a fair

9    trial.  She reasons that the government was not permitted to unilaterally withdraw Siegel's

10   immunity agreement; instead the government was required to prove breach to the court, and the

11   court was then required to determine the proper consequences of that breach.[218]

12       The parties agreed at oral argument for this motion that, because Fiore's trial counsel

13   didn't seek a determination of breach or otherwise object to Siegel's blanket invocation of her

14   Fifth Amendment right, the plain-error-review standard applies.[219]  "Plain error is (1) error, (2)

15   that is plain, and (3) that affects substantial rights."[220]  An error is plain if it is clear or obvious

---

[216] *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

[217] *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).

[218] ECF No. 97 at 18–20.

[219] *See* ECF No. 53 (minutes of oral-argument proceedings).  Fiore's trial counsel did move for a mistrial on the basis of the government's question and opposed the motion to strike her testimony.  But he didn't seek any alternative relief to striking her testimony, nor did he object to the conclusion that Siegel properly invoked her Fifth Amendment right.

[220] *United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (quoting *United States v. Hammons*, 558 F.3d 1100, 1103 (9th Cir. 2009)).

under current law.[221]  And plain error affects substantial rights if there is "a reasonable

probability" that, but for the error, "the jury's verdict would have been different."[222]

The decision to strike Siegel's testimony resulted from a confluence of anomalous events:

- The defense—not the government—called an unindicted co-conspirator to testify in the defense's case in chief.

- That unindicted co-conspirator was the defendant's adult daughter.

- The United States Attorney's Office for the District of Nevada and the unindicted co-conspirator entered into an agreement conditioning her immunity from campaign-finance-related charges on truthful testimony.  The DOJ Public Integrity Section that prosecuted Fiore's case was not a party to that agreement, nor did the plain language of the agreement apply to the wire-fraud charges at issue in Fiore's trial.

- No one informed the court of the existence of the immunity agreement until after the unindicted co-conspirator had been appointed counsel following her potentially incriminating testimony on the stand.  Nor did anyone tell the court that she had been represented by counsel prior to trial or that her counsel was curiously outside the jurisdiction during her testimony.

- Defense counsel did not object to the court's ruling that the unindicted co-conspirator properly invoked her Fifth Amendment right to self-incrimination, nor did he seek or propose any relief as an alternative to striking her testimony.

### a. *Fiore's authority concerning a court's obligation to determine whether the immunity agreement was breached isn't the right fit for these circumstances.*

Fiore frames her challenge to striking Siegel's testimony as one affecting her

constitutional right to present witnesses in her defense.  At the heart of a criminal defendant's

---

[221] *Johnson v. United States*, 520 U.S. 461, 467 (1997).

[222] *United States v. Teague*, 722 F.3d 1187, 1192 (9th Cir. 2013) (cleaned up); *see also Greer v. United States*, 593 U.S. 503, 507–08 (2021) (holding that plain "error must affect substantial rights, which generally means that there must be a reasonable probability that, but the error, the outcome of the proceedings would have been different" (cleaned up)).

due-process right is "the right to fairly 'present a defense.'"[223]  "The right to present witnesses 'has long been recognized as essential'" to that right, as well as the right to compulsory process under the Sixth Amendment.[224]  But that right is not absolute because defense-witness testimony may be limited by the proper application of evidentiary and procedural rules.[225]

Fiore contends that the court failed to protect her right to present witnesses in her defense because it did not require the government to prove that Siegel breached the agreement before striking her testimony.[226]  Even if Siegel did violate the agreement, she adds, "the consequences for" that violation "would have been new criminal charges[,] not withdrawal of the agreement."[227]  The government responds that the real issue here is whether Siegel's invocation of her Fifth Amendment right was proper and, as the court determined at trial, it was.[228]

My exhaustive research has turned up no case in which any court has encountered parallel facts and sorted out the law that should apply to them, suggesting that any error to be

---

[223] *United States v. Juan*, 704 F.3d 1137, 1141 (9th Cir. 2013) (quoting *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam)).

[224] *Denham*, 954 F.2d at 1503 (first quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), then citing *Taylor v. Illinois*, 484 U.S. 400, 409 (1988)).

[225] *See, e.g.*, *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor*, 484 U.S. at 410 ("The accused does not have an unfettered right to offer testimony that is incompetent, *privileged*, or otherwise inadmissible under standard rules of evidence." (emphasis added)).

[226] ECF No. 97 at 17–23.  Fiore also argues that the DOJ Public Integrity Section attorneys who prosecuted this case didn't have standing to argue that Siegel breached the immunity agreement because the DOJ wasn't a party to it; the United States Attorney's Office for the District of Nevada was.  *Id.* at 20.  The prosecution responds that, under that logic, the immunity agreement wouldn't have applied to Siegel's questioning in this case at all, so any argument that the prosecutors were bound by the agreement would be moot.  To avoid that result, the government "assumes arguendo that the informal immunity agreement applied until breached by Ms. Siegel." ECF No. 104 at 6 n.23.  Fiore doesn't press her standing argument in her reply.  For the purposes of this motion, I follow the lead of the parties and assume that the agreement applied to Siegel's testimony at these proceedings and thus that the parties were correct to operate as if it controlled.

[227] ECF No. 97 at 17.

[228] ECF No. 104 at 5.

ascribed here is far from plain. What seems clear, however, is that the authority Fiore relies on to assert that the court was required to determine breach and that the burden was on the government to prove breach doesn't apply to this scenario in which the breach isn't the defendant's. In each of Fiore's cases, the government brought criminal charges against a defendant based on information that the defendant provided under an immunity agreement, and the defendant moved to dismiss his indictment, arguing that the agreement prevented the government from charging him.[229] The Ninth Circuit has generally held that, when faced with a dismissal motion based on the application of an immunity agreement, the government must prove by a preponderance of the evidence that the defendant breached the agreement.[230] The focus in those cases rests squarely on the rights of the witness-turned-defendant and whether his immunity agreement bars the government's charges.

But that wasn't the situation with Siegel's testimony. This court was not asked to determine whether any charges against Siegel should be dismissed because the government received information leading to those charges as a result of her immunity agreement in Fiore's case. Nor did anyone—the government, Fiore's trial counsel, or Siegel's appointed counsel— argue that the court was required to determine whether Siegel breached the agreement during the

---

[229] *See United States v. Mark*, 795 F.3d 1102, 1105 (9th Cir. 2015) (determining whether a defendant's charges should be dismissed on the basis of his contention that he didn't breach an immunity agreement); *United States v. Packwood*, 848 F.2d 1009, 1011 (9th Cir. 1988) (affirming district court's dismissal of indictment after finding that the defendant didn't breach his plea agreement conditional on agreement to provide truthful information); *United States v. Carrillo*, 709 F.2d 35, 37 (9th Cir. 1983) (upholding dismissal of indictment after district court found that the defendant didn't breach the terms of a cooperation agreement); *United States v. Plummer*, 941 F.2d 799, 802–03 (9th Cir. 1991) (determining whether defendant's charges should be dismissed on the basis that he was charged based on information he gave under an informal immunity agreement); *United States v. Irvine*, 756 F.2d 708, 711 (9th Cir. 1985) (rejecting defendant's argument that his conviction should be overturned because the facts stemmed from information he provided while party to an informal immunity agreement).

[230] *See supra* n.229.

44

1  nearly two days that were devoted to problem-solving the disruption to her testimony.  Even if

2  they had, Fiore's authority would not have supplied the right legal standard.

3          There appear to be two separate lines of cases that have emerged to address issues

4  concerning immunity agreements and self-incriminating testimony.  Fiore's line relies on law

5  developed to protect a defendant from being charged with a crime that the government

6  contractually agreed not to prosecute.  But there is a separate and distinct set of standards that

7  applies in a scenario much more analogous to what happened with Siegel's testimony: when a

8  defendant complains that she was deprived of her right to present witnesses because a defense

9  witness invoked the privilege against self-incrimination.  Under that line of cases, a defense

10 witness's invocation of her Fifth Amendment privilege, standing alone, does not warrant any

11 relief for the defendant.  The consensus among appellate courts is that a defendant "does not

12 have an absolute right to witness immunity"[231] and that a defendant's due-process and

13 compulsory-process rights do not override a witness's proper claim of Fifth Amendment

14 privilege.[232]

15

---

16 [231] *United States v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983) (first citing *United States v. Garner*, 663 F.2d 834, 839–40 (9th Cir. 1981), *cert. denied*, 456 U.S. 905 (1982); then citing *United States v. Carman*, 577 F.2d 556, 561 (9th Cir. 1978); then citing *United States v. Alessio*, 528

17 F.2d 1079, 1082 (9th Cir. 1976), *cert. denied*, 426 U.S. 948 (1976)); *see also, e.g., United States*

18 *v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991) ("A criminal defendant is not entitled to compel the government to grant immunity to a witness."); *Blissett v. Lefevre*, 924 F.2d 434, 441

19 (2d Cir. 1991) (holding that "absent exceptional circumstances, the due-process clause imposes no requirement that defense-witness immunity be ordered whenever it seems fair to grant it"

20 (cleaned up)); *United States v. Moussaoui*, 365 F.3d 292, 303 (4th Cir. 2004) (noting that the circuit courts "have uniformly held that district courts do not have any authority to grant

21 immunity, even when a grant of immunity would allow a defendant to present material, favorable testimony" (citations omitted)).

22 [232] *See, e.g., Vavages*, 151 F.3d at 1191–92 (noting that "a criminal defendant's right to compulsory process to secure the attendance of a witness does not include the right to compel the

23 witness to waive her Fifth Amendment privilege against self-incrimination"); *United States v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005) (concluding that "[s]everal courts of appeal . . . have held [that] a defendant's right to present a defense does not include the right to compel a

1    The Ninth Circuit has recognized a prosecutorial-misconduct exception to that general

2  rule.  When a prosecutor attempts to intentionally discourage a defense witness from testifying,

3  the government's conduct may violate the defendant's due-process rights.  The appellate cases

4  analyzing that issue suggest that, if a prosecutor either (1) engages in misconduct by deliberately

5  causing a defense witness with relevant testimony to invoke her Fifth Amendment right, or (2)

6  grants immunity to government witnesses while refusing immunity to a defense witness with

7  directly contradictory testimony, then the defendant may have been deprived of her right to

8  present witnesses in her defense.[233]  If the defendant proves by a preponderance of the evidence

9  that either scenario occurred, the court "should enter a judgment of acquittal for the defendant

10  unless the prosecution invokes 18 U.S.C. §§ 6002–6003 by asking the district court to extend use

11  immunity to the defense witness" so that the witness may testify without fear of later

12  prosecution.[234]

---

14  witness to waive his Fifth Amendment privilege against self-incrimination" and collecting cases (cleaned up)).

15  [233] *See United States v. Straub*, 538 F.3d 1147, 1162 (9th Cir. 2008).  The Supreme Court has endorsed a similar standard that applies when the government's conduct "effectively dr[ives a] witness off the stand."  *Webb*, 409 U.S. at 98.  The Ninth Circuit has explained that "under *Webb*, 'it is well established that substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'"  *Soo Park v. Thompson*, 851 F.3d 910, 919 (9th Cir. 2017) (quoting *Ayala v. Chappell*, 829 F.3d 1081, 1111 (9th Cir. 2016)) (cleaned up).  "A defendant alleging such interference is required to demonstrate misconduct by a preponderance of the evidence."  *Vavages*, 151 F.3d at 1188 (citing *Lord*, 711 F.2d at 891 n.3).  Under this test, "a defendant's constitutional rights are implicated only [if] the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness's decision whether to testify."  *Id.* at 1189 (cleaned up).

21  [234] *Straub*, 538 F.3d at 1161 (quoting *Lord*, 711 F.2d at 891–92) (cleaned up).  Throughout her brief, Fiore suggests that Siegel was granted immunity under those statutes.  She wasn't.  Those statutes apply only when the government seeks a court order compelling a witness to testify after she refuses to do so on the basis of her privilege against self-incrimination.  *See* 18 U.S.C. § 6002 (stating that a "witness may not refuse to comply with" a court order to testify in a proceeding "on the basis of his privilege against self-incrimination," on the condition that "no testimony or other information compelled under the order . . . may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing

The burden of proof for this showing is the converse of Fiore's proposed standard—the *defendant* must show by a preponderance of the evidence that the prosecution's actions violated her rights.[235]  Fiore doesn't adequately explain why, when the law limits a defendant's ability to compel a witness's testimony over a valid invocation of the Fifth Amendment, the burden should fall on the government to justify the prosecutorial decision to revoke immunity for a defense witness.  Had this issue been raised under authority better suited to these circumstances, it would have been the defendant's burden to show that the government's actions warranted a more searching inquiry into Siegel's immunity agreement and her decision to invoke her right against self-incrimination.

To be sure, Fiore's case is distinguishable from the typical one in which the Ninth Circuit has addressed whether a defense witness's invocation of the Fifth Amendment should be cured by compelled-use immunity to protect a defendant's rights.  Siegel already had an informal immunity agreement when she began testifying for the defense, while the defense witnesses in the Ninth Circuit's compelled-use-immunity cases[236] did not.  And rather than refusing to grant a witness immunity, the government here took immunity away.  But I don't find that these distinctions render the case law addressing compelled-use immunity inapplicable here.  Had the defense argued that the immunity agreement must be kept in place during Siegel's testimony because of the prosecution's role in Siegel's decision to invoke her Fifth Amendment rights, then this is the law that I would have applied to determine if that was the appropriate step.  A relevant question in that inquiry may have been whether the facts supported the government's claim that

---

to comply with the order"); § 6003 (establishing procedures for a U.S. Attorney to seek an order compelling testimony under § 6002).  The government didn't seek a court order compelling immunity in this case, so the immunity the government provided was informal at best.

[235] *See, e.g.*, *Lord*, 711 F.2d at 891.

[236] *See supra* at n.231–33.

1  Siegel breached the agreement.  But the burden would have been on Fiore to show that the

2  government deliberately and illegitimately claimed breach for the express purpose of preventing

3  Siegel's defense testimony.  Contrary to Fiore's suggestion, at no point would it have been the

4  government's burden to prove breach.

5      In sum, I conclude that it was not plain error to not apply law that would have placed the

6  burden on the government to prove that Siegel breached the immunity agreement before she

7  could properly invoke her Fifth Amendment right against self-incrimination.  And because Fiore

8  doesn't contend that the prosecution engaged in misconduct or deliberately derailed Siegel's

9  testimony to prevent her from providing information that would have contradicted any

10  government witnesses, I need not—so I do not—undertake any analysis based on that

11  authority.[237]

12         **b.    *Even if the failure to inquire further about the withdrawal of Siegel's
             immunity agreement was plain error, that error did not affect Fiore's
13           substantial rights.***

14      Even if I were to conclude that striking Siegel's testimony was plain error, a new trial is

15  not warranted because that error did not affect Fiore's substantial rights.  Fiore contends that

16  striking Siegel's testimony prejudiced her defense because, had the jury been able to consider

17  Siegel's testimony, it "would have supported the defense theory of the case, namely that the

18  donated money was used for charitable purposes."[238]  But Fiore fails to establish (1) how

19  Siegel's testimony supported this theory and (2) why this theory provides a defense to Fiore's

20  charges.

---

21  [237] The closest Fiore gets to this argument is a footnote citation to *Lord*, 711 F.2d at 891–92, one
    of the Ninth Circuit's seminal cases concerning prosecutorial misconduct and compelled-use
22  immunity.  *See* ECF No. 97 at 21.  But she does not seek any determination of whether the
    prosecution engaged in misconduct, nor does she analyze any such issue under the standards
23  discussed in *Lord*.  *Id.*

    [238] ECF No. 99 at 23.

48

Because Fiore's counsel had completed his direct examination of Siegel before her testimony was struck, the court has the luxury of reviewing her actual testimony—not just a hypothetical expectation—to determine if it really was the silver bullet Fiore claims. It wasn't. While Siegel did testify to various charitable endeavors that she contributed to as part of her work with her mother, she was unable to connect the statue donations to any of those endeavors. She narrated photographs of various events and items that she claimed were purchased to benefit Fiore's constituents, like Christmas toys and back-to-school backpacks for the kids, and a "pasta event" for the holidays.[239] But the fact that Fiore also spent some money on charitable endeavors doesn't negate the theory of the government's case: whatever the money was spent on, it wasn't spent on the Alyn Beck statue, contrary to Fiore's direct representations that it would be. None of Siegel's testimony upends the persuasive, albeit largely circumstantial, evidence that the government presented to show that Fiore and Siegel used funds donated specifically for the Beck statue to fund Fiore's personal life. So I cannot conclude that, had the jury been allowed to consider Siegel's testimony, the trial would have ended differently. I thus deny Fiore's motion for a new trial based on any alleged errors associated with accepting Siegel's invocation of her Fifth Amendment right and striking her testimony.

---

[239] *See* ECF No. 91 at 47–58.

1

2

**2.** ***The court's limitation of Special Agent Fryxell's testimony did not deprive Fiore of a fair trial.***

3

4

    **a.** ***Fryxell's defense testimony was limited to discussing standard FBI practices and how agents chose what to seize (and not seize) during the search of Fiore's home.***

5    Fiore next contends that the court erred by limiting the scope of Special Agent Fryxell's

6 testimony.[240]  Fiore's trial counsel represented that he intended to call Fryxell for testimony

7 about "the breadth of the investigation itself in terms of the type of efforts that were made,"

8 including whether the FBI conducted video surveillance of Fiore, "the number of resources that

9 went into the investigation, and that at the end of the investigation we don't have the things that

10 they thought they would find."[241]  He argued that this information was relevant because "it goes

11 to the effort to which they were trying to find evidence of the wrongdoing that they are accusing

12 . . . Fiore of doing, and they don't find it."[242]

13    The government moved to preclude that inquiry, arguing that the defense was calling

14 Fryxell not to show that the FBI's investigation was sloppy, but rather to evade the court's prior

15 ruling that Fiore could not introduce evidence in support of her vindictive- or selective-

16 prosecution theories.[243]  I granted that motion in part and slightly narrowed the scope of the

17 defense's examination of Fryxell:

18

---

19 [240] ECF No. 97 at 23–26.

20 [241] ECF No. 90 at 156:18–24.

[242] *Id.* at 157:20–23.

21

[243] *Id.* at 161:18–162:13; *see also* ECF No. 51 at 18–22 (order on parties' motions in limine,

22 concluding that Fiore's vindictive- and selective-prosecution theories should have been raised in a pretrial motion to dismiss and precluding her from introducing evidence of argument about

23 those theories at trial because they concern "issue[s] of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged" (quoting *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983))).

To the extent that the defense intended to offer Agent Fryxell to inquire about the full breadth of the investigation, including surveillance or video surveillance on the defendant and Ms. Siegel's homes or to get into what crimes were charged and why or how much evidence was seized and what might be implied by the size of that haul, those lines of inquiry are precluded.

The defendant has provided no authority for the proposition that it is relevant with this 20/20 hindsight that only a fraction of the stuff seized during the search has found its way into this trial. Such is true for every prosecution, and it is not relevant to any charge or permissible legal defense in this case.

And the law also recognizes, as explained, for example, in the United States Supreme Court case of *Bordenkircher v. Hayes*, . . . that "the decision whether or not to prosecute and what charge to file or bring before a grand jury generally rests entirely in the prosecutor's discretion."[244] So the decision about which crimes get charged as a result of a potentially broader investigation is not relevant at trial of the ultimately charged offenses.

Permitting the defense here to inquire into the broad scope of the investigation generally or the methods or manner of the investigation, like surveillance, would have no purpose but to inflame the jury and confuse the issues, and that risk would be substantially greater than any probative value of that testimony.

But [Fiore's counsel] also explained yesterday that a line of inquiry for this witness would include the defense theory that no special agent put things in a way to follow the trail, which is consistent with the defense's sloppy-investigation theory. So the defense may call Agent Fryxell for the limited purpose of inquiring about the search, the scope of the search and the search warrant, what choices the case agents made about what to seize or not seize in the search of the defendant's home, and how that evidence was collected from the search, gathered, maintained, or organized.

The defense may also inquire into any standard FBI practices that they contend were ignored or missed in the investigation basically by asking about anything that Fryxell did not do but normally would have.[245]

---

[244] *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

[245] ECF No. 91 at 6:11–8:2.

### b.    The defense elicited testimony to support Fiore's sloppy-investigation theory and discussed that theory extensively during closing arguments.

Fiore's counsel elicited testimony from Fryxell indicating that there were many people involved in executing a search warrant and that they determined what and what not to seize based on the search warrant and supporting affidavit that explains what may be relevant to the conduct under investigation.[246]  He also elicited testimony that the search team seized voluminous receipts from Fiore's home, but not all of them were photographed during the search.[247]  Fryxell further testified that when executing search warrants, the search team takes everything they find that matches the descriptions in the warrant affidavit—they do not assess whether that evidence may be exculpatory or inculpatory when determining what to seize.[248] Defense counsel also sought to show that the search team singled out some receipts for high-end expenditures—for example, a $1,841 receipt from the luxury brand Louis Vuitton—but otherwise batched receipts, insinuating that the search team took a closer look at inculpatory evidence.[249]  Fryxell testified that some receipts were logged separately not because of any perceived evidentiary value, but due to the way they were found: some receipts were found in a large group while others were found alone.[250]

Fiore's counsel questioned other government witnesses about the investigation into her conduct too.[251]  When cross-examining Douglas Smith, the FBI agent who led the Evidence

---

[246] *Id.* at 134:1–139:25.

[247] *Id.* at 148:1–150:13.

[248] *Id.* at 170:8–171:8.

[249] *Id.* at 183:8–23.

[250] *Id.*

[251] ECF No. 87 at 171–221 (cross-examination of FBI agent Douglas Smith, who assisted with processing evidence seized from Fiore's home); ECF No. 90 at 80, 173.

Response Team during the search of Fiore's home, defense counsel elicited testimony showing that the agents did not seize cash that day but allowed Fiore to enter her home and take some cash during the search.[252]  He also probed the FBI's decisions not to seize receipts, purchases, and other items from Fiore's home.[253]  He elicited testimony from forensic accountant Harris, showing that she reviewed only bank-account records and did not aggressively analyze the receipts found in Fiore's home and had no knowledge of whether Fiore had access to cash that hadn't been deposited into those accounts.[254]  And the scope of the FBI's investigation and search of Fiore's home was a central theme in defense counsel's closing arguments.[255]

> ### c.     *Fiore has not shown that it was error to preclude questions about the full breadth of the investigation into her other potentially criminal conduct.*

Fiore argues that precluding her counsel from questioning Fryxell about the motives behind the FBI's investigation prevented her from offering a complete version of her sloppy-investigation defense.[256]  She contends that evidence of the government's far-reaching investigation into other aspects of her political and business dealings would have rounded out the defense by showing "that law enforcement was not interested in exculpatory evidence and

---

[252] ECF No. 87 at 218:25–220:1.

[253] *See generally id.* at 171–221.

[254] ECF No. 90 at 142:15–21.

[255] *See, e.g.*, ECF No. 93 at 76:18–24 (arguing that the FBI "failed to do a complete and unbiased investigation into Fiore"), 83:12–86:3 (contending that the search of Fiore's home didn't turn up any evidence of extravagant purchases or other "results of the crime"), 97:19–99:11 (implying that the FBI was trying to find only inculpatory evidence of Fiore's guilt during its search and pointing to photos of receipts and paperwork in her home that may have proven her innocence had they been seized), 99:15–100:5 (arguing that the government didn't expend sufficient resources to thoroughly search Fiore's home for exculpatory evidence), 108:15–109:14 (highlighting the jury instruction permitting the jury to infer that evidence not preserved during the search was unfavorable to the government and arguing that the jury should consider unseized receipts and documents under that standard).

[256] ECF No. 97 at 23–26.

specifically suppressed the same."[257]  Fiore maintains that she should have been able to get into that theory to show why the FBI investigation was "shoddy."[258]

Fiore doesn't elucidate what potentially exculpatory evidence the FBI suppressed in its alleged quest to charge her with criminal conduct regardless of the evidence.  At one point in her brief she suggests that the FBI avoided information that would have indicated that she regularly handled transactions in cash.[259]  But she doesn't show that my ruling prevented her trial counsel from asking about that issue.  In fact, he did ask at least two government witnesses about Fiore's use of cash to establish that the government didn't seize cash from her home despite knowing it was there and to show that forensic accountant Harris couldn't rule out the possibility that some personal expenses may have been paid in cash that wasn't earmarked for the Alyn Beck statue.

At base, Fiore's complaint is that she wasn't permitted to argue that the government was out to get her regardless of her guilt or innocence and to invite the jury to speculate that the FBI rigged its investigation to achieve that result.  But that's not a sloppy-investigation defense; it's an attempt to present evidence of investigative methods that were ultimately irrelevant to the facts of this case for the improper purpose of suggesting to the jury that the FBI was selectively investigating Fiore for political or vindictive reasons.  The probative value of that testimony was substantially outweighed by the risk of confusing the issues or misleading the jury, and it was thus inadmissible under Federal Rule of Evidence (FRE) 403.

Fiore's reliance on two Ninth Circuit cases does not alter this analysis.  The first is *United States v. Crosby*, in which the defendant was accused of assaulting his girlfriend.[260]  The

---

[257] *Id.* at 25.

[258] *Id.* at 26.

[259] *Id.* at 39–40.

[260] *United States v. Crosby*, 75 F.3d 1343 (9th Cir. 1996).

defense pursued two theories during trial: (1) someone else—the victim's husband—could have committed the assault, and (2) law enforcement's investigation was sloppy.[261]  The trial court excluded evidence that the victim's husband didn't have an alibi and had previously assaulted both the defendant and the victim because of their "intimate relationship."[262]  The Ninth Circuit found that the exclusion of this evidence was error under FRE 403.  It was highly probative, partially because "everyone was in a drunken stupor" when the assault occurred, so there was little direct evidence of what happened.[263]  It was also directly relevant to the defense's theory that someone else committed the crime, and the defendant's inability to introduce evidence about the victim's husband prevented him from "fully argu[ing] his sloppy investigation theory."[264] Without the evidence of the husband's potential culpability, the Ninth Circuit reasoned, the defendant was unable to "suggest [] exculpatory evidence [that] the police might have found had they conducted a more thorough investigation."[265]

Fiore's second excluded-investigation-evidence case is *United States v. Sager*.[266] Defense counsel in *Sager* began questioning an investigator about various aspects of his investigation, but the court stopped that inquiry and instructed the jury to not "grade [the] investigation" or consider "how well you think this agent conducted his investigation" when determining his credibility on the stand.[267]  The Ninth Circuit found that instruction erroneous, noting that it is a valid defense to attack the quality of an investigation and that a jury may

---

[261] *Id.* at 1347.

[262] *Id.* at 1346.

[263] *Id.* at 1345–47.

[264] *Id.* at 1347.

[265] *Id.* at 1347–38.

[266] ECF No. 97 at 25 (citing *United States v. Sager*, 227 F.3d 1138 (9th Cir. 2000)).

[267] *Sager*, 227 F.3d at 1143.

consider evidence of a sloppy investigation when determining whether the investigator's testimony is credible.[268]  The appellate court noted that this was a particularly important line of questioning after the investigator had copped to "a highly damaging flaw" in his recollection of a witness statement, concluding that, while defense counsel "may have been fishing for flaws, [] it is obvious that he cast his bait in a promising pond."[269]

Fiore's case is materially distinguishable from *Crosby* and *Sager* because she was permitted to fish for flaws.  Her trial counsel inquired about the investigative tactics that led to the evidence that was presented in this case, probed the reasons why the FBI didn't collect other evidence, and argued that the government didn't find evidence that would have supported its theory of Fiore's fraud.  At no point did the government or the court suggest that the jury was not permitted to consider the quality of the investigation or its results.  Indeed, defense counsel's criticism of the investigation was the centerpiece of his closing argument.[270]  And, unlike in *Crosby*, Fiore has not shown that the probative value of unlimited inquiry into Fryxell's investigation substantially outweighed the risk of confusing the issues and misleading the jury about matters irrelevant to her guilt or innocence on the wire-fraud and conspiracy charges.  Unlike the defendants in *Crosby* and *Sager*, Fiore was able to showcase her sloppy-investigation theory despite my limitations on the scope of Fryxell's testimony.  So that limitation under FRE 403 was not error.

---

[268] *Id.* at 1145–46.

[269] *Id.* at 1145.

[270] *See* ECF No. 93 at 76–127.

### 3.     The court's denial of Fiore's motion to preclude Nicole Beck's testimony was not error.

Before trial, Fiore moved in limine to preclude Officer Alyn Beck's widow Nicole from testifying.  She argued that Nicole's testimony was irrelevant because she "does not have any personal information regarding the purchase or fundraising of a statue" and cumulative because "[t]he [g]overnment has already noticed witnesses who can testify as to the purpose of the statue in question, without invoking the predictable emotional response of a widow."[271]  I denied that motion, finding Nicole's anticipated testimony probative because she could provide "circumstantial evidence of Fiore's intent to defraud her donors" based on the fact that Fiore never told Nicole that she was fundraising for the statue or consulted her about the idea or process.[272]  As anticipated, when Nicole took the stand as the prosecution's first witness, she testified to her own involvement in the park project before Fiore became her ward's councilperson, recounted that Fiore did not discuss her idea to commission a statue of Beck or directly communicate with Nicole throughout that process, and established that she wasn't aware of any fundraising efforts by Fiore for the statue.

Fiore contends that much of Nicole's testimony was cumulative of other witnesses who testified about Beck's death, efforts to establish a park in his honor, and Fiore's presence at the park's groundbreaking and the statue dedication.[273]  She also contends that Nicole didn't have personal knowledge of any relevant information, as shown by her testimony that she didn't know

---

[271] ECF No. 31 at 2.

[272] ECF No. 51 at 17.

[273] ECF No. 97 at 28–29.

1  about Fiore's efforts to raise money for the statue.[274]  Thus, Fiore concludes, Nicole's "testimony

2  was clearly not needed and was only offered for emotional effect."[275]

3        Of course, evidence is not excludable merely because it is cumulative or has an emotional

4  impact.  To exclude evidence under FRE 403, the court must find that the evidence's "probative

5  value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting

6  cumulative evidence."[276]  Nicole's testimony fell far short of that mark.  It was probative of the

7  defendant's state of mind and intent to defraud because the jury could infer from Fiore's failure

8  to discuss her plans with the widow of the officer she was purporting to memorialize that her

9  efforts were insincere.  That Nicole had no personal knowledge of Fiore's fundraising efforts is

10  also probative of Fiore's guilt.  As the prosecution argued, the fact that Fiore did not tell those

11  closest to the process that she was fundraising for the statue is circumstantial evidence that she

12  avoided telling people who could have uncovered her fraud.

13        Nor were the dangers of allowing Nicole to testify high.  As I said in my in limine order,

14  "the fraud scheme that Fiore is accused of naturally lends itself to some emotional testimony.

15  Given that Fiore chose this backdrop for her alleged fraud, it cannot be said that the prejudice

16  from those sympathy-inducing details is unfair, let alone substantially so."[277]  Nor was Nicole's

17  trial performance so emotional that the jury would have been prejudiced by her testimony.  For

18  the most part, Nicole was calm and straightforward while discussing the park and her

19  interactions with Fiore—she briefly teared up only when she was explaining her reservations

20  about the statue.  The government avoided asking her questions about her husband's death or the

21  _____

22  [274] *Id.*

    [275] *Id.* at 30.

23  [276] Fed. R. Evid. 403.

    [277] ECF No. 51 at 17.

impact that loss had on her, sticking solely to her involvement with the memorial park.  I

conclude that the slight emotional impact of Nicole's testimony did not substantially outweigh its

probative value.  So I cannot conclude that allowing Nicole Beck to testify was an error that

merits a new trial.

### 4.    *The jury instruction on the elements of conspiracy fairly and accurately informed the jury of the necessary elements of the crime.*

Fiore next contends that the jury instruction on the elements of conspiracy to commit

wire fraud—language proposed, agreed to, and submitted jointly by both parties—was

constitutionally deficient.  As given, the instruction read:

> The defendant is charged in Count One of the indictment with conspiracy to commit wire fraud in violation of Section 1349 of Title 18 of the United States Code.  For the defendant to be found guilty of the offense, the government must prove each of the following elements beyond a reasonable doubt:

> First, two or more persons, in some way or manner, agreed to accomplish a common and unlawful plan to commit wire fraud, as charged in the indictment;

> Second, the defendant knew the unlawful purpose of the plan and willfully joined in it.  A "conspiracy" is an agreement by two or more persons to commit an unlawful act.  In other words, it is a kind of partnership for criminal purposes.  Every member of the conspiracy becomes the agent or partner of every other member.

> The government does not have to prove that all the people referenced in the indictment were members of the plan, or that those who were members made any kind of formal agreement.  The heart of the conspiracy is the making of the unlawful plan itself, so the government does not have to prove that the conspirators succeeded in carrying out the plan.[278]

---

[278] ECF No. 70 at 3.  This language was lifted verbatim from the parties' proposed joint instructions.  ECF No. 36 at 12.  As support for this statement of the elements, the parties cited Modern Federal Jury Instruction 54 and *United States v. Thompson*, 990 F.3d 680, 684 (9th Cir. 2021).

Fiore contends that the instruction should have also included two paragraphs from the Ninth

Circuit's Model Instruction 11.1 that further explain the contours of a conspiratorial relationship:

> For a conspiracy to have existed, it is not necessary that the
> conspirators made a formal agreement or that they agreed on every
> detail of the conspiracy. It is not enough, however, that they
> simply met, discussed matters of common interest, acted in similar
> ways, or perhaps helped one another. You must find that there was
> a plan to commit at least one of the crimes alleged in the
> indictment as an object of the conspiracy with all of you agreeing
> as to the particular crime which the conspirators agreed to commit.
>
> One becomes a member of a conspiracy by knowingly
> participating in the unlawful plan with the intent to advance or
> further some object or purpose of the conspiracy, even though the
> person does not have full knowledge of all the details of the
> conspiracy. Furthermore, one who knowingly joins an existing
> conspiracy is as responsible for it as the originators. On the other
> hand, one who has no knowledge of a conspiracy, but happens to
> act in a way which furthers some object or purpose of the
> conspiracy, does not thereby become a conspirator. Similarly, a
> person does not become a conspirator merely by associating with
> one or more persons who are conspirators, nor merely by knowing
> that a conspiracy exists.[279]

Fiore argues that it was error not to include this language in the conspiracy instruction

because that language would have supported the defense theory "that there was no agreement to

do something illegal."[280] She insists that the jury needed to be informed of all the ways someone

*isn't* a conspirator: mere association, knowing about a conspiracy, etc. And because Siegel's

testimony was stricken, Fiore contends that "this error was extremely prejudicial and could have

affected the outcome of trial."[281]

---

[279] ECF No. 97 at 31 (quoting 9th Cir. Manual of Model Crim. Jury Instr. 11.1).

[280] *Id.*

[281] ECF No. 99 at 32.

1    "Jury instructions must be formulated so that they fairly and adequately cover the issues

2    presented, correctly state the law, and are not misleading."[282]  Allegations of error raised for the

3    first time post-trial are reviewed for plain error.[283]  For a jury-instruction error to affect a

4    defendant's substantial rights, "the error must have prejudiced in some substantial manner [her]

5    right to a fair trial."[284]

6         Fiore hasn't shown that the conspiracy instruction given was plainly erroneous.  Her only

7    argument is a 20/20-hindsight one—that she would have preferred to include language indicating

8    further bounds of a conspiratorial agreement that she omitted from the instruction *she proposed*

9    and that was given at trial.  The jury was instructed that a conspiracy forms only when two or

10   more people agree to commit an unlawful act.  Implicit in the instruction that the conspirators

11   must actually agree is the plain inference that mere association does not constitute a conspiracy.

12   Fiore hasn't shown that a jury would be misled by the omission of the additional paragraphs or

13   that the jury was misinformed about the elements of a conspiracy charge.

14        Nor has Fiore shown that the omission substantially affected her rights.  The

15   government's evidence demonstrated that the agreement between this mother-daughter pair

16   couldn't be perceived as a "mere association."[285]  Nor would considering more words about the

17   requisite knowledge of a conspiracy alter the jury's understanding that the conspirators needed to

18   agree to commit an unlawful act.  So I conclude that the conspiracy instruction given wasn't

19   plainly erroneous, and I deny Fiore's request for a new trial on that basis.

20   _____

21   [282] *Duran v. City of Maywood*, 221 F.3d 1127, 1130 (9th Cir. 2000) (cleaned up).

22   [283] Fed. R. Crim. P. 52(b); *United States v. Tirouda*, 394 F.3d 683, 688 (9th Cir. 2005) ("If a party does not properly object" to an erroneous jury instruction at trial, "the plain error doctrine applies.").

23   [284] *Tirouda*, 394 F.3d at 688 (cleaned up).

[285] *See supra* at pp. 37–40.

5.    ***Fiore's trial counsel was not constitutionally deficient based on this record.***

Fiore's last and most comprehensive argument is that she is entitled to a new trial because her trial counsel was constitutionally ineffective. "Counsel's performance is constitutionally infirm if it falls below an objective standard of reasonableness and there is a reasonable probability that, but for the inadequate representation, the result of the proceeding would have been different."[286] So a defendant seeking relief based on ineffective assistance of counsel must show that her trial counsel's performance was deficient and that she was prejudiced as a result.[287]

a.    ***Trial counsel wasn't ineffective for failing to object to various witnesses.***

As her first criticism of counsel's performance, Fiore contends that he should have objected to or moved to exclude witnesses under FRE 602 for lack of personal knowledge.[288] That rule permits a witness to testify "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[289] Fiore argues that Lee, Lombardo, and donors who didn't identify Fiore as the person who solicited their donations

---

[286] *United States v. Anderson*, 850 F.2d 563, 565 (9th Cir. 1988) (citing *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984)).

[287] *See Harrington v. Richter*, 562 U.S. 86, 104 (2011). The government suggests that I should decline to consider Fiore's ineffective-assistance-of-counsel arguments because they are better resolved through habeas proceedings, when a court may create an evidentiary record concerning trial counsel's strategies that may weigh on whether his performance was deficient. ECF No. 104 at 15. Because I conclude that none of trial counsel's decisions were deficient or prejudicial based solely on the trial record, I exercise my discretion to adjudicate Fiore's ineffective-assistance arguments here. *See United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) (noting that a district court "may, and at times should, consider" an ineffective-assistance claim when raised during the underlying proceedings); *United States v. Singh*, 979 F.3d 697, 731–32 (9th Cir. 2020) (holding that the decision to review an ineffective-assistance claim is "best left to the discretion of the district court").

[288] ECF No. 97 at 32.

[289] Fed. R. Evid. 602.

1   should have been excluded under this rule and that trial counsel's failure to object to their

2   testimony was constitutionally deficient.

3           *i.      Peter Lee's testimony was based on personal knowledge, and any*

4           *failure to object to his testimony was not deficient or prejudicial.*

5           Peter Lee was the manager of the home Fiore was renting.  At trial, Lee testified that his

6   son owned the home but Lee managed it—he advertised the property, reviewed applicants, and

7   handled maintenance requests.  He also explained that he rarely communicated with Fiore, his

8   son collected her rent payments, and he wasn't sure if her payments were made by check,

9   cashier's check, or money order.  Despite Lee's tenuous knowledge of the details of Fiore's rent

10  payments, she argues, the government used this witness to discuss bank records showing rent

11  payments made to Lee's son.  Fiore's trial counsel didn't object to any of these questions for lack

12  of foundation.  Fiore argues that this failure was prejudicial because the government "was able to

13  create an inference, through the improper witness, that . . . Fiore was expending personal funds

14  utilizing cashier's checks or money orders to pay rent, purportedly using donations and campaign

15  contributions [that] were not to be used for her personal benefit."[290]

16          This characterization of Lee's testimony grossly understates the level of his personal

17  knowledge of her rental history.  Lee found Fiore as a tenant, testified that she signed a rental

18  agreement that he had seen before and recognized, and knew her monthly rental fee based on that

19  agreement.  He testified that Fiore's rent payments went to his son and that she would pay with

20  "a check or something."[291]  When asked if she may have also paid with a cashier's check or

21  money order, he answered, "Yeah, I think so.  But the details I'm not sure."[292]  The government

22  _____

[290] ECF No. 97 at 34–35.

23  [291] ECF No. 60 at 215:4–10.

[292] *Id.* at 215:13–15.

1  then showed Lee a series of checks—which Fiore stipulated to have admitted before trial—

2  showing that Fiore paid rent.[293]  Fiore's counsel waived cross-examination of Lee.

3         Fiore has not shown that her trial counsel was constitutionally ineffective for failing to

4  object to Lee's testimony.  Lee was familiar with the rental agreement, the amount Fiore paid in

5  rent, and the basics of how she paid.  The only things he was unsure of were how many people

6  lived in the home, whether Fiore lived there full time, and which form of payment she used to

7  pay rent.  But his foundational knowledge was established by the fact that he was the property

8  manager and was familiar with Fiore's rental agreement.

9         Even if Lee lacked personal knowledge for certain aspects of his testimony, trial

10 counsel's failure to object did not prejudice Fiore.  This testimony was not crucial to proving any

11 element of Fiore's charges.  The government also introduced through forensic accountant Harris

12 bank records reflecting her rent payments, and pictures of the home came in through a special

13 agent, so much of the evidence suggesting that Fiore used charity and PAC funds to pay her rent

14 came from other witnesses.  Ultimately, the government needed only to show that Fiore did not

15 use any of her charity or PAC funds to pay for the statue that she elicited donations for, and that

16 showing was made through the forensic accounting of her bank records and the testimony of

17 other witnesses.  Had Fiore's trial counsel successfully objected to some aspects of Lee's

18 testimony or even gotten Lee excluded, it would not have affected the verdict.

19

20                    *ii.    The witnesses who donated based on Jay Brown's representations
                          about the statue had the necessary personal knowledge.*

21         Fiore also contends that her trial counsel should have objected to the testimony of donors

22 Robert Groesbeck, Harry Mohney, David Chesnoff, and Robert Richardson because they did not

23 _____

[293] *Id.* at 218:20–221:12.

testify that Fiore herself asked them for a donation. Groesbeck and Richardson testified that Jay Brown asked them for the donation, and Mohney and Chesnoff couldn't recall who made the ask but didn't believe it was Fiore.[294] Fiore contends that "allowing numerous witnesses to testify about donations that the [g]overnment could not prove was at the behest of . . . Fiore was error and should have been objected to."[295]

Fiore doesn't explain how these donors lacked personal knowledge of what they testified about: that they donated money to Fiore's PAC or charity based on representations about the Beck statue. They all testified that they donated money to that cause. Fiore seems instead to take issue with the fact that they didn't have personal knowledge of her creation of those misrepresentations, but they didn't testify that they did. Rather, the government relied on Jay Brown's testimony and the similarities between Brown's and Fiore's solicitation messaging as circumstantial evidence that these additional donors also gave money based on Fiore's fraud. Brown testified that if anyone had asked him to seek further donations, it would have been Fiore.[296] Brown's email to Groesbeck also parroted much of the language in the solicitation letter signed by Fiore.[297] And the government argued that Brown was an unwitting participant in perpetuating Fiore's fraud.[298]

---

[294] ECF No. 87 at 270:18–271:4 (Chesnoff testified that he had no recollection of Fiore asking for the money and wasn't aware of receiving a flyer or letter seeking statue donations); ECF No. 88 at 15:12–15 (Mohney testified that Fiore was not "the one who reached out to [him] and gave [him]" the flyer that caused him to donate). Mohney also testified that he received a flyer seeking donations to FFN for the statue, and that it likely would have been one of his attorneys that caused him to donate; he identified Jay Brown as one of his attorneys. *Id.* at 13:15–14:3, 15:18–23.

[295] ECF No. 97 at 36.

[296] ECF No. 60 at 24:22–25:19.

[297] *Compare* Gov't Ex. 50 (Brown's email to Groesbeck) *with* Gov't Ex. 30 (ABPF's solicitation letter).

[298] ECF No. 93 at 44.

But even if Fiore's trial counsel was deficient for failing to object to these donor witnesses, Fiore doesn't argue that this failure prejudiced her, so her ineffective-assistance claim must fail. She does not contend that striking that testimony—which was not used to support any particular wire-fraud charge but rather to show her pattern of converting donor funds for her personal use as further evidence of her intent to defraud—would have changed the outcome of her trial, and I conclude that it would not have. So Fiore has not shown that her trial counsel violated her right to effective counsel by failing to object to the testimony of Robert Groesbeck, Harry Mohney, David Chesnoff, or Robert Richardson on the basis that they lacked personal knowledge.

> ### iii. Trial counsel wasn't ineffective for failing to suggest that Lombardo's testimony was inconsistent with summaries of his prior statements.

Fiore also takes issue with her counsel's failure to challenge Lombardo's testimony that she solicited his donation by pointing out alleged inconsistencies between his testimony and information he provided to the FBI during a "302 interview."[299] She contends that Lombardo ███████████████████████████████████, but at trial he testified that it was Fiore who asked for the funds.[300] Fiore acknowledges that her trial counsel could not have directly impeached Lombardo with the 302 document because it's not a witness statement; rather, it's just an FBI agent's notes summarizing statements made by a witness during an interview.[301] But she argues that her counsel should have used another witness—Special Agent Kyle Jaski, who

---

[299] ECF No. 99 at 37.

[300] *Id.*

[301] *Id.*; *see also* ECF No. 104 at 20 (citing *United States v. Palermo*, 360 U.S. 343 (1959) (holding that summaries of an oral statement by a witness are not considered the witness's own words under the Jencks Act)).

1  was present at Lombardo's interview—to show the contradiction in Lombardo's testimony, and

2  that failing to do so was prejudicial.[302]

3      This theory fails for several reasons. The most important one is that Lombardo's

4  testimony didn't actually contradict any of his interview statements memorialized in the 302s.

5  ███████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████████████[303]████████████████████████████

8  ████████████████████████████████████████████████

9  █████████████████████████[304]  Neither of these statements is

10 inconsistent with Lombardo's trial testimony that Fiore asked him for the donation.[305]

11      Even if there was an inconsistency, Fiore hasn't shown that her trial counsel was

12 deficient for failing to probe these alleged inconsistencies during his examination of Jaski. She

13 fails to explain what questions concerning these 302 interviews would have made a difference

14 given Lombardo's unambiguous trial testimony. And even if trial counsel had successfully

15 gotten Jaski to discuss Lombardo's prior statements, Fiore has not shown that the jury would

16 have evaluated Lombardo's testimony any differently. I cannot conclude that trial counsel's

17 failure to do so prejudiced Fiore, so I find that his performance was not constitutionally

18 ineffective with respect to Lombardo's testimony.[306]

19 _____

20 [302] ECF No. 99 at 37–38.

[303] ECF No. 99-5 at 2.

21 [304] ECF No. 116 at 1.

22 [305] Because the "inconsistencies" Fiore relies on are not really inconsistencies, I don't consider
her suggestion that the government was under some duty to "withdraw" or correct Lombardo's
23 unambiguous testimony about her solicitations.

[306] In footnotes, Fiore raises other issues concerning the government's failure to disclose
information that may have been relevant to the credibility of Lombardo and another witness.

1

        **b.**    ***Trial counsel wasn't ineffective for failing to introduce allegedly***
2
                ***exculpatory evidence.***

3        Fiore next contends that her trial counsel should have introduced "exculpatory evidence

4 . . . that [she] regularly handled transactions in cash."[307]  He could have used tax returns and

5 Siegel's testimony to show that Fiore had access to additional income ███████████████████

6 ███████████████████████████████████.  And, according to Fiore, the fact that the FBI

7 allowed her to take cash from her home when they executed the search warrant shows that they

8 were intentionally avoiding this "exculpatory evidence."[308]  She argues that trial counsel's failure

9 to elicit testimony about her use of cash prejudiced her because she may have been able to show

10 "that the monies received to be used for the statue were not in fact used for personal use, but

11 rather, were used for other charitable purposes."[309]

12        Fiore fails to cogently explain how evidence that she regularly used cash could be

13 considered exculpatory.  The crux of the government's case was that Fiore solicited money for a

14 statue and didn't use the donations for that purpose.  Fiore's habit of using cash isn't probative of

15 any aspect of that theory.  She doesn't contend that she would have been able to trace any other

16 cash payments to the statue or anything to do with Alyn Beck; she merely says that some of her

17 money went to charitable purposes.  Nor does she contend that, had trial counsel introduced

18 _____

19 ECF No. 97 at 37 n. 208 & 209.  "Arguments raised only in footnotes, or only on reply, are
generally deemed waived" and need not be considered.  *Estate of Saunders v. Comm'r*, 745 F.3d
20 953, 962 n.8 (9th Cir. 2014).  I decline to consider these footnote-only arguments because they
are insufficiently developed to allow for full and fair resolution.

21 [307] ECF No. 99 at 39.

[308] *Id.* at 39–40.
22
[309] *Id.* at 41.  Fiore cites to several documents from the FBI's investigation to support her
23 contention that her trial counsel was deficient for focusing on Fiore's access to other sources of
cash.  Those documents are sealed, and most of them are irrelevant to the narrow question
presented here.  I cite to those documents only when necessary to address Fiore's arguments.

evidence of cash income, she would have been able to show that she had enough money to pay for her personal expenses while setting aside $80,000 for the statue—the amount she told donors she was hoping to raise.  Fiore has not shown how or why her habit of using cash would have been exculpatory, so I cannot conclude that her trial counsel was ineffective for failing to introduce more evidence related to her cash transactions.[310]

> **c.    *Fiore has not shown that motions seeking discovery or dismissal for vindictive or selective prosecution would have been fruitful, so trial counsel was not ineffective for failing to seek that relief.***

Fiore's next ineffective-assistance claim is that trial counsel was ineffective for failing seek dismissal of her charges based on vindictive or selective prosecution.  She insists that there was sufficient evidence to support her theory that she was prosecuted "solely out of animus" for her because of her "outspoken position on the Cliven Bundy case, . . . her political affiliation, and her involvement in the 'badlands' litigation . . . ."[311]  She notes that AUSA Steven Myhre—one of the prosecutors in the criminal case against the Bundy ranching family, which was ultimately dismissed due to prosecutorial misconduct—was involved in investigations of her

---

[310] Fiore specifically insists that her trial counsel should have questioned witness ███████████████ ██████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████  Nothing in the agents' comments during that conversation could be reasonably interpreted as an attempt to avoid receiving exculpatory evidence about Fiore's use of cash.  So I don't analyze that specific contention any further.

[311] ECF No. 99 at 43.

1  conduct.[312]  And she insists that because the FBI's investigation into her conduct was far-

2  reaching—including ███████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████[313]—it follows that the government was on a fishing expedition to find evidence of any

8  possible wrongdoing that would take her down.  And she points to ███████████████

9  ████████████████████████████████████████████

10  ██████████████[314]

11       "To prove a selective-prosecution claim, a defendant must show discriminatory effect"—

12  i.e., that "other similarly situated individuals have not been prosecuted"—"and discriminatory

13  intent," i.e., that her prosecution "was based on an impermissible motive."[315]  So to successfully

14  make out a prima facie case for selective prosecution, Fiore would have needed to point to

15  "similarly situated individuals" who were not prosecuted by the FBI.  At no point has she even

16  attempted to make such a showing.

17       Fiore's vindictive-prosecution argument fares no better.  Vindictive prosecution typically

18  comes into play when a prosecutor "seeks additional charges solely to punish a defendant from

19

20  [312] Id.; see also United States v. Bundy, 406 F. Supp. 3d 932 (D. Nev. 2018) (denying the
    government's motion for reconsideration of the court's dismissal of the indictment against the
    Bundys).

21  [313] ECF No. 99 at 44.

22  [314] Id.

23  [315] United States v. Rundo, 108 F.4th 792, 798 (9th Cir. 2024) (quoting United States v.
    Armstrong, 517 U.S. 456, 468 (1996), then quoting United States v. Sutcliffe, 505 F.3d 944, 954
    (9th Cir. 2007)) (cleaned up).

exercising a constitutional or statutory right."[316]  "A defendant may establish vindictive

prosecution (1) by producing direct evidence of the prosecutor's punitive motivation, or (2) by

showing that the circumstances establish a reasonable likelihood of vindictiveness, thus giving

rise to a presumption that the government must in turn rebut."[317]  A "mere appearance of

vindictiveness"[318] may suffice to establish that rebuttal presumption only when "as a practical

matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have

occurred but for hostility or a punitive animus towards the defendant because [s]he has exercised

h[er] specific legal rights."[319]  "Particularly when a vindictiveness claim pertains to pretrial

charging decisions, the Supreme Court urges deference to the prosecutor.  Deference is

appropriate for pretrial charging decisions because, 'in the course of preparing a case for trial,

the prosecutor may uncover additional information that suggests a basis for further

prosecution.'"[320]

    None of the evidence Fiore points to suggests that her prosecution was motivated by any

animus against her. ██████████████████████████████████████

██████████████████████████████████████████████████ But the fact

that the FBI had several ongoing investigations into Fiore, without more, doesn't suggest that the

FBI was acting with an improper motive.  Nor does the fact that one AUSA was working on

several cases suggest that the U.S. Attorney's Office was acting with an improper motive.  At

---

[316] *United States v. Gamez-Orduno*, 235 F.3d 453, 462 (9th Cir. 2000) (citing *Bordenkircher*, 434 U.S. at 363).

[317] *United States v. Kent*, 649 F.3d 906, 912–13 (9th Cir. 2011) (cleaned up).

[318] *United States v. Ruesga-Martinez*, 534 F.2d 1367, 1369 (9th Cir. 1976).

[319] *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).

[320] *United States v. Brown*, 875 F.3d 1235, 1240 (9th Cir. 2017) (quoting *Goodwin*, 457 U.S. at 373).

1  oral argument, Fiore's new counsel conceded that her attempts to link AUSA Myhre to her

2  vindictive-prosecution claim were based solely on "timing."[321]  But "the link of vindictiveness

3  cannot be inferred simply because the prosecutor's actions followed the exercise of a right, or

4  because they would not have been taken but for exercise of a defense right."[322]  That an entirely

5  different cadre of lawyers from a different unit took over and prosecuted this wire-fraud case

6  against Fiore further diminishes any notion that the entire investigation into her conduct was the

7  work of a single prosecutor with a vindictive motive.

8  ████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10 ███████████████████████████████████████████  So,

11 because Fiore's best evidence of vindictive prosecution is unpersuasive, trial counsel's failure to

12 move for dismissal on that basis before trial was not ineffective assistance.

13      Fiore separately contends that, had trial counsel properly raised this issue earlier, it

14 "could have given [her] an opportunity to obtain discovery on the issues which would either have

15 supported a motion to dismiss, or if unsuccessful, support her theory at the time of trial that a less

16 than subpar investigation took place because the prosecution was vindictive and law enforcement

17 was not interested in exculpatory evidence."[323]  The Supreme Court has established that, to

18 obtain discovery on a selective-prosecution claim, the defendant must come forward with "some

19 evidence tending to show the existence" of discriminatory effect *and* discriminatory intent.[324]

20 While this discovery standard is less stringent than the showing necessary to make a prima facie

21 _____

22 [321] *See* ECF No. 115 (minutes of oral-argument proceedings).

   [322] *Gallegos-Curiel*, 681 F.2d at 1168.

23 [323] ECF No. 99 at 45.

   [324] *Armstrong*, 517 U.S. at 468.

case for selective prosecution, it is still a "rigorous one designed to minimize interference with the prosecutorial function."[325]  As the Ninth Circuit has explained, "the standard for discovery for a selective-prosecution claim should be nearly as rigorous as that for proving the claim itself."[326]  The same standard applies to vindictive-prosecution claims: "A criminal defendant may be entitled to discovery if he or she establishes a prima facie showing of a likelihood of vindictiveness by some evidence tending to show the essential elements of the defense."[327]

For the same reasons that her vindictive- and selective-prosecution arguments would have ultimately failed, Fiore does not show that further discovery into those claims was warranted.  The evidence of animus presented before trial and in the new-trial briefing does not meet the slightly lower standard applied to motions seeking discovery.  All Fiore has is (1) evidence that the government was investigating several aspects of her finances; (2) the fact that an AUSA was involved in her case and another politically controversial case at around the same time; and (3) ██████████████████████████████████████.  This showing is insufficient to warrant further discovery into these theories, and any pretrial motion asking for that relief would have been denied.  So trial counsel was not ineffective for failing to pursue this path, and his failure to do so does not warrant a new trial.

#### d.    Trial counsel was not ineffective for failing to move to suppress the contents of the ABPF binder seized from Fiore's home.

Finally, Fiore contends that her counsel should have filed a motion to suppress evidence gathered during the search of her home.  She argues that the search warrant was focused on her campaign and PAC accounts, yet agents seized a binder related to her nonprofit entity ABPF, the

---

[325] *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003).

[326] *United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018) (cleaned up).

[327] *United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990).

contents of which were introduced at trial. She claims that the seizure of that binder violated her Fourth Amendment rights and that her trial counsel was ineffective for failing to move to suppress it.

The Fourth Amendment protects privacy rights against government intrusion by requiring that search warrants may issue only "upon probable cause, supported by Oath or affirmation." The warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized."[328] A warrant's description of items to be seized "must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized."[329] If the police seize items not described in a warrant or its affidavit in a sufficiently particular way, the court may order that the illegally seized evidence cannot be used to support the government's case against the defendant.[330]

The search warrant and affidavit targeting Fiore's home permitted collection of "all documents relating to the scheme to defraud, . . . any financial transaction arising from the scheme, . . . the proceeds of the scheme, . . . and the disposition of th[ose] proceeds as set forth in the affidavit."[331] Beyond those broader categories, the warrant also specified that documents and communications related to Hamlet Events, the Fiore for Nevada Campaign, the Future for Nevadans PAC, or the organizations Truth in Politics and Politically Off the Wall should be seized.[332] It also sought "all documents and communications related to goods or services

---

[328] U.S. Const. amend. IV.

[329] *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (cleaned up).

[330] *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

[331] ECF No. 99-23 at 11 (search warrant).

[332] *Id.* at 12.

provided by Sheena Siegel."[333]  In the search-warrant affidavit, when laying out the "facts establishing the scheme to defraud," the affiant asserted that Fiore and Siegel used ABPF to move funds around as part of the campaign-finance-violation scheme.[334]

At base, Fiore's argument is that, because ABPF was not listed as one of the specific organizations that the FBI should seize documents about, the ABPF binder should not have been seized.  But the search warrant was not so limited, nor did it need to be.  The affidavit specifically referenced this charity as a conduit for illegally obtained funds, so the category seeking documents related to the disposition of the proceeds of Fiore's scheme clearly covered documents related to ABPF.[335]  Any motion to suppress the contents of the ABPF binder would not have been successful, so Fiore's trial counsel was thus not ineffective for failing to raise that meritless argument.

## Conclusion

In sum, Fiore's attempts to set aside the jury's verdict are unavailing.  Her acquittal motion fails because:

- The evidence at trial supports a finding that Fiore used the wires—through the bank's process for clearing checks—as a step in her plot to defraud her donors out of tens of thousands of dollars by claiming that she was raising money for a statue of fallen officer Alyn Beck;

- The government introduced sufficient evidence that Fiore intended to deceive and cheat the donors who wrote checks before February 2020;

---

[333] *Id.*

[334] *Id.* at 34.

[335] Fiore doesn't raise any arguments that these categories, which generally seek documents pertaining to the scheme to defraud, are unconstitutionally broad.

- There was sufficient evidence that Fiore's false representations about the Alyn Beck statue caused Joseph Lombardo, Peter Palivos, and Tommy White to write checks to her charity and PAC; and

- The ample circumstantial evidence of Sheena Siegel's involvement in Fiore's wire-fraud scheme is sufficient to sustain Fiore's conspiracy conviction.

Fiore's motion for a new trial fails because none of the errors she alleges, whether considered individually or cumulatively, suggests a serious miscarriage of justice that only a new trial can cure:

- The court didn't commit plain error by not requiring the government to prove that Siegel breached her immunity agreement before striking her testimony. Even if it had, striking Siegel's testimony didn't substantially affect Fiore's rights because Siegel's testimony did not prove any defense to the charged crimes;

- The court didn't err by limiting Special Agent Cody Fryxell's testimony because the probative value of the excluded topics was substantially outweighed by the danger of misleading the jury and confusing the issues. Plus, the defense was able to question Fryxell about the FBI's investigation and decisions when executing the search warrant on Fiore's home to support the sloppy-investigation theory of defense;

- Letting Beck's widow Nicole testify was not error because the probative value of her testimony was not substantially outweighed by a risk of undue prejudice or cumulative evidence;

- The jury instruction on conspiracy (that Fiore agreed to and jointly proposed) fairly and accurately informed the jury of the elements of that crime; and

- Fiore's trial counsel did not provide ineffective assistance by failing to object to various witnesses, introduce exculpatory evidence, move to dismiss based on selective- or vindictive-prosecution theories, or move to suppress evidence seized from Fiore's home.

It is THEREFORE ORDERED that Fiore's motions for acquittal and a new trial **[ECF Nos. 96, 97, 99] are DENIED.**

_____
U.S. District Judge Jennifer A. Dorsey
April 18, 2025